12 CV 1817

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Thomas Laumann, Fernanda Garber, and Robert Silver, representing themselves and all others similarly situated,<br><br>     Plaintiffs,<br><br>    v.<br><br>National Hockey League, NHL Enterprises L.P., NHL Interactive Cyberenterprises LLC, New York Rangers Hockey Club, New Jersey Devils LLC, New York Islanders Hockey Club L.P., Comcast-Spectacor L.P., Lincoln Hockey LLC, Lemieux Group, L.P., Hockey Western New York LLC, Chicago Blackhawks Hockey Team Inc., San Jose Sharks LLC, Directv, Directv Sports Networks LLC, Root Sports Pittsburgh, Comcast Corp., Comcast Sportsnet Philly, L.P, Comcast Sportsnet Mid-Atlantic, L.P., Comcast Sportsnet Bay Area, L.P., Comcast Sportsnet Chicago, L.P., and Madison Square Garden Company,<br><br>     Defendants. | Civil Action No:<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Fernanda Garber, Thomas Laumann, and Robert Silver, by and

through their attorneys, file this Complaint against Defendants and allege as

follows:

## I.
## NATURE OF THE ACTION

1.    The National Hockey League ("NHL" or "League") is comprised of

thirty separately owned and operated major league men's professional ice hockey

clubs in the United States and Canada. The NHL clubs, like other sports leagues, have structured their governance to permit major decisions regarding on-ice sporting competition and off-ice business competition to be made by the club owners themselves. In so doing, the owners act in their own economic self-interest, including entering into a series of agreements that eliminate, restrict, and prevent off-ice competition. These anti-competitive agreements go far beyond any cooperation reasonably necessary to provide major league men's professional ice hockey contests that increase fan appeal or respond to consumer preferences.

2.      This action challenges—and seeks to remedy—the Defendants' agreements to eliminate competition in the distribution of live men's hockey games over the Internet and television. The Defendants have accomplished this elimination of competition by agreeing to divide the live-game video presentation market into exclusive territories, which are protected by anticompetitive blackouts. Not only are such agreements not necessary to producing hockey contests, they are directed at reducing competition in the live-game video presentation market, involving and protecting third parties who operate only in that separate market.

3.      Defendant Madison Square Garden—the owner of Defendant New York Rangers Hockey Club—itself challenged these naked, horizontal, geographical restraints in a lawsuit in 2007. Its complaint stated that the NHL is a "cartel" and acknowledged that the League's television and Internet restrictions were anti-competitive and unlawful. (Exhibit A, Amended Complaint ¶ 6, *Madison Square Garden, L.P. v. Nat'l Hockey League*, No. 07-8455 (S.D.N.Y.) ("MSG Complaint")). After the Rangers survived the League's motion to dismiss the complaint, the

League and the Rangers settled their lawsuit on a confidential basis with the League's anticompetitive practices remaining in place.

4.    Similarly, in a bankruptcy adversary action brought by the Phoenix Coyotes hockey club against the NHL, the Coyotes stated, "The NHL and its members have conspired to create exclusive television and radio broadcast rights within designated territories through contracts with individual NHL members, thereby maintaining monopoly power within each team's 'home territory' by preventing others from broadcasting events within those territories." (Second Amended Complaint, *Coyotes Hockey LLC v. NHL*, Adv. No. 09-494 (Bankr. D. Ariz. June 5, 2009).) That action was ultimately resolved when the League obtained ownership of the Phoenix Coyotes through the bankruptcy.

5.    In *American Needle, Inc. v. National Football League*, 130 S. Ct. 2201 (2010), the United States Supreme Court unanimously rejected the NFL's claim that an agreement regarding the joint marketing of club-owned intellectual property was the decision of a "single entity"—the league—not subject to section 1 of the Sherman Act. The Court reaffirmed lower court decisions that sports leagues are subject to the antitrust laws and that league owners must refrain from agreements that unreasonably restrain trade. The Court also reaffirmed its own decision in *NCAA v. Board of Regents*, 468 U.S. 85 (1984), which held that the hallmark of an unreasonable restraint is one that raises price, lowers output, or renders output unresponsive to consumer preference. The Court's decision extended a long line of precedents that recognize that sports leagues are subject to the antitrust laws. Indeed, the United States District Court for the Eastern District of

Pennsylvania found several decades ago that television blackout agreements of the very kind at issue in this case amount to "an unreasonable and illegal restraint of trade." *United States v. Nat'l Football League*, 116 F. Supp. 319, 327 (E.D. Pa. 1953).

6.     Despite these clear precedents, the NHL's member clubs continue to agree to divide the live-game video presentation market by assigning an exclusive territory to each team and its television partners. In exchange for being granted anticompetitive protections in its own home market, the team and its partners expressly agree not to compete in the other teams' exclusive territories. The stated purpose of these policies is to create regional monopolies that protect the partners from competition in their respective local areas.

7.     The only way consumers can watch video presentations of other teams is through one of two exclusive "out-of-market" packages: NHL Gamecenter Live, which is streamed over the internet, and NHL Center Ice, which is distributed through cable and satellite providers. For both packages, the "in-market" games are blacked out to protect the local television partner. Thus, a New York Rangers fan living in New York cannot watch the Rangers play through the internet or television package. The fan must own a television and subscribe to a cable package that includes the channels that carry Rangers' games.

8.     In addition, the Defendants have colluded to sell the "out of market" packages only through the League. The League Defendants are then able to exploit their illegal monopoly by charging supra-competitive prices. As a result of this monopoly, moreover, the League is able to require purchasers of NHL Gamecenter Live or NHL Center Ice to buy all "out-of-market" games of all the League's teams

{00034214;1 }                                    4

even if the fan is only interested in a particular team or a particular game. Thus, a Detroit Red Wings fan living in New York cannot watch the Red Wings play, except occasional games on network television, unless he purchases the entire package of League games from the NHL's exclusive Gamecenter Live or NHL Center Ice products.

9.    As one set of commentators has put it, "Absent the exclusive territorial arrangements agreed to by league owners, individual teams would ... arrange for their own games to be available out-of-market. ... Fans wishing to see only their favorite team now pay for more games than they want, so sports leagues are currently using their monopoly power to effectuate a huge wealth transfer. Another significant group of less fanatic consumers would be willing to pay a more modest sum for their favorite teams' games only. As to these fans, the current scheme reduces output." Stephen F. Ross & Stefan Szymanski, Fans of the World Unite! (Stanford Univ. 2008).

10.    As MSG/New York Rangers stated in its antitrust complaint against the League: "There are no legitimate, procompetitive justifications for these 'exclusive' agreements and other competitive restraints, which have harmed consumers in various ways ...." (Exhibit A, MSG Complaint, ¶ 46). In particular, as MSG stated, these restraints result in "reduced output, diminished product quality, diminished choice and suppressed price competition." (Id. at ¶45).

11.    These restraints are not reasonably necessary to maintain a level of competitive balance within the League that fans prefer, or to maintain the viability of franchises. To the extent that competition among teams for internet or television rights would result in revenue disparities that preclude a fan-optimal level of competitive balance, agreements that require revenue sharing, if set at levels that do not restrict output, is an obvious and well-recognized less restrictive alternative.

12.    Plaintiffs are individuals who were, and continue to be, harmed by the Defendants' anti-competitive agreements. They have either (1) purchased a cable package that includes a network that is protected from competition and therefore is overpriced or (2) purchased an "out-of-market" package (either online or through their television provider) that is overpriced because of these unlawful agreements. Plaintiffs seek to restore off-ice competition among and between the clubs and their partners by ending the Defendants' collusive distribution agreements.

## II.
## PARTIES

### A.    The Plaintiffs

13.    Plaintiff Fernanda Garber now lives in Burlingame, California. From 2009 through March 2011, she subscribed to Comcast cable service in Oakland, California. Her service included Comcast Sportsnet California and Comcast Sportsnet Bay Area. She was charged supra-competitive prices for her service due to Defendants' conduct.

14.    Plaintiff Thomas Laumann lives in Bradenton, Florida. He has been a subscriber to NHL Gamecenter Live since at least 2010. His favorite hockey team is the New York Islanders. He would prefer not to be required to purchase a full "out-of-market" package to get New York Islanders games, and would prefer not to have to subscribe to pay television to be able to watch New York Islanders games involving the Florida Panthers and Tampa Bay Lighting, which are blacked out when he tries to watch them through NHL Gamecenter Live.

{00034214;1 }                                        6

15.     Plaintiff Robert Silver lives in Philadelphia, Pennsylvania. Until 2010, he subscribed to the NHL Center Ice, which he received through Directv satellite service. His Directv package also included other channels carrying live professional hockey games not available on a sponsored telecast. He was charged supra-competitive prices for his service due to Defendants' conduct.

## B.     The League Defendants

16.     Defendant NHL is an unincorporated association of the thirty major league men's professional ice hockey teams in the United States and Canada. Its headquarters are located at 1251 Avenue of the Americas, New York, New York.

17.     As MSG stated in its complaint against the League, each NHL team is "a separate and independent business with a separate and independent owner and significant autonomy in its business operations." (Exhibit A, Exhibit A, MSG Complaint, ¶ 24). (There is currently one temporary exception to this, as the Phoenix Coyotes were purchased by the League out of bankruptcy in 2009 with the intention of finding a permanent, independent owner.) The teams cooperate to schedule and produce ice hockey games and facilitate competition on the ice, but the clubs are independent businesses that compete with each other. "For example, the member clubs of the NHL independently set the prices of tickets for attending games in person; compete for contracting with players and in hiring coaches; create and manage their individual marketing and promotional programs, including the sale of advertising opportunities and merchandise; and develop, license and market their respective trademarks for various purposes." (Exhibit A, MSG Complaint, ¶2). The clubs also enter into separate contracts with regional television partners.

{00034214;1 }                                      7

18.    Defendant NHL Enterprises, L.P. ("NHLE"), is a Delaware limited partnership with its principal place of business at 1251 Avenue of the Americas, New York, New York. The "beneficial owners" of NHLE are the thirty NHL clubs or entities. These entities control NHLE, and can profit either from NHLE policies that enrich the league as a whole or NHLE policies that benefit individual clubs, even at the expense of the league as a whole. (Exhibit A, MSG Complaint, ¶ 25).

19.    Defendant NHL Interactive Cyberenterprises, LLC ("NHL ICE"), is a subsidiary of NHLE, and a Delaware limited liability company with its principal place of business at 1251 Avenue of the Americas, New York, New York. NHL ICE provides the NHL's Internet services, including operation of its website and the websites of the thirty member clubs, as well as Internet streaming of live and archived hockey games. NHL ICE, NHLE, and the NHL are collectively referred to herein as "the NHL Defendants" or "the League."

**C.    The NHL Member Club Defendants**

20.    The member clubs of the NHL that are named as defendants are:

a.    Chicago Blackhawks Hockey Team, Inc., a Delaware corporation whose located at the United Center, 1901 Madison Street, Chicago, Illinois.

b.    Comcast-Spectacor, L.P. (d/b/a "Philadelphia Flyers"), a Delaware limited partnership located at the Wells Fargo Center, 3601 South Broad Street, Philadelphia, Pennsylvania. Comcast-Spectacor is a subsidiary of Comcast Corporation.

c.  Hockey Western New York, LLC (d/b/a "Buffalo Sabres"), a New York limited liability company located at the First Niagara Center, One Seymour H. Know III Plaza, Buffalo, New York.

d.  Lemieux Group, L.P. (d/b/a "Pittsburgh Penguins"), a Pennsylvania limited partnership located at the CONSOL Energy Center, 1001 Fifth Avenue, Pittsburgh, Pennsylvania.

e.  Lincoln Hockey, LLC (d/b/a "Washington Capitals"), located at the Verizon Center, 601 F Street NW, Washington, D.C.

f.  New Jersey Devils, LLC, a New Jersey corporation located at the Prudential Center, 165 Mulberry Street, Newark, New Jersey.

g.  New York Islanders Hockey Club, L.P., a New York limited partnership located at Nassau Veterans memorial Coliseum, 1255 Hempstead Turnpike, Uniondale, New York.

h.  New York Rangers Hockey Club, located at Madison Square Garden, 2 Pennsylvania Plaza, New York, New York. The Rangers are owned by Defendant MSG.

i.  San Jose Sharks, LLC, a Delaware limited liability corporation located at HP Pavilion at San Jose, 525 West Santa Clara Street, San Jose, California.

**D.  Other NHL Member Clubs**

a.  Anaheim Ducks Hockey Club, LLC, a California limited liability company located at Honda Center, 2695 Katella Avenue, Anaheim, California.

b.     Boston Professional Hockey Association, Inc. (d/b/a "Boston Bruins"), a Massachusetts corporation located at the TD Garden, 100 Legends Way, Boston, Massachusetts.

c.     COLHOC, L.P. (d/b/a "Columbus Blue Jackets NHL Hockey Club"), an Ohio limited partnership located at Nationwide Arena, 200 West Nationwide Boulevard, Columbus, Ohio.

d.     Colorado Avalanche, LLC, a Colorado limited liability company located at the Pepsi Center, 1000 Chopper Circle, Denver, Colorado.

e.     Coyotes Hockey, LLC (d/b/a "Phoenix Coyotes"), a Delaware limited liability corporation located at the Jobing.com Arena, 9400 West Maryland Avenue, Glendale, Arizona.

f.     Dallas Stars, L.P., a Delaware Limited Partnership located at 2500 Victory Avenue, Dallas, Texas.

g.     Detroit Red Wings, Inc., a Michigan corporation located at Joe Louis Arena, 19 Steve Yzerman Drive, Detroit, Michigan.

h.     Florida Panthers Hockey Club, Ltd., a Florida limited partnership located at BankAtlantic Center, One Panther Parkway, Sunrise, Florida. Florida Panthers Hockey Club, Ltd. is a subsidiary of Sunrise Sports and Entertainment, L.P., a Delaware limited partnership

i.     Hurricanes Hockey, L.P. (d/b/a "Carolina Hurricanes"), a Delaware limited partnership, located at RBC Center, 1400 Edward Mill Road, Raleigh, North Carolina.

j.      Lightning Hockey, L.P. (d/b/a "Tampa Bay Lightning"), a Delaware limited partnership located at the St. Pete Times Forum, 401 Channelside Drive, Tampa, Florida.

k.      Los Angeles Kings Hockey Club, L.P., a limited partnership located at the Staples Center, 1111 S. Figueroa Street, Los Angeles, California.

l.      Minnesota Wild Hockey Club, L.P., a Minnesota limited partnership located at Xcel Energy Center, 199 West Kellogg Boulevard, St. Paul, Minnesota.

m.      Nashville Hockey Club, L.P., a Tennessee limited partnership located at Bridgestone Arena, 501 Broadway, Nashville, Tennessee.

n.      St. Louis Blues Hockey Club, LP, a Missouri limited partnership located at the Scottrade Center, 1401 Clark Ave., St. Louis, Missouri.

o.      Calgary Flames L.P., located at Scotiabank Saddledome, 555 Saddledome Rise SE, Calgary, Alberta.

p.      Capital Sports and Entertainment, Inc. ("Ottawa Senators"), locate at Scotiabank Place, 1000 Palladium Drive, Ottawa, Ontario.

q.      Club de hockey Canadien, Inc. ("Montréal Canadiens"), located at the Centre Bell, 1909 Avenue des Canadiens-de-Montréal, Montréal, Québec.

r.      Maple Leafs Sports and Entertainment ("Toronto Maple Leafs"), located at the Air Canada Center, 40 Bay Street, Toronto, Ontario.

s.      Rexall Sports Corp. ("Edmonton Oilers"), located at Rexall Place, 7424 118 Avenue, Edmonton, Alberta.

t.    The Vancouver Canucks, L.P., located at Rogers Arena, 800 Griffiths Way, Vancouver, British Columbia.

u.    True North Sports and Entertainment Ltd. ("Winnipeg Jets"), located at the MTS Centre, 300 Portage Avenue, Winnipeg, Manitoba.

E.    **The Television Defendants**

21.    Defendant Madison Square Garden Company, f/k/a "Madison Square Garden, Inc." ("MSG") is a Delaware corporation with its principal offices at Two Pennsylvania Plaza, New York, New York. MSG owns the New York Rangers professional ice hockey club and the mark "New York Rangers." MSG also owns Madison Square Garden, where the New York Rangers play their home games, as well as two regional sports networks, MSG Network and MSG Plus, which carry Rangers games, as well as games of the New York Islanders, New Jersey Devils, and Buffalo Sabres NHL hockey clubs. MSG is a member or partner and beneficiary of the NHL, NHLE and NHL ICE.

22.    Prior to the incorporation of the Madison Square Garden Company (then known as "Madison Square Garden, Inc."), MSG was a wholly-owned subsidiary of Cablevision, at which time it was organized as a Delaware limited partnership, Madison Square Garden, L.P. On February 9, 2010, Cablevision spun off MSG to the shareholders. Because the same persons—the Dolan family—continue to own controlling shares of both MSG and Cablevision, however, MSG is still controlled by Cablevision. James L. Dolan, the president and chief executive officer of Cablevision is the executive chairman of MSG. He serves as governor to the NHL on behalf of the New York Rangers Hockey Club.

23.     Defendant Directv is a Delaware corporation whose principal place of business is 2230 East Imperial Highway, El Segundo, California. Directv and its subsidiaries, including Defendant The Directv Group, Inc., provide satellite television service ("DBS") throughout the United States.

24.     Defendant Directv Sports Networks LLC, a wholly owned subsidiary controlled by Directv, is a Delaware limited liability company, whose principal place of business is 2230 East Imperial Highway, El Segundo, California.

25.     Defendant Root Sports Pittsburgh, a/k/a "Directv Sports Net Pittsburgh LLC," is a Delaware limited liability company whose principal place of business is 2230 East Imperial Highway, El Segundo, California. Root Sports Pittsburgh is wholly-owned subsidiary of, and controlled by, Directv and/or Directv Sports Networks LLC. Root Sports Pittsburgh is a regional sports network that presents Pittsburgh Penguins games.

26.     Defendant Comcast Corporation ("Comcast") is a Pennsylvania corporation whose principal place of business is 1701 John F. Kennedy Boulevard, Philadelphia, Pennsylvania. Comcast owns and operates cable systems throughout the United States.

27.     Comcast owns and controls Comcast Sportsnet Defendants, which include Defendants Comcast Sportsnet Philly, L.P, located at 3601 South Broad Street, Philadelphia, Pennsylvania; Comcast Sportsnet Mid-Atlantic, L.P., located at 7700 Wisconsin Avenue, Suite 200, Bethesda, Maryland; Comcast Sportsnet Bay Area, L.P., located at 370 3rd Street, 2nd Floor, San Francisco, California; and.

Comcast Sportsnet Chicago, L.P., located at 350 N. Orleans Street, Suite S1-100, Chicago, Illinois. These entities are controlled subsidiaries of Comcast Corporation and operate Regional Sports Networks ("RSNs") that produce and distribute video presentations for the Philadelphia Flyers, Washington Capitals, San Jose Sharks, and Chicago Blackhawks, respectively.

### F.   Other Relevant Entities

28.    In addition to the Comcast RSN Defendants, as well as other RSNs, Comcast Corporation also controls the two most significant national producers of NHL games in the United States: NBC, an over-the-air network, which airs games nationwide, and NBC Sports Network, a widely available pay-television sports channel available exclusively through cable and satellite providers (known as "Versus" until January 2, 2012).

29.    Comcast is also a majority owner of and controls, through its subsidiary Defendant Comcast-Spectacor, the Philadelphia Flyers Hockey Club.

30.    Fox Sports Net, Inc., a subsidiary of News Corporation, owns and controls a number of regional sports networks engaged in producing and presenting NHL hockey games and which are part of the conspiracy to divide the live hockey video market:

   a.    Fox Sports West and Prime Ticket are RSNs that carry Anaheim Ducks and Los Angeles Kings games.

   b.    Fox Sports Carolina carries Carolina Hurricanes games.

   c.    Fox Sports Ohio carries Columbus Blue Jackets games.

   d.    Fox Sports Southwest carries Dallas Stars games.

e.     Fox Sports Detroit carries Detroit Red Wings games.

f.     Fox Sports Florida carries Florida Panthers games.

g.     Fox Sports North carries Minnesota Wild games.

h.     Fox Sports Tennessee carries Nashville Predators games.

i.     Fox Sports Arizona carries Phoenix Coyotes games.

j.     Fox Sports Midwest carries St. Louis Blues games.

k.     Sun Sports carries Tampa Bay Lightning games.

31.     Other RSNs carrying professional hockey games in the United States include Altitude Sports and Entertainment, which carries Colorado Avalanche games, and New England Sports Network ("NESN"), which carries Boston Bruins games. The Boston Professional Hockey Association, Inc. (the Boston Bruins), is a minority owner of NESN.

32.     A small number of games of a few teams are carried by local, over-the-air channels, including KDOC in Southern California (Anaheim Ducks games), WGN in Chicago (Blackhawks games), TXA-21 in Dallas (Stars games), and CW44 in Tampa (Lightning games).

### III.
### CLASS ACTION ALLEGATIONS

33.     Plaintiffs bring this action on behalf of themselves and as a class action under the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons in the United States (excluding Defendants, their present and former parents, subsidiaries, affiliates, and Co-Conspirators, the

named Plaintiffs, government entities, and any judge assigned to this action) who fall within the following classes:

    a.    <u>Television Class</u>: All individuals who purchased television service from Directv and/or Comcast, or their subsidiaries, at any time within four years prior to the filing of this complaint and until the effects of the anti-competitive conduct end, that included channels carrying video presentations of live NHL hockey games that were not available through a sponsored telecast (as that term is used by the Sports Broadcasting Act, 15 U.S.C. § 1291, *et seq.*).

    b.    <u>Internet Class</u>: All individuals who purchased NHL Gamecenter Live in the United States directly from any of the NHL Defendants or their subsidiaries at any time within four years prior to the filing of this complaint and until the effects of the anti-competitive conduct end.

34.    Due to the nature of the trade and commerce involved, Plaintiffs believe that each class consists of at least many thousands of members, the exact number and their identities being known to Defendants and their co-conspirators.

35.    The Classes are so numerous and geographically dispersed that joinder of all members is impracticable.

36.    There are questions of law and fact common to the Classes, including:

a.   Whether Defendants and their co-conspirators engaged in a contract, combination or conspiracy among themselves to fix, raise, maintain or stabilize prices of video presentations of live NHL hockey games by blacking out potentially competing presentations of NHL games;

b.   Whether Defendants and their co-conspirators engaged in a contract, combination or conspiracy among themselves to fix, raise, maintain, or stabilize prices of NHL Center Ice by preventing any competitor from offering competing products;

c.   Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize prices of NHL Gamecenter Live by preventing any competitor from offering competing products;

d.   The effect of Defendants' conspiracy on the prices of NHL Gamecenter Live and NHL Center Ice in the United States during the class period;

e.   The effect of Defendants' conspiracy on the prices of pay television packages that include NHL hockey games that are not available on a sponsored telecast;

f.   The identity of the participants of the conspiracy;

g.   The duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

h.   Whether the alleged conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

i.   Whether the alleged conspiracy violated Section 2 of the Sherman Act, 15 U.S.C. § 2;

j.   Whether the conduct of Defendants and their co-conspirators, as alleged in this complaint, caused injury to the Plaintiffs and the other members of the Classes;

{00034214;1 }                        17

k.     The appropriate class-wide measure of damages.

37.     Plaintiff Thomas Laumann is a purchaser of NHL Gamecenter Live. His claims are typical of the claims of the Internet Class members, and Mr. Laummann will fairly and adequately protect the interests of that Class.

38.     Plaintiff Fernanda Garber was, during the class period, a subscriber to pay television service provided by Comcast, which included channels carrying NHL hockey games that are not available on a sponsored telecast. Her claims are typical of the claims of the Television Class members, and Ms. Garber will fairly and adequately protect the interests of that Class.

39.     Plaintiff Robert Silver was a subscriber to pay television service provided by Directv, which included channels carrying NHL hockey games that are not available on a sponsored telecast. Mr. Silver was a subscriber to NHL Center Ice as part of this service. His claims are typical of the claims of the Television Class members, and Mr. Silver will fairly and adequately protect the interests of the Television Class.

40.     Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

41.     Given the high cost of establishing that the Defendants' agreements violated the antitrust laws (including, but not limited to, substantial expert witness costs and attorneys' fees), a class action is the only economically feasible means for the plaintiffs to enforce their statutory rights.

42.     The prosecution of separate actions by individual members of the Classes would also create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

43.     The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

44.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Classes are readily definable and are ones for which records should exist. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. This class action presents no difficulties in management that would preclude maintenance as a class action.

## IV.
## JURISDICTION AND VENUE

45.     Plaintiffs bring this action pursuant to Section 16 of the Clayton Act (15 U.S.C. §§ 15, 26), for a violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1, 2. This Court has subject matter jurisdiction over that claim pursuant to 28 U.S.C. §§ 1331 and 1337.

46.     Venue is proper pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 22. The Defendants transact business in this district, and are subject to personal jurisdiction in this district.

{00034214;1 }                                  19

47.    Class members were injured in this district.

48.    Jurisdiction over all defendants comports with the United States Constitution.

## V.
## TRADE AND COMMERCE

49.    As Defendant MSG has stated, "There are peculiar and unique characteristics that set major league men's professional ice hockey apart from other sports or leisure activities. Close substitutes do not exist, and watching (or participating as a fan in) major league men's professional ice hockey is not reasonably interchangeable with watching (or participating as a fan in) other sports or other leisure activities." (Exhibit A, MSG Complaint, ¶ 29).

50.    "There is a relevant product or service market defined as the provision of major league professional ice hockey contests in North America. This market is characterized by high barriers to entry. The NHL is the only significant, and therefore the dominant, provider of major league hockey games, and has market power. . . . The NHL, acting through and in combination with the separate and independent clubs that own and control it, also exercises market power through the unnecessary and unjustified restraints on each team's competitive activities described herein." (Exhibit A, MSG Complaint, ¶32)

51.    Most importantly for this action, there is a relevant market for live video presentations of major league professional hockey games. The NHL's dominance in the production of major league professional hockey games in the United States gives it the ability to exercise market power, together with its

television partners, in the market for live video presentations of major league professional hockey games.

52.     The relevant geographic market consists of North America, including the United States. Various geographic submarkets also may exist.

53.     Defendants' conduct has directly affected and foreseeably restrained the interstate and foreign commerce of the United States, by, inter alia, the interstate and foreign distribution of video of NHL games.

## VI.
## FACTS

### A.     The Anticompetitive Exclusive License Agreements.

54.     It has been long recognized that the NHL's member clubs, like the member clubs of all professional sports leagues, must cooperate to define, schedule, and produce league contests. That limited cooperation is consistent with, and permissible under, the antitrust laws. But the member clubs continue to exist as separate businesses with separate owners. They retain significant autonomy and seek their own profits. Thus, the clubs compete in business matters that are separate and distinct from the facilitation of ice hockey games.

55.     Pursuant to a series of agreements between and among Defendants, the League has obtained centralized control over distribution of live video programming of NHL games. As described more fully below, as a result of these agreements, the clubs have agreed not to compete in business matters related to the video presentation of live major-league men's professional hockey games.

56.   The majority of NHL hockey games are televised pursuant to contracts entered into by the individual clubs with separate entities, primarily RSNs, including MSG, Root Sports, various regional Comcast Sportsnets, and others.

57.   A smaller number of presentations are produced pursuant to national agreements between the League and a national network, including NBC Sports Network (f/k/a "Versus"), a pay-television channel owned and controlled by Comcast, and the National Broadcasting Company ("NBC"), an over-the-air network controlled by Comcast since January 2011. The League also owns its own channel, the NHL Network, which televises nationally through certain cable and satellite providers.

### 1.   Regional Blackout System

58.   At the core of Defendants' restraint of competition in the video programming market are the regional blackout agreements. The result of these agreements is a classic, horizontal, geographical market division. In the absence of a separate out-of-market package or a national telecast (both are discussed below), a consumer of video presentations of live major league hockey games is required to purchase the video presentation provided by the consumers' local team and its television partner.

59.   The League acknowledges that the purpose of these restrictions is to restrain competition, stating that they exist for the purpose of "protect[ing] the local television telecasters of each NHL game in the local markets of the teams."[1] The League openly acknowledges this anticompetitive purpose despite the fact that, as

---

[1] http://www.nhl.com/ice/page.htm?id=58154

the corporate parent of the New York Rangers Hockey Club has admitted, "[l]ongstanding precedent holds that a sports league's allocation of broadcasting territories violates the Sherman Act ...." Pl. Mem. Opp. Mot. Dismiss at 8, *Madison Square Garden, L.P. v. Nat'l Hockey League*, No. 07-8455 (S.D.N.Y.).

60.     Defendants Comcast and Directv have joined the conspiracy by agreeing to enforce and maintain these anticompetitive restrictions.

61.     As MSG correctly states in challenging these restrictions, "the serious harm to competition from a sports league's division of broadcasting territories has long been established as an antitrust violation."  Exhibit B, Pl. Mem. Opp. Mot. Dismiss at 27, *Madison Square Garden, L.P. v. Nat'l Hockey League*, No. 07-8455 (S.D.N.Y.) (citing *United States v. NFL*, 116 F. Supp. 319 (E.D. Pa. 1953); Stephen Ross, *Antitrust Options to Redress Anticompetitive Restraints and Monopolistic Practices by Professional Sports Leagues*, 52 Case W. Res. L. Rev. 133, 141-42 (2001)).

62.     In the absence of these restrictions, fans would have access to live video from teams throughout the United States and Canada. The availability of multiple sources of major-league professional hockey programming would result in competition among the Defendants, which would lower prices and increase choice for consumers.

## 2.     Implementation of the Blackout System through Agreements Restraining Competition Among Sports Networks

63.     The clubs implement their system of exclusive territories through a system of agreements with regional networks. These agreements require the

networks to agree not to compete with other regional networks in the presentation of NHL hockey games.

64.     The networks (and their corporate parents) agree to these requirements knowing that other networks must agree not to compete in their territories. The result is a horizontal division of the market that is enforced by the horizontal agreement between the Defendants.

65.     In each case, the local television network (and the entity that controls that network) agrees with the League and member clubs that it will not permit its presentations of the games to be shown in areas outside of its exclusive territory, knowing that other networks will likewise agree not to compete in their exclusive home territory. The League and the network also agree that the network will not carry games of other teams outside their territory.

66.     Regional Sports Networks (RSNs) enter agreements with multichannel video programming distributers (MVPDs), like defendants Comcast and Directv, to implement the blackouts. But-for these agreements, the MVPDs would facilitate "foreign" RSN entry and other forms of competition.

67.     The result is that each local network has a monopoly on live televised hockey games in its territory. (This is true even in markets with multiple teams, as all three teams' games in the New York area are carried by MSG, and both Southern California teams' games are carried by Fox Sports West.) In certain cases, the outer areas of a team's territory may overlap with another team's or teams'

territories, permitting a viewer to watch either team's games, if they are available, and subjecting the viewer to local blackouts of all such teams games.

68.     These express restrictions on competition have made local sports networks extremely valuable. The Federal Communications Commission has repeatedly described RSNs as the clearest example of "must-have" channels because of their exclusive control of sports programming. *See, e.g., In re AT&T Servs., Inc.*, FCC 11-168, 2011 WL 5534853, *3 (Nov. 10, 2011). In upholding FCC rules designed to ensure that RSNs are not used to unfairly harm competition in the MVPD market, the Court of Appeals for the District of Columbia Circuit agreed that this control of sports programming made RSNs "'must have' and nonreplicable." *Cablevision Sys. Corp. v. FCC*, 649 F.3d 695, 702 (D.C. Cir. 2011).

69.     These restrictions have the purpose and effect of creating a series of regional monopolies in order to increase the price that can be charged by the teams, the television networks, and television distributers like Comcast and Directv. Plaintiffs and all purchasers of video programming that include these networks consequently pay higher prices for television services that include presentations of major league professional hockey games.

### B.     "Out-of Market" Packages

70.     For a consumer to obtain games that are not available through a local cable or over-the-air, there are only two options, both of which, as a consequence of agreements by and among the member clubs, are controlled by the League: "NHL Gamecenter Live," which is streamed over the Internet and is available only through the league; and "NHL Center Ice," which is a similar service available through cable companies and other television distributors, including Directv.

71.    The NHL defines these products as "out-of-market" packages, and games from outside of a protected territory as "out-of-market" games. "In-market" and "out-of-market" are terms defined by reference to the anticompetitive geographical restrictions imposed by Defendants and their co-conspirators.

72.    NHL Gamecenter Live is provided over the Internet and is sold directly by the League to the consumer, through Defendant NHL ICE. As of December 2011, the cost for Gamecenter Live was $169.00 for the season.

73.    For most games, NHL Gamecenter Live offers both the "home" and "away" feeds—a feature the League actively markets—but neither team's game is available in a game involving a local team. These "in-market" games are blacked out within that team's "market." Nationally televised games are blacked out in the United States as a whole. In fact, the other team's presentation is never available through any source in a game involving a local team, regardless of whether that game is played locally or in the other team's arena.

74.    When games are blacked out on NHL Gamecenter Live, there is typically no other means of watching the game over the Internet.

75.    The League offers NHL Gamecenter Live only as all-or-nothing. Purchasers of Gamecenter Live must buy all out-of-market games for all teams even if they are only interested in watching the games of a particular team. Likewise, consumers must buy the complete season of games and may not purchase individual games.

76.    Because of these restrictions on competition, there is no way for consumers in the United States to obtain live, Internet-streaming of games involving a team from within the exclusive territory of that team. No one in New York, for example, has access to any live presentation of a contest involving the Rangers over the Internet, despite the fact that Rangers' contests are routinely streamed over the Internet to consumers elsewhere, and no additional cost would be incurred by permitting Rangers games to be viewed over the Internet by New York hockey fans. The sole reason for this restriction is to interfere with competition.

77.    The reason for this restriction is to interfere with competition, as the League has admitted, acknowledging that local Internet blackouts are intended to "protect" the local television network.

78.    Teams are prohibited from streaming their own games even within their own exclusive territories. When MSG attempted to stream New York Rangers games over the Internet, the League enforced its monopoly by issuing fines to the Rangers. (Exhibit A, MSG Complaint, ¶4).

79.    Because the League is the only source of such programming, it is able to charge monopoly pricing and limit the choices available to consumers. The inevitable consequence is higher pricing, lower quality, less choice to consumers, and lower output.

80.    NHL Center Ice is a similar product as Gamecenter Live, but is available by satellite through Directv and Dish Network, as well as through most

cable companies through In Demand, whose majority owner is Comcast. The price for the service, as of November 2011, is $179.80 for the season.

81. As with Gamecenter Live, all NHL Center Ice games involving a team whose exclusive territory encompasses the viewer's location are blacked out from Center Ice, regardless of whether the game is being held locally, and regardless of whether the game is available to the viewer through a different network. Again, the NHL states that these blackouts are for the express purpose of preventing competition: "Blackout restrictions exist to protect the local telecasters of each NHL game in the local markets of the teams." http://www.nhl.com/ice/page.htm?id= 26371.

82. As the parent company of the New York Rangers stated in objecting, on antitrust grounds, to these packages, "the clubs' horizontal elimination of competition against that package—given the distinct market for professional ice hockey broadcasts—produces higher prices and reduced consumer welfare." Exhibit B, Pl. Mem. Opp. Mot. Dismiss at 30, *Madison Square Garden, L.P. v. Nat'l Hockey League*, No. 07-8455 (S.D.N.Y.).

83. The NHL maintains discipline over the member clubs by sanctioning, or threatening to sanction, teams for engaging in independent activities in violation of the above-described agreements or otherwise in violation of rules that the NHL has developed over the years to implement these agreements.

84. These sanctions are significant and real. When Defendant MSG attempted to compete in certain markets, including Internet streaming, the New

York Rangers were assessed fines of $100,000 per day. (Exhibit A, MSG Complaint, ¶ 4).

85.    "In short, defendants have restrained and threatened to restrain competition in the broadcasting, rebroadcasting and other distribution of games, game highlights and game footage, seeking to control the delivery of content through all existing and future media platforms in ways that go well beyond what is reasonably necessary to the success of the NHL." (Exhibit A, MSG Complaint, ¶ 40.C.).

**C.    The Agreements Have Restrained Horizontal Competition and Have Had Anticompetitive Effects and Led to Consumer Harm.**

86.    The above-described agreements have restrained horizontal competition between and among the NHL clubs, together with their media partners, and the NHL, including in the commercial exploitation of video presentations of live games where the member clubs' media partners could and would compete with each other and with the NHL. In particular, in the absence of the exclusive licenses and other competitive restraints, NHL teams and their partners would compete with each other in the presentation of their teams' games to a much greater extent than the limited opportunities that are now available.

87.    As the owner of the New York Rangers itself has stated in challenging these rules, "The teams would compete with each other in the broadcasting, rebroadcasting and other distribution of NHL games (apart from any national broadcasting contract), game highlights and game footage in a variety of media and, further, in the operation of their websites." (Exhibit A, MSG Complaint, ¶ 42).

88.    The above-described agreements have adversely affected and substantially lessened competition in the relevant markets. Output of presentations of live NHL games, as well as output of game highlights and footage, is lower, and prices are higher, than they would be in the absence of the agreements to restrict competition.

89.    Competition by individual clubs independently acting to exploit the distribution of their teams' games would produce consumer benefits, such as an increase in the availability of live video presentations over a wider range of media, including cable, the internet and wireless devices.

90.    The above-described agreements do not concern matters of league structure and do not concern any unique characteristic or need of hockey exhibitions. These anticompetitive restraints are not necessary to the exhibition of hockey and are not integral to the sport itself.

91.    There are no legitimate, pro-competitive justifications for these exclusive license agreements and other competitive restraints, which have harmed consumers in various ways, including in the above-described ways.

**D.    Plaintiffs' Have Suffered Antitrust Injury.**

92.    Plaintiffs have been overcharged for the video presentation of live NHL games.

93.    Subscribers to pay television service with standard channel packages have been forced and will continue to be forced to overpay for their television service because of the inclusion of sports programming that commands supra-competitive pricing. Subscribers suffer this overpayment even if they do not watch sports

{00034214;1 }

30

programming. *See, e.g.*, Brian Stetler and Amy Chozick, *Paying a 'Sports Tax,' Even if You Don't Watch*, N.Y. TIMES, Dec. 15, 2011, available at http://www.nytimes.com /2011/12/16/business/media/for-pay-tv-clients-a-steady-diet-of-sports.html.

94.     Subscribers to NHL Center Ice have been forced and will continue to be forced to overpay for "out-of-market" games because of the lack of competition created by the geographical exclusivity system that the New York Rangers and MSG have admitted are unlawful restraints on trade.

95.     Subscribers to NHL Gamecenter Live have been forced and will continue to be forced to overpay for Internet-delivered games and have been and will continue to be forced to purchase Internet-delivered games in a bundle of all such games (other than those blacked out), despite the fact that, in the absence of collusive agreements, individual games and individual teams' games would be available at substantially lower prices.

96.     Plaintiffs have been and will continue to be prevented from obtaining Internet-delivered videos of the games involving local teams.

97.     Plaintiffs have been and will continue to be prevented from obtaining games involving a local team from any source other than the team's RSN partner, which typically requires the purchase of a full pay-television subscription, including tens or hundreds of other channels Plaintiffs may not want.

98.     Individual teams and their media partners are restrained from distributing their games through cable, satellite, Internet and otherwise in ways

that they may determine are best suited to reaching their respective and potential fan bases throughout the country and abroad.

## VII.
## CLAIMS FOR RELIEF

### COUNT ONE
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT
### On Behalf of the Television Class

99.    Plaintiffs Garber and Silver, on behalf of themselves and the Television Class, incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

100.   Beginning at a time presently unknown to Plaintiffs, and continuing through the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, combination or conspiracy in restraint of trade with the purpose, intent, and effect of restraining horizontal competition among the NHL member clubs and their television partners, and between the clubs and the NHL, with the purpose, intent, and effect of restraining trade and commerce in the distribution of major league professional hockey games, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

101.   The contract, combination or conspiracy has resulted in an agreement, understanding, or concerted action between and among the Defendants and their co-conspirators that regular season games will only be carried within a team's protected geographical territory ("in-market games"). The agreement forbids carrying or online streaming of any NHL game in any geographic market except those licensed by the NHL team in that geographical market.

{00034214;1 }                          32

102.   The contract, combination, or conspiracy has restrained competition between and among the Defendants in violation of Section 1 of the Sherman Act. It has led to anticompetitive effects in the relevant markets, as alleged above, and caused injury to consumers and competition in those relevant markets and elsewhere.

103.   The Defendants' contract, combination, agreement, understanding or concerted action with the co-conspirators occurred in or affected interstate commerce. The Defendants' unlawful conduct was through mutual understandings, combinations or agreements by, between and among the Defendants and other unnamed co-conspirators. These other co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

104.   Defendants' anticompetitive conduct has directly and proximately caused antitrust injury, in the form of higher prices and reduced choice, as set forth above. Plaintiffs Garber and Silver and other consumers will continue to suffer antitrust injury and other damage unless Defendants are enjoined from continuing to engage in the foregoing violations of law.

## COUNT TWO
## VIOLATION OF SECTION 1 OF THE SHERMAN ACT
### On Behalf of the Television Class

105.   Plaintiffs Garber and Silver, on behalf of themselves and the Television Class, incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

106.    Beginning at a time presently unknown to Plaintiffs, and continuing through the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, combination or conspiracy in restraint of trade with the purpose, intent, and effect of restraining horizontal competition among the NHL member clubs and their television partners, and between the clubs and the NHL, with the purpose, intent, and effect of restraining trade and commerce in the distribution of major league professional hockey games, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

107.    The contract, combination or conspiracy has resulted in an agreement, understanding, or concerted action between and among the Defendants and their co-conspirators that the League will be the exclusive provider of live "out-of-market" games distributed through television providers. The Defendants and their co-conspirators have agreed that no club or network will offer a competing product, or make their programming available within another team's exclusive territory.

108.    The contract, combination, or conspiracy has restrained competition between and among the Defendants in violation of Section 1 of the Sherman Act. It has led to anticompetitive effects in the relevant markets, as alleged above, and caused injury to consumers and competition in those relevant markets and elsewhere.

109.    The Defendants' contract, combination, agreement, understanding or concerted action with the co-conspirators occurred in or affected interstate commerce. The Defendants' unlawful conduct was through mutual understandings,

combinations or agreements by, between and among the Defendants and other unnamed co-conspirators. These other co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

110.    Defendants' anticompetitive conduct has directly and proximately caused antitrust injury, in the form of higher prices and reduced choice, as set forth above. Plaintiff Silver and other consumers will continue to suffer antitrust injury and other damage unless Defendants are enjoined from continuing to engage in the foregoing violations of law.

**COUNT THREE**
**VIOLATION OF SECTION 1 OF THE SHERMAN ACT**
**On Behalf of the Internet Class**

111.    Plaintiff Laumann, on behalf of himself and the Internet Class, incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

112.    Beginning at a time presently unknown to Plaintiffs, and continuing through the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, combination or conspiracy in restraint of trade with the purpose, intent, and effect of restraining horizontal competition among the NHL member clubs and their television partners, and between the clubs and the NHL, with the purpose, intent, and effect of restraining trade and commerce in the distribution of major league professional hockey games, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

113.   The contract, combination or conspiracy has resulted in an agreement, understanding, or concerted action between and among the Defendants and their co-conspirators that the League will be the exclusive provider of live "out-of-market" games over the Internet. The Defendants and their co-conspirators have agreed that no club or network will offer a competing product, or make their presentation of games over the internet available within another team's exclusive territory.

114.   The contract, combination, or conspiracy has restrained competition between and among the Defendants in violation of Section 1 of the Sherman Act. It has led to anticompetitive effects in the relevant markets, as alleged above, and caused injury to consumers and competition in those relevant markets and elsewhere.

115.   The Defendants' contract, combination, agreement, understanding or concerted action with the co-conspirators occurred in or affected interstate commerce. The Defendants' unlawful conduct was through mutual understandings, combinations or agreements by, between and among the Defendants and other unnamed co-conspirators. These other co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

116.   Defendants' anticompetitive conduct has directly and proximately caused antitrust injury, in the form of higher prices and reduced choice, as set forth above. Plaintiff Laumann and other consumers will continue to suffer antitrust

injury and other damage unless Defendants are enjoined from continuing to engage in the foregoing violations of law.

**COUNT FOUR**
**VIOLATION OF SECTION 2 OF THE SHERMAN ACT**
**On Behalf of All Classes**

117.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

118.   Defendants and their co-conspirators, by the above-mentioned conduct, possess monopoly power over the market for video presentations of major league hockey games and Internet streaming of the same and have used that power for the purposes of unreasonably excluding and/or limiting competition, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. These activities have gone beyond those which could be considered as "legitimate business activities," and are an abuse of market position.

119.   Through the anti-competitive conduct described herein, Defendants and their co-conspirators have willfully acquired and maintained, and unless restrained by the Court, will continue to willfully maintain, that monopoly power by anti-competitive and unreasonably exclusionary conduct. Defendants and their co-conspirators have acted with an intent to illegally acquire and maintain that monopoly power in the relevant product market, and their illegal conduct has enabled them to do so, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

120.   Defendants' anticompetitive conduct has directly and proximately caused antitrust injury, as set forth above. Plaintiffs and other consumers will

continue to suffer antitrust injury and other damage unless defendants are enjoined from continuing to engage in the foregoing violations of law.

## VIII.
## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray as follows:

A.    That the Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and that Plaintiffs be named representatives of their respective classes.

B.    That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators as alleged in this complaint, be adjudged to have been a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

C.    That the Defendants and their co-conspirators actions to illegally acquire and maintain monopoly power in the relevant product market, be adjudged to have been in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

D.    That judgment be entered for Plaintiffs and members of the Class against Defendants for three times the amount of damages sustained by Plaintiffs and the members of the Class as allowed by law, together with the costs of this action, including reasonable attorneys' fees, pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

E.    That Plaintiffs and the Class be awarded pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

F.    That Defendants and their co-conspirators be enjoined from further violations of the antitrust laws; and,

G.     That Plaintiffs and members of the Class have such other, further or different relief, as the case may require and the Court may deem just and proper under the circumstances.

Dated:  March 12, 2012

POMERANTZ HAUDEK
GROSSMAN & GROSS LLP

By:_____
          Michael M. Buchman

100 Park Avenue, 26th Floor
New York, York, 10017
Telephone: (212) 661-1100
Facsimile:  (212) 661-8665

Edward Diver
Howard Langer
Peter Leckman
**LANGER, GROGAN & DIVER, P.C.**
1717 Arch Street, Suite 4130
Philadelphia, PA 19103
Telephone: (215) 320-5660
Facsimile:   (215) 320-5703
*Attorneys for Plaintiffs*

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
----------------------------------------------------- x
MADISON SQUARE GARDEN, L.P.,          )      No. 07 CIV. 8455 (LAP)
                                       )
              Plaintiff,               )
                                       )
        v.                             )      FIRST AMENDED COMPLAINT FOR
                                       )      INJUNCTIVE RELIEF
NATIONAL HOCKEY LEAGUE,                )
NATIONAL HOCKEY LEAGUE                 )
ENTERPRISES, L.P., NHL INTERACTIVE     )
CYBERENTERPRISES, LLC., NHL            )
ENTERPRISES CANADA, L.P., and NHL      )
ENTERPRISES, B.V.,                     )
                                       )
              Defendants.              )
                                       )
                                       )
                                       )
                                       )
----------------------------------------------------- x
```

Plaintiff MADISON SQUARE GARDEN, L.P. ("MSG"), by and through its attorneys,

files this First Amended Complaint against defendants and alleges as follows:

## I.   PRELIMINARY STATEMENT

1.   MSG owns the New York Rangers, a major league men's professional ice hockey

team, and one of the "original six" members of the National Hockey League ("NHL"). Rangers

fans are among the most intense and loyal fans of any NHL team, indeed of any team in

professional sports, and the Rangers have gone to great lengths to enhance fan experience by

offering a wide range of information, products, and services in competition with other NHL

teams.

A.    **The NHL Has Become An Illegal Cartel**.

2.      The New York Rangers are proud to be among the oldest members of the NHL, a limited purpose joint venture of legally separate and independent ice hockey clubs.  The NHL joint venture was created to provide the means for its member clubs to compete on the ice and thus to generate fan interest and excitement in major league men's professional ice hockey contests.  The teams cooperate to schedule and produce ice hockey games and facilitate competition on the ice, which is necessary for the venture's success.  But the amount of off-the-ice cooperation reasonably required for the success of the venture is limited, and in fact, the NHL member clubs compete vigorously in various ways off the ice, especially in metropolitan areas (such as in the New York area) where there are multiple NHL clubs.  For example, the member clubs of the NHL independently set the prices of tickets for attending games in person; compete for contracting with players and in hiring coaches; create and manage their individual marketing and promotional programs, including the sale of advertising opportunities and merchandise; and develop, license and market their respective trademarks for various purposes.  While the NHL member clubs may choose to cooperate in various ways off the ice, the vast majority of such activity is not reasonably necessary to the success of the NHL joint venture.

3.      Over the years, and increasingly in recent years, the NHL member clubs, acting collusively as the League and through the Commissioner, have taken steps to eliminate, restrict and prevent off-the-ice competition between and among the member clubs as well as between the NHL itself and the member clubs, in numerous areas – including licensing, merchandise sales, advertising, broadcasting, and new media – and in ways that are not necessary to the purpose of the NHL joint venture, i.e., the provision of major league men's professional ice hockey contests. As these activities have accelerated, MSG has objected to these steps, and has tried to persuade the NHL member clubs and the League Office that eliminating and preventing off-the-ice

- 2 -

competition between and among the NHL member clubs and/or the NHL was both unnecessary to the success of the NHL joint venture and, when carried too far, illegal. MSG's efforts have been unsuccessful. Accordingly, MSG brings this suit to restrain the NHL member clubs, acting collusively as the League and through the Commissioner, from continuing to eliminate, restrict and prevent the independent competitive activities of the NHL's members in violation of federal and state antitrust laws.

4. The NHL has recently engaged in a pattern of rapidly-increasing anticompetitive behavior. At the onset of the 2007 Stanley Cup playoffs, MSG took three modest but important steps to increase its competitive offerings. MSG made Rangers-branded merchandise available locally through a convenient, online ordering process on its Rangers website (rather than through the existing, more cumbersome process of downloading a website catalog). MSG also made Rangers games available to local cable subscribers of those games by an additional means – i.e., broadband distribution that was gated and therefore limited to the Rangers' local area . In addition, MSG sought to increase revenue by selling non-intrusive virtual advertising to advertisers on MSG's television broadcasts of Rangers home games. Instead of welcoming these enhancements, which would have increased consumer choice and led to other pro-competitive effects, the NHL immediately imposed on MSG an arbitrary penalty of $100,000 per day. This, in turn, forced MSG to shut down these innovations and sent the unmistakable message that future efforts at competition would also be harshly punished. After MSG complied with the League's demands, but refused to pay what MSG asserted was an unlawful fine, the NHL withheld $200,000 from third-party payments otherwise due MSG.

5. MSG capitulated to the NHL's threats because the exorbitant size of the fines would have made absorbing the fines economically suicidal; because MSG did not want to

distract attention from the NHL playoffs; and, in addition, because MSG continued to hope that further discussion would persuade the NHL that its insistence on eliminating or otherwise restraining all competition between and among the member clubs as well as between the NHL itself and the member clubs was unwise and illegal. At the start of the 2007-08 season, however, the NHL again threatened the imposition of extortionate fines to enforce its suppression of competition, this time requiring MSG to "migrate" its independent nyrangers.com website – which MSG had been using as a competitive tool to generate and maintain fan interest in the Rangers in competition with the other NHL clubs – to a "common technology platform" under NHL control and subject to new NHL rules dictating the layout and significant parts of the content of the site; and further, prohibiting MSG from operating any competitive Rangers website independent of the NHL common platform.

6. The NHL's imposition of, and its threats to impose, fines on MSG for communicating with Rangers fans, offering choices to consumers, and competing through the Rangers website are merely the latest examples of anticompetitive conduct by a legitimate joint venture that has veered into unlawful behavior. The NHL began as a legitimate joint venture producing a product – major league men's professional ice hockey competition – that no one club can produce alone. MSG and the Rangers have always been loyal members of the NHL, supporting joint initiatives in appropriate areas, including revenue sharing and collective bargaining with the NHL's players. But by seeking to control the competitive activities of independent businesses in ways that are not reasonably necessary to the functioning of that legitimate joint venture or to any other legitimate procompetitive purpose, the NHL has become an illegal cartel.

- 4 -

7.     Through this Complaint, MSG seeks to establish the appropriate bounds, under the antitrust laws, of the conduct of the NHL's member clubs, acting collusively through the League and/or the Commissioner.  The NHL is a joint venture of independently owned and operated member clubs; the antitrust laws prohibit those clubs, like the members of any joint venture, from restricting the individual competitive activities of the individual members of the venture, except where any such restriction is shown to be reasonably necessary to the success of the League or the achievement of some other legitimate procompetitive purpose.  The goal of this lawsuit is to restore and protect from unlawful restraint the competition between and among the NHL member clubs and the NHL that increasingly has been eliminated and restrained by the NHL's anticompetitive rules and policies and that threatens to become restrained to an even greater extent absent this Court's intervention.

**B.     The NHL Has Extended Its Collective Activities Beyond What Is Legally Permissible.**

8.     The NHL is a joint venture of legally separate and independent men's professional ice hockey clubs.  It was created by the individual member teams for a specific limited purpose, i.e., to assist them in producing a product – major league men's professional ice hockey contests – that no one team could produce alone.  Now consisting of 30 member clubs located throughout the United States and Canada, the NHL is engaged in a variety of legitimate collective activities.  These legitimate activities include negotiating labor agreements with the players, negotiating national television broadcasting arrangements, promulgating and enforcing agreed rules of play, and scheduling ice hockey contests, including playoff and championship competitions.  While MSG sometimes has differed with its fellow Member Clubs and the League Office on strategy and tactics in some of these areas, particularly in the area of national television, MSG generally accepts and supports these activities, to the extent they are necessary

- 5 -

to the success of the NHL and do not unnecessarily limit the independent competitive activities of the individual member clubs.

9.     Notwithstanding these valuable and appropriate collective activities, the member clubs remain independently owned and operated businesses, fully capable of competing – and actually competing – with each other in various ways.  The clubs are not simply an extension of the NHL; rather, the NHL is an artificial creation of its member clubs and subject to their collective control.  Each club, as an independent and separate business, is individually responsible for all of its business affairs that have not been properly and lawfully delegated by the clubs to the NHL.  Notwithstanding this basic principle – *i.e.,* that the League serves the clubs, not vice versa – the League over the years, with the support or acquiescence of many of the NHL member clubs, has asserted an increasing amount of control over the independent clubs' activities and sought increasingly to aggrandize the centralized, collective activities of the League while restricting independent competition by and among the clubs.  Indeed, at a 2006 meeting of the NHL's owners, NHL Commissioner Gary Bettman took the extreme position that the NHL has "granted" the individual clubs only a limited number of property rights and that all other rights are subject to the will of a majority of the club owners, each of whom has a vote on the NHL Board of Governors.

10.     Such broad collective control over the competitive activities of independent businesses is unlawful under federal and New York state antitrust laws.  The NHL joint venture is seeking to take what does not belong to it, and to control, without any cognizable procompetitive justification, independent assets and entities that otherwise would compete with each other and with the NHL.  In so doing, the NHL crosses the line and becomes an illegal cartel, constraining MSG's ability to compete with other NHL member clubs and with the NHL

- 6 -

itself.  The joint venture's stiff fines against MSG, and its threats of further fines, imposed solely because MSG has sought and continues to seek to compete in very modest ways with the NHL and other NHL clubs, establish that the NHL has moved beyond the operation of a legitimate joint venture and into illegal cartel behavior.  The Rangers have complained about, objected to, and withheld their approval of, this behavior for several years, to no avail.

**C.    The NHL Seeks To Eliminate And Prevent Competitive Activities**.

11.    The New York Rangers, along with the Montreal Canadiens, the Toronto Maple Leafs, the Boston Bruins, the Detroit Red Wings and the Chicago Blackhawks, are known as the NHL's "Original Six" teams – essentially its founding members.  The Rangers have won the Stanley Cup four times, most recently in 1994.  Players as memorable as Vic Hadfield, Eddie Giacomin, Rod Gilbert, Mike Richter, Mark Messier and Wayne Gretzky have played for the New York Rangers, and stars such as Jaromir Jagr and Brendan Shanahan now play for the Rangers.  Gretzky, the game's greatest player, retired as a New York Ranger.

12.    Over the years, MSG has developed, reinforced and encouraged fan interest in the Rangers, making substantial investments in the Rangers franchise as it seeks to compete with other NHL teams, including but not limited to the two other NHL teams in the New York metropolitan area.  MSG, for example, has spent significant sums to attract to its team established international hockey stars such as Jagr and Shanahan (the former Red Wings star), and, most recently, young American stars such as Scott Gomez and Chris Drury, all in an effort to generate "True Blue" excitement at Rangers games at Madison Square Garden and elsewhere. MSG, in addition, has consistently spent significant sums to market the New York Rangers, and the Rangers' following extends well beyond the New York area.  Hockey fans across the country (and indeed the world) identify with the New York Rangers, and seek the opportunity to experience the Rangers wherever they can, including by attending games or by viewing live or

- 7 -

recorded games or game highlights, as well as by buying Rangers-branded apparel and merchandise.

13. As part of their legitimate and independent business efforts, the individual member clubs comprising the NHL, including the Rangers, have ownership rights in, and have registered, various copyrights, trademarks, trade dress and trade names (collectively, "marks") in logos and designs relating to their teams. Individual NHL member clubs, including the Rangers, have undertaken substantial efforts over the years to develop and enhance the value of their marks and the image of their teams as they compete with each other for fan interest.

14. MSG's efforts and the loyalty of Rangers fans have created value for the New York Rangers brand and marks. MSG's aggressive efforts have created and increased consumer demand for products and services, including information, merchandise, apparel and memorabilia, containing the Rangers logo, as well as consumer demand for the opportunity to view Rangers games or game highlights. There remains great unexploited potential in this brand and these marks, and MSG intends and desires to exploit them further, in competition with the other clubs, to generate income from on-line, video and licensing opportunities and to generate and maintain fan interest in New York Rangers hockey.

15. The NHL, however, seeks to ban independent competition in these areas by and among the individual clubs and to expropriate these competitive opportunities for itself. Such excessive centralization and aggrandizement of the NHL at the expense of the member clubs is not reasonably necessary for the success of the NHL venture or for any other legitimate procompetitive purpose, and because of that it is not permissible under state and federal antitrust law. Yet that is the course the NHL has taken. In addition, and notwithstanding the strenuous

- 8 -

objections of MSG (and occasionally other clubs), the NHL has chosen to enforce its anticompetitive regime through oppressive daily fines.

16.     Defendants have inappropriately and illegally claimed and usurped more and more centralized control over what have been and should be the independent competitive activities of the individual clubs, eliminating competition in a number of ways, including the following:

A.     <u>Excessive League control over the licensing of NHL club marks and the marketing of club-branded apparel, merchandise and memorabilia.</u>  The NHL member clubs, acting collusively as the League and through the Commissioner, assert the power to control the licensing of individual NHL team marks for virtually all commercial purposes and to constrain the ability of individual teams to market apparel, merchandise and memorabilia both within and beyond the team's local area, imposing restrictions on sales through retailers and prohibiting sales of team-related video/DVD products.  The NHL member clubs, acting collusively as the League and through the Commissioner, also claim the right to prohibit the sale of apparel, merchandise and memorabilia through online team stores, fining MSG for competing in that way, and permitting MSG to offer to consumers on its website only the inefficient, time-consuming option of downloading the team's mail order catalog.  In addition, MSG faces significant NHL-imposed restrictions even in the sale of Rangers jerseys outside Madison Square Garden itself.  This centralized control eliminates competition among individual clubs and is not reasonably necessary for any cognizable procompetitive purpose.  Each member club is legally entitled to exploit its own intellectual property, including its marks and logos, and each individual club is legally required to decide independently whether and to what extent it will

authorize the NHL to act as a non-exclusive licensing agent in any particular instance in the marketing and promotion of club-branded apparel, merchandise and memorabilia.

        B.    <u>Excessive League restrictions on individual teams' relationships with advertisers and sponsors</u>.  The NHL member clubs, acting collusively as the NHL and the Commissioner, claim the almost unlimited right to enter into advertising or sponsorship arrangements that automatically preempt individual clubs' abilities to sell advertising or sponsorship arrangements, even in the clubs' local home arenas.  In addition, the NHL member clubs, acting collusively as the League and through the Commissioner, have eliminated competition for advertising sales between home and away clubs by prohibiting individual clubs from using virtual signage, *i.e.*, signage that can be electronically superimposed during telecasts of a club's games, even when such signage does not block or substitute for existing in-arena signage.  By doing so, the NHL prohibits an innovative means of expanding advertisers' access to interested consumers.  This prohibition is not reasonably necessary for the success of the NHL venture.

        C.    <u>Excessive League control over individual club broadcasting and other distribution opportunities</u>.  Media revenues are critical to any professional sports franchise, and one of the core activities of a professional sports league is to develop and negotiate a national television contract.  In most professional sports, national television revenues are an important means of balancing revenues between and among individual teams.  The NHL, however, has been unsuccessful to date in its efforts to obtain significant national television revenues.  At the same time, the NHL member clubs, acting collusively as the League and through the Commissioner, have restrained the individual clubs' broadcasting and other distribution opportunities, and in so doing eliminated competition among the clubs in ways that are not

reasonably necessary for the success of the NHL venture or for any other legitimate procompetitive purpose. In particular, the NHL member clubs, acting collusively as the League and through the Commissioner, claim the right to control jointly all broadcasting and other distribution rights, both inside and outside each club's local area, as well as internationally. In asserting this control, the League has acknowledged that it has allocated the geography of virtually all of North America among the various member clubs. By doing so, the League has illegally eliminated the ability of a club to broadcast its games into areas allocated to the other clubs, in competition with those clubs, except where multiple clubs are located in the same metropolitan area such as in the New York area. The League also unreasonably limits the extent to and terms on which a club can broadcast its games even in the area allocated to that club. In addition, the NHL member clubs, acting collusively as the League and through the Commissioner, have unreasonably restricted a team's ability to distribute its own live games through that team's website and/or the website of its local television rightsholder or through wireless devices, as well as rebroadcasts of its games over the internet or on a "video-on-demand" basis. These restraints on individual teams' competitive activities are clearly anticompetitive, not reasonably necessary to the success of the NHL joint venture or to any other legitimate procompetitive purpose, and far exceed the limited antitrust immunity afforded by the Sports Broadcasting Act.

D.     Excessive League control of all "new media" activities. The NHL member clubs, acting collusively as the League and through the Commissioner, have taken exclusive control of various "new media" activities and banned the individual clubs from competing independently in this area. As one example, the NHL has forced each team to turn over that team's individual website to the League, which now controls those sites through the

only League permitted website – "nhl.com."  The League's elimination of independent competition between and among club websites goes well beyond any legitimate need to ensure the basic appearance and quality of individual clubs' websites or the clubs' other new media activities, and is not reasonably necessary for any legitimate procompetitive purpose.  By banning teams from operating additional, independent websites, the NHL has unreasonably restricted the ability of teams such as the Rangers to use websites in unique and creative ways to communicate with existing fans, to develop new fans, and generally to compete for fans with other NHL clubs. Indeed, defendants have openly conceded their intention to eliminate what they viewed as the overly "tribal" nature of the various team websites – i.e., to eliminate the purported over-emphasis on team-against-team competition produced by independent competitors responding to consumer preferences and other market forces – and instead to use the League's centralized control to make the various team websites more League-centered and less "tribal." Pursuant to its "new media" policy, the NHL has also forced teams to give the League more attractive ad inventory on team home pages, irrespective of the adverse effect on the teams' ability to sell advertising and sponsorships in competition with each other and with the NHL, and has otherwise restrained the distribution of games and highlights through handheld technologies.

17.    The NHL is the only provider of major league men's professional ice hockey contests in the United States, and MSG is subject to the NHL's Constitution and By-laws.  Those League rules purport to require MSG to comply with the joint decisions of the member clubs and with decisions of the Commissioner, including decisions imposing the above-described restraints.  League rules adopted by the NHL member clubs also give the Commissioner extraordinary and unregulated power to enforce the joint elimination of competition through massive monetary fines, and even possible expulsion from the NHL pursuant to provisions of the

NHL Constitution permitting the "involuntary termination" of member clubs that violate League

rules.  Such a termination would prevent MSG from continuing to provide major league men's

professional ice hockey contests to its fans.  Indeed, as explained above, the NHL sent a letter to

MSG on April 18, 2007, fining MSG $100,000 per day for what the League described as conduct

in "clear and blatant" violation of the NHL's anticompetitive rules and policies.  Although MSG

disagreed with the NHL's position in that letter, the NHL's anticompetitive demand that MSG

cease competing on pain of a $100,000 per day fine left MSG with no choice but to comply even

as MSG continued to try to find a way to resolve its differences with the NHL short of litigation.

The NHL's subsequent letter, threatening MSG with further fines of $100,000 per day beginning

on September 28, 2007 for continuing to operate a Rangers website outside of League control,

reflects a continuation of the NHL's anticompetitive overreaching.

        18.      The NHL's coercive actions require MSG to pursue this lawsuit in order to

protect its investment in its marks and its efforts to compete in the marketplace.  MSG's only

goal is to end agreements that restrain and adversely affect competition among teams in areas

where the elimination of independent competition is not reasonably necessary to produce major

league men's professional ice hockey contests or to the achievement of any other cognizable

procompetitive purpose.  MSG therefore seeks no money damages, but only injunctive relief to

restrain and prevent the NHL's continuing violations of federal and state antitrust laws.

## II.    NATURE OF CLAIMS, JURISDICTION AND VENUE

        19.      MSG brings this action pursuant to Section 16 of the Clayton Act (15 U.S.C. §

26), for a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  This Court has subject

matter jurisdiction over that claim pursuant to 28 U.S.C. §§ 1331 and 1337.  MSG also brings

this action pursuant to New York General Business Law § 340.  This Court has jurisdiction over

that claim pursuant to 28 U.S.C. § 1367 and the doctrine of pendent jurisdiction.

20.     Venue is proper pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 22.  The NHL, National Hockey League Enterprises, L.P. ("NHLE"), and NHL Interactive CyberEnterprises, LLC ("NHL ICE"), transact business, maintain their principal offices and are found in this district, and a substantial part of the events or omissions giving rise to MSG's claims occurred in this district.  NHL Enterprises Canada, L.P. ("NHLE Canada"), and NHL Enterprises, B.V. ("NHLE International"), transact business in New York and are subject to personal jurisdiction in this district.

21.     Jurisdiction over all defendants comports with the United States Constitution.

### III.   **PARTIES**

22.     MSG is a Delaware limited partnership with its principal offices at Two Pennsylvania Plaza, New York, New York 10121-0091.  MSG owns the New York Rangers men's professional ice hockey club and the mark "New York Rangers," a federally registered trademark, as well as various registered and unregistered trademarks and trade names derived from, and copyrights and trade dress in the form of logos associated with, that mark.  MSG also owns Madison Square Garden, as well as two programming services, MSG Network and FSN New York, which license the right to distribute Rangers games, as well as games of the New York Islanders, New Jersey Devils and Buffalo Sabres NHL hockey clubs.  MSG is a member or partner and beneficiary of the NHL, NHLE and NHL ICE, as well as related entities, including NHLE Canada and NHLE International.

23.     Defendant NHL is an unincorporated association of the 30 major league men's professional ice hockey teams in the United States and Canada, and is the dominant provider of major league men's professional ice hockey contests in the world.  The NHL has its headquarters at 1251 Avenue of the Americas, New York, New York 10020-1198.  The NHL owns valuable marks relating to ice hockey and acts to facilitate the provision of major league men's

- 14 -

professional ice hockey contests.  The NHL transacts business in the Southern District of New York by engaging in activities there relating to the business of major league men's professional ice hockey contests and the licensing of marks relating to that business.  It also enters into contracts in this district.

24.     Each team, or club, that is a member of the NHL is a separate and independent business with a separate and independent owner and significant autonomy in its business operations.  The NHL and its member clubs are independent entities that are capable of conspiring (and, in fact, have done so, as alleged in this Complaint) in the licensing of their respective marks and in other competitive areas not necessary for the provision of major league men's professional ice hockey competition.

25.     Defendant NHLE is a Delaware limited partnership with its principal place of business at 1251 Avenue of the Americas, New York, New York 10020-1198.  NHLE is a limited partnership, the beneficial owners of which are the 30 NHL clubs or entities under their control.  NHLE transacts business in the Southern District of New York by engaging in activities there relating to the business of major league men's professional ice hockey contests and the licensing of NHL and individual team marks relating to that business.  It also enters into contracts in this district.

26.     Defendant NHL ICE is a Delaware limited liability company with its principal place of business at 1251 Avenue of the Americas, New York, New York 10020-1198.  NHL ICE is a subsidiary of NHLE.  NHL ICE transacts business in the Southern District of New York by engaging in activities there relating to the business of major league men's professional ice hockey contests and the licensing of NHL and individual team marks relating to that business.  It

also enters into contracts and manages the online sale of NHLE-licensed products for the NHL.com website in this district.

27.     Defendant NHLE Canada is a Canada limited partnership with its principal place of business in Ontario, Canada.  NHLE Canada is owned equally, directly or indirectly, by the owners of the 30 member clubs that constitute the NHL.  NHLE Canada primarily conducts trade or commerce in Canada, relating to the business of major league men's professional ice hockey contests and the licensing of NHL and individual team marks relating to that business.  Its conduct of trade or commerce in Canada, however, has had and continues to have direct, substantial and reasonably foreseeable effects on U.S. domestic and export commerce in ways that give rise to MSG's claims.  NHLE Canada transacts business in New York by licensing marks owned by member clubs located in New York, by licensing marks owned by the NHL and/or NHLE, by remitting monies to New York member clubs, as well as to the NHL and/or NHLE, by remitting monies to all member clubs by means of accounts managed in New York by the NHL and/or NHLE, by engaging in joint advertising and marketing efforts with the NHL and NHLE, by frequent and regular contacts with the NHL and NHLE in this district, including contacts relating to contractual negotiations, and by engaging in other similar activities.

28.     Defendant NHLE International is a Netherlands private limited liability company with its principal place of business at Polakweg 14, 2288GG, Rijswijk, The Netherlands.  NHLE International is owned equally, directly or indirectly, by the owners of the 30 member clubs that constitute the NHL.  NHLE International primarily conducts trade or commerce outside North America, relating to the business of major league men's professional ice hockey contests and the licensing of NHL and individual team marks relating to that business.  Its conduct of trade or commerce outside North America, however, has had and continues to have direct, substantial and

- 16 -

reasonably foreseeable effects on U.S. domestic and export commerce in ways that give rise to MSG's claims. NHLE International transacts business in New York by licensing marks owned by member clubs located in New York, by licensing marks owned by NHL and/or NHLE, by remitting monies to New York member clubs, as well as to the NHL and/or NHLE, by remitting monies to all member clubs by means of accounts managed in New York by the NHL and/or NHLE, by engaging in joint advertising and marketing efforts with the NHL and NHLE, by frequent and regular contacts with the NHL and NHLE in this district, including contacts relating to contractual negotiations, and by engaging in other similar activities.

## IV.   **TRADE AND COMMERCE**

29.     There are peculiar and unique characteristics that set major league men's professional ice hockey apart from other sports or leisure activities. Close substitutes do not exist, and watching (or participating as a fan in) major league men's professional ice hockey is not reasonably interchangeable with watching (or participating as a fan in) other sports or other leisure activities. So, too, the copyrights, trademarks, trade names, trade dress and logos of the major league men's professional ice hockey clubs have no reasonably close substitutes. There is a separate demand, and hence a relevant market, for the licensing of those marks to licensees for various uses. Also, arenas when used for major league men's professional ice hockey contests provide an outlet for or involving advertising to hockey fans for which there is a separate demand and no close substitutes.

30.     There is a relevant product or service market for the licensing of the trademarks, trade names, trade dress and copyrights (including logos) owned by the NHL clubs and the NHL itself. This market is comprised of several smaller segments that themselves constitute relevant markets or submarkets, including:

A.    A market or submarket for the licensing of NHL and NHL club marks for use on apparel, merchandise and memorabilia.

B.    A market or submarket for the sale of NHL-branded and NHL club-branded apparel, merchandise and memorabilia.

C.    A market or submarket for the licensing of NHL and NHL club marks for use in corporate advertising and sponsorships.

D.    Markets or submarkets for the licensing of broadcasting, rebroadcasting or other distribution rights to NHL games, either live or recorded, as well as game highlights, footage and related ancillary programming, over media such as cable and satellite television, the internet and wireless handheld devices, either by licensing those rights to content aggregators or by offering programming directly to consumers.

There is also a relevant product or service market consisting of the sale of advertising at or involving venues when used as the setting for major league men's professional ice hockey contests.

31.    At competitive prices, the rights to license or use the marks of the NHL and NHL clubs for these various purposes, the rights to broadcast, rebroadcast or otherwise distribute NHL games, and the rights to sell advertising rights at or involving venues when used as the setting for NHL hockey contests, are not reasonably interchangeable with any other products, services or rights.  Defendants have the power to raise or maintain prices above the competitive level as a result of: (i) the various restraints imposed by the NHL and the other defendants on the ability of the individual clubs to exploit their individual marks, as well as apparel, merchandise and memorabilia displaying those marks, for virtually all commercial purposes, and the various

- 18 -

broadcasting and other distribution restraints; (ii) the power to restrain the ability of individual clubs to promote and market their teams in competition with other teams through individual team websites; and (iii) the power to control the amount and type of advertising at or involving venues when exhibiting major league men's professional ice hockey contests.

32.     There is also a relevant product or service market defined as the provision of major league men's professional ice hockey contests in North America.  This market is characterized by high barriers to entry.  The NHL is the only significant, and therefore the dominant, provider of this product or service, and has market power.  As a result, MSG has had no choice but to comply with the competitive restraints that are the subject of this Complaint or face the risk of adverse consequences as described in this Complaint, but even its efforts to comply with the NHL's competitive restraints have not prevented the League from fining MSG for activities that the League has described as "clear and blatant" violations of the NHL's anticompetitive rules and policies.  The NHL, acting through and in combination with the separate and independent clubs that own the NHL, also exercises market power through the exclusive agreements and the other unnecessary and unjustified restraints on each club's competitive activities that are the subject of this Complaint.

33.     The relevant geographic market consists of North America, including the United States.  Various geographic submarkets also may exist.

34.     Defendants' conduct complained of herein has taken place in and affected, and directly, substantially, and foreseeably restrained, the interstate and foreign trade and commerce of the United States, and the effects in foreign trade and commerce have had and continue to have direct, substantial and reasonably foreseeable effects on U.S. domestic and export commerce in ways that give rise to MSG's claims. The referenced licensing, marketing and

- 19 -

advertising activities have taken place and continue to take place in such trade and commerce. The products and services containing, using or referencing the marks of the NHL and NHL clubs are also sold and/or licensed in such trade and commerce.

## V.   FACTS RELEVANT TO MSG'S CLAIMS

### A.   Licensing And Other Forms Of Competition.

35.     The Rangers and the NHL's other member clubs must cooperate to schedule and produce major league men's professional ice hockey contests. That limited cooperation is fully consistent with the antitrust laws. But there has not been a complete integration of the member clubs, which continue to exist as separate businesses with separate owners that retain significant degrees of autonomy in their operations. In these operations, the clubs compete in businesses that are separate and distinct from the production of ice hockey contests. One such area of competition is the sale of tickets to attend live major league men's professional ice hockey games. MSG, for example, sells tickets to Rangers home games in competition with other NHL member clubs – including, but not limited to, the other two NHL teams in the New York area – that also seek to sell tickets to their teams' home games.

36.     There are other areas where the Rangers can and do compete with the other NHL clubs and with the NHL, including in the licensing of individual team marks and in the operation of an independent Rangers website for communicating with its fans and potential fans. There is also a significant demand for the broadcasting, rebroadcasting and other distribution of live and recorded Rangers games, as well as game highlights and game footage, through various media. By satisfying that demand, MSG can generate and increase fan interest in Rangers hockey in competition with other NHL teams, reinforcing the marketing activities that MSG is undertaking through its website, and enabling marketing and licensing opportunities in other areas, including opportunities that would take place in the absence of the NHL's competitive restraints.

- 20 -

37.     In short, MSG has sought to compete with the 29 other teams and the NHL to the limited extent permitted by the exclusive agreements challenged in this Complaint.  In a fully competitive marketplace, the Rangers could and would compete to an even greater extent.  In particular, by licensing the Rangers marks in creative ways and at lower costs, as well as by freely selling team-branded apparel and merchandise, by increasing the opportunity to view Rangers games throughout the country, whether through cable, satellite or on the internet (including on its own website, rather than on a website controlled by the NHL), and by exploiting the Rangers marks and engaging in other marketing efforts through the Rangers website, MSG would be able to generate and increase fan interest and excitement in Rangers hockey and Rangers-themed products, all in competition with the other NHL teams.

**B.      The Anticompetitive Exclusive Agreements.**

38.     Pursuant to a series of agreements beginning in the 1980s, and renewed several times since then, defendants purported to obtain the "exclusive" right to control for virtually all commercial purposes the individual clubs' marks and licensing opportunities.  Defendants have exercised and enforced those rights in ways that have significantly restrained the competitive activities of the member clubs on a continuous basis since then.

39.     In June 2006, and over the objection of MSG and certain other clubs, the member clubs purportedly renewed and extended the "exclusive" agreements until 2016, which further eliminates competition and continues to injure MSG's ability to compete in the marketplace.  Also over objection, the clubs additionally purported to grant defendants the exclusive opportunity to exploit team websites and other new media opportunities, eliminating competition among the teams and restraining one of the most effective competitive tools used by the Rangers in recent years to compete in the marketplace.

- 21 -

40.     These "exclusive" agreements, adopted by agreement between the independent

member clubs of the NHL, place entirely – and illegally – in defendants' hands a wide range of

otherwise competitive business activities where team cooperation is not reasonably necessary to

produce major league men's professional ice hockey contests or to achieve any other cognizable

procompetitive purpose, usurping the rights of the individual clubs to conduct their businesses

independently and eliminating competition among the clubs and with the NHL in areas such as

the following:

A.     Defendants assert the exclusive worldwide right to license team marks for

use on team jerseys, practice wear, winter outerwear, products containing the player's name,

number or image, and player photos, allowing each team to enter into licenses only for other, less

lucrative products and only for sales within their arenas.  This necessarily eliminates competition

that would otherwise exist among teams and between teams and the NHL.

B.     Defendants assert the right to control the sale of team apparel and

merchandise, including through each team's direct-mail catalogs, requiring that 65% of the

products offered through team catalogs must be produced by licensees selected by defendants

and effectively prohibiting teams from offering for sale locally-licensed products through any

outlet beyond, or in any catalog distributed outside of an area within, 75 miles of the team's

home arena.  Defendants have prevented teams from selling team merchandise on the internet

other than through an NHL-controlled store, even when a team restricts such internet sales to

consumers residing within a 75-mile radius of the team's arena.  Defendants have also banned

teams' efforts to create consumer-friendly online versions of their mail order catalogs, even

though the League has otherwise permitted mail order catalogs as long as the merchandise in the

catalogs complies with the League's additional anticompetitive requirement that no team seek

lower costs or better quality from alternative, non-NHL selected manufacturers.  Banning a more efficient, online version of a team's mail order catalog makes it more difficult for a team such as the Rangers to compete in the sale of team merchandise, apparel and memorabilia even to the limited extent permitted by the NHL.

C.      Defendants assert the right to control the broadcasting, rebroadcasting and other distribution of games, game highlights and game footage in media such as cable and satellite television, the radio, "video-on-demand," the internet and handheld technologies. Specifically, defendants have unreasonably restrained the broadcasting and other distribution rights of individual clubs by allocating the geography of virtually all of North America among the member clubs and prohibiting each club from transmitting its games, on television or over the internet, into territories allocated to other clubs or outside North America.  The League keeps for itself the right to broadcast games into territories allocated to individual clubs, but the League exercises that right by selling only cable packages of all NHL games.  Even in the area allocated to a club, defendants do not fully allow that club to distribute its games, (i) allowing cable distribution of only a limited number of that club's games in some portions of the area on a fee-for-subscriber basis established by the League, (ii) blacking out games while the NHL's broadcasters are providing nationwide coverage of an NHL game, precluding the blacked-out teams from broadcasting or otherwise distributing their own games through other outlets even locally on those occasions, and (iii) restraining the ability of a club to distribute its games on the club's website or on other internet sites and via "video-on-demand" even when such distribution has been gated and therefore limited to the area allocated to that club (although such a limitation itself is not permissible under the antitrust laws).  All of these restraints are clearly more restrictive of competition than necessary to achieve any legitimate procompetitive purpose of the

- 23 -

NHL joint venture. Defendants have also restricted output by limiting the ability of teams to

license rebroadcasts of their games, permitting such rebroadcasts only within 48 hours of game

endings and prohibiting teams altogether from licensing the rebroadcasts of historic games.

Restraints also exist with respect to game highlights and footage. Defendants, and not the

individual teams, claim the exclusive right to market for commercial purposes all highlights and

footage of NHL games, and defendants have stated their intention to create an NHL-controlled

"hockey factory" to ensure that the offering of NHL highlights and game footage over the

internet and wireless technologies is controlled through the NHL joint venture. The teams, by

contrast, are only permitted to use short segments of game highlights or game footage on team

websites. Recently, defendants have even proposed to remove free radio feeds from team and

radio station websites. In short, defendants have restrained and threatened to restrain

competition in the broadcasting, rebroadcasting and other distribution of games, game highlights

and game footage, seeking to control the delivery of content through all existing and future

media platforms in ways that go well beyond what is reasonably necessary to any legitimate

procompetitive purpose.

     D.     Defendants have restricted the ability of teams to sell advertising space on

dasherboards, *i.e.*, the low partitions erected around the ice itself, and in the ice during games,

regulating the size and spacing of such advertising and controlling the most desirable

dasherboard and "in-ice" space during nationally broadcast games. Defendants have increased

their control of arena and "in-ice" advertising in recent years, in particular during the playoffs

and championship games. Defendants, moreover, have claimed the right to limit the output of

advertising by prohibiting teams from using new technologies to offer virtual signage that can be

electronically superimposed during telecasts of a club's games, even when such signage does not

delete or substitute existing in-arena signage, and the NHL fined MSG in 2007 for its efforts to sell such virtual signage over its own broadcasts of Rangers games.  The League is also requiring each hockey arena to display League-sponsored advertising in connection with League-provided, same-day, "out-of-town" highlights of other NHL games.

        E.      Defendants control the design, operation and exploitation of team websites, including products and services that can be offered on those sites.  By doing so, defendants in effect have seized control of one of the teams' best branding, competitive and outreach opportunities, converting individual team sites into standardized sites that will necessarily lack the originality and creativity of fully independent team sites, forcing teams to accept content that does not promote that team's efforts to market itself and restraining the ability of individual teams to use their sites to market and promote their teams in competition with each other.  Indeed, defendants concededly intend to eliminate what they deem overly "tribal" competition and instead to replace that competition with a League-centered focus that de-emphasizes competition among the independent clubs.  Defendants already have reduced competition in the sale of advertising by taking control of the sale of banner ads at the top of, and in the primary box of, team websites, and have further sought to take over an even greater percentage of the advertising space on team websites, especially on the inside pages where consumers are directed to visit and experience team-focused content.

        41.      The NHL asserts the authority to sanction teams for engaging in independent activities in violation of the above-described agreements or otherwise in violation of rules that the NHL joint venture has developed over the years to implement these agreements.  MSG's recent, coerced decisions to stop competing or face $100,000 per day fines prove that MSG has no choice but to accede to the NHL's dictates.  Pursuant to the NHL Constitution and By-Laws,

MSG could be subject to additional, significant adverse consequences, including sanctions up to and including expulsion from the NHL, if MSG did not abide by the exclusive, anticompetitive agreements.  MSG has invested significant sums in the Rangers, and no other major league men's professional ice hockey league exists in the United States for the Rangers to join.  As a result, MSG is bound by these restraints on its ability to compete independently absent relief from this Court.

**C.**   **The Agreements Have Restrained Horizontal Competition And Have Had Anticompetitive Effects And Led To Consumer Harm.**

42.   The above-described agreements between the member clubs of the NHL, acting collusively as the League and through the Commissioner,  have restrained horizontal competition between and among the NHL clubs and the NHL in various areas where the member clubs could and would compete with each other and with the NHL.  In particular, in the absence of the exclusive agreements and other competitive restraints, NHL teams would compete with each other in the licensing of their teams' marks to a much greater extent than the limited opportunities that are now available and they also would compete with the NHL, which owns and licenses the NHL logo.  Further, they would compete in the sale of team-branded merchandise, apparel and memorabilia.  The teams also would compete with each other and with the NHL in the broadcasting, rebroadcasting and other distribution of NHL games (apart from any national broadcasting contract), game highlights and game footage in a variety of media and, further, in the operation of their websites.  Moreover, the teams would compete with each other and with the NHL in the sale of advertising in arenas they own or lease during NHL ice hockey contests.

43.   The above-described agreements have adversely affected and substantially lessened competition in the relevant markets, in at least the following ways:

CLI-1435955v31

A.     Prices for the licensing of NHL and NHL team marks, including the Rangers marks, for use in merchandise, apparel and memorabilia are higher, and output is lower, than they would be in the absence of the "exclusive" agreements.  Competition through the ability of individual teams to license their marks for such purposes would produce consumer benefits, such as lower prices, higher quality and more variety, including consumer benefits in the sale of products and services associated with NHL and individual team marks.  Competition through the ability of individual teams to license their own marks would create greater incentives for individual teams to invest in and more fully exploit and maximize the value of their licensing activities, leading to greater levels of competition in the relevant markets and in the sale of NHL and NHL-club branded products and services, to the benefit of consumers.

B.     Prices for team-branded merchandise, apparel and memorabilia are higher, and output is lower, than they would be in the absence of the "exclusive" agreements.  Consumer choice has been limited, and quality and availability of apparel, merchandise and memorabilia has suffered.

C.     Prices for the licensing of NHL and NHL team marks, including the Rangers marks, for use in advertising and other sponsorships are higher, and output is lower, than they would be in the absence of the "exclusive" agreements.  Competition through the ability of individual teams to license their marks for such purposes would produce consumer benefits, such as lower prices, higher quality and more variety.

D.     Output of broadcasts, rebroadcasts and internet and other distribution of NHL games, as well as output of game highlights and footage, is lower, and prices are higher, than they would be in the absence of the "exclusive" agreements.  Adverse effects exist in distribution markets for licensing to content aggregators such as, but not limited to, MSG

- 27 -

Network and FSNY, which license the rights to broadcast the Rangers, Islanders, Devils and Sabres ice hockey contests, as well as in end use markets for the sale of programming directly to consumers.  Competition by individual clubs independently acting to exploit the broadcasting, rebroadcasting and other distribution of their teams' games would produce consumer benefits, such as an increase in the availability of broadcasts over a wider range of media, including cable, the internet and wireless devices.

    E.  Defendants have restricted competition for the sale of advertising space at NHL hockey games.  MSG's ability to license advertisers and sponsors in Madison Square Garden has been restricted by the national licensing contracts negotiated by defendants, as well as by other unreasonable restraints imposed by defendants.  Local advertisers and sponsors have been denied access to valuable advertising space to the extent that defendants have exercised control and licensed the space only to national advertisers, and advertisers and sponsors have been forced to pay more than they would in the absence of the exclusive agreements.

    F.  The NHL's prohibition of independent team websites has eliminated the independent competition that would exist but for these anticompetitive agreements among the NHL member clubs, acting collusively as the League and through the Commissioner.  This has led to a standardized approach to team sites to the detriment of the creative and individualized approaches that otherwise would exist, limiting the ability of teams to communicate with, and compete for, fans in ways that the individual teams believe are most effective and in their best individual interests, reducing fan interest in the process.  In addition, NHL control of significant portions of the advertising on team websites has restricted the ability of individual teams to compete in the sale of such advertising.  An NHL-controlled approach to individual team websites will be less responsive to competitive opportunities available to individual teams, and

consumers will be harmed by the reduction of the website competition that existed between and among the NHL member teams and the NHL prior to the NHL's recent exercise of control over individual team websites, as well as by the elimination of website output and competition that would exist in the absence of the NHL's anticompetitive ban on independent team websites.

44.     Other adverse competitive effects exist as well.  The "exclusive" agreements have adversely affected, and will continue to adversely affect, the incentives of individual clubs to invest in, and exploit, their marks.  Individual team efforts are competitively significant because the NHL distributes the income from its own exploitation of team marks equally to each member club regardless of the club's contribution (if any) to the value of its marks, the club's efforts (if any) to promote itself and its marks, and the club's investment (if any) in creating a positive association with its marks.  The result, again, is reduced output, diminished product quality, diminished choice and suppressed price competition.

45.     In the absence of the "exclusive" agreements, the various clubs, including MSG, would increase their licensing output, offering licensing and broadcast opportunities that they are not now able to offer, increasing competition between and among the individual teams and the NHL, and leading to lower prices in the relevant markets.

46.     There are no legitimate, procompetitive justifications for these "exclusive" agreements and other competitive restraints, which have harmed consumers in various ways, including in the above-described ways.

**D.     MSG Has Suffered Antitrust Injury.**

47.     MSG has been injured and threatened with loss or damage as a result of the anticompetitive effects of the challenged conduct, in at least the following ways:

A.     MSG has been denied the right to freely compete in the exploitation of the Rangers marks.  MSG has been unable to license the Rangers marks in ways that it believes are

most likely to maximize the value of those marks and hence increase and strengthen fan interest and excitement in the Rangers hockey club.  MSG has lost and will continue to lose profits and sales, including in domestic and export commerce, as a result of its inability to fully exploit the Rangers marks within and outside the United States.

B.     MSG is forced and will continue to be forced to overpay for League-licensed products.  MSG has been restricted in its ability to offer Rangers-logoed apparel, merchandise and memorabilia on the Rangers website and elsewhere, and the products that MSG is able to offer on the Rangers site through an NHL-controlled store are available only at artificially-inflated prices.  In addition, MSG has been restrained from offering products and services for sale to consumers through an online version of its team's mail order catalog.

C.     MSG has been and will continue to be unduly restricted in its ability to design and enter into efficient and fan-responsive relationships with merchandisers, advertisers and sponsors that may want to associate themselves with the Rangers.  MSG has been and will continue to be restrained from negotiating creative or other special relationships with sponsors and advertisers, in particular, across multiple advertising platforms, including the internet. Further, MSG is being threatened in its efforts fully to exploit recent and future technological opportunities that would allow MSG to offer sponsors in-game, on-air signage opportunities through the real-time, video insertion of computer-generated electronic images into broadcasts of Rangers and other NHL games.  In the absence of the challenged agreements, MSG would be able to provide increased opportunities to sponsors with respect to in-arena signage.

D.     MSG has been and will continue to be unable to distribute Rangers games, game highlights and game footage through cable, satellite, internet and otherwise in ways that it believes are best suited to reaching the Rangers fan base throughout the country and abroad in

- 30 -

order to generate fan interest and excitement in the Rangers.  In addition, MSG, through MSG

Network and FSNY, has lost licensing and other revenues as the result of its inability fully to

exploit Rangers, Islanders, Devils and Sabres ice hockey contests.

        E.     MSG has been constrained and is being threatened still further in its ability

to communicate with Rangers fans and potential fans on the Rangers website, and to market an

individualized Rangers website that furthers MSG's ability to compete for fans and that

generates fan excitement in the Rangers and the experience of Rangers games at Madison Square

Garden, as well as Rangers game telecasts.

## COUNT ONE:  SECTION 1 OF THE SHERMAN ACT

48.     MSG incorporates the averments of paragraphs 1 through 47, above.

49.     Defendants and the independent businesses that comprise the member clubs in the

NHL have engaged in a contract, combination or conspiracy with the purpose, intent and effect

of restraining horizontal competition among the NHL member clubs and between the clubs and

the NHL, and, in addition, with the purpose, intent and effect of restraining trade and commerce

in licensing activities in the relevant markets, in the distribution of NHL games, and in the sale

of advertising at venues when used as the setting for major league men's professional ice hockey

contests.

50.     The foregoing contract, combination or conspiracy has restrained competition

between and among the NHL clubs and the NHL in violation of Section 1 of the Sherman Act.  It

has led to anticompetitive effects in the relevant markets, as alleged above, and caused injury to

consumers and competition in those relevant markets and elsewhere.

51.     Defendants' anticompetitive conduct has directly and proximately caused antitrust

injury and threatened loss or damage to MSG's business and property, as set forth above.  MSG

will continue to suffer antitrust injury and threatened loss or damage unless defendants are enjoined from continuing to engage in the foregoing violations of law.

**COUNT TWO:  NEW YORK GENERAL BUSINESS LAW § 340**

52.    MSG incorporates the averments of paragraphs 1 through 51, above.

53.    Defendants have engaged in a contract, agreement, arrangement or combination that has restrained the free exercise of competition in the above-described markets in this state and elsewhere or that has otherwise resulted in a monopoly, all in violation of New York General Business Law § 340.

**VI.   PRAYER**

**WHEREFORE**, MSG prays for judgment against defendants as follows:

1.    Preliminary and permanent injunctive and declaratory relief against those collective activities, policies and rules of the NHL that are not reasonably necessary to the success of the NHL joint venture.  Without in any way limiting the foregoing, such relief should include at least the following specific items of relief:

    A.    Prohibiting defendants from (i) imposing or enforcing any restriction on MSG's use of the Rangers marks or the means, media or affiliations through which MSG promotes or markets the Rangers or otherwise exploits the Rangers marks, or (ii) licensing or otherwise making use of or exercising control over the Rangers marks without MSG's express consent;

    B.    Prohibiting defendants from imposing or enforcing any restriction on the means by which MSG may distribute or sell apparel, merchandise, memorabilia, or any other items bearing a Rangers mark, including but not limited to (1) any restriction on MSG's choice of manufacturers for such apparel, merchandise, memorabilia or other items; (2) any geographic restriction; or (3) any restriction on sales through any outlet or by any means (including sales through the Rangers website);

    C.    Prohibiting defendants from imposing or enforcing any restriction on MSG's audio and/or video distribution of Rangers games, game footage or game highlights (including the sale of rights thereto) via any medium, now known or hereafter developed, including over-the-air broadcasting, cable,

- 32 -

satellite or broadband television, the internet or wireless devices, except to the extent reasonably necessary to achieving cognizable procompetitive efficiencies such as in the case of a national broadcasting agreement authorized by the Sports Broadcasting Act, 15 U.S.C. § 1291 *et seq.*;

D.    Prohibiting defendants from entering into any distribution agreement other than one or more agreements for the national distribution of games of all NHL member teams that, in the aggregate, permit the League-approved rightsholder(s) exclusive distribution of no more than eight Rangers games in any one season without the express written permission of the Rangers;

E.    Prohibiting defendants from entering into any advertising or sponsorship agreement that overrides, conflicts with, or preempts any MSG or Rangers local sponsorship agreement;

F.    Prohibiting defendants from imposing or enforcing any requirement that any in-arena or other advertising or sponsorship inventory be reserved for or provided to the League or its sponsors;

G.    Prohibiting defendants from imposing or enforcing any restriction on the existence, content, format, or design of an independent Rangers website except to the extent necessary and appropriate to ensure reasonable minimum quality standards;

H.    Prohibiting defendants from requiring MSG to participate in any joint effort relating to the internet or any other new media activities, except to the extent reasonably necessary to achieving cognizable procompetitive efficiencies through such joint efforts; and

I.    Prohibiting defendants from sanctioning, penalizing, or otherwise taking adverse action against the Rangers or any individuals or entities affiliated with the Rangers for the filing and prosecution of this lawsuit or any actions related thereto, or for failing to comply with any illegal NHL rules or practices.

2.    Such other relief as is necessary and appropriate to restore full and free competition in the relevant markets.

3.    Its attorneys fees and cost of suit, and such other and further relief as may be just and proper.

CLI-1435955v31

March 31, 2008                                    JONES DAY


                                                 By: _____

                                                   Meir Feder  (MF-2574)
                                                   Robert W. Gaffey  (RG-4004)
                                                   William J. Hine (WH-6766)
                                                   222 East 41st Street
                                                   New York, NY  10017-6702
                                                   Telephone:  (212) 326-3939
                                                   Facsimile:  (212) 755-7306


OF COUNSEL:

Thomas F. Cullen, Jr.
Joe Sims
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700

Thomas Demitrack
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH  44114-1190
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

CLI-1435955v31

## CERTIFICATE OF SERVICE

I declare that on March 31, 2008, I caused the attached FIRST AMENDED

COMPLAINT FOR INJUNCTIVE RELIEF to be served via U.S. Mail on the following counsel:

Shepard Goldfein
James A. Keyte
Skadden, Arps, Slate, Meagher & Flom LLP and Affiliates
Four Times Square
New York, New York 10036
Tel. 212.735.3000
Fax. 212.735.2000

*Attorneys for Defendants*

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York          JONES DAY
       March 31, 2008

By: _____
    Meir Feder  (MF-2574)
    Robert W. Gaffey  (RG-4004)
    William J. Hine (WH-6766)
    Tracy V. Schaffer (TS-4952)
    222 East 41st Street
    New York, NY  10017
    Telephone:  (212) 326-3939
    Facsimile:  (212) 755-7306

    *Attorneys for Plaintiff*

OF COUNSEL:

Thomas F. Cullen, Jr.
Joe Sims
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113

Thomas Demitrack
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH  44114-1190

NYI-4075462v2

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x
MADISON SQUARE GARDEN, L.P.,                  )
                                              )
                    Plaintiff,                )         No. 07 CIV. 8455 (LAP)
                                              )
             v.                               )         ECF Case
                                              )
NATIONAL HOCKEY LEAGUE, NATIONAL              )
HOCKEY LEAGUE ENTERPRISES, L.P., NHL          )
INTERACTIVE CYBERENTERPRISES, L.L.C.,         )
NHL ENTERPRISES CANADA, L.P., and NHL         )
ENTERPRISES, B.V.,                            )
                                              )
                    Defendants.               )
                                              )
                                              )
-------------------------------------------------------------------- x


## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO TO DISMISS OR IN THE ALTERNATIVE FOR PARTIAL SUMMARY JUDGMENT


**JONES DAY**
**222 East 41st St.**
**New York, NY  10017-6702**
**(212) 326-3939**

*Attorneys for Plaintiff Madison*
*Square Garden, L.P.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................ iii

PRELIMINARY STATEMENT ........................................................................ 1

MSG'S ALLEGATIONS, AND THE CASE SUPPORTING THEM ......................... 5

    A.    The Structure Of The League, And Competition Between The Teams ...................... 5

    B.    The Relevant Markets ........................................................................... 6

    C.    The NHL's Restrictions On Competition .................................................. 7

        (1)    Licensing and Merchandising .......................................................... 7

        (2)    Broadcasting and Streaming ........................................................... 8

        (3)    New Media .................................................................................. 9

        (4)    Advertising and Sponsorship ......................................................... 10

STANDARD OF REVIEW ........................................................................... 11

I.    THE NHL'S CLAIM THAT ITS RESTRICTIONS ARE EXEMPT FROM
ANTITRUST SCRUTINY BORDERS ON THE FRIVOLOUS .................................. 11

    A.    The Second Circuit And Other Courts Have Repeatedly Rejected Claims That
Sports Leagues Are Single Entities .......................................................... 11

        (1)    The Single Entity Argument Is Foreclosed By Precedent ............................ 12

        (2)    Even Aside From Binding Precedent, The NHL's Request For
Exemption From Section 1 Scrutiny Has No Merit .................................... 15

    B.    The Argument That *Dagher* Frees The NHL From The Obligation To Comply
With The Antitrust Laws Is Also Without Merit ......................................... 20

    C.    The NHL's Claim That Joint Ventures' Restrictions On Competition By Their
Members Are Exempt From Scrutiny Is Demonstrably Wrong ............................. 22

II.    THE NHL'S LEGAL ARGUMENTS REGARDING ANTITRUST INJURY
ARE WITHOUT MERIT ............................................................................. 25

III.    THE NHL'S OTHER PURPORTED BARS TO SCRUTINY OF ITS ACTIONS
ARE WITHOUT MERIT ............................................................................. 31

    A.    The Consent Agreement Cited By The NHL Cannot Insulate The NHL's
Actions From Antitrust Scrutiny ............................................................ 31

        (1)    The Consent Agreement Does Not Cover Conduct That Occurs
Following The Date Of The Agreement ................................................. 32

        (2)    A Prospective Release Of The Right To Sue For An Injunction
Against Antitrust Violations Would Be Unenforceable ............................... 33

    B.    MSG's Claims Are Not Barred By Laches .................................................. 36

**TABLE OF CONTENTS**
**(continued)**

|  |  | Page |
|---|---|---|
| C. | MSG's Claim Regarding Exclusive Broadcast Territories Is Not Barred By Judicial Estoppel | 39 |
| CONCLUSION |  | 40 |

## <u>TABLE OF AUTHORITIES</u>

**Page**

### CASES

*AXA Marine & Aviation Ins. (UK) Ltd.*,
    84 F.3d 622 (2d Cir. 1996)..........................................................................39, 40

*Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*,
    910 F.2d 139 (4th Cir. 1990) .............................................................................15

*Am. Needle, Inc. v. New Orleans La. Saints*,
    496 F. Supp. 2d 941 (N.D. Ill. 2007) ................................................................14

*Arizona v. Maricopa County Med. Soc'y*,
    457 U.S. 332 (1982)............................................................................................20

*Bell Atlantic Corp. v. Twombly*,
    127 S. Ct. 1955 (2007)..........................................................................5, 11, 26

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
    603 F.2d 263 (2d Cir. 1979)...............................................................................37

*Bernstein v. Universal Pictures, Inc.*,
    517 F.2d 976 (2d Cir. 1975)...............................................................................38

*Blackburn v. Sweeney*,
    53 F.3d 825 (7th Cir. 1995) ...............................................................................23

*Bolt v. Halifax Hosp. Med. Ctr.*,
    891 F.2d 810 (11th Cir. 1990) ...........................................................................15

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
    441 U.S. 1 (1979)..........................................................................................24, 31

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*,
    996 F.2d 537 (2d Cir. 1993)..........................................................................15, 16

*Cellar Door Prods., Inc. v. Kay*,
    897 F.2d 1375 (6th Cir. 1990) ...........................................................................33

*Chapdelaine Corporate Sec. & Co. v. Depository Trust & Clearing Corp.*,
    No. 05 Civ. 10711, 2006 WL 2020950 (S.D.N.Y. July 13, 2006) ....................25

*Chicago Prof'l Sports Ltd. P'ship v. NBA*,
    95 F.3d 593 (7th Cir. 1996) ...............................................................................14

## TABLE OF AUTHORITIES
### (continued)

Page

*Chicago Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n,*
    961 F.2d 667 (7th Cir. 1992) ....................................................................4, 19

*Citizen Publ'g Co. v. United States,*
    394 U.S. 131 (1969)............................................................................................22

*City of Mt. Pleasant v. Associated Elec. Coop., Inc.,*
    838 F.2d 268 (8th Cir. 1988) ........................................................................17, 18

*Clarett v. NFL,*
    369 F.3d 124 (2d Cir. 2004)..............................................................................14

*Columbia Broad. Sys., Inc. v. Am. Society of Composers, Authors & Publishers,*
    620 F.2d 930 (2d Cir. 1980)..............................................................................21

*Columbia Steel Casting Co. v. Portland Gen. Elec. Co.,*
    111 F.3d 1427 (9th Cir. 1996) ..........................................................................37

*Condit v. Dunne,*
    No. 06 Civ. 13126, 2008 WL 2676306 (S.D.N.Y. July 8, 2008) .....................11

*Conopco, Inc. v. Campbell Soup Co.,*
    95 F.3d 187 (2d Cir. 1996)................................................................................38

*Copperweld Corp. v. Independence Tube Corp.,*
    467 U.S. 752 (1984)................................................................................ *passim*

*Daniel v. Am. Bd. of Emergency Med.,*
    428 F.3d 408 (2d Cir. 2005)...........................................................................2, 25

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.,*
    129 F.3d 240 (2d Cir. 1997)..............................................................................31

*Erickson v. Pardus,*
    127 S.Ct. 2197 (2007)........................................................................................11

*Festa v. Local 3 Int'l Bhd. of Elec. Workers,*
    905 F.2d 35 (2d Cir. 1990)................................................................................11

*Fishman v. Estate of Wirtz,*
    807 F.2d 520 (7th Cir. 1986) ............................................................................15

*Fitzpatrick v. Sony-BMG Music Entm't, Inc.,*
    No. 07-2933, 2008 WL 84541 (S.D.N.Y. Jan. 8, 2008) ..............................38, 39

## TABLE OF AUTHORITIES
### (continued)

*Fourth Toro Family Ltd. P'ship v. PV Bakery, Inc.*,
    88 F. Supp. 2d 188 (S.D.N.Y. 2000)..............................................................4, 39

*Fox Midwest Theatres, Inc. v. Means*,
    221 F.2d 173 (8th Cir. 1955) ...................................................................34, 35

*Fraser v. Major League Soccer, L.L.C.*,
    284 F.3d 47 (1st Cir. 2002)................................................................14, 16, 17

*Freeman v. San Diego Ass'n of Realtors*,
    322 F.3d 1133 (9th Cir. 2003) ...........................................................15, 17, 18

*Gaines v. Carrollton Board of Trade, Inc.*,
    386 F.2d 757 (6th Cir. 1967) ......................................................................34

*Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*,
    744 F.2d 588 (7th Cir. 1984) .................................................................19, 24

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
    392 U.S. 481 (1968).................................................................................37

*Higgins v. N.Y. Stock Exch. Inc.*,
    942 F.2d 829 (2d Cir. 1991).....................................................................37

*Hunt v. Mobil Oil Corp.*,
    654 F. Supp. 1487 (S.D.N.Y. 1987).............................................................34

*Hunter Douglas, Inc. v. Comfortex Corp.*,
    No. 98-CV-0479, 1999 U.S. Dist. LEXIS 10906 (N.D.N.Y. Mar. 11, 1999) ..................35

*Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp.*,
    449 F. Supp. 1158 (D. Hawaii 1978) ............................................................38

*In re Intel Corp. Microprocessor Antitrust Litig.*,
    496 F. Supp. 2d 404 (D. Del. 2007)..............................................................26

*Iqbal v. Hasty*,
    490 F.3d 143 (2d Cir. 2007).......................................................................11

*KFC Corp. v. Marion-Kay Co.*,
    620 F. Supp. 1160 (S.D. Ind. 1985) .............................................................38

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Kaiser Steel Corp. v. Mullins*,
  455 U.S. 72 (1982)................................................................34

*Kassner v. 2nd Avenue Delicatessen Inc.*,
  496 F.3d 229 (2d Cir. 2007)..............................................11, 26

*Kingray, Inc. v. NHL Enters., Inc.*,
  No. 00-CV-1544-L (BEN), slip op. (S.D. Cal. July 2, 2002) .....................29, 30

*Klehr v. A.O. Smith Corp.*,
  521 U.S. 179 (1997)...............................................................36

*L.A. Mem'l Coliseum Comm'n v. NFL*,
  726 F.2d 1381 (9th Cir. 1984) .......................................1, 4, 13

*Law v. Nat'l Collegiate Athletic Ass'n*,
  134 F.3d 1010 (10th Cir. 1998) .........................................24

*Lawlor v. Nat'l Screen Serv. Corp.*,
  349 U.S. 322 (1955)..............................................................32, 33

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  127 S. Ct. 2705 (2007).........................................................29

*Lyons P'ship, L.P. v. Morris Costumes, Inc.*,
  243 F.3d 789 (4th Cir. 2001) ...........................................38

*MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*,
  161 F.3d 443 (7th Cir. 1998) ...........................................36

*Major League Baseball v. Crist*,
  331 F.3d 1177 (11th Cir. 2003) .......................................1, 18

*McNeil v. NFL*,
  790 F. Supp. 871 (D. Minn. 1992) ...................................18

*Mitchell v. Washingtonville Cent. Sch. Dist.*,
  190 F.3d 1 (2d Cir. 1999) .................................................40

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
  473 U.S. 614 (1985).............................................................34

*Mktg. Assistance Plan, Inc. v. Associated Milk Producers, Inc.*,
  338 F. Supp. 1019 (S.D. Tex. 1972) .................................33, 34, 35

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Mulvaney Mech., Inc. v. Sheet Metal Workers Int'l Ass'n*,
    288 F.3d 491 (2d Cir. 2002), *vacated on other grounds*, 123 S. Ct. 1572 (2003)............40

*Murray-Gardner Mgmt., Inc. v. Iroquois Gas Transmission Sys., L.P.*,
    646 N.Y.S.2d 418 (N.Y. App. Div. 1996) ........................................................32

*N. Am. Soccer League v. NFL*,
    670 F.2d 1249 (2d Cir. 1982)..................................................................12, 13

*NCAA v. Board of Regents*,
    468 U.S. 85 (1984)....................................................................... *passim*

*NFL v. N. America Soccer League*,
    459 U.S. 1074 (1982) ..........................................................................14

*NHL Players' Ass'n v. Plymouth Whalers*,
    419 F.3d 462 (6th Cir. 2005) ..................................................................13

*N.Y. Medscan LLC v. N.Y. Univ. Sch. of Med.*,
    430 F. Supp. 2d 140 (S.D.N.Y. 2006)......................................................25, 26

*Palmer v. BRG of Ga., Inc.*,
    498 U.S. 46 (1990)............................................................................23

*Perma Life Mufflers, Inc. v. Int'l Parts Corp.*,
    392 U.S. 134 (1968)........................................................................34, 38

*Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc.*,
    351 F. Supp. 462 (E.D. Pa. 1972) ...........................................................2, 6

*Polk Bros., Inc. v. Forest City Enters., Inc.*,
    776 F.2d 185 (7th Cir. 1985) ..................................................................23

*Polygram Holding, Inc. v. FTC*,
    416 F.3d 29 (D.C. Cir. 2005) ..................................................................21

*Record Club of Am., Inc. v. United Artists Records, Inc.*,
    611 F. Supp. 211 (S.D.N.Y. 1985)............................................................36

*Redel's Inc. v. Gen. Elec. Co.*,
    498 F.2d 95 (5th Cir. 1974) ...............................................................33, 35

**TABLE OF AUTHORITIES**
(continued)

Page

*Richard's Lumber & Supply Co. v. U.S. Gypsum Co.*,
    545 F.2d 18 (7th Cir. 1976) ........................................................36

*Ross v. Bank of Am., N.A.*,
    524 F.3d 217 (2d Cir. 2008)........................................................30

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
    792 F.2d 210 (D.C. Cir. 1986) ...................................................23

*Sanjuan v. Am. Board of Psychiatry & Neurology, Inc.*,
    40 F.3d 247 (7th Cir. 1994) ..................................................33, 34

*Schering-Plough Corp. v. FTC*,
    402 F.3d 1056 (11th Cir. 2005) ................................................23

*Seabury Mgmt., Inc. v. Prof'l Golfers Ass'n of Am., Inc.*,
    878 F. Supp. 771 (D. Md. 1994), *aff'd in part, rev'd in part on other grounds*, 52
    F.3d 322 (4th Cir. 1995) ...........................................................17

*Sullivan v. NFL*,
    34 F.3d 1091 (1st Cir. 1994)...............................................13, 15

*Texaco Inc. v. Dagher*,
    547 U.S. 1 (2006)........................................................... *passim*

*Three Rivers Motor Co. v. Ford Motor Co.*,
    522 F.2d 885 (3d Cir. 1975)................................................34, 36

*U.S. Fid. & Guar. Co. v. Treadwell Corp.*,
    58 F. Supp. 2d 77 (S.D.N.Y. 1999)...........................................40

*United States v. Addyston Pipe & Steel Co.*,
    85 F. 271 (6th Cir. 1898), *aff'd*, 175 U.S. 211 (1899) .....................23

*United States v. NFL*,
    116 F. Supp. 319 (E.D. Pa. 1953) ....................................1, 8, 27

*United States v. N. Improvement Co.*,
    814 F.2d 540 (8th Cir. 1987) .....................................................37

*United States v. Penn-Olin Chem. Co.*,
    378 U.S. 158 (1964).................................................................24

## TABLE OF AUTHORITIES
### (continued)

Page

*United States v. Topco Assocs., Inc.*,
　405 U.S. 596 (1972)...................................................................22

*United States v. Visa U.S.A., Inc.*,
　344 F.3d 229 (2d Cir. 2003)...................................................... *passim*

*Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*,
　857 F.2d 55 (2d Cir. 1988).....................................................13, 25

*Westmoreland Asbestos Co. v. Johns-Manville Corp.*,
　39 F. Supp. 117 (S.D.N.Y. 1941)...........................................33, 34, 35

*Willsea v. Theis*,
　No. 98 Civ. 6773, 1999 WL 595629 (S.D.N.Y. Aug. 6, 1999) .......................36

*In re WorldCom, Inc. Sec. Litig.*,
　308 F. Supp. 2d 236 (S.D.N.Y. 2004)............................................40

*Xerox Corp. v. Media Scis. Int'l, Inc.*,
　511 F. Supp. 2d 372 (S.D.N.Y. 2007).....................................25, 26

*Zenith Radio Corp v. Hazeltine Research, Inc.*,
　401 U.S. 321 (1971)...............................................................37

## STATUTES

Sports Broadcasting Act of 1961, 15 U.S.C. §§ 1291 *et seq.* ........................8

## MISCELLANEOUS

PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW (2d ed. 2004) ................... *passim*

Marc Edelman, *Single Entity Ruling: 'Needle' in Haystack*, 239 N.Y.L.J. 4 (Jan. 2, 2008).........14

Marc Edelman, *Why the Single Entity Defense Can Never Apply to NFL Clubs: A Primer on Property-Rights Theory in Professional Sports*, 18 FORDHAM INTELL. PROP. MEDIA & ENTM'T L.J. 891 ..................................................13

Brandon L. Grusd, *The Antitrust Implications of Professional Sports' League-Wide Licensing And Merchandising Arrangements*, 1 VA. J. SPORTS & LAW 1 (1999)...............................................................1, 8, 27, 35

# TABLE OF AUTHORITIES
**(continued)**

**Page**

William J. Hoffman, *Dallas' Head Cowboy Emerges Victorious in a Licensing Showdown with the N.F.L.: National Football League Properties v. Dallas Cowboys Football Club*, 7 SETON HALL J. SPORT L. 255 (1997) .......................................4

Stephen F. Ross, *Antitrust Options To Redress Anticompetitive Restraints And Monopolistic Practices By Professional Sports Leagues,* 52 CASE W. RES. L. REV. 133 (2001) ........................................................................................ *passim*

Stephen F. Ross & Stefan Szymanski, *Antitrust and Inefficient Joint Ventures: Why Sports Leagues Should Look More Like McDonald's and Less Like the United Nations*, 16 MARQ. SPORTS L. REV. 213 (2006) ......................................5, 11, 15

James D. Weinberger, *Baseball Trademark Licensing and the Antitrust Exemption: An Analysis of New York Yankees Partnership v. Major League Baseball Enterprises, Inc.*, 23 COLUM.-VLA J.L. & ARTS 75 (1999)..................................................4

# PRELIMINARY STATEMENT

There is no "sports league" or "joint venture" exemption from the antitrust laws. Sports leagues, like other collective efforts, produce benefits that cannot be achieved by firms acting alone. But such concerted action is not invariably beneficial: when it exceeds its proper scope, it causes harm that is "well documented" — *i.e.,* "welfare losses stemming from the potentially anticompetitive agreements among professional sports clubs." *Major League Baseball v. Crist*, 331 F.3d 1177, 1188 (11th Cir. 2003). Accordingly, the courts require scrutiny of *all* agreements restricting competition between participants in joint ventures — including sports leagues.

To be sure, some such agreements easily pass muster — on-field/ice rules, for example — but only because their obvious pro-competitive benefits easily outweigh any anticompetitive effects. MSG, however, is not challenging the validity of the NHL joint venture, or rules governing on-ice competition. MSG challenges only specific horizontal agreements that go far beyond what is reasonably necessary to operating a professional hockey league — agreements that severely restrict individual team competition, and consumer choice, in areas such as broadcasting and licensing. Such agreements are at the opposite pole from on-ice or on-field rules: they are not necessary to the operation of a sports league, have rarely been upheld, and have long been regarded as suspect. *See, e.g., L.A. Mem'l Coliseum Comm'n v. NFL*, 726 F.2d 1381 (9th Cir. 1984) (upholding challenge to NFL rule creating exclusive territories); *United States v. NFL*, 116 F. Supp. 319 (E.D. Pa. 1953) (limits on team broadcasts of games unlawful).[1]

MSG's First Amended Complaint ("Complaint") is extraordinary only in that sports league members have rarely been willing to challenge their leagues' actions; from the standpoint

---

[1] *See also, e.g.,* Stephen F. Ross, *Antitrust Options To Redress Anticompetitive Restraints And Monopolistic Practices By Professional Sports Leagues*, 52 CASE W. RES. L. REV. 133, 143-44 (2001) (restrictions on out-of-market broadcasting unlawful); Brandon L. Grusd, *The Antitrust Implications of Professional Sports' League-Wide Licensing And Merchandising Arrangements*, 1 VA. J. SPORTS & LAW 1 (1999) (exclusive league-wide merchandising and licensing arrangements unlawful).

of antitrust law, MSG's challenge to these agreements breaks no new ground.  The complaint

rests on four fundamental, but unexceptional, propositions:

(1)     Exclusivity requirements imposed by joint ventures like the NHL are not simply a

matter of contract law or venture internal rules, but instead are highly suspect agreements under

the antitrust laws.  Indeed, agreements among joint venturers not to compete individually, "[f]ar

from being 'presumptively legal' . . . are exemplars of the type of anticompetitive behavior

prohibited by the Sherman Act."  *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 242 (2d Cir.

2003) (citing three sports league antitrust cases);

(2)     There are distinct, hockey-specific relevant markets — both local and national —

in which the NHL has market power, as other courts have repeatedly held with respect to various

sports leagues, including the NHL itself.  *See Philadelphia World Hockey Club, Inc. v.*

*Philadelphia Hockey Club, Inc.*, 351 F. Supp. 462, 501-02 (E.D. Pa. 1972); Ross, *Antitrust*

*Options*, 52 CASE W. RES. L. REV. at 140 n.16 (citing cases);

(3)     The restraints at issue here necessarily harm competition, raise prices, and reduce

consumer options in those markets.  Because this conduct also harms the Rangers, who are

foreclosed from competing, MSG is a proper "private attorney general" under the antitrust laws.

*See, e.g.*, *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 440 (2d Cir. 2005) (suit by

member of alleged cartel challenging restraints necessarily establishes antitrust injury); and

(4)     The NHL cannot carry the heavy burden of justifying these anticompetitive

effects — particularly on a motion to dismiss.  The restraints are not reasonably necessary (*i.e.*,

"ancillary") to achieving any pro-competitive purpose, let alone one that outweighs the harms

they create.  *See, e.g.*, *Visa U.S.A.*, 344 F.3d at 238, 243 (restraint must be "reasonably

necessary" and its benefits must outweigh its "anticompetitive effects").  Simply repeating that

no team can play hockey on its own does not suffice, much less provide a blanket justification for decisions by the NHL's member clubs, in whatever area, to cease competing independently.

The NHL's motion makes little effort to defend these anticompetitive agreements on their merits. Instead, the NHL seeks a way to avoid that challenge entirely. But its various attempts to evade antitrust scrutiny of its members' actions are uniformly without merit.

In particular, the NHL's long-discredited claim that it is a "single entity" under *Copperweld*, and therefore exempt from compliance with Section 1 of the Sherman Act, has been overwhelmingly rejected by the courts, including the Second Circuit. Precedent aside, the NHL fails to identify any benefit that this exemption would offer to offset the consumer harm caused by immunizing anticompetitive league practices.

Likewise, the NHL's attempt to construe *Texaco Inc. v. Dagher*, 547 U.S. 1 (2006), as giving NHL clubs *carte blanche* to agree not to compete with each other in any area in which the League operates misreads *Dagher*, is contrary to binding Second Circuit law, *see Visa U.S.A.*, 344 F.3d at 242, and would overturn more than a century of settled joint venture case law. [2]

The NHL's various attempts to avoid scrutiny by attacking MSG as a plaintiff are also without merit. *First*, the claim that eliminating independent competition — and thereby producing higher prices, reduced output, and fewer consumer options in hockey-specific markets — does not establish antitrust injury is demonstrably wrong. *Second*, the contention that a combination of competitors can insulate itself from antitrust scrutiny by entering into agreements not to sue is untenable — and, in any event, the agreements on which the NHL relies do not even purport to release claims based on ongoing or prospective antitrust violations. *Third*, the NHL's

---

[2] As explained in detail *infra, Dagher* only determined how, not whether, the antitrust laws would be applied to a *fully integrated* joint venture's own activities. The NHL is not such an integrated joint venture; in addition, the claims here relate to restrictions on the independent activities of venture participants, not the activities of the joint venture itself; and, in any event, *Dagher* holds only that the Rule of Reason, not the *per se* rule, should be used in applying the antitrust laws to the challenged conduct.

invocation of judicial estoppel based on its prior litigation of a completely different claim misrepresents the other lawsuit, and misstates judicial estoppel doctrine. *Fourth*, the NHL cannot invoke laches against a suit to enjoin its continuing antitrust violations, let alone on a motion to dismiss.

Finally, the NHL's *ad hominem* attempt to avoid the merits by describing this suit as the "specious tactic" of a "disgruntled owner," is pointless. Most antitrust plaintiffs have their own motives for going to court; indeed, Congress sought to stimulate such motives by offering treble damages. And, in the sports league context, it is almost by definition owners whom others might regard as "disgruntled" who are most likely to overcome pressures to conform, and thus carry out the "private attorney general" role that is critical to the American antitrust system. In the NHL itself, MSG is aware of numerous owners who have objected strongly to anti-competitive practices, but have been unwilling to pursue antitrust litigation. In the rare instances when a "disgruntled" owner has dared to challenge league practices or rules in court, the leagues have been unable to establish their legality.[3]

This record of lack of success may explain why the NHL seeks an exemption from antitrust scrutiny. But the NHL's various arguments for escaping such scrutiny are all contrary to well-settled law, and the NHL's motion should therefore be denied.

---

[3] Al Davis's challenge to an NFL exclusive territory rule was successful, *L.A. Mem'l Coliseum Comm'n*, 726 F.2d 1381, as was Jerry Reinsdorf's challenge to the NBA's limits on superstation broadcasts, *Chicago Prof. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 961 F.2d 667 (7th Cir. 1992) ("*Bulls I*"). And Jerry Jones and George Steinbrenner settled on favorable terms with the NFL and Major League Baseball, respectively. *See* William J. Hoffman, *Dallas' Head Cowboy Emerges Victorious in a Licensing Showdown with the N.F.L.: National Football League Properties v. Dallas Cowboys Football Club*, 7 SETON HALL J. SPORT L. 255 (1997); James D. Weinberger, *Baseball Trademark Licensing and the Antitrust Exemption: An Analysis of New York Yankees Partnership v. Major League Baseball Enterprises, Inc.*, 23 COLUM.-VLA J.L. & ARTS 75 (1999).

## MSG'S ALLEGATIONS, AND THE CASE SUPPORTING THEM

### A.     The Structure Of The League, And Competition Between The Teams

The NHL is a joint venture created to schedule and produce ice hockey games. Complaint ¶ 2.  It facilitates "on ice" activities by, among other things, setting the rules of play, organizing the season, and handling administrative responsibilities.  *Id.* ¶ 8.  It is thus a joint venture producing a product: major league men's professional ice hockey competition.  *Id.* ¶ 6.

The NHL clubs are not simply an extension of the League; rather, the NHL is an artificial creation of its member clubs and subject to their collective control.  *Id.* ¶ 9.  The clubs are separately owned and operated entities that have retained their autonomy in running their day-to-day businesses.  *Id.* ¶¶ 7, 35.  They have separate assets, stadium rights, employees, and ownership rights in various copyrights, trademarks, trade dress, and trade names (collectively, "marks") in team logos and designs.  *Id.* ¶ 13.  Moreover, the clubs vary in their ability to generate attendance (both for home and road games), sell merchandise, and market broadcasting rights, and team valuations reflect those differences.  *See* Declaration of Jerry A. Hausman, July 17, 2008 ("Hausman Decl.") ¶¶ 15-17.[4]  Ultimate authority over the League rests with the NHL Board of Governors, which is controlled by the votes of the individual clubs, each of which has its own interests.  Complaint ¶ 9.  Accordingly, the teams control the league, not the other way around.  *See* Hausman Decl. ¶ 21.[5]

The NHL clubs compete vigorously off the ice in all of the ways they have not collectively agreed to prohibit:  they independently set ticket prices; compete for players and

---

[4] Professor Hausman's affidavit is not submitted not as a means of supplementing the complaint, but rather for the sole purpose of illustrating, pursuant to *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007), that the allegations in the Amended Complaint, as pled, form the basis of a more than plausible antitrust claim.

[5] Collective control by clubs acting in their own interests produces "significant economic difference[s]" — including different, and less efficient, decisionmaking incentives— "compared to a league controlled by a single entity."  Stephen F. Ross & Stefan Szymanski, *Antitrust and Inefficient Joint Ventures: Why Sports Leagues Should Look More Like McDonald's and Less Like the United Nations*, 16 MARQ. SPORTS L. REV. 213, 238 (2006); *see id.* at 222-37.

coaches; create and manage marketing and promotional programs, including the sale of advertising; and develop, license, and market their respective trademarks.  Complaint ¶ 2.  For example, there is fierce competition between the three New York metropolitan area clubs to attract fans and sponsors, and to sell merchandise.  *See* Hausman Decl. ¶¶ 35-39.  Individual clubs, including the Rangers, have undertaken substantial efforts over the years to enhance the value of their marks and the images of their teams as they compete with each other for fan interest both locally and nationally.  Complaint ¶ 13.

As a result of MSG's substantial investments in developing and marketing the Rangers franchise, the Rangers' following extends well beyond the New York area.  *Id.* ¶ 12.  MSG's aggressive efforts have created and increased consumer demand for products and services, including information, merchandise, apparel, and memorabilia containing the Rangers logo, as well as consumer demand for the opportunity to view Rangers games and highlights.  *Id.* ¶ 14.

### B.     The Relevant Markets

Major league men's professional ice hockey has unique characteristics that set it apart from other sports or leisure activities.  Complaint ¶ 29.  At competitive prices, the rights to license or use the marks of the NHL and NHL clubs, the rights to broadcast or otherwise distribute NHL games, and the rights to sell advertising rights at or involving NHL venues are not reasonably interchangeable with any substitutes.  *Id.* ¶ 31.  As a result — and as numerous courts have found regarding the NHL and other major sports leagues, *see, e.g., Philadelphia World Hockey Club,* 351 F. Supp. at 501-02; *see also* cases cited in Ross, *Antitrust Options*, 52 CASE W. RES. L. REV. at 140 n.16 — major league men's professional ice hockey products and services are a distinct market, in various local and national geographic areas, over which the NHL has market power.  Complaint ¶ 32; *see* Hausman Decl. ¶¶ 30-45.

For example, the NHL clubs have agreed to ban out-of-market broadcasting of a team's games, which gives the NHL Center Ice cable package substantial pricing power.  For fans of NHL hockey, other forms of entertainment are not reasonably interchangeable, leading such consumers to pay higher prices for the Center Ice package — and/or to purchase the entire Center Ice package rather than individual games or the games of a single team — than they would if individual clubs were not foreclosed from offering their own games as a competing alternative.  *See* Hausman Decl. ¶¶ 36, 44, 48; Ross, *Antitrust Options*, 52 Case W. Res. L. Rev. at 143-44.

### C.    The NHL's Restrictions On Competition

The NHL clubs, acting through the League, have agreed to limit off-the-ice competition among the clubs, and between the NHL itself and the clubs, in numerous ways that are not reasonably necessary to any efficiency produced by the NHL joint venture.  Complaint ¶ 3.

### (1)    Licensing and Merchandising.

The NHL clubs have agreed to give the purported "exclusive" right to control the individual clubs' marks and licensing opportunities, for virtually all commercial purposes, to the League.  *Id.* ¶ 38.  This eliminates each club's ability to compete to sell, among other things, clothing and other products containing a player's name, number, or image.  *Id.* ¶ 40A.  In addition, the clubs have agreed to require that 65% of the products offered through team catalogs be produced by licensees selected by the League and have effectively prohibited teams from selling locally-licensed products outside of the team's home arena.  *Id.* ¶ 40B.  They have also prevented teams from selling team merchandise on the internet other than through an NHL-controlled store.  *Id.*

As a result, individual clubs like the Rangers are precluded from seeking out lower-cost or higher-quality manufacturing arrangements than those entered into by the League, and from

offering consumers merchandise options not offered by the League.  In addition, because of the absence of reasonably interchangeable alternatives to NHL-themed merchandise, the restrictions on competition necessarily result in higher prices, lower quality, and reduced responsiveness to consumer preferences.  *See, e.g.*, Grusd, *Antitrust Implications*, 1 VA. J. SPORTS & LAW at 38 ("[I]t appears that each league has sufficient market power to adversely affect the market."); Hausman Decl. ¶¶ 4, 44-47, 58.

### (2)   Broadcasting and Streaming.

Longstanding precedent holds that a sports league's allocation of broadcasting territories violates the Sherman Act, *United States v. NFL*, 116 F. Supp. 319 — precedent that prompted the Sports Broadcasting Act of 1961, 15 U.S.C. §§ 1291 *et seq.*, which provides limited antitrust immunity for certain over-the-air broadcasting agreements.[6]  Yet the NHL member teams have agreed to prohibit each club from transmitting its games, on television or over the Internet, outside defined territories.  Complaint ¶¶ 16C, 40C.  The only alternative provided for fans is the Center Ice cable package — a package of *all* non-local NHL games.  *Id.* ¶ 40C.  Even within each club's area, these agreements allow cable distribution of only a limited number of games in some portions of the area — on a fee-for-subscriber basis centrally determined by the League — and prevent the club from distributing games on the internet.  *Id*. ¶ 40C.  The agreements also limit the ability of teams to license rebroadcasts of their games, permitting them only within 48 hours of game endings and prohibiting teams from licensing the rebroadcasts of historic games.  *Id*.

The necessary effect of these agreements to restrict competition, in the distinct market for professional ice hockey broadcasts, is higher prices and reduced consumer welfare.  "If

---

[6] Although the SBA creates a limited exception to the rule of *United States v. NFL*, there is no contention that the NHL rules challenged here fall within the protection of the SBA.

consumers were able to contract for out-of-market games on a per-team basis, for example, there would still be a market for the league's blanket license, but the price would be lower, and many consumers who are primarily interested in watching the games of a single out-of-market team would be able to obtain the desired product at vastly reduced cost."  Ross, *Antitrust Options*, 52 CASE W. RES. L. REV. at 143-44.

####          (3)       New Media.

The NHL member clubs have centralized control of various "new media" activities and agreed to ban the individual clubs from competing independently in this area.  *Id.* ¶ 16D.  As one prominent example, the NHL member teams have agreed to require each team to place individual team websites under centralized control on a central server.  They have also agreed to reduce competition in the sale of Internet advertising by giving the League control of the sale of banner ads at the top of, and in the primary box of, team websites.  *Id.* ¶ 40E.  The teams are limited to providing "local content," and a limited amount of advertising, for inclusion on those sites — subject to strict rules governing design and placement of content — and the sites include new non-local content that was not previously present.  *Id.*  Concurrently, the NHL clubs have prohibited teams from launching independent sites to compete with the NHL-controlled sites.  *Id.*

The result of these new rules is a reduction in output in the distinct markets in which the NHL has market power.  For example, by banning independent websites, the NHL teams have necessarily restrained the number of competing sites, and output, at a minimum, includes "the number of units" available to consumers and advertisers.  XI  PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 1901d, at 205-06 (2d ed. 2004).  In addition, the NHL's common template qualitatively restricts output, in that restraining any of the relevant features of a product "is an 'output reduction,' just as certainly as is an agreement increasing . . . price."  *Id*. Indeed, the NHL itself views the website changes as affecting consumers, in that they are

designed to ensure that — instead of the varied and largely "provincial" websites that consumers demanded, and the unrestrained market produced — all team websites "articulate a single NHL brand persona and voice."  Declaration of John Collins in Support for Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction ¶ 7 & Ex. A at 21 (Oct. 11, 2007).

### (4)     Advertising and Sponsorship.

The clubs have agreed to give the League the right to enter into advertising or sponsorship arrangements that automatically preempt individual clubs from selling advertising or sponsorships. *Id.* ¶ 16B.  For example, teams are restrained in selling advertising space in the ice or on dasherboards, *i.e.*, the low partitions erected around the ice itself, because the League regulates the size and number of the boards and is given the most desirable space during national broadcasts. *Id.* ¶ 40D.  Moreover, the NHL clubs have prohibited teams from using virtual signage that can be electronically superimposed during game telecasts. *Id.*  These rules eliminate competition that would otherwise exist for businesses seeking to advertise or promote to the distinct demographic of NHL hockey fans. *See* Hausman Decl. ¶¶ 14, 47.

In sum, numerous horizontal restrictions on member team competition have caused higher prices and lower output, and have precluded teams from increasing consumer options, for NHL-related products and services. *See* Complaint ¶ 43.  Absent the exclusive agreements and other restraints, NHL teams would compete in these areas to a much greater extent. *Id.*  Indeed, until it was fined by the NHL, MSG had operated its own team website, and had made Rangers-branded merchandise available through the website. *Id.* ¶ 4.  MSG had also sold virtual advertising on MSG's television broadcasts of Rangers home games, and made Rangers games available to local cable subscribers through broadband Internet distribution limited to the Rangers' local area. *Id.*

**STANDARD OF REVIEW**

In addressing a motion to dismiss, the court must "accept as true all facts alleged in the complaint" and "draw all reasonable inferences in favor of the plaintiff." *Kassner v. 2nd Avenue Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). "'The court's function . . . is not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient.'" *Condit v. Dunne*, No. 06 Civ. 13126, 2008 WL 2676306, at *2 (S.D.N.Y. July 8, 2008) (quoting *Festa v. Local 3 Int'l Bhd. of Elec. Workers*, 905 F.2d 35, 37 (2d Cir. 1990)) (ellipsis in original). Accordingly, the complaint "need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Iqbal v. Hasty*, 490 F.3d 143, 157 (2d Cir. 2007) (quoting *Erickson v. Pardus*, 127 S.Ct. 2197, 2200 (2007) (in turn citing *Twombly v. Bell Atlantic Corp.*, 127 S.Ct. 1955, 1964 (2007) (omission in original))).

**ARGUMENT**

**I.     THE NHL'S CLAIM THAT ITS RESTRICTIONS ARE EXEMPT FROM ANTITRUST SCRUTINY BORDERS ON THE FRIVOLOUS.**

   **A.     The Second Circuit And Other Courts Have Repeatedly Rejected Claims That Sports Leagues Are Single Entities.**

The NHL initially argues that the challenged restraints are exempt from Section 1 antitrust scrutiny as actions of a "single entity." Memorandum of Law in Support of Defendants' Motion to Dismiss ("MTD") at 13-25 (June 2, 2008). This long-discredited argument has been "overwhelmingly rejected," in the Second Circuit and elsewhere. Ross & Szymanski, *Antitrust and Inefficient Joint Ventures*, 16 MARQ. SPORTS L. REV. at 238 (citing cases). It is particularly ill-suited to the NHL, which is an especially *non*-unitary enterprise — both in an absolute sense, and as compared with other major sports leagues — with over 90% of its revenues generated at the local level and a fan base that the NHL itself describes as uniquely "tribal." *See* Complaint ¶ 40E; Hausman Decl. ¶¶ 22, 27.

Moreover, this precedent aside, treating the NHL as a single entity would expand *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984), far outside its recognized bounds, and turn it into a license to sports leagues to fix ticket prices, collude on player salaries, and harm consumer welfare in other ways that are currently — and rightly — forbidden by the antitrust laws.  The NHL offers no explanation of how consumers and competition would be helped, rather than harmed, by granting such an immunity.

### (1)  The Single Entity Argument Is Foreclosed By Precedent.

The Second Circuit's decision in *N. Am. Soccer League v. NFL*, 670 F.2d 1249 (2d Cir. 1982) ("*NASL*"), decisively rejected the argument that a sports league with separately-owned teams is a single entity, reasoning that such a "loophole" would "permit league members to escape antitrust responsibility for any restraint . . . that would benefit their league . . . even though the benefit would be outweighed by its anticompetitive effects."  *Id.* at 1257.  The court also noted that a single-entity characterization could not be accurate where "the financial performance of each team, while related to that of the others, does not . . . necessarily rise or fall with that of the others."  *Id.* at 1252.

The NHL attempts to limit this holding to "non-venture activities," MTD at 14, but *NASL* does not distinguish between venture and non-venture activities, and, indeed, stated that there would be *more* reason to allow the NFL's cross-ownership ban — a clear "non-venture activity" — than rules involving "playing sites, which affect competition between member teams."  670 F.2d at 1257.[7]  Similarly, the NHL claims that *NASL* relied on an "intra-enterprise" theory later

---

[7] Even if *NASL* were limited to non-venture activities, moreover, it would avail the NHL nothing.  The NHL uses the phrase "non-venture activities" to mean a narrow category of activities entirely outside the area in which the joint venture does business.  Joint venture case law, however, uses the phrase to cover *all* individual activities by members of a venture, *including* those within the sphere of the venture's activities.  For example, *Texaco, Inc. v. Dagher*, 547 U.S. 1 (2006), cites, as its initial example of "restrictions imposed . . . on nonventure activities" the restrictions at issue in *NCAA* on universities' broadcasts of their college football games.  *Id.* at 7.  Under this standard definition, all of the restraints challenged by MSG are restraints on non-venture activities.

rejected by the Supreme Court in *Copperweld*.  *See* MTD at 13-14.  However, *NASL* never mentioned or relied upon any such theory.

Moreover, the Second Circuit expressly reaffirmed *NASL* after *Copperweld*.  *See Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 71 (2d Cir. 1988) ("Courts have consistently held that, since joint ventures—including sports leagues and other such associations—consist of multiple entities, they can violate § 1 of the Sherman Act.").  While the NHL claims that "*Volvo* did not involve the collective output of the interdependent members of a sports-league venture," *Volvo* itself suggests no such limitation on its holding.  And, more recently, *Visa U.S.A* cited three sports league cases as examples of the proper application of antitrust restrictions on joint ventures.  344 F.3d at 242.

Courts outside the Second Circuit have likewise overwhelmingly held, post-*Copperweld*, that sports leagues are not single entities, but rather are subject to the same scrutiny as other joint ventures.  *See, e.g.*, *NCAA v. Bd. of Regents*, 468 U.S. 85, 113 (1984) (sports league, like other joint ventures, has "no immunity from the antitrust laws"); *NHL Players' Ass'n v. Plymouth Whalers*, 419 F.3d 462, 469-70 (6th Cir. 2005) (relying on *NASL* in holding that the Ontario Hockey League was not a single entity); *Sullivan v. NFL*, 34 F.3d 1091, 1099 (1st Cir. 1994) (NFL not a single entity); *L.A. Mem'l Coliseum Comm'n*, 726 F.2d at 1388-90 (same); *see also* Marc Edelman, *Why the Single Entity Defense Can Never Apply to NFL Clubs: A Primer on Property-Rights Theory in Professional Sports*, 18 FORDHAM INTELL. PROP. MEDIA & ENTM'T L.J. 891, 893 n.11 ("Many courts have rejected the single-entity defense in the scope of premier American sports leagues.").[8]

---

[8] *L.A. Mem'l Coliseum Comm'n* was decided before *Copperweld*, but a petition for certiorari was pending when *Copperweld* was decided.  Instead of vacating and remanding, as the Court normally would have done had *Copperweld* cast any doubt on the holding, the Court denied the petition.  469 U.S. 990 (1984).

The NHL makes no effort to distinguish these or the many other cases rejecting sports leagues' "single entity" arguments. The only circuit court case it cites, *Chicago Prof'l Sports Ltd. P'ship v. NBA*, 95 F.3d 593 (7th Cir. 1996) ("*Bulls II*"), actually *rejected* the NBA's argument that "it necessarily is one [entity], for every purpose," 95 F.3d at 599, and ultimately did not decide any single-entity issue, *id.* at 600.[9] In any event, *Bulls II* cannot overcome binding Second Circuit authority. *Cf. Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47, 55-56 & n.3 (1st Cir. 2002) (First Circuit refuses to follow *Bulls II* because its "approach has not been adopted in this circuit"). The same is true of *American Needle, Inc. v. New Orleans Louisiana Saints*, 496 F. Supp. 2d 941 (N.D. Ill. 2007), which is in any event a recognized aberration. *See* Marc Edelman, *Single Entity Ruling: 'Needle' in Haystack*, 239 N.Y.L.J. 4 (Jan. 2, 2008) ("The opinion is not supported by previous case law, nor has it been followed by subsequent cases.").

Indeed, if sports leagues were thought to be single entities, there would be no need for a Sports Broadcasting Act or a baseball antitrust exemption, as the conduct protected by those exemptions would be immune from legal challenge as the conduct of a single entity. *See also, e.g.*, *Clarett v. NFL*, 369 F.3d 124 (2d Cir. 2004) (rejecting claim against the NFL under the labor exemption to the antitrust laws — an analysis that would have been unnecessary if sports leagues were immune from antitrust scrutiny).

In short, the NHL's argument that it is exempt from Sherman Act Section 1 scrutiny is accurate only as a description of the NHL's cavalier attitude toward compliance with the antitrust laws. As a description of the governing law, it bears no relationship to reality.

---

[9] Similarly, Justice Rehnquist's dissent from denial of certiorari in *NASL* did not, as the NHL claims, argue that the NFL is a single entity, *see* MTD at 14 n.7, but rather that the league policy was valid under a rule-of-reason analysis. *NFL v. N. Am. Soccer League*, 459 U.S. 1074 (1982) (Rehnquist, J., dissenting from denial of certiorari).

### (2) Even Aside From Binding Precedent, The NHL's Request For Exemption From Section 1 Scrutiny Has No Merit

Arguments for treating sports leagues as single entities have been roundly rejected for good reason: they go far beyond the holding and reasoning of *Copperweld*, and have little to recommend them from the standpoint of antitrust policy.

The NHL's depiction of *Copperweld* as creating an open-ended analysis by which joint ventures can be deemed single entities finds no support in *Copperweld*. *Copperweld* was expressly limited to the "narrow issue" of "whether a parent and its wholly owned subsidiary are capable of conspiring in violation of § 1 of the Sherman Act." 467 U.S. at 767. Its reasoning was equally narrow, driven by Congress's "purposeful choice to accord different treatment to unilateral and concerted conduct." *Id.* at 775. Accordingly, the Supreme Court's emphasis of the fact that a "parent and its wholly owned subsidiary have a complete unity of interest," 467 U.S. at 771, was not, as the NHL claims, merely descriptive. Rather, it was the critical factor making the actions of a parent and wholly-owned subsidiary "unilateral" rather than "concerted."

Recognizing the importance of such a complete unity of economic interests, the Second Circuit has held that a physicians' independent practice association was not a "single entity" under *Copperweld* because its members retained "separate economic interests." *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 544-45 (2d Cir. 1993). Other courts have similarly recognized *Copperweld*'s limitation to situations where there is a "complete unity of interest." *See, e.g.*, *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1148 (9th Cir. 2003) (Kozinski, J.); *Sullivan*, 34 F.3d at 1099.[10]

---

[10] *See also Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 146 (4th Cir. 1990) (reasoning that *Copperweld* "recommended that courts consider whether affiliated corporate entities have a complete unity of interest"); *Bolt v. Halifax Hosp. Med. Ctr.*, 891 F.2d 810, 819 (11th Cir. 1990) (finding no single entity where each doctor on a hospital's staff "practices medicine in his individual capacity" and thus "is a separate economic entity potentially in competition with other physicians"); *Fishman v. Estate of Wirtz*, 807 F.2d 520, 541-42 n.19 (7th Cir. 1986) (rejecting a single-entity defense because the corporations "lacked the 'complete unity of

Here, the NHL's teams plainly have "separate economic interests," *Capital Imaging*, 996 F.2d at 544. The NHL claims that the Board of Governors is a single decisionmaking entity that is equivalent to a single organization. MTD at 18. However, the Board of Governors is composed of the owner or a representative of each club, and these members bring the clubs' distinct interests to bear on the Board's decisions. *See* Hausman Decl. ¶ 24. This creates collective, not unilateral, action, and the decisions that result are different from — and less efficient than — the decisions of a unitary entity. *See* Ross & Szymanski, *Antitrust and Inefficient Joint Ventures*, 16 MARQ. SPORTS L. REV. at 222-38. In contrast to a parent and subsidiary, whose "actions are guided or determined not by two separate corporate consciousnesses, but one," *Copperweld*, 467 U.S. at 771, Board of Governors decisions are guided by the separate consciousnesses of the 30 NHL clubs. *See* Hausman Decl. ¶ 24.

Indeed, *NCAA*, which was decided shortly after *Copperweld*, dealt with a decisionmaking body that, like the NHL Board of Governors, was "ultimately controlled by the vote of member institutions." 468 U.S. at 99. Rather than treat the decisions of this body as those of a single entity, the Supreme Court made clear that any restraint imposed by such a member-controlled body is a "horizontal restraint—an agreement among competitors on the way in which they will compete with one another." *Id.*

The member clubs' control of the Board of Governors is also fatal to the NHL's argument that "the NHL and its Member Clubs" can "assert full control over MSG," just as in *Copperweld* "'the parent [could] assert full control'" over its subsidiary. MTD at 20 (quoting *Copperweld*, 461 U.S. at 772). As Judge Boudin explained in *Fraser v. Major League Soccer,*

---

(continued…)

interest' necessary to find them to be a 'single enterprise for purposes of section 1'" (quoting *Copperweld*, 467 U.S. at 771)).

*L.L.C.*, horizontal control by a group of competitors is critically different from the vertical

parent-subsidiary control in *Copperweld*:

> [T]he operator/investors are not mere servants of MLS; effectively, they control it, having the majority of votes on the managing board. The problem is especially serious where, as here, the stockholders are themselves potential competitors with MLS and with each other. Here, . . . [MLS] (arguably) [serves] as a nominally vertical device for producing horizontal coordination, *i.e.*, limiting competition among operator/investors.
>
>  From the standpoint of antitrust policy, this prospect of horizontal coordination among the operator/investors through a common entity is a distinct concern. Whatever efficiencies may be thought likely where a single entrepreneur makes decisions for a corporate entity (or set of connected entities), the presumption is relaxed— and may in some contexts be reversed—where separate entrepreneurial interests can collaborate; the fixing of above market prices by sellers is the paradigm.

284 F.3d at 57; *see also Visa U.S.A.*, 344 F.3d at 243 (citing *Fraser* for this distinction between

vertical and horizontal control).  Accordingly, the NHL's attempted analogy is completely

inapposite.  In addition, the *extent* of control here falls far short of *Copperweld*, because NHL

teams retain the ability to compete against each other for fans, players and revenue, and there is

no suggestion that the Board of Governors could simply opt to seize total control of teams'

operations and assets.[11]  *See* Hausman Decl. ¶¶ 6, 10-14, 21-22.

Furthermore, as Judge Kozinski has observed, *Copperweld* is inapplicable to entities that

are actual or *potential* competitors, because "[a]bsence of actual competition may simply be a

manifestation of the anticompetitive agreement itself."  *Freeman*, 322 F.3d at 1149.  For

example, *City of Mt. Pleasant v. Associated Electric Cooperative, Inc.*, 838 F.2d 268 (8th Cir.

1988) — on which the NHL relies, *see* MTD at 16-17 — emphasized, in finding a single entity,

---

[11] Similarly, the NHL's reliance on *Seabury Mgmt., Inc. v. Prof'l Golfers Ass'n of Am., Inc.*, 878 F. Supp. 771 (D. Md. 1994), *aff'd in part, rev'd in part on other grounds*, 52 F.3d 322 (4th Cir. 1995), is misplaced.  *See* MTD at 21.  The restriction there was on the PGA's regional sections, not on the individual competing members, and "the PGA and its member sections function as a single economic unit."  *Id.* at 777.  The PGA had total control over its regional sections, which could not compete with each other as the NHL teams do here.

that there was no evidence that defendants were "actual or potential competitors." 838 F.2d at 276; *see also Freeman*, 322 F.3d at 1148 (noting that this fact was critical in *Mt. Pleasant*); *McNeil v. NFL*, 790 F. Supp. 871, 878-79 & n.8 (D. Minn. 1992) (holding, after *Mt. Pleasant*, that NFL is not a single entity). Here, even aside from the actual competition among NHL teams, they are clearly potential competitors in all the areas in which they have agreed to eliminate competition.

Tellingly, other than its specious analogy to *Copperweld*, the NHL offers no coherent rationale for single-entity treatment. In particular, the NHL points to no substantial benefit that would offset the "well documented" consumer "welfare losses stemming from the potentially anticompetitive agreements among professional sports clubs." *Major League Baseball v. Crist*, 331 F.3d 1177, 1188 (11th Cir. 2003).

To be sure, the NHL does argue that, because no team can "create NHL hockey by itself," "the NHL enterprise is the one and only source of any value" related to professional hockey products and services. MTD at 17 (emphasis in original). But this argument is flawed both factually and legally. Factually, the argument ignores that the teams' own investments contribute substantial value, and that the extent of that value is different for different teams — for example, many clubs charge higher ticket prices for "premium" games when playing a popular team such as the Rangers. *See* Hausman Decl. ¶ 18. In addition, the notion that all value flows exclusively from the League is inconsistent with the vastly different franchise values of the various teams. *See id.* ¶ 16. It is also inconsistent with the history of sports leagues, which shows that leagues and league membership are not fixed — and that teams have moved from one league to another while retaining considerable franchise value.[12]

---

[12] At a minimum, the NHL's dubious and contested "sole source of value" theory cannot be adopted for purposes of a motion to dismiss.

More fundamentally, the NHL's argument is contrary to established law, which makes clear that teams' inability to produce games on their own is irrelevant. For example, the college teams in *NCAA* could not produce "NCAA football" or NCAA football broadcasts on their own, yet this did not allow NCAA members to restrict competition without antitrust scrutiny. Nor does the NHL offer any reason why its "sole source of value" theory is relevant from an antitrust standpoint: it changes neither the reality that the 30 NHL clubs have individual economic interests, nor the fundamental antitrust principle disfavoring collusion among potential competitors. As Judge Posner has noted, "[i]t does not follow that because two firms sometimes have a cooperative relationship there are no competitive gains from forbidding them to cooperate in ways that yield no economies but simply limit competition." *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 594 (7th Cir. 1984); *see also* Hausman Decl. ¶ 23.

Finally, the NHL errs in arguing for single-entity treatment on the ground that the teams have agreed to centralize control over areas such as marketing. *See* MTD at 18-19. This reasoning would turn the very essence of an antitrust violation — an agreement not to compete — into a justification for eliminating antitrust scrutiny. This is precisely the opposite of what antitrust law seeks to accomplish. *See Chicago Prof'l Sports Ltd. P'ship v. NBA*, 961 F.2d 667, 674 (7th Cir. 1992) ("*Bulls I*") ("Agreements limiting to whom, and how much, a firm may sell are the defining characteristics of cartels and may not be invoked as justifications of a cutback in output.") (emphasis omitted). While the NHL cites *Copperweld* for this argument, *see* MTD at 20-21, there was no such issue in *Copperweld* because "[w]ith or without a formal 'agreement,' the subsidiary acts for the benefit of the parent, its sole shareholder." 467 U.S. at 771. Here, in contrast, there *would* be vigorous independent competition but for the challenged agreements.

In sum, the NHL's single-entity argument is supported by neither precedent nor policy.

**B.    The Argument That *Dagher* Frees The NHL From The Obligation To Comply With The Antitrust Laws Is Also Without Merit.**

The NHL's attempt to use *Texaco Inc. v. Dagher*, 547 U.S. 1 (2006), to bolster its single-entity argument, *see* MTD at 22-25, thoroughly misapprehends *Dagher*.

To begin with, the NHL's claim that *Dagher* described "the circumstances under which Section 1 should not apply to the ongoing operations of legitimate joint ventures," MTD at 22, is incorrect. *Dagher* stated that "we need not address" any such issue, 547 U.S. at 7 n.2. Rather, *Dagher* held only that *per se* (and quick-look) analysis would not apply to the joint venture at issue, while suggesting that "respondents should have challenged [the practice at issue] pursuant to the rule of reason." *Id.* at 7. Indeed, *Dagher*'s question presented began with: "whether it is *per se* illegal under § 1 of the Sherman Act . . . ." *Id.* at 3.

Moreover, *Dagher* concerned only fully integrated joint ventures in which the participants combine *all* their relevant assets into a single corporate entity through which they share all profits and losses. *See id.* at 4, 6. The Court emphasized the close analogy between such a venture and a single firm, reasoning that "[w]hen 'persons who would otherwise be competitors *pool their capital and share the risks of loss as well as the opportunities for profit* ... such joint ventures [are] regarded as a single firm competing with other sellers in the market.'" *Id.* at 6 (emphasis added; ellipsis in original) (quoting *Arizona v. Maricopa County Med. Soc'y*, 457 U.S. 332, 356 (1982)). Indeed, the question presented expressly concerned an "economically integrated joint venture." *Id.* at 3. Sports leagues, with their independently-operating clubs — which do not share all profits and losses — bear no resemblance to such fully integrated ventures.

The NHL contends that such integration is unnecessary where the participants cannot produce the product on their own, MTD at 24, but *Dagher* never suggests any application

beyond fully integrated joint ventures.  Such an extension would make no sense:  complete integration is the only factor cited by the Court as justifying an analogy to "a single firm competing with other sellers."  547 U.S. at 6.  Accordingly, as the leading antitrust treatise rightly cautions, "one should not overread the opinion" beyond its unique facts.  *See* VII AREEDA & HOVENKAMP, ANTITRUST LAW (2007 App.) ¶ 2132, at 469.

The NHL also overlooks another critical limit on *Dagher*'s holding:  its limitation to "the *core* activity of *the joint venture itself*."  547 U.S. at 7 (emphasis added).  The Court drew a sharp distinction between antitrust challenges to "restrictions . . . on nonventure activities" — *i.e.*, restrictions imposed by a venture on the independent activities of its members, like those challenged in *NCAA*, *see id.* — and challenges to the "activity of the joint venture *itself*," such as the price-setting by the venture entity in *Dagher*.  *Id.* (emphasis added).  *Dagher* simply has no application to a venture's restrictions on the separate activities of its members.  *See also, e.g.*, *Polygram Holding, Inc. v. FTC*, 416 F.3d 29 (D.C. Cir. 2005) (holding unlawful agreement not to advertise venturers' individual products in competition with the joint product); *Columbia Broad. Sys., Inc. v. Am. Soc'y of Composers, Authors & Publishers*, 620 F.2d 930, 935-36 (2d Cir. 1980) (blanket license lawful only if no restraint on sales by individual members).[13]

Moreover, *Dagher* is in any event further limited to "core" activities.  *Id.*  In *Dagher*, setting a price for the venture's product was "integral to the running of a business."  547 U.S. at 8.  It is hardly "integral" to a hockey league, however, to control licensing, merchandising, advertising, broadcasting, and new media centrally — let alone for its members to agree not to compete in those areas.  Indeed, there are leagues, such as the English Premier League, that are highly successful without features the NHL claims to be "core."  *See* Hausman Decl. ¶ 29.  Nor

---

[13] This point (and the other limitations on *Dagher*'s holding addressed in the text) is fatal both to the NHL's claim that *Dagher* supports its single entity argument and to the equally misconceived claim, MTD at 25-27, that restraints on independent competition by member clubs can be exempted from scrutiny under *Dagher* as the "core activities of the venture itself."

does the NHL provide any support for its expansive definition of "core," MTD at 27, in either *Dagher* or any normal understanding of the word "core." Indeed, under the NHL's theory, the broadcast restrictions in *NCAA* would have been a "core" element of the venture and would have been exempt from Section 1. Yet there is no hint in *Dagher* that the Court intended to overrule *NCAA* and several other cases — all cited positively in *Dagher* — requiring scrutiny of restraints imposed by a joint venture. *See* 547 U.S. at 5-7 (citing *NCAA*, *United States v. Topco Assocs., Inc.*, 405 U.S. 596 (1972), and *Citizen Publ'g Co. v. United States*, 394 U.S. 131, 135 (1969)); *see also* AREEDA & HOVENKAMP, *supra*, ¶ 2132, at 468-69.

Finally, *Dagher* has no relevance where the challenged restraint eliminates competition that would otherwise exist. In *Dagher*, the two participants merged all of their gas-selling operations into the joint-venture entity. Thus, the pricing policy was "not a pricing agreement between competing entities with respect to their competing products," and no competition was restricted. 547 U.S. at 6. In contrast, since the colleges in *NCAA* did "compete against each other to attract television revenues, not to mention fans and athletes," 468 U.S. at 99, the restraint on broadcasting of games was unlawful. Here, the NHL teams clearly *would* compete but for the challenged restraints; those restraints must therefore be subject to antitrust scrutiny.

### C. The NHL's Claim That Joint Ventures' Restrictions On Competition By Their Members Are Exempt From Scrutiny Is Demonstrably Wrong.

The NHL offers yet another attempt to eliminate antitrust scrutiny, arguing that it is "hornbook law" that the NHL, as a joint venture, "may preclude . . . 'competition' from its individual members." MTD at 27-28. This argument, too, is squarely contrary to binding case law: the Second Circuit has emphasized that agreements among joint venturers not to compete with the venture, "[f]ar from being 'presumptively legal' . . . are exemplars of the type of anticompetitive behavior prohibited by the Sherman Act." *Visa U.S.A.*, 344 F.3d at 242. Such

restraints on individual venturers are lawful only if they are "ancillary," *i.e.*, "reasonably necessary" to the efficiencies of the venture.  *See, e.g.*, *id.* at 238 (restraint is invalid if plaintiff can show that it "is not reasonably necessary to achieve the defendants' procompetitive justifications"); *Schering-Plough Corp. v. FTC*, 402 F.3d 1056, 1072 (11th Cir. 2005) (likewise citing "reasonably necessary" standard applicable to ancillary restraints).

Indeed, the NHL's own cases decisively refute the NHL's revolutionary claim that joint venture members may freely agree not to compete with the venture.  *United States v. Addyston Pipe & Steel Co.*, 85 F. 271 (6th Cir. 1898), *aff'd*, 175 U.S. 211 (1899), expressly holds that, before such an agreement can be upheld, "the court must find that the restraints attempted thereby are *reasonably necessary* . . . to the legitimate ends of the existing partnership."  *Id.* at 281 (emphasis added).  The case further says that a permissible restraint is one that is "ancillary to the main and lawful purpose of the contract, and . . . necessary to the protection of the covenantee in the carrying out of that main purpose."  *Id.* at 283.

Likewise, *Polk Brothers, Inc. v. Forest City Enterprises, Inc.*, 776 F.2d 185 (7th Cir. 1985), upheld a "limited agreement not to sell certain competing products" only because "it was an ancillary restraint" in that it "'contribute[d] to the success of a cooperative venture that promises greater productivity and output.'"  *Blackburn v. Sweeney*, 53 F.3d 825, 828 (7th Cir. 1995) (quoting *Polk Bros.*, 776 F.2d at 189) (brackets in original).  Interpreting *Polk Brothers*, the Seventh Circuit later specified that such an agreement could *not* be upheld if it "was not a necessary condition for the increased competition."  *Id.*  And *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210 (D.C. Cir. 1986), upheld the restraint at issue on the ground that it was "reasonably necessary to the business [the venture] is authorized to conduct."  *Id.* at 227.[14]

_____

[14] The NHL claims that *Addyston Pipe* falls under an exception "where the members have competed in the relevant market on their own prior to a venture formation that itself creates market power," MTD at 27 n.12, but *Addyston Pipe* mentions no such limitation on its holding.  Such a limitation would make no sense — antitrust law

Numerous other cases, not cited by the NHL, also reject the view that a joint venture's restraints on its members are not subject to antitrust scrutiny. Indeed, "[e]nsuring that individual members of a joint venture are free to increase output has been viewed as central in evaluating the competitive character of joint ventures." *NCAA*, 468 U.S. at 114 n.54; *see also Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 23-24 (1979) (permissibility of joint licensing arrangement was contingent on allowing members to compete individually); *Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010, 1020 (10th Cir. 1998) (the only cognizable rationales for NCAA actions that court would recognize "are those necessary to produce competitive intercollegiate sports"); *Gen. Leaseways,* 744 F.2d at 595 (invalidating a restraint because "the organic connection between the restraint and the cooperative needs of the enterprise that would allow us to call the restraint a merely ancillary one is missing"); XI AREEDA & HOVENKAMP, ANTITRUST LAW, ¶ 1908h, at 275 ("[E]xclusivity [of a joint venture] is often a danger signal requiring a hard look at the challenged restraint.").

The NHL fails to discuss the above cases. Instead, the NHL quotes *United States v. Penn-Olin Chemical Co.*, 378 U.S. 158, 168 (1964), for the proposition that "'parents [of a joint venture] would not compete with their progeny [the venture itself].'" MTD at 27. However, this statement was merely descriptive; no question as to the lawfulness of an agreement not to compete with the venture was at issue. *See* 378 U.S. at 168. Rather, in *Penn-Olin*, it was the initial acquisition itself that was under review.

The NHL also seeks support in a further misrepresentation of *Dagher*, portraying *Dagher* as holding that a restraint on non-venture conduct is lawful so long as it is "related to the

---

(continued…)

does not focus solely on pre-existing, as opposed to potential, competition, *see Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49-50 (1990) — and in any event the NHL makes no attempt to distinguish the numerous other cases applying the ancillary restraint doctrine without reference to any such limitation.

'legitimate and competitive purposes of the business association.'"  MTD at 25 (quoting *Dagher*,

547 U.S. at 7).  This argument, however, is based entirely on a cropped quotation and a

misleading paraphrase.  Far from saying that a restraint need only be "related to" the legitimate

purposes of the venture to be valid, what *Dagher actually* says is that the restraint must be

"*ancillary* to the legitimate and competitive purposes" of the venture.  547 U.S. at 7 (emphasis

added).  In short, *Dagher* reaffirms the longstanding requirement that restraints on joint venture

members must qualify as ancillary — *i.e.*, reasonably necessary — to be valid.

## II.     THE NHL'S LEGAL ARGUMENTS REGARDING ANTITRUST INJURY ARE WITHOUT MERIT.

The NHL's sole attempt to address the merits of MSG's claims is its argument that MSG

has not sufficiently alleged antitrust injury.  MTD at 28-33.  However, this argument, too, is

incompatible with binding precedent:  the Second Circuit has squarely held that an alleged cartel

member's challenge to restraints imposed by the cartel necessarily satisfies the antitrust injury

requirement.  "If . . . a cartel-member plaintiff seeks to remove the restraint so he may be 'free to

compete—such that the member's interest coincides with the public interest in vigorous

competition—' he satisfies the antitrust injury requirement."  *Daniel v. Am. Bd. of Emergency*

*Med.*, 428 F.3d 408, 440 (2d Cir. 2005) (quoting *Volvo N. Amer. Corp.*, 857 F.2d at 67-70); *see*

*also N.Y. Medscan LLC v. N.Y. Univ. Sch. of Med.*, 430 F. Supp. 2d 140, 146 (S.D.N.Y. 2006)

(applying this case law in holding the antitrust injury requirement satisfied).  This rule is as it

should be, because horizontal restraints on competition inherently tend to raise prices and reduce

output — the essence of antitrust injury.  *E.g., Xerox Corp. v. Media Scis. Int'l, Inc.*, 511 F.

Supp. 2d 372, 381-83 (S.D.N.Y. 2007).[15]

---

[15] "Antitrust injury is 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'"  *Xerox*, 511 F. Supp. 2d at 380 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).  To allege antitrust injury, "antitrust plaintiffs must assert harm to competition as a whole, by alleging adverse effects on the price, quality, or output of the relevant good or service."

Moreover, this precedent aside, the Complaint's allegations are more than sufficient under the governing standard on a motion to dismiss, which requires the court to "accept as true all facts alleged in the complaint" and "draw all reasonable inferences in favor of the plaintiff." *Kassner*, 496 F.3d at 237. This standard "do[es] not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007). Courts have consistently recognized the sufficiency of antitrust injury allegations similar to those made here. *See, e.g.*, *Xerox*, 511 F. Supp. 2d at 382 ("MS claims to have been injured by being excluded from selling to certain retail outlets. . . . [MS's loss of business] is sufficient if it stems from conduct that prevents potential customers from obtaining a desired product."); *In re Intel Corp. Microprocessor Antitrust Litig.*, 496 F. Supp. 2d 404, 410 (D. Del. 2007) (antitrust-injury requirement satisfied by allegation that "'but for' Intel's anticompetitive conduct, Intel's prices would have been lower," and defendant's argument that its actions did not raise prices inappropriate on motion to dismiss); *N.Y. Medscan LLC*, 430 F. Supp. 2d at 147.

Here, the Complaint alleges ample facts with respect to each of the challenged restraints to more than plausibly establish the antitrust injury element of MSG's claim.

**Licensing and Merchandising**. The NHL member clubs have adopted restraints precluding individual clubs like the Rangers from seeking out lower-cost or higher-quality manufacturing arrangements than those entered into by the League, and from offering consumers different merchandise options or lower prices than those of the League. Complaint ¶¶ 38, 40A, 40B, 40C. Such restrictions, in a market without reasonably interchangeable substitutes for

---

(continued…)

*Chapdelaine Corporate Sec. & Co. v. Depository Trust & Clearing Corp.*, No. 05 Civ. 10711, 2006 WL 2020950, at *3 (S.D.N.Y. July 13, 2006) (internal quotation marks omitted). For example, where the complaint "alleg[es] that defendants' illegal conduct has harmed plaintiffs in their business and has decreased the price, quality, and output" of the relevant product, the antitrust injury requirement is satisfied. *N.Y. Medscan LLC*, 430 F. Supp. 2d at 147.

products related to professional ice hockey, inherently tend to lead to higher prices, reduced output, and lower quality — the most basic forms of antitrust injury. *See, e.g.*, Grusd, *Antitrust Implications*, 1 VA. J. SPORTS & LAW at 36 (describing anticompetitive effects of exclusive sports league licensing and merchandising arrangements); Hausman Decl. ¶¶ 7, 44-46, 61.

      **Broadcasting and Streaming.**  The restraints adopted by the NHL clubs prohibit each club from transmitting its games, on television or over the Internet, into territories allocated to other clubs or outside North America.  Complaint ¶¶ 16C, 40C.  Although many out-of-market fans who wish to see a team's games can do so by purchasing the NHL's Center Ice blanket license, they are deprived of alternatives that could be offered by individual clubs — such as the ability to purchase single games or the games of a single team — and of the lower prices that would result from such competition with the Center Ice package.  These consumer welfare losses clearly constitute antitrust injury; indeed, the serious harm to competition from a sports league's division of broadcasting territories has long been established as an antitrust violation.  *United States v. NFL*, 116 F. Supp. 319 (E.D. Pa. 1953); *see also* Ross, *Antitrust Options*, 52 CASE W. RES. L. REV. at 141-42; Hausman Decl. ¶¶ 12, 29, 48-57.

      **New Media.**  The NHL clubs have given exclusive control of various "new media" activities to the League, and agreed to ban most competition from individual clubs.  Complaint ¶ 16D.  Even where individual clubs have retained some role — contributing content to League-controlled team sites on a common website platform — those sites are substantially restricted. The common platform website (1) imposes prominently placed League-centered content that was not previously part of the Rangers' site; (2) moves team-centered content to less favorable locations on the website; (3) requires that all websites follow a common "template" in their design; and (4) gives the NHL the ability, through its control of the server, to make further

changes at any time.  The clubs have also agreed to prohibit teams from operating additional websites in competition with the common platform sites.  The NHL itself views these changes as affecting consumers, in that they are designed to ensure that—instead of the varied and largely "provincial" websites that consumers demanded, and the unrestrained market produced—"tribal" competition is displaced by a League-centered focus that de-emphasizes competition among the individual clubs.  *Id.* ¶¶ 16D, 40E.  The teams have also agreed to reduce competition in website advertising, by designating the most valuable advertising space on each site for the League.  *Id.*

The member clubs' agreement to ban additional, independent websites that would compete with the common platform websites necessarily restricts output.  At a minimum, output includes "the number of units" available to consumers and advertisers — such as the number of competing websites.  XI AREEDA & HOVENKAMP, ANTITRUST LAW, ¶ 1901d, at 205-06.  In addition, "the relevant output consists of not merely the naked product itself, but all information, amenities, and other features" associated with it.  *Id.* at 206.  An agreement restraining any of the relevant features of a potentially competitive product "is an 'output reduction,' just as certainly as is an agreement increasing . . . price."  *Id.*; *see also Visa U.S.A.*, 344 F.3d at 240 (exclusionary rules had harmed competition by reducing "available card features").  Here, the restraint limits both the number and type of websites available to consumers and advertisers; it also limits the use of websites to compete for advertising, ticket sales, and other commerce.  It thus necessarily works a restriction of output.  *See* Hausman Decl. ¶ 47.

**Advertising and Sponsorship.**  The NHL clubs have agreed to League-wide advertising and sponsorship arrangements that automatically preempt individual clubs' abilities to sell such arrangements, even in the clubs' home arenas.  Complaint ¶ 16B.  Moreover, they have agreed to prohibit virtual signage that can be electronically superimposed during telecasts of a club's

games.  *Id.* ¶ 40D.  It is fundamental that "[a]greements restricting advertising are a form of output restriction in the production of information useful to consumers."  XII Areeda & Hovenkamp, Antitrust Law, ¶ 2023b, at 184.  Moreover, these rules eliminate competition that would otherwise exist for businesses seeking to advertise or promote to the distinct demographic of NHL hockey fans.  *See* Hausman Decl. ¶¶ 14, 42, 47.

The NHL's arguments as to why the Complaint's allegations purportedly fail to allege antitrust injury are uniformly specious.  *First*, the NHL points to language in the Complaint about harm to MSG, and argues that harm to a competitor does not establish antitrust injury in the absence of harm to competition.  MTD at 29-30.  But there is no inconsistency between alleging harm to MSG *and* harm to competition and consumers, and — as described above — that is precisely what the Complaint does.

*Second*, the NHL cites case law for the proposition that a potential distributor's complaints about a manufacturer's exclusive dealing relationship do not establish an antitrust claim.  MTD at 30-31.  But those cases are completely inapposite, as they deal with the vastly different category of *vertical* restraints — which generally do not reduce output, and are far less suspect than horizontal restraints.  *See, e.g.*, *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,* 127 S. Ct. 2705, 2714, 2717 (2007).  It is beyond dispute that sports league restraints are horizontal.  *See, e.g.*, *NCAA*, 468 U.S. at 99.

*Third*, the NHL cites, and badly misconstrues, *Kingray, Inc. v. NHL Enterprises, Inc.*, No. 00-CV-1544-L (BEN) (S.D. Cal. July 2, 2002) (Goldfein Decl., Ex. 2).  Contrary to the NHL's suggestion that *Kingray* found that the NHL clubs' horizontal allocation of broadcasting territories caused no harm to competition, the court in fact expressly refused to address such a claim.  Slip op., at 13, 15-17.  Specifically, the court held that the plaintiff, as an indirect

purchaser, had no standing to raise — and it would therefore not address — the claim that absent the territorial allocation, "rival teams would compete with one another and offer their out-of-market game broadcasts to consumers, placing downward pressure on the price of Center Ice and result in increased output and greater choice for consumers."  *Id.* at 15.  Accordingly, *Kingray* addressed only the much narrower claimed *vertical* restraint that "Center Ice *itself* reduces output," *id.* at 13 (emphasis added) — *i.e.*, that the mere act of offering a cable package reduces output, even in the absence of any restraints on individual clubs preventing them from competing with the package.  That is not the claim made here.

In any event, the proposition the NHL seeks to draw from *Kingray* — that the horizontal allocation of broadcasting territories causes no consumer harm, because Center Ice gives consumers "the ability to watch virtually every NHL game," MTD at 32, is untenable.  Even if consumers can "watch virtually every NHL game" by purchasing the Center Ice package, the clubs' horizontal elimination of competition against that package — given the distinct market for professional ice hockey broadcasts — produces higher prices and reduced consumer welfare.  As one commentator has noted, "[i]f consumers were able to contract for out-of-market games on a per-team basis [as an alternative to blanket licenses like Center Ice] . . . the price would be lower, and many consumers who are primarily interested in watching the games of a single out-of-market team would be able to obtain the desired product at vastly reduced cost."  Ross, *Antitrust Options*, 52 CASE W. RES. L. REV. at 143-44.  This is the essence of antitrust injury.  *See, e.g., Ross v. Bank of Am., N.A.*, 524 F.3d 217, 223 (2d Cir. 2008) ("A valid antitrust injury would be an injury to the consumers whose power of choice was impaired as a result of Defendants' conduct.").

Indeed, the NHL's position is directly contrary to *BMI*, in which the Supreme Court stressed that the permissibility of a blanket licensing arrangement was contingent on allowing individual members to compete individually. *Broad. Music*, 441 U.S. at 23-24; *see also NCAA*, 468 U.S. at 114 (freedom to compete individually essential to *BMI*'s holding). Under the NHL's approach, the Court should have deemed such individual competition superfluous, because music licensees could obtain any song by purchasing the blanket license — just as NHL fans can "watch virtually every NHL game" if they purchase the Center Ice blanket license. Needless to say, neither the Supreme Court nor any other court has adopted this view.

*Finally*, the NHL cites *Electronics Communications Corp. v. Toshiba America Consumer Products, Inc.*, 129 F.3d 240, 245 (2d Cir. 1997), which is also an inapposite vertical restraint case. In that case, as in the NHL's distributorship cases, output was not reduced because there no was horizontal restraint, only a vertical restraint that allowed "the continuing presence of [the product] in the market—in whatever number consumers demand." *Id.*

In sum, the Complaint easily satisfies the antitrust injury requirement.

## III. THE NHL'S OTHER PURPORTED BARS TO SCRUTINY OF ITS ACTIONS ARE WITHOUT MERIT.

### A. The Consent Agreement Cited By The NHL Cannot Insulate The NHL's Actions From Antitrust Scrutiny.

The NHL makes the extraordinary argument that its members' cartel-like behavior is immunized from scrutiny by the members' agreements not to challenge the cartel's unlawful behavior. In particular, the NHL contends, citing a 2005 Consent Agreement — and similar agreements on which it does not specifically rely — that MSG agreed to the anti-competitive agreements and released its right to seek injunctive relief against ongoing unlawful conduct, except the clubs' new website rules. MTD at 33-35. This argument fails for two reasons: The

Consent Agreement, by its plain terms, does not cover claims based on continued violations of the law after the Agreement. And any release of such claims would clearly be unenforceable.

### (1)  The Consent Agreement Does Not Cover Conduct That Occurs Following The Date Of The Agreement.

*First*, the Consent Agreement does not release claims for violations that occur after the Agreement. The Agreement designates New York law as the governing law, and in New York "releases bar suits on causes of action arising on or prior to the date of their execution but will not bar subsequent claims unless they are specifically embraced within the release or fall within the fair import of its terms." *Murray-Gardner Mgmt., Inc. v. Iroquois Gas Transmission Sys., L.P.*, 646 N.Y.S.2d 418, 419 (N.Y. App. Div. 1996). Here, the release in the 2005 Consent Agreement expressly *excluded* claims based on future anti-competitive conduct.

MSG's claims challenge ongoing conduct. The Agreement, by contrast, releases only claims that relate to NHL hockey and "exist as of the date of execution of this Consent Agreement *by reason of any act, omission, transaction or occurrence taken or occurring at any time up to and including the date of the execution of this Consent Agreement*." § 10(a) (emphasis added). Because the NHL clubs' ongoing, *post*-Agreement conduct is more than sufficient to give rise to each of MSG's claims — and, indeed, the essence of injunctive claims is *current* conduct, not historical conduct — such claims necessarily were not released.

This understanding is, moreover, consistent with well-established antitrust law. In *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322 (1955), the plaintiffs' initial suit was dismissed with prejudice when the parties settled. *See id.* at 324. In a new antitrust suit based on similar alleged violations, the Supreme Court rejected a res judicata defense that, like the NHL's contention here, was premised on the fact that "both suits involved 'essentially the same course of wrongful conduct.'" *Id.* at 326. This "conclusion [was] unaffected by the circumstance that

the [prior] complaint sought … injunctive relief which, if granted, would have prevented the illegal acts now complained of."  *Id.* at 328.  The court emphasized that the defendants' position "would in effect confer on them a partial immunity from civil liability for future violations," a result "consistent with neither the antitrust laws nor the doctrine of res judicata."  *Id.* at 329; *see also Cellar Door Prods., Inc. v. Kay*, 897 F.2d 1375, 1376-78 (6th Cir. 1990).

Notably, the NHL cites only snippets of language from the Agreement in support of its argument, and makes no attempt to reconcile the language with its argument.  Instead, the NHL cites a handful of cases with different release language, none of which required that the claim exist by reason of an "act … taken … up to … the date of the execution of [the] Agreement."  In fact, in cases with language similar to the language at issue here, courts have consistently held that the release does not bar future injunctive claims.  *See, e.g.*, *Redel's Inc. v. Gen. Elec. Co.*, 498 F.2d 95, 98-99 (5th Cir. 1974); *Mktg. Assistance Plan, Inc. v. Associated Milk Producers, Inc.*, 338 F. Supp. 1019, 1021-23 (S.D. Tex. 1972); *Westmoreland Asbestos Co. v. Johns-Manville Corp.*, 39 F. Supp. 117, 119 (S.D.N.Y. 1941).

> ### (2)  A Prospective Release Of The Right To Sue For An Injunction Against Antitrust Violations Would Be Unenforceable

*Second*, even if MSG *had* purported to release its claims for injunctive relief against future anti-competitive acts, such a release would be unenforceable as contrary to public policy.  Although the NHL notes that a party may release antitrust claims for past or current conduct, MTD at 34, it neglects to mention that a party cannot prospectively release its right to bring suit against *subsequent* antitrust violations.  *See, e.g.*, *Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 250 (7th Cir. 1994) ("A no-suit agreement may be one of the devices for shoring up a cartel. … We therefore conclude that plaintiffs' release does not prevent them from making an antitrust claim in court."); *Redel's*, 498 F.2d at 99 (reasoning that such an agreement

deprives the public of the protection of private antitrust suits, and thereby is itself a contract in restraint of trade); *see also Three Rivers Motor Co. v. Ford Motor Co.*, 522 F.2d 885, 896 n.27 (3d Cir. 1975); *Gaines v. Carrollton Bd. of Trade, Inc.*, 386 F.2d 757, 759 (6th Cir. 1967); *Fox Midwest Theatres, Inc. v. Means*, 221 F.2d 173, 180 (8th Cir. 1955); *Hunt v. Mobil Oil Corp.*, 654 F. Supp. 1487, 1516 (S.D.N.Y. 1987); *Mktg. Assistance Plan*, 338 F. Supp. at 1022; *Westmoreland Asbestos Co.*, 39 F. Supp. at 119.

Indeed, the Supreme Court has stated that it would "condemn[] . . . as against public policy" an agreement that "operated . . . as a prospective waiver of a party's right to purse statutory remedies for antitrust violations." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985). Moreover, agreements to violate the antitrust laws are unenforceable, *see Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 81-82 (1982), and — if MSG's claims have merit — a no-suit agreement to protect the NHL members' other unlawful agreements is itself unlawful.

This strong public policy is further reflected in *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134 (1968), which held that the "doctrine of *in pari delicto*" — which generally bars relief for wrongdoing when the plaintiff is involved in the wrongdoing — "is not to be recognized as a defense to an antitrust action." *Id.* at 138, 140. The Court reasoned that "the purposes of the antitrust laws are best served by insuring that the private action will be an ever-present threat to deter anyone contemplating business behavior in violation of the antitrust laws." *Id.* at 139. If the parties to anti-competitive agreements could release future antitrust claims against each other, cartels could easily eliminate this deterrent. *See Sanjuan*, 40 F.3d at 250.

This point has particular force regarding sports leagues, where numerous other factors deter antitrust suits by league members. The result of these deterrents is that questionable agreements long ripe for antitrust scrutiny have gone unchallenged, *see, e.g.*, Grusd, *Antitrust Implications*, 1 VA. J. SPORTS & LAW at 26-41 (exclusive licensing), as owners have rarely been willing to invoke such scrutiny. The enforcement of cartel agreements "releasing" the right to bring antitrust claims would eliminate even this check on cartel behavior.

The NHL suggests that this policy does not apply to claims based on post-release conduct that started before the release. MTD at 34. However, numerous cases are to the contrary. *See, e.g.*, *Fox Midwest Theatres*, 221 F.2d at 179-80 (release unenforceable even "against any continued . . . combinational or conspiratorial acts . . . , such as [the plaintiffs] had charged [the defendants] with having previously engaged in"); *see also Redel's*, 498 F.2d at 98, 99 (1969 release would not be enforced with respect to subsequent acts, even though plaintiff asserted "numerous claims of unlawful price discrimination occurring from 1965 through 1971"); *Mktg. Assistance Plan*, 338 F. Supp. at 1022-23 (release could "not bar the assertion … of any post-release causes of actions" challenging "renewed monopolistic activities by the defendants"); *Westmoreland Asbestos Co.*, 39 F. Supp. at 119 (plaintiffs not bound by release of "oppressions and wrongdoings" that had "continued unabated" since the release).

Against this weight of authority, the NHL cites only one case to the contrary, *Hunter Douglas, Inc. v. Comfortex Corp.*, No. 98-CV-0479, 1999 U.S. Dist. LEXIS 10906, *16-22 & n.10 (N.D.N.Y. Mar. 11, 1999), which does not account for the harm to the public when plaintiffs release their right to enjoin ongoing antitrust violations. The rest of the NHL's case law does not support the argument at all. Three of the cases involve claims that related

*exclusively* to pre-release conduct.[16]  And three other cases — all from district courts — barred only claims for damages, not injunctive relief.[17]  Even if defendants could be shielded from damages based on continuing conduct, it would be far more harmful to the public interest to shield such defendants from injunctive relief.  In sum, the vast majority of the case law — including all Supreme Court and Circuit authority — rejects the enforceability of agreements to bar claims for injunctive relief against ongoing antitrust violations.

### B.       MSG's Claims Are Not Barred By Laches.

The NHL also contends that laches bars most of MSG's claims.  *See* MTD at 35-37.  However, laches does not apply to claims, like the ones here, against continuing antitrust violations, and the NHL cites no precedent to the contrary.  In any event, the NHL cannot establish this defense on a motion to dismiss.

To begin with, the NHL's laches argument relies on a presumption derived from the applicability of the statute of limitations, but the statute of limitations does not apply where, as here, there is a continuing violation.  "[I]n the case of a 'continuing violation,' say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, 'each overt act that is part of the violation and that injures the plaintiff,' *e.g.,* each sale to the plaintiff, 'starts the statutory period running again.'"  *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997)

---

[16] *See Richard's Lumber & Supply Co. v. U.S. Gypsum Co.*, 545 F.2d 18, 20 (7th Cir. 1976) (claim for damages based on defendant's "allegedly illegal conduct from 1968 to 1972," with release entered into in 1973); *Three Rivers Motors Co.*, 522 F.2d at 887-88 (claim for damages based on alleged price-fixing arrangement that existed when plaintiff owned a franchise; release entered into when plaintiff sold franchise); *Ruffo v. Gulf Oil Corp.*, No. 74 C 1615, 1978 WL 1327, at *1 (E.D.N.Y. Mar. 13, 1978) (claim based on defendant's alleged anti-competitive behavior while the plaintiff leased a gas station; release entered into when he terminated the lease).

[17] *See Record Club of Am., Inc. v. United Artists Records, Inc.*, 611 F. Supp. 211, 213-14, 217 n.8 (S.D.N.Y. 1985) (antitrust complaint seeking damages, but no injunctive relief); *Willsea v. Theis*, No. 98 Civ. 6773, 1999 WL 595629, at *11, *12 & n.15 (S.D.N.Y. Aug. 6, 1999) (plaintiff's Sherman Act claim "seeks only monetary damages at law"); *MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 161 F.3d 443, 446 (7th Cir. 1998) (noting that injunctive relief had become moot).  Moreover, *Record Club of America* never passed on a public policy challenge to the release's application to damages for post-release conduct because the plaintiff never raised that objection.  *See* 611 F. Supp. at 215-17.  And *Willsea* expressly left open the question whether the plaintiff could have sought injunctive relief against the alleged monopolistic conduct.  *See* 1999 WL 595629, at *11, *12 n.15.  Finally, *MCM Partners, Inc.* distinguished a situation where — as in this case — the facts "would establish a new agreement or even an affirmation of the [pre-release] agreement."  *See id.*

(quoting II AREEDA & HOVENKAMP, ANTITRUST LAW, ¶ 338b, at 145). The Second Circuit has

stated that "in 'the context of a continuing conspiracy to violate the antitrust laws. . . . each time

a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the

damages caused by that act.'" *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 295 (2d

Cir. 1979) (quoting *Zenith Radio Corp v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971));

*accord Higgins v. N.Y. Stock Exch. Inc.*, 942 F.2d 829, 832 (2d Cir. 1991).

The NHL argues that MSG is challenging old agreements, MTD at 36, but the Complaint

is plainly directed at ongoing actions that are *currently* violating the antitrust laws. The statute

of limitations does not apply to such actions *regardless* of whether they reflect a prior policy or

agreement. For example, an ongoing refusal to deal "constitute[s] a continuing violation of the

Sherman Act" and is not barred by the statute of limitations, even where the policy began

decades earlier. *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 501 n.15 (1968);

*see also, e.g.*, *Columbia Steel Casting Co. v. Portland Gen. Elec. Co.*, 111 F.3d 1427 (9th Cir.

1996) (refusal to deal, in accordance with prior agreement between competitors, restarted the

statute of limitations); *United States v. N. Improvement Co.*, 814 F.2d 540, 542-43 (8th Cir.

1987) (statute of limitations resets until bid-rigging conspirators have received the last payment

on their successful but illegal bid).

Here, the Complaint alleges recent overt acts, such as the clubs' purported extension of

exclusive licensing agreements in 2006, and the actual and threatened imposition of fines to

penalize MSG's attempts to compete independently despite the challenged restraints. *E.g.*,

Complaint ¶¶ 4-5, 17, 39. The continuing nature of the violations is also clear from the relief

sought, which is prospective injunctive relief to bar ongoing violations. *See* Complaint Part VI;

*see also, e.g.*, *id.* ¶¶ 16, 40 (describing ongoing violations); *id.* ¶ 18 (describing these as

"continuing violations").  "A prospective injunction is entered only on the basis of current, ongoing conduct that threatens future harm.  Inherently, such conduct cannot be so remote in time as to justify the application of the doctrine of laches."  *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 799 (4th Cir. 2001).  Only one of the cases cited by the NHL concerns an injunction, *see Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191-92 (2d Cir. 1996), and there the court found that the challenged action was within the limitations period (though laches was found in other grounds).[18]  The leading antitrust treatise also recognizes that with regard to "long-term contracts that are unlawful, if at all, from the beginning" there should be "flexibility in equity to permit the injunction against continued enforcement."  II AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 320c3, at 213.

Since the NHL's laches argument is based entirely on a purported presumption arising from application of the limitations period, *see* MTD at 36, the continuing nature of the violations means it cannot succeed.  In any event, the continuing nature of the violation applies equally to laches as it does to the statute of limitations.  *See, e.g.*, *KFC Corp. v. Marion-Kay Co.*, 620 F. Supp. 1160, 1168 (S.D. Ind. 1985) ("[F]or the same reasons[] this case is not barred by the statute of limitations, it is also not barred by laches."); *Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp.*, 449 F. Supp. 1158, 1171 (D. Hawaii 1978) (similar).

Finally, a motion to dismiss on laches grounds is only allowed "when the defense of laches is clear on the face of the complaint, and where it is clear that the plaintiff can prove no set of facts to avoid" the defense.  *Fitzpatrick v. Sony-BMG Music Entm't, Inc.*, No. 07-2933, 2008 WL 84541, at *3 (S.D.N.Y. Jan. 8, 2008).  To establish the defense, the delay must be

---

[18] Also, *Conopco* was not an antitrust case, and in the antitrust context the Supreme Court has recognized "the inappropriateness of invoking broad common-law barriers to relief [since the] private suit serves important public purposes."  *Perma Life Mufflers*, 392 U.S. at 138.  *Conopco* itself notes that "the public good is of paramount importance when considering the equitable defense of laches."  95 F.3d at 193; *cf. Bernstein v. Universal Pictures, Inc.*, 517 F.2d 976, 981 (2d Cir. 1975) ("[I]t is highly unlikely that estoppel can be readily allowed to defeat antitrust claims.").

unreasonable and cause prejudice to the defendant, *see id.* at *2 (quoting *Ikelionwu v. United States*, 150 F.3d 233, 237 (2d Cir. 1998)), and here it is not "clear from the face of the complaint" that any delay in filing suit was unreasonable or that the NHL was prejudiced by the delay. Indeed, the Complaint describes the escalation of the NHL's actions in restricting competition, including an agreement and policy pronouncement in 2006 and fines in 2007, Complaint ¶¶ 9, 17, 39, which would justify any initial delay. *See, e.g.*, *Fourth Toro Family Ltd. P'ship v. PV Bakery, Inc.*, 88 F. Supp. 2d 188, 197-98 (S.D.N.Y. 2000).

For all of these reasons, the NHL's laches argument cannot be sustained.

### C. MSG's Claim Regarding Exclusive Broadcast Territories Is Not Barred By Judicial Estoppel.

The NHL argues that judicial estoppel bars MSG from challenging exclusive broadcast territories because "MSG" — in reality, a group of defendants led by the NHL — purportedly argued otherwise in *Kingray*. MTD at 37-38. This argument fails because it rests on an seriously inaccurate portrayal of the *Kingray* litigation. In addition, judicial estoppel requires a showing that "(1) the party against whom judicial estoppel is being asserted advanced an inconsistent *factual* position in a prior proceeding, and (2) the prior inconsistent position was adopted by the first court in some manner." *AXA Marine & Aviation Ins. (UK) Ltd.*, 84 F.3d 622, 628 (2d Cir. 1996) (emphasis added). The NHL satisfies neither requirement.

*First*, the NHL's contention that the *Kingray* defendants "sought and obtained a ruling, as a matter of law, that these very exclusive broadcast territories could not violate Section 1," MTD at 38, is simply false. As explained earlier, *Kingray* expressly refused to address such a claim because it agreed with the defendants' argument that the plaintiff lacked standing to assert it. *See* p. 29, *supra*. There is no tenable reading of *Kingray* that even arguably supports the NHL's

characterization of it.  Accordingly, there can be no argument that MSG's claim in this case is inconsistent with either the NHL's arguments in *Kingray* or with the *Kingray* court's ruling.

*Second*, and in any event, legal arguments are not subject to judicial estoppel.  As noted above, the standard requires "an inconsistent factual position."  *AXA Marine*, 84 F.3d at 628.  Accordingly, "legal conclusions are not 'inconsistent factual positions' as would ordinarily justify judicial estoppel."  *Mulvaney Mech., Inc. v. Sheet Metal Workers Int'l Ass'n*, 288 F.3d 491, 504 (2d Cir. 2002), *vacated on other grounds*, 123 S. Ct. 1572 (2003).  Judicial estoppel for non-factual arguments has therefore repeatedly been denied.  *See, e.g.*, *In re WorldCom, Inc. Sec. Litig.*, 308 F. Supp. 2d 236, 248 (S.D.N.Y. 2004) (judicial estoppel inapplicable because party had "not taken inconsistent factual positions" and "their argument" in the other court "was not a factual assertion, it was an argument"); *U.S. Fid. & Guar. Co. v. Treadwell Corp.*, 58 F. Supp. 2d 77, 93 (S.D.N.Y. 1999) (judicial estoppel "inapplicable" because "whatever inconsistency" there was related to issues of "law, not fact").[19]

Here, there is no doubt that the NHL seeks estoppel based on a legal argument, because it argues that MSG — in reality, a group of defendants led by the NHL — "sought and obtained a ruling, as a matter of law, that these very exclusive broadcast territories could not violate Section 1."  MTD at 38.  For this reason, too, the NHL's judicial estoppel argument is without basis.

## CONCLUSION

For the reasons stated above, MSG respectfully requests that this Court deny the defendants' motion.

---

[19] Even the case cited by the NHL for the judicial estoppel standard, *Mitchell v. Washingtonville Central School District*, 190 F.3d 1, 6-7 (2d Cir. 1999), makes clear that "[j]udicial estoppel prevents a party from asserting a *factual* position in a legal proceeding that is contrary to a position previously taken by [that party] in a prior legal proceeding."  *Id.* at 6 (emphasis added) (internal quotation marks omitted).

July 17, 2008                                    JONES DAY


                                                By:  /s/ Robert W. Gaffey
                                                    Meir Feder  (MF-2574)
                                                    Thomas F. Cullen, Jr. (*pro hac vice*)
                                                    Robert W. Gaffey  (RG-4004)
                                                    222 East 41st Street
                                                    New York, NY  10017-6702
                                                    Telephone:  (212) 326-3939
                                                    Facsimile:  (212) 755-7306


OF COUNSEL:

Joe Sims
Glen D. Nager
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001-2113
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700

Thomas Demitrack
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH  44114-1190
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212