

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Thomas Laumann, Fernanda Garber, Robert Silver, Garrett Traub, David Dillon, and Peter Herman, representing themselves and all others similarly situated, | |
|                Plaintiffs, | Civil Action No: 12-1817 (SAS) <br> ECF Case |
|        v. | **SECOND AMENDED CLASS** <br><br> **ACTION COMPLAINT** |
| National Hockey League, NHL Enterprises L.P., NHL Interactive Cyberenterprises LLC, New York Rangers Hockey Club, New Jersey Devils LLC, New York Islanders Hockey Club L.P., Comcast-Spectacor L.P., Lincoln Hockey LLC, Lemieux Group, L.P., Hockey Western New York LLC, Chicago Blackhawks Hockey Team Inc., San Jose Sharks LLC, Directv, LLC, Directv Sports Networks LLC, Root Sports Pittsburgh, Comcast Corp., Comcast Sportsnet Philadelphia, L.P, Comcast Sportsnet Mid-Atlantic, L.P., Comcast Sportsnet California, LLC, Comcast Sportsnet Chicago, LLC, and Madison Square Garden Company, | **JURY TRIAL DEMANDED** |
|               Defendants. | |

      Plaintiffs Thomas Laumann, Fernanda Garber, Robert Silver, Garrett Traub,

David Dillon, and Peter Herman, by and through their attorneys, file this

Complaint against Defendants and allege as follows:

**I.**
## NATURE OF THE ACTION

      1.     The National Hockey League ("NHL" or "League") is comprised of

thirty separately owned and operated major league men's professional ice hockey

clubs in the United States and Canada. The NHL clubs, like other sports leagues, have structured their governance to permit major decisions regarding on-ice sporting competition and off-ice business competition to be made by the club owners themselves. In so doing, the owners act in their own economic self-interest, including entering into a series of agreements that eliminate, restrict, and prevent off-ice competition. These anti-competitive agreements go far beyond any cooperation reasonably necessary to provide major league men's professional ice hockey contests that increase fan appeal or respond to consumer preferences.

2.      This action challenges—and seeks to remedy—the Defendants' agreements to eliminate competition in the distribution of live men's hockey games over the Internet and television. The Defendants have accomplished this elimination of competition by agreeing to divide the live-game video presentation market into exclusive territories, which are protected by anticompetitive blackouts. Not only are such agreements not necessary to producing hockey contests, they are directed at reducing competition in the live-game video presentation market, involving and protecting third parties who operate only in that separate market.

3.      Defendant Madison Square Garden—the owner of Defendant New York Rangers Hockey Club—itself challenged these naked, horizontal, geographical restraints in a lawsuit in 2007. Its complaint stated that the NHL is a "cartel" and acknowledged that the League's television and Internet restrictions were anti-competitive and unlawful. (Exhibit A, Amended Complaint ¶ 6, *Madison Square Garden, L.P. v. Nat'l Hockey League*, No. 07-8455 (S.D.N.Y.) ("MSG Complaint")).

After the Rangers survived the League's motion to dismiss the complaint, the League and the Rangers settled their lawsuit on a confidential basis with the League's anticompetitive practices remaining in place.

4.      Similarly, in a bankruptcy adversary action brought by the Phoenix Coyotes hockey club against the NHL, the Coyotes stated, "The NHL and its members have conspired to create exclusive television and radio broadcast rights within designated territories through contracts with individual NHL members, thereby maintaining monopoly power within each team's 'home territory' by preventing others from broadcasting events within those territories." (Second Amended Complaint, *Coyotes Hockey LLC v. NHL*, Adv. No. 09-494 (Bankr. D. Ariz. June 5, 2009).) That action was ultimately resolved when the League obtained ownership of the Phoenix Coyotes through the bankruptcy.

5.      In *American Needle, Inc. v. National Football League*, 130 S. Ct. 2201 (2010), the United States Supreme Court unanimously rejected the NFL's claim that an agreement regarding the joint marketing of club-owned intellectual property was the decision of a "single entity"—the league—not subject to section 1 of the Sherman Act. The Court reaffirmed lower court decisions that sports leagues are subject to the antitrust laws and that league owners must refrain from agreements that unreasonably restrain trade. The Court also reaffirmed its own decision in *NCAA v. Board of Regents,* 468 U.S. 85 (1984), which held that the hallmark of an unreasonable restraint is one that raises price, lowers output, or renders output unresponsive to consumer preference. The Court's decision extended

3

a long line of precedents that recognize that sports leagues are subject to the antitrust laws. Indeed, the United States District Court for the Eastern District of Pennsylvania found several decades ago that television blackout agreements of the very kind at issue in this case amount to "an unreasonable and illegal restraint of trade." *United States v. Nat'l Football League,* 116 F. Supp. 319, 327 (E.D. Pa. 1953).

6.     Despite these clear precedents, the NHL's member clubs continue to agree to divide the live-game video presentation market by assigning an exclusive territory to each team and its television partners. In exchange for being granted anticompetitive protections in its own home market, the team and its partners expressly agree not to compete in the other teams' exclusive territories. The stated purpose of these policies is to create regional monopolies that protect the partners from competition in their respective local areas.

7.     The only way consumers can watch video presentations of other teams is through one of two exclusive "out-of-market" packages: NHL Gamecenter Live, which is streamed over the internet, and NHL Center Ice, which is distributed through cable and satellite providers. For both packages, the "in-market" games are blacked out to protect the local television partner. Thus, a New York Rangers fan living in New York cannot watch the Rangers play through the internet or television package. The fan must own a television and subscribe to a cable package that includes the channels that carry Rangers' games.

4

8.     In addition, the Defendants have colluded to sell the "out of market" packages only through the League. The League Defendants are then able to exploit their illegal monopoly by charging supra-competitive prices. As a result of this monopoly, moreover, the League is able to require purchasers of NHL Gamecenter Live or NHL Center Ice to buy all "out-of-market" games of all the League's teams even if the fan is only interested in a particular team or a particular game. Thus, a Detroit Red Wings fan living in New York cannot watch the Red Wings play, except occasional games on network television, unless he purchases the entire package of League games from the NHL's exclusive Gamecenter Live or NHL Center Ice products.

9.     As one set of commentators has put it, "Absent the exclusive territorial arrangements agreed to by league owners, individual teams would … arrange for their own games to be available out-of-market. … Fans wishing to see only their favorite team now pay for more games than they want, so sports leagues are currently using their monopoly power to effectuate a huge wealth transfer. Another significant group of less fanatic consumers would be willing to pay a more modest sum for their favorite teams' games only. As to these fans, the current scheme reduces output." Stephen F. Ross & Stefan Szymanski, Fans of the World Unite! (Stanford Univ. 2008).

10.    As MSG/New York Rangers stated in its antitrust complaint against the League: "There are no legitimate, procompetitive justifications for these 'exclusive' agreements and other competitive restraints, which have harmed

consumers in various ways ....." (Exhibit A, MSG Complaint, ¶ 46). In particular, as MSG stated, these restraints result in "reduced output, diminished product quality, diminished choice and suppressed price competition." (*Id.* at ¶45).

11.     These restraints are not reasonably necessary to maintain a level of competitive balance within the League that fans prefer, or to maintain the viability of franchises. To the extent that competition among teams for internet or television rights would result in revenue disparities that preclude a fan-optimal level of competitive balance, agreements that require revenue sharing, if set at levels that do not restrict output, is an obvious and well-recognized less restrictive alternative.

12.     Plaintiffs are individuals who were, and continue to be, harmed by the Defendants' anti-competitive agreements. They have either (1) purchased a cable package that includes a network that is protected from competition and therefore is overpriced or (2) purchased an "out-of-market" package (either online or through their television provider) that is overpriced because of these unlawful agreements. Plaintiffs seek to restore off-ice competition among and between the clubs and their partners by ending the Defendants' collusive distribution agreements.

## II.
## PARTIES

### A.     The Plaintiffs

13.     Plaintiff Fernanda Garber now lives in Burlingame, California. From 2009 through March 2011, she subscribed to Comcast cable service in Oakland, California. Her service included Comcast Sportsnet California and Comcast

Sportsnet Bay Area. She was charged supra-competitive prices for her service due to Defendants' conduct.

14.     Plaintiff Thomas Laumann lives in Bradenton, Florida. He has been a subscriber to NHL Gamecenter Live since at least 2010. His favorite hockey team is the New York Islanders. He would prefer not to be required to purchase a full "out-of-market" package to get New York Islanders games, and would prefer not to have to subscribe to pay television to be able to watch New York Islanders games involving the Florida Panthers and Tampa Bay Lighting, which are blacked out when he tries to watch them through NHL Gamecenter Live.

15.     Plaintiff Robert Silver lives in Philadelphia, Pennsylvania. Until 2010, he subscribed to the NHL Center Ice, which he received through Directv satellite service. His Directv package also included other channels carrying live professional hockey games not available on a sponsored telecast. He was charged supra-competitive prices for his service due to Defendants' conduct.

16.     Plaintiff Garrett Traub lives in Washington, D.C. He subscribed to the NHL Center Ice package for the 2011-2012 season, which he received through Comcast. His Comcast package also included other channels carrying live professional hockey games not available on a sponsored telecast. He was charged supra-competitive prices for his service due to Defendants' conduct. He intends to purchase television and professional hockey programming services in the future.

17.     Plaintiff David Dillon lives in Kyle, Texas. He subscribed to NHL Gamecenter Live beginning in 2011, for which he was charge supra-competitive

7

prices as a result of Defendants' conduct. His favorite hockey team is the Dallas Stars. Although he subscribes to a pay-television service that includes the regional sports network that carries most Dallas Stars games, the version of the channel he gets in his area does not show most Stars games. Nevertheless, he is unable to watch any Stars games through the NHL Gamecenter Live package that he purchased. He intends to purchase television and professional hockey programming services in the future.

18.     Plaintiff Peter Herman lives at 1595 Little John Court in Highland Park, Illinois. During the class period he subscribed to Directv satellite television service. His package included channels carrying live professional hockey games not available on a sponsored telecast. He was charged supra-competitive prices for his service due to Defendants' conduct.

**B.     The League Defendants**

19.     Defendant NHL is an unincorporated association of the thirty major league men's professional ice hockey teams in the United States and Canada. Its headquarters are located at 1251 Avenue of the Americas, New York, New York.

20.     As MSG stated in its complaint against the League, each NHL team is "a separate and independent business with a separate and independent owner and significant autonomy in its business operations." (Exhibit A, Exhibit A, MSG Complaint, ¶ 24). (There is currently one temporary exception to this, as the Phoenix Coyotes were purchased by the League out of bankruptcy in 2009 with the intention of finding a permanent, independent owner.) The teams cooperate to schedule and produce ice hockey games and facilitate competition on the ice, but the

clubs are independent businesses that compete with each other. "For example, the member clubs of the NHL independently set the prices of tickets for attending games in person; compete for contracting with players and in hiring coaches; create and manage their individual marketing and promotional programs, including the sale of advertising opportunities and merchandise; and develop, license and market their respective trademarks for various purposes." (Exhibit A, MSG Complaint, ¶2). The clubs also enter into separate contracts with regional television partners.

21.     Defendant NHL Enterprises, L.P. ("NHLE"), is a Delaware limited partnership with its principal place of business at 1251 Avenue of the Americas, New York, New York. The "beneficial owners" of NHLE are the thirty NHL clubs or entities. These entities control NHLE, and can profit either from NHLE policies that enrich the league as a whole or NHLE policies that benefit individual clubs, even at the expense of the league as a whole. (Exhibit A, MSG Complaint, ¶ 25).

22.     Defendant NHL Interactive Cyberenterprises, LLC ("NHL ICE"), is a subsidiary of NHLE, and a Delaware limited liability company with its principal place of business at 1251 Avenue of the Americas, New York, New York. NHL ICE provides the NHL's Internet services, including operation of its website and the websites of the thirty member clubs, as well as Internet streaming of live and archived hockey games. NHL ICE, NHLE, and the NHL are collectively referred to herein as "the NHL Defendants" or "the League."

C.     **The NHL Member Club Defendants**

23.     The member clubs of the NHL that are named as defendants are:

9

a.      Chicago Blackhawks Hockey Team, Inc., a Delaware corporation whose located at the United Center, 1901 Madison Street, Chicago, Illinois.

b.      Comcast-Spectacor, L.P. (d/b/a "Philadelphia Flyers"), a Delaware limited partnership located at the Wells Fargo Center, 3601 South Broad Street, Philadelphia, Pennsylvania. Comcast-Spectacor is a subsidiary of Comcast Corporation.

c.      Hockey Western New York, LLC (d/b/a "Buffalo Sabres"), a New York limited liability company located at the First Niagara Center, One Seymour H. Know III Plaza, Buffalo, New York.

d.      Lemieux Group, L.P. (d/b/a "Pittsburgh Penguins"), a Pennsylvania limited partnership located at the CONSOL Energy Center, 1001 Fifth Avenue, Pittsburgh, Pennsylvania.

e.      Lincoln Hockey, LLC (d/b/a "Washington Capitals"), located at the Verizon Center, 601 F Street NW, Washington, D.C.

f.      New Jersey Devils, LLC, a New Jersey corporation located at the Prudential Center, 165 Mulberry Street, Newark, New Jersey.

g.      New York Islanders Hockey Club, L.P., a New York limited partnership located at Nassau Veterans memorial Coliseum, 1255 Hempstead Turnpike, Uniondale, New York.

h.      New York Rangers Hockey Club, located at Madison Square Garden, 2 Pennsylvania Plaza, New York, New York. The Rangers are owned by Defendant MSG.

      i.     San Jose Sharks, LLC, a Delaware limited liability corporation located at HP Pavilion at San Jose, 525 West Santa Clara Street, San Jose, California.

**D.    <u>Other NHL Member Clubs</u>**

      a.     Anaheim Ducks Hockey Club, LLC, a California limited liability company located at Honda Center, 2695 Katella Avenue, Anaheim, California.

      b.     Boston Professional Hockey Association, Inc. (d/b/a "Boston Bruins"), a Massachusetts corporation located at the TD Garden, 100 Legends Way, Boston, Massachusetts.

      c.     COLHOC, L.P. (d/b/a "Columbus Blue Jackets NHL Hockey Club"), an Ohio limited partnership located at Nationwide Arena, 200 West Nationwide Boulevard, Columbus, Ohio.

      d.     Colorado Avalanche, LLC, a Colorado limited liability company located at the Pepsi Center, 1000 Chopper Circle, Denver, Colorado.

      e.     Coyotes Hockey, LLC (d/b/a "Phoenix Coyotes"), a Delaware limited liability corporation located at the Jobing.com Arena, 9400 West Maryland Avenue, Glendale, Arizona.

      f.     Dallas Stars, L.P., a Delaware Limited Partnership located at 2500 Victory Avenue, Dallas, Texas.

      g.     Detroit Red Wings, Inc., a Michigan corporation located at Joe Louis Arena, 19 Steve Yzerman Drive, Detroit, Michigan.

      h.     Florida Panthers Hockey Club, Ltd., a Florida limited partnership located at BankAtlantic Center, One Panther Parkway, Sunrise,

Florida. Florida Panthers Hockey Club, Ltd. is a subsidiary of Sunrise Sports and Entertainment, L.P., a Delaware limited partnership

      i.     Hurricanes Hockey, L.P. (d/b/a "Carolina Hurricanes"), a Delaware limited partnership, located at RBC Center, 1400 Edward Mill Road, Raleigh, North Carolina.

      j.     Lightning Hockey, L.P. (d/b/a "Tampa Bay Lightning"), a Delaware limited partnership located at the St. Pete Times Forum, 401 Channelside Drive, Tampa, Florida.

      k.     Los Angeles Kings Hockey Club, L.P., a limited partnership located at the Staples Center, 1111 S. Figueroa Street, Los Angeles, California.

      l.     Minnesota Wild Hockey Club, L.P., a Minnesota limited partnership located at Xcel Energy Center, 199 West Kellogg Boulevard, St. Paul, Minnesota.

      m.     Nashville Hockey Club, L.P., a Tennessee limited partnership located at Bridgestone Arena, 501 Broadway, Nashville, Tennessee.

      n.     St. Louis Blues Hockey Club, LP, a Missouri limited partnership located at the Scottrade Center, 1401 Clark Ave., St. Louis, Missouri.

      o.     Calgary Flames L.P., located at Scotiabank Saddledome, 555 Saddledome Rise SE, Calgary, Alberta.

      p.     Capital Sports and Entertainment, Inc. ("Ottawa Senators"), locate at Scotiabank Place, 1000 Palladium Drive, Ottawa, Ontario.

q.     Club de hockey Canadien, Inc. ("Montréal Canadiens"), located at the Centre Bell, 1909 Avenue des Canadiens-de-Montréal, Montréal, Québec.

r.     Maple Leafs Sports and Entertainment ("Toronto Maple Leafs"), located at the Air Canada Center, 40 Bay Street, Toronto, Ontario.

s.     Rexall Sports Corp. ("Edmonton Oilers"), located at Rexall Place, 7424 118 Avenue, Edmonton, Alberta.

t.     The Vancouver Canucks, L.P., located at Rogers Arena, 800 Griffiths Way, Vancouver, British Columbia.

u.     True North Sports and Entertainment Ltd. ("Winnipeg Jets"), located at the MTS Centre, 300 Portage Avenue, Winnipeg, Manitoba.

**E.     The Television Defendants**

24.     Defendant Madison Square Garden Company, f/k/a "Madison Square Garden, Inc." ("MSG") is a Delaware corporation with its principal offices at Two Pennsylvania Plaza, New York, New York. MSG owns the New York Rangers professional ice hockey club and the mark "New York Rangers." MSG also owns Madison Square Garden, where the New York Rangers play their home games, as well as two regional sports networks, MSG Network and MSG Plus, which carry Rangers games, as well as games of the New York Islanders, New Jersey Devils, and Buffalo Sabres NHL hockey clubs. MSG is a member or partner and beneficiary of the NHL, NHLE and NHL ICE.

25.     Prior to the incorporation of the Madison Square Garden Company (then known as "Madison Square Garden, Inc."), MSG was a wholly-owned subsidiary of Cablevision, at which time it was organized as a Delaware limited

13

partnership, Madison Square Garden, L.P. On February 9, 2010, Cablevision spun off MSG to the shareholders. Because the same persons—the Dolan family— continue to own controlling shares of both MSG and Cablevision, however, MSG is still controlled by Cablevision. James L. Dolan, the president and chief executive officer of Cablevision is the executive chairman of MSG. He serves as governor to the NHL on behalf of the New York Rangers Hockey Club.

26.     Defendant Directv, LLC, is a Delaware corporation whose principal place of business is 2230 East Imperial Highway, El Segundo, California. Directv and its subsidiaries provide satellite television service ("DBS") throughout the United States.

27.     Defendant Directv Sports Networks LLC, a wholly owned subsidiary controlled by Directv, is a Delaware limited liability company, whose principal place of business is 2230 East Imperial Highway, El Segundo, California.

28.     Defendant Root Sports Pittsburgh, a/k/a "Directv Sports Net Pittsburgh LLC," is a Delaware limited liability company whose principal place of business is 2230 East Imperial Highway, El Segundo, California. Root Sports Pittsburgh is wholly-owned subsidiary of, and controlled by, Directv and/or Directv Sports Networks LLC. Root Sports Pittsburgh is a regional sports network that presents Pittsburgh Penguins games.

29.     Defendant Comcast Corporation ("Comcast") is a Pennsylvania corporation whose principal place of business is 1701 John F. Kennedy Boulevard,

Philadelphia, Pennsylvania. Comcast owns and operates cable systems throughout the United States.

30.     Comcast owns and controls Comcast Sportsnet Defendants, which include Defendants Comcast Sportsnet Philadelphia, L.P, located at 3601 South Broad Street, Philadelphia, Pennsylvania; Comcast Sportsnet Mid-Atlantic, L.P., located at 7700 Wisconsin Avenue, Suite 200, Bethesda, Maryland; Comcast Sportsnet California, LLC, located at 370 3rd Street, 2nd Floor, San Francisco, California; and Comcast Sportsnet Chicago, LLC, located at 350 N. Orleans Street, Suite S1-100, Chicago, Illinois. These entities are controlled subsidiaries of Comcast Corporation and operate Regional Sports Networks ("RSNs") that produce and distribute video presentations for the Philadelphia Flyers, Washington Capitals, San Jose Sharks, and Chicago Blackhawks, respectively.

**F.     Other Relevant Entities**

31.     In addition to the Comcast RSN Defendants, as well as other RSNs, Comcast Corporation also controls the two most significant national producers of NHL games in the United States: NBC, an over-the-air network, which airs games nationwide, and NBC Sports Network, a widely available pay-television sports channel available exclusively through cable and satellite providers (known as "Versus" until January 2, 2012).

32.     Comcast is also a majority owner of and controls, through its subsidiary Defendant Comcast-Spectacor, the Philadelphia Flyers Hockey Club.

33.     Fox Sports Net, Inc., a subsidiary of News Corporation, owns and controls a number of regional sports networks engaged in producing and presenting

15

NHL hockey games and which are part of the conspiracy to divide the live hockey video market:

    a.    Fox Sports West and Prime Ticket are RSNs that carry Anaheim Ducks and Los Angeles Kings games.

    b.    Fox Sports Carolina carries Carolina Hurricanes games.

    c.    Fox Sports Ohio carries Columbus Blue Jackets games.

    d.    Fox Sports Southwest carries Dallas Stars games.

    e.    Fox Sports Detroit carries Detroit Red Wings games.

    f.    Fox Sports Florida carries Florida Panthers games.

    g.    Fox Sports North carries Minnesota Wild games.

    h.    Fox Sports Tennessee carries Nashville Predators games.

    i.    Fox Sports Arizona carries Phoenix Coyotes games.

    j.    Fox Sports Midwest carries St. Louis Blues games.

    k.    Sun Sports carries Tampa Bay Lightning games.

34.    Other RSNs carrying professional hockey games in the United States include Altitude Sports and Entertainment, which carries Colorado Avalanche games, and New England Sports Network ("NESN"), which carries Boston Bruins games. The Boston Professional Hockey Association, Inc. (the Boston Bruins), is a minority owner of NESN.

35.    A small number of games of a few teams are carried by local, over-the-air channels, including KDOC in Southern California (Anaheim Ducks games),

WGN in Chicago (Blackhawks games), TXA-21 in Dallas (Stars games), and CW44 in Tampa (Lightning games).

### III.
### CLASS ACTION ALLEGATIONS

36.  Plaintiffs bring this action on behalf of themselves and as a class action under the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons in the United States (excluding Defendants, their present and former parents, subsidiaries, affiliates, and Co-Conspirators, the named Plaintiffs, government entities, and any judge assigned to this action) who fall within the following classes:

  a.  <u>Television Class</u>: All individuals who purchased television service from Directv and/or Comcast, or their subsidiaries, at any time within four years prior to the filing of this complaint and until the effects of the anti-competitive conduct end, that included channels carrying video presentations of live NHL hockey games that were not available through a sponsored telecast (as that term is used by the Sports Broadcasting Act, 15 U.S.C. § 1291, *et seq.*).

  b.  <u>Internet Class</u>: All individuals who purchased NHL Gamecenter Live in the United States directly from any of the NHL Defendants or their subsidiaries at any time within four years prior to the filing of this complaint and until the effects of the anti-competitive conduct end.

17

37.    Due to the nature of the trade and commerce involved, Plaintiffs believe that each class consists of at least many thousands of members, the exact number and their identities being known to Defendants and their co-conspirators.

38.    The Classes are so numerous and geographically dispersed that joinder of all members is impracticable.

39.    There are questions of law and fact common to the Classes, including:

a.    Whether Defendants and their co-conspirators engaged in a contract, combination or conspiracy among themselves to fix, raise, maintain or stabilize prices of video presentations of live NHL hockey games by blacking out potentially competing presentations of NHL games;

b.    Whether Defendants and their co-conspirators engaged in a contract, combination or conspiracy among themselves to fix, raise, maintain, or stabilize prices of NHL Center Ice by preventing any competitor from offering competing products;

c.    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize prices of NHL Gamecenter Live by preventing any competitor from offering competing products;

d.    The effect of Defendants' conspiracy on the prices of NHL Gamecenter Live and NHL Center Ice in the United States during the class period;

e.      The effect of Defendants' conspiracy on the prices of pay television packages that include NHL hockey games that are not available on a sponsored telecast;

f.      The identity of the participants of the conspiracy;

g.      The duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

h.      Whether the alleged conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

i.      Whether the alleged conspiracy violated Section 2 of the Sherman Act, 15 U.S.C. § 2;

j.      Whether the conduct of Defendants and their co-conspirators, as alleged in this complaint, caused injury to the Plaintiffs and the other members of the Classes;

k.      The appropriate class-wide measure of damages.

40.   Plaintiffs Thomas Laumann and David Dillon are purchasers of NHL Gamecenter Live. Their claims are typical of the claims of the Internet Class members, and they will fairly and adequately protect the interests of that Class.

41.   Plaintiff Fernanda Garber was, during the class period, a subscriber to pay television service provided by Comcast, which included channels carrying NHL hockey games that are not available on a sponsored telecast. Her claims are typical of the claims of the Television Class members, and Ms. Garber will fairly and adequately protect the interests of that Class.

19

42.     Plaintiff Robert Silver was a subscriber to pay television service provided by Directv, which included channels carrying NHL hockey games that are not available on a sponsored telecast. Mr. Silver was a subscriber to NHL Center Ice as part of this service. His claims are typical of the claims of the Television Class members, and Mr. Silver will fairly and adequately protect the interests of the Television Class.

43.     Plaintiff Garrett Traub was a subscriber to pay television service provided by Comcast, which included channels carrying NHL hockey games that are not available on a sponsored telecast. Mr. Traub was a subscriber to NHL Center Ice as part of this service. His claims are typical of the claims of the Television Class members, and Mr. Traub will fairly and adequately protect the interests of the Television Class.

44.     Plaintiff Peter Herman subscribed to a cable package from Directv during the class period that was overpriced due to Defendants' conduct. His claims are typical of the claims of the Television Class members, and he will fairly and adequately protect the interests of that Class.

45.     Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

46.     Given the high cost of establishing that the Defendants' agreements violated the antitrust laws (including, but not limited to, substantial expert witness costs and attorneys' fees), a class action is the only economically feasible means for the plaintiffs to enforce their statutory rights.

47. The prosecution of separate actions by individual members of the Classes would also create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

48. The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

49. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Classes are readily definable and are ones for which records should exist. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. This class action presents no difficulties in management that would preclude maintenance as a class action.

## IV.
## JURISDICTION AND VENUE

50. Plaintiffs bring this action pursuant to Section 16 of the Clayton Act (15 U.S.C. §§ 15, 26), for a violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1, 2. This Court has subject matter jurisdiction over that claim pursuant to 28 U.S.C. §§ 1331 and 1337.

51. Venue is proper pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 22. The Defendants transact business in this district, and are subject to personal jurisdiction in this district.

52.    Class members were injured in this district.

53.    Jurisdiction over all defendants comports with the United States
Constitution.

## V.
## TRADE AND COMMERCE

54.    As Defendant MSG has stated, "There are peculiar and unique
characteristics that set major league men's professional ice hockey apart from other
sports or leisure activities. Close substitutes do not exist, and watching (or
participating as a fan in) major league men's professional ice hockey is not
reasonably interchangeable with watching (or participating as a fan in) other sports
or other leisure activities." (Exhibit A, MSG Complaint, ¶ 29).

55.    "There is a relevant product or service market defined as the provision
of major league professional ice hockey contests in North America. This market is
characterized by high barriers to entry. The NHL is the only significant, and
therefore the dominant, provider of major league hockey games, and has market
power. . . . The NHL, acting through and in combination with the separate and
independent clubs that own and control it, also exercises market power through the
unnecessary and unjustified restraints on each team's competitive activities
described herein." (Exhibit A, MSG Complaint, ¶32)

56.    Most importantly for this action, there is a relevant market for live
video presentations of major league professional hockey games. The NHL's
dominance in the production of major league professional hockey games in the
United States gives it the ability to exercise market power, together with its

22

television partners, in the market for live video presentations of major league professional hockey games.

57.     The relevant geographic market consists of North America, including the United States. Various geographic submarkets also may exist.

58.     Defendants' conduct has directly affected and foreseeably restrained the interstate and foreign commerce of the United States, by, inter alia, the interstate and foreign distribution of video of NHL games.

## VI.
## FACTS

### A.     The Anticompetitive Exclusive License Agreements.

59.     It has been long recognized that the NHL's member clubs, like the member clubs of all professional sports leagues, must cooperate to define, schedule, and produce league contests. That limited cooperation is consistent with, and permissible under, the antitrust laws. But the member clubs continue to exist as separate businesses with separate owners. They retain significant autonomy and seek their own profits. Thus, the clubs compete in business matters that are separate and distinct from the facilitation of ice hockey games.

60.     Pursuant to a series of agreements between and among Defendants, the League has obtained centralized control over distribution of live video programming of NHL games. As described more fully below, as a result of these agreements, the clubs have agreed not to compete in business matters related to the video presentation of live major-league men's professional hockey games.

61.     The majority of NHL hockey games are televised pursuant to contracts entered into by the individual clubs with separate entities, primarily RSNs, including MSG, Root Sports, various regional Comcast Sportsnets, and others.

62.     A smaller number of presentations are produced pursuant to national agreements between the League and a national network, including NBC Sports Network (f/k/a "Versus"), a pay-television channel owned and controlled by Comcast, and the National Broadcasting Company ("NBC"), an over-the-air network controlled by Comcast since January 2011. The League also owns its own channel, the NHL Network, which televises nationally through certain cable and satellite providers.

### 1.     Regional Blackout System

63.     At the core of Defendants' restraint of competition in the video programming market are the regional blackout agreements. The result of these agreements is a classic, horizontal, geographical market division. In the absence of a separate out-of-market package or a national telecast (both are discussed below), a consumer of video presentations of live major league hockey games is required to purchase the video presentation provided by the consumers' local team and its television partner.

64.     The League acknowledges that the purpose of these restrictions is to restrain competition, stating that they exist for the purpose of "protect[ing] the local television telecasters of each NHL game in the local markets of the teams."[1] The League openly acknowledges this anticompetitive purpose despite the fact that, as

[1] http://www.nhl.com/ice/page.htm?id=58154

the corporate parent of the New York Rangers Hockey Club has admitted,

"[l]ongstanding precedent holds that a sports league's allocation of broadcasting

territories violates the Sherman Act …." Pl. Mem. Opp. Mot. Dismiss at 8, *Madison*

*Square Garden, L.P. v. Nat'l Hockey League*, No. 07-8455 (S.D.N.Y.).

65.    Defendants Comcast and Directv have joined the conspiracy by

agreeing to enforce and maintain these anticompetitive restrictions.

66.    As MSG correctly states in challenging these restrictions, "the serious

harm to competition from a sports league's division of broadcasting territories has

long been established as an antitrust violation."  Exhibit B, Pl. Mem. Opp. Mot.

Dismiss at 27, *Madison Square Garden, L.P. v. Nat'l Hockey League*, No. 07-8455

(S.D.N.Y.) (citing *United States v. NFL*, 116 F. Supp. 319 (E.D. Pa. 1953); Stephen

Ross, *Antitrust Options to Redress Anticompetitive Restraints and Monopolistic*

*Practices by Professional Sports Leagues*, 52 Case W. Res. L. Rev. 133, 141-42

(2001)).

67.    In the absence of these restrictions, fans would have access to live

video from teams throughout the United States and Canada. The availability of

multiple sources of major-league professional hockey programming would result in

competition among the Defendants, which would lower prices and increase choice

for consumers.

## 2.    Implementation of the Blackout System through Agreements Restraining Competition Among Sports Networks

68.    The clubs implement their system of exclusive territories through a

system of agreements with regional networks. These agreements require the

networks to agree not to compete with other regional networks in the presentation of NHL hockey games.

69.     The networks (and their corporate parents) agree to these requirements knowing that other networks must agree not to compete in their territories. The result is a horizontal division of the market that is enforced by the horizontal agreement between the Defendants.

70.     In each case, the local television network (and the entity that controls that network) agrees with the League and member clubs that it will not permit its presentations of the games to be shown in areas outside of its exclusive territory, knowing that other networks will likewise agree not to compete in their exclusive home territory. The League and the network also agree that the network will not carry games of other teams outside their territory.

71.     Regional Sports Networks (RSNs) enter agreements with multichannel video programming distributers (MVPDs), like defendants Comcast and Directv, to implement the blackouts. But-for these agreements, the MVPDs would facilitate "foreign" RSN entry and other forms of competition.

72.     The result is that each local network has a monopoly on live televised hockey games in its territory. (This is true even in markets with multiple teams, as all three teams' games in the New York area are carried by MSG, and both Southern California teams' games are carried by Fox Sports West.) In certain cases, the outer areas of a team's territory may overlap with another team's or teams'

territories, permitting a viewer to watch either team's games, if they are available, and subjecting the viewer to local blackouts of all such teams games.

73.     These express restrictions on competition have made local sports networks extremely valuable. The Federal Communications Commission has repeatedly described RSNs as the clearest example of "must-have" channels because of their exclusive control of sports programming. *See, e.g., In re AT&T Servs., Inc.*, FCC 11-168, 2011 WL 5534853, *3 (Nov. 10, 2011). In upholding FCC rules designed to ensure that RSNs are not used to unfairly harm competition in the MVPD market, the Court of Appeals for the District of Columbia Circuit agreed that this control of sports programming made RSNs "'must have' and nonreplicable." *Cablevision Sys. Corp. v. FCC*, 649 F.3d 695, 702 (D.C. Cir. 2011).

74.     These restrictions have the purpose and effect of creating a series of regional monopolies in order to increase the price that can be charged by the teams, the television networks, and television distributers like Comcast and Directv. Plaintiffs and all purchasers of video programming that include these networks consequently pay higher prices for television services that include presentations of major league professional hockey games.

### B.     "Out-of Market" Packages

75.     For a consumer to obtain games that are not available through a local cable or over-the-air, there are only two options, both of which, as a consequence of agreements by and among the member clubs, are controlled by the League: "NHL Gamecenter Live," which is streamed over the Internet and is available only

through the league; and "NHL Center Ice," which is a similar service available

through cable companies and other television distributors, including Directv.

76.     The NHL defines these products as "out-of-market" packages, and

games from outside of a protected territory as "out-of-market" games. "In-market"

and "out-of-market" are terms defined by reference to the anticompetitive

geographical restrictions imposed by Defendants and their co-conspirators.

77.     NHL Gamecenter Live is provided over the Internet and is sold

directly by the League to the consumer, through Defendant NHL ICE. As of

December 2011, the cost for Gamecenter Live was $169.00 for the season.

78.     For most games, NHL Gamecenter Live offers both the "home" and

"away" feeds—a feature the League actively markets—but neither team's game is

available in a game involving a local team. These "in-market" games are blacked out

within that team's "market." Nationally televised games are blacked out in the

United States as a whole. In fact, the other team's presentation is never available

through any source in a game involving a local team, regardless of whether that

game is played locally or in the other team's arena.

79.     When games are blacked out on NHL Gamecenter Live, there is

typically no other means of watching the game over the Internet.

80.     The League offers NHL Gamecenter Live only as all-or-nothing.

Purchasers of Gamecenter Live must buy all out-of-market games for all teams even

if they are only interested in watching the games of a particular team. Likewise,

consumers must buy the complete season of games and may not purchase individual games.

81.    Because of these restrictions on competition, there is no way for consumers in the United States to obtain live, Internet-streaming of games involving a team from within the exclusive territory of that team. No one in New York, for example, has access to any live presentation of a contest involving the Rangers over the Internet, despite the fact that Rangers' contests are routinely streamed over the Internet to consumers elsewhere, and no additional cost would be incurred by permitting Rangers games to be viewed over the Internet by New York hockey fans. The sole reason for this restriction is to interfere with competition.

82.    The reason for this restriction is to interfere with competition, as the League has admitted, acknowledging that local Internet blackouts are intended to "protect" the local television network.

83.    Teams are prohibited from streaming their own games even within their own exclusive territories. When MSG attempted to stream New York Rangers games over the Internet, the League enforced its monopoly by issuing fines to the Rangers. (Exhibit A, MSG Complaint, ¶4).

84.    Because the League is the only source of such programming, it is able to charge monopoly pricing and limit the choices available to consumers. The inevitable consequence is higher pricing, lower quality, less choice to consumers, and lower output.

85. NHL Center Ice is a similar product as Gamecenter Live, but is available by satellite through Directv and Dish Network, as well as through most cable companies through In Demand, whose majority owner is Comcast. The price for the service, as of November 2011, is $179.80 for the season.

86. As with Gamecenter Live, all NHL Center Ice games involving a team whose exclusive territory encompasses the viewer's location are blacked out from Center Ice, regardless of whether the game is being held locally, and regardless of whether the game is available to the viewer through a different network. Again, the NHL states that these blackouts are for the express purpose of preventing competition: "Blackout restrictions exist to protect the local telecasters of each NHL game in the local markets of the teams." http://www.nhl.com/ice/page.htm?id= 26371.

87. As the parent company of the New York Rangers stated in objecting, on antitrust grounds, to these packages, "the clubs' horizontal elimination of competition against that package—given the distinct market for professional ice hockey broadcasts—produces higher prices and reduced consumer welfare." Exhibit B, Pl. Mem. Opp. Mot. Dismiss at 30, *Madison Square Garden, L.P. v. Nat'l Hockey League*, No. 07-8455 (S.D.N.Y.).

88. The NHL maintains discipline over the member clubs by sanctioning, or threatening to sanction, teams for engaging in independent activities in violation of the above-described agreements or otherwise in violation of rules that the NHL has developed over the years to implement these agreements.

89.    These sanctions are significant and real. When Defendant MSG attempted to compete in certain markets, including Internet streaming, the New York Rangers were assessed fines of $100,000 per day. (Exhibit A, MSG Complaint, ¶ 4).

90.    "In short, defendants have restrained and threatened to restrain competition in the broadcasting, rebroadcasting and other distribution of games, game highlights and game footage, seeking to control the delivery of content through all existing and future media platforms in ways that go well beyond what is reasonably necessary to the success of the NHL." (Exhibit A, MSG Complaint, ¶ 40.C.).

C.    **The Agreements Have Restrained Horizontal Competition and Have Had Anticompetitive Effects and Led to Consumer Harm.**

91.    The above-described agreements have restrained horizontal competition between and among the NHL clubs, together with their media partners, and the NHL, including in the commercial exploitation of video presentations of live games where the member clubs' media partners could and would compete with each other and with the NHL. In particular, in the absence of the exclusive licenses and other competitive restraints, NHL teams and their partners would compete with each other in the presentation of their teams' games to a much greater extent than the limited opportunities that are now available.

92.    As the owner of the New York Rangers itself has stated in challenging these rules, "The teams would compete with each other in the broadcasting, rebroadcasting and other distribution of NHL games (apart from any national

broadcasting contract), game highlights and game footage in a variety of media and, further, in the operation of their websites." (Exhibit A, MSG Complaint, ¶ 42).

93.     The above-described agreements have adversely affected and substantially lessened competition in the relevant markets. Output of presentations of live NHL games, as well as output of game highlights and footage, is lower, and prices are higher, than they would be in the absence of the agreements to restrict competition.

94.     Competition by individual clubs independently acting to exploit the distribution of their teams' games would produce consumer benefits, such as an increase in the availability of live video presentations over a wider range of media, including cable, the internet and wireless devices.

95.     The above-described agreements do not concern matters of league structure and do not concern any unique characteristic or need of hockey exhibitions. These anticompetitive restraints are not necessary to the exhibition of hockey and are not integral to the sport itself.

96.     There are no legitimate, pro-competitive justifications for these exclusive license agreements and other competitive restraints, which have harmed consumers in various ways, including in the above-described ways.

**D.     Plaintiffs' Have Suffered Antitrust Injury.**

97.     Plaintiffs have been overcharged for the video presentation of live NHL games.

98.     Subscribers to pay television service with standard channel packages have been forced and will continue to be forced to overpay for their television service

because of the inclusion of sports programming that commands supra-competitive pricing. Subscribers suffer this overpayment even if they do not watch sports programming. *See, e.g.*, Brian Stetler and Amy Chozick, *Paying a 'Sports Tax,' Even if You Don't Watch*, N.Y. TIMES, Dec. 15, 2011, available at http://www.nytimes.com /2011/12/16/business/media/for-pay-tv-clients-a-steady-diet-of-sports.html.

99.     Subscribers to NHL Center Ice have been forced and will continue to be forced to overpay for "out-of-market" games because of the lack of competition created by the geographical exclusivity system that the New York Rangers and MSG have admitted are unlawful restraints on trade.

100.     Subscribers to NHL Gamecenter Live have been forced and will continue to be forced to overpay for Internet-delivered games and have been and will continue to be forced to purchase Internet-delivered games in a bundle of all such games (other than those blacked out), despite the fact that, in the absence of collusive agreements, individual games and individual teams' games would be available at substantially lower prices.

101.     Plaintiffs have been and will continue to be prevented from obtaining Internet-delivered videos of the games involving local teams.

102.     Plaintiffs have been and will continue to be prevented from obtaining games involving a local team from any source other than the team's RSN partner, which typically requires the purchase of a full pay-television subscription, including tens or hundreds of other channels Plaintiffs may not want.

103.   Individual teams and their media partners are restrained from distributing their games through cable, satellite, Internet and otherwise in ways that they may determine are best suited to reaching their respective and potential fan bases throughout the country and abroad.

## VII.
## CLAIMS FOR RELIEF

### COUNT ONE
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT
### On Behalf of the Television Class

104.   Plaintiffs Garber, Silver, Traub, and Herman, on behalf of themselves and the Television Class, incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

105.   Beginning at a time presently unknown to Plaintiffs, and continuing through the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, combination or conspiracy in restraint of trade with the purpose, intent, and effect of restraining horizontal competition among the NHL member clubs and their television partners, and between the clubs and the NHL, with the purpose, intent, and effect of restraining trade and commerce in the distribution of major league professional hockey games, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

106.   The contract, combination or conspiracy has resulted in an agreement, understanding, or concerted action between and among the Defendants and their co-conspirators that regular season games will only be carried within a team's protected geographical territory ("in-market games"). The agreement forbids

34

carrying or online streaming of any NHL game in any geographic market except those licensed by the NHL team in that geographical market.

107.   The contract, combination, or conspiracy has restrained competition between and among the Defendants in violation of Section 1 of the Sherman Act. It has led to anticompetitive effects in the relevant markets, as alleged above, and caused injury to consumers and competition in those relevant markets and elsewhere.

108.   The Defendants' contract, combination, agreement, understanding or concerted action with the co-conspirators occurred in or affected interstate commerce. The Defendants' unlawful conduct was through mutual understandings, combinations or agreements by, between and among the Defendants and other unnamed co-conspirators. These other co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

109.   Defendants' anticompetitive conduct has directly and proximately caused antitrust injury, in the form of higher prices and reduced choice, as set forth above. Plaintiffs and other consumers will continue to suffer antitrust injury and other damage unless Defendants are enjoined from continuing to engage in the foregoing violations of law.

## COUNT TWO
## VIOLATION OF SECTION 1 OF THE SHERMAN ACT
### On Behalf of the Television Class

110.  Plaintiffs Garber, Silver, Traub, and Herman, on behalf of themselves and the Television Class, incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

111.  Beginning at a time presently unknown to Plaintiffs, and continuing through the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, combination or conspiracy in restraint of trade with the purpose, intent, and effect of restraining horizontal competition among the NHL member clubs and their television partners, and between the clubs and the NHL, with the purpose, intent, and effect of restraining trade and commerce in the distribution of major league professional hockey games, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

112.  The contract, combination or conspiracy has resulted in an agreement, understanding, or concerted action between and among the Defendants and their co-conspirators that the League will be the exclusive provider of live "out-of-market" games distributed through television providers. The Defendants and their co-conspirators have agreed that no club or network will offer a competing product, or make their programming available within another team's exclusive territory.

113.  The contract, combination, or conspiracy has restrained competition between and among the Defendants in violation of Section 1 of the Sherman Act. It has led to anticompetitive effects in the relevant markets, as alleged above, and

36

caused injury to consumers and competition in those relevant markets and elsewhere.

114.    The Defendants' contract, combination, agreement, understanding or concerted action with the co-conspirators occurred in or affected interstate commerce. The Defendants' unlawful conduct was through mutual understandings, combinations or agreements by, between and among the Defendants and other unnamed co-conspirators. These other co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

115.    Defendants' anticompetitive conduct has directly and proximately caused antitrust injury, in the form of higher prices and reduced choice, as set forth above. Plaintiffs and other consumers will continue to suffer antitrust injury and other damage unless Defendants are enjoined from continuing to engage in the foregoing violations of law.

**COUNT THREE**
**VIOLATION OF SECTION 1 OF THE SHERMAN ACT**
**On Behalf of the Internet Class**

116.    Plaintiffs Laumann and Dillon, on behalf of themselves and the Internet Class, incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

117.    Beginning at a time presently unknown to Plaintiffs, and continuing through the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, combination or

conspiracy in restraint of trade with the purpose, intent, and effect of restraining horizontal competition among the NHL member clubs and their television partners, and between the clubs and the NHL, with the purpose, intent, and effect of restraining trade and commerce in the distribution of major league professional hockey games, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

118.    The contract, combination or conspiracy has resulted in an agreement, understanding, or concerted action between and among the Defendants and their co-conspirators that the League will be the exclusive provider of live "out-of-market" games over the Internet. The Defendants and their co-conspirators have agreed that no club or network will offer a competing product, or make their presentation of games over the internet available within another team's exclusive territory.

119.    The contract, combination, or conspiracy has restrained competition between and among the Defendants in violation of Section 1 of the Sherman Act. It has led to anticompetitive effects in the relevant markets, as alleged above, and caused injury to consumers and competition in those relevant markets and elsewhere.

120.    The Defendants' contract, combination, agreement, understanding or concerted action with the co-conspirators occurred in or affected interstate commerce. The Defendants' unlawful conduct was through mutual understandings, combinations or agreements by, between and among the Defendants and other unnamed co-conspirators. These other co-conspirators have either acted willingly or,

due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

121.   Defendants' anticompetitive conduct has directly and proximately caused antitrust injury, in the form of higher prices and reduced choice, as set forth above. Plaintiffs and other consumers will continue to suffer antitrust injury and other damage unless Defendants are enjoined from continuing to engage in the foregoing violations of law.

**COUNT FOUR**
**VIOLATION OF SECTION 2 OF THE SHERMAN ACT**
**On Behalf of All Classes**

122.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

123.   Defendants and their co-conspirators, by the above-mentioned conduct, possess monopoly power over the market for video presentations of major league hockey games and Internet streaming of the same and have used that power for the purposes of unreasonably excluding and/or limiting competition, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. These activities have gone beyond those which could be considered as "legitimate business activities," and are an abuse of market position.

124.   Through the anti-competitive conduct described herein, Defendants and their co-conspirators have willfully acquired and maintained, and unless restrained by the Court, will continue to willfully maintain, that monopoly power by anti-competitive and unreasonably exclusionary conduct. Defendants and their co-

conspirators have acted with an intent to illegally acquire and maintain that monopoly power in the relevant product market, and their illegal conduct has enabled them to do so, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

125.   Defendants' anticompetitive conduct has directly and proximately caused antitrust injury, as set forth above. Plaintiffs and other consumers will continue to suffer antitrust injury and other damage unless defendants are enjoined from continuing to engage in the foregoing violations of law.

## VIII.
## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray as follows:

A.   That the Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and that Plaintiffs be named representatives of their respective classes.

B.   That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators as alleged in this complaint, be adjudged to have been a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

C.   That the Defendants and their co-conspirators actions to illegally acquire and maintain monopoly power in the relevant product market, be adjudged to have been in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

D.   That judgment be entered for Plaintiffs and members of the Class against Defendants for three times the amount of damages sustained by Plaintiffs and the members of the Class as allowed by law, together with the costs of this

action, including reasonable attorneys' fees, pursuant to Sections 4 and 16 of the

Clayton Act, 15 U.S.C. §§ 15 and 26.

      E.    That Plaintiffs and the Class be awarded pre-judgment and post-

judgment interest at the highest legal rate from and after the date of service of this

Complaint to the extent provided by law;

      F.    That Defendants and their co-conspirators be enjoined from further

violations of the antitrust laws; and,

      G.    That Plaintiffs and members of the Class have such other, further or

different relief, as the case may require and the Court may deem just and proper

under the circumstances.

Dated: October 25, 2012

By: _____
      Michael M. Buchman

**POMERANTZ GROSSMAN
    HUFFORD DAHLSTROM &
    GROSS LLP**
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile:  (212) 661-8665

Edward Diver
Howard Langer
Peter Leckman
**LANGER, GROGAN & DIVER, P.C.**
1717 Arch Street, Suite 4130
Philadelphia, PA 19103
Telephone: (215) 320-5660
Facsimile:  (215) 320-5703

J. Douglas Richards
**COHEN, MILSTEIN, SELLERS &**
        **TOLL, PLLC**
88 Pine Street
14th Floor
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-7745

Kevin Costello
Gary Klein
**KLEIN KAVANAGH**
        **COSTELLO, LLP**
85 Merrimac Street, 4th Floor
Boston, MA 02114
Telephone: (617) 357-5500
Facsimile: (617) 357-5030

Robert LaRocca
**KOHN, SWIFT & GRAF, P.C.**
One South Broad Street
Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700
Facsimile: (215) 238-1968

*Attorneys for Plaintiffs Thomas*
*Laumann, Fernanda Garber,*
*Robert Silver, Garrett Traub, and*
*David Dillon*

Fred T. Isquith
Alex Schmidt
**WOLF HALDENSTEIN ADLER**
        **FREEMAN & HERZ LLP**
270 Madison Avenue
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653

*Attorneys for Plaintiff Peter*
*Herman*

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------ x
MADISON SQUARE GARDEN, L.P.,     )     No. 07 CIV. 8455 (LAP)
                                    )
         Plaintiff,             )
                                      )
           v.                )     FIRST AMENDED COMPLAINT FOR
                                    )     INJUNCTIVE RELIEF
NATIONAL HOCKEY LEAGUE,      )
NATIONAL HOCKEY LEAGUE        )
ENTERPRISES, L.P., NHL INTERACTIVE )
CYBERENTERPRISES, LLC., NHL      )
ENTERPRISES CANADA, L.P., and NHL  )
ENTERPRISES, B.V.,              )
                                    )
         Defendants.         )
                                    )
                                    )
                                    )
------------------------------------------------ x

      Plaintiff MADISON SQUARE GARDEN, L.P. ("MSG"), by and through its attorneys,

files this First Amended Complaint against defendants and alleges as follows:

## I.   **PRELIMINARY STATEMENT**

     1.    MSG owns the New York Rangers, a major league men's professional ice hockey

team, and one of the "original six" members of the National Hockey League ("NHL"). Rangers

fans are among the most intense and loyal fans of any NHL team, indeed of any team in

professional sports, and the Rangers have gone to great lengths to enhance fan experience by

offering a wide range of information, products, and services in competition with other NHL

teams.

A.      **The NHL Has Become An Illegal Cartel.**

2.      The New York Rangers are proud to be among the oldest members of the NHL, a limited purpose joint venture of legally separate and independent ice hockey clubs.  The NHL joint venture was created to provide the means for its member clubs to compete on the ice and thus to generate fan interest and excitement in major league men's professional ice hockey contests.  The teams cooperate to schedule and produce ice hockey games and facilitate competition on the ice, which is necessary for the venture's success.  But the amount of off-the-ice cooperation reasonably required for the success of the venture is limited, and in fact, the NHL member clubs compete vigorously in various ways off the ice, especially in metropolitan areas (such as in the New York area) where there are multiple NHL clubs.  For example, the member clubs of the NHL independently set the prices of tickets for attending games in person; compete for contracting with players and in hiring coaches; create and manage their individual marketing and promotional programs, including the sale of advertising opportunities and merchandise; and develop, license and market their respective trademarks for various purposes.  While the NHL member clubs may choose to cooperate in various ways off the ice, the vast majority of such activity is not reasonably necessary to the success of the NHL joint venture.

3.      Over the years, and increasingly in recent years, the NHL member clubs, acting collusively as the League and through the Commissioner, have taken steps to eliminate, restrict and prevent off-the-ice competition between and among the member clubs as well as between the NHL itself and the member clubs, in numerous areas – including licensing, merchandise sales, advertising, broadcasting, and new media – and in ways that are not necessary to the purpose of the NHL joint venture, i.e., the provision of major league men's professional ice hockey contests.  As these activities have accelerated, MSG has objected to these steps, and has tried to persuade the NHL member clubs and the League Office that eliminating and preventing off-the-ice

- 2 -

competition between and among the NHL member clubs and/or the NHL was both unnecessary to the success of the NHL joint venture and, when carried too far, illegal. MSG's efforts have been unsuccessful. Accordingly, MSG brings this suit to restrain the NHL member clubs, acting collusively as the League and through the Commissioner, from continuing to eliminate, restrict and prevent the independent competitive activities of the NHL's members in violation of federal and state antitrust laws.

4.      The NHL has recently engaged in a pattern of rapidly-increasing anticompetitive behavior. At the onset of the 2007 Stanley Cup playoffs, MSG took three modest but important steps to increase its competitive offerings. MSG made Rangers-branded merchandise available locally through a convenient, online ordering process on its Rangers website (rather than through the existing, more cumbersome process of downloading a website catalog). MSG also made Rangers games available to local cable subscribers of those games by an additional means – i.e., broadband distribution that was gated and therefore limited to the Rangers' local area . In addition, MSG sought to increase revenue by selling non-intrusive virtual advertising to advertisers on MSG's television broadcasts of Rangers home games. Instead of welcoming these enhancements, which would have increased consumer choice and led to other pro-competitive effects, the NHL immediately imposed on MSG an arbitrary penalty of $100,000 per day. This, in turn, forced MSG to shut down these innovations and sent the unmistakable message that future efforts at competition would also be harshly punished. After MSG complied with the League's demands, but refused to pay what MSG asserted was an unlawful fine, the NHL withheld $200,000 from third-party payments otherwise due MSG.

5.      MSG capitulated to the NHL's threats because the exorbitant size of the fines would have made absorbing the fines economically suicidal; because MSG did not want to

CLI-1435955v31

distract attention from the NHL playoffs; and, in addition, because MSG continued to hope that

further discussion would persuade the NHL that its insistence on eliminating or otherwise

restraining all competition between and among the member clubs as well as between the NHL

itself and the member clubs was unwise and illegal.  At the start of the 2007-08 season, however,

the NHL again threatened the imposition of extortionate fines to enforce its suppression of

competition, this time requiring MSG to "migrate" its independent nyrangers.com website –

which MSG had been using as a competitive tool to generate and maintain fan interest in the

Rangers in competition with the other NHL clubs – to a "common technology platform" under

NHL control and subject to new NHL rules dictating the layout and significant parts of the

content of the site; and further, prohibiting MSG from operating any competitive Rangers

website independent of the NHL common platform.

      6.     The NHL's imposition of, and its threats to impose, fines on MSG for

communicating with Rangers fans, offering choices to consumers, and competing through the

Rangers website are merely the latest examples of anticompetitive conduct by a legitimate joint

venture that has veered into unlawful behavior.  The NHL began as a legitimate joint venture

producing a product – major league men's professional ice hockey competition – that no one

club can produce alone.  MSG and the Rangers have always been loyal members of the NHL,

supporting joint initiatives in appropriate areas, including revenue sharing and collective

bargaining with the NHL's players.  But by seeking to control the competitive activities of

independent businesses in ways that are not reasonably necessary to the functioning of that

legitimate joint venture or to any other legitimate procompetitive purpose, the NHL has become

an illegal cartel.

- 4 -

7.     Through this Complaint, MSG seeks to establish the appropriate bounds, under the antitrust laws, of the conduct of the NHL's member clubs, acting collusively through the League and/or the Commissioner.  The NHL is a joint venture of independently owned and operated member clubs; the antitrust laws prohibit those clubs, like the members of any joint venture, from restricting the individual competitive activities of the individual members of the venture, except where any such restriction is shown to be reasonably necessary to the success of the League or the achievement of some other legitimate procompetitive purpose.  The goal of this lawsuit is to restore and protect from unlawful restraint the competition between and among the NHL member clubs and the NHL that increasingly has been eliminated and restrained by the NHL's anticompetitive rules and policies and that threatens to become restrained to an even greater extent absent this Court's intervention.

**B.     The NHL Has Extended Its Collective Activities Beyond What Is Legally Permissible.**

8.     The NHL is a joint venture of legally separate and independent men's professional ice hockey clubs.  It was created by the individual member teams for a specific limited purpose, i.e., to assist them in producing a product – major league men's professional ice hockey contests – that no one team could produce alone.  Now consisting of 30 member clubs located throughout the United States and Canada, the NHL is engaged in a variety of legitimate collective activities.  These legitimate activities include negotiating labor agreements with the players, negotiating national television broadcasting arrangements, promulgating and enforcing agreed rules of play, and scheduling ice hockey contests, including playoff and championship competitions.  While MSG sometimes has differed with its fellow Member Clubs and the League Office on strategy and tactics in some of these areas, particularly in the area of national television, MSG generally accepts and supports these activities, to the extent they are necessary

- 5 -

to the success of the NHL and do not unnecessarily limit the independent competitive activities of the individual member clubs.

9.     Notwithstanding these valuable and appropriate collective activities, the member clubs remain independently owned and operated businesses, fully capable of competing – and actually competing – with each other in various ways.  The clubs are not simply an extension of the NHL; rather, the NHL is an artificial creation of its member clubs and subject to their collective control.  Each club, as an independent and separate business, is individually responsible for all of its business affairs that have not been properly and lawfully delegated by the clubs to the NHL.  Notwithstanding this basic principle – *i.e.,* that the League serves the clubs, not vice versa – the League over the years, with the support or acquiescence of many of the NHL member clubs, has asserted an increasing amount of control over the independent clubs' activities and sought increasingly to aggrandize the centralized, collective activities of the League while restricting independent competition by and among the clubs.  Indeed, at a 2006 meeting of the NHL's owners, NHL Commissioner Gary Bettman took the extreme position that the NHL has "granted" the individual clubs only a limited number of property rights and that all other rights are subject to the will of a majority of the club owners, each of whom has a vote on the NHL Board of Governors.

10.     Such broad collective control over the competitive activities of independent businesses is unlawful under federal and New York state antitrust laws.  The NHL joint venture is seeking to take what does not belong to it, and to control, without any cognizable procompetitive justification, independent assets and entities that otherwise would compete with each other and with the NHL.  In so doing, the NHL crosses the line and becomes an illegal cartel, constraining MSG's ability to compete with other NHL member clubs and with the NHL

- 6 -

itself. The joint venture's stiff fines against MSG, and its threats of further fines, imposed solely because MSG has sought and continues to seek to compete in very modest ways with the NHL and other NHL clubs, establish that the NHL has moved beyond the operation of a legitimate joint venture and into illegal cartel behavior. The Rangers have complained about, objected to, and withheld their approval of, this behavior for several years, to no avail.

**C.    The NHL Seeks To Eliminate And Prevent Competitive Activities.**

11.    The New York Rangers, along with the Montreal Canadiens, the Toronto Maple Leafs, the Boston Bruins, the Detroit Red Wings and the Chicago Blackhawks, are known as the NHL's "Original Six" teams – essentially its founding members. The Rangers have won the Stanley Cup four times, most recently in 1994. Players as memorable as Vic Hadfield, Eddie Giacomin, Rod Gilbert, Mike Richter, Mark Messier and Wayne Gretzky have played for the New York Rangers, and stars such as Jaromir Jagr and Brendan Shanahan now play for the Rangers. Gretzky, the game's greatest player, retired as a New York Ranger.

12.    Over the years, MSG has developed, reinforced and encouraged fan interest in the Rangers, making substantial investments in the Rangers franchise as it seeks to compete with other NHL teams, including but not limited to the two other NHL teams in the New York metropolitan area. MSG, for example, has spent significant sums to attract to its team established international hockey stars such as Jagr and Shanahan (the former Red Wings star), and, most recently, young American stars such as Scott Gomez and Chris Drury, all in an effort to generate "True Blue" excitement at Rangers games at Madison Square Garden and elsewhere. MSG, in addition, has consistently spent significant sums to market the New York Rangers, and the Rangers' following extends well beyond the New York area. Hockey fans across the country (and indeed the world) identify with the New York Rangers, and seek the opportunity to experience the Rangers wherever they can, including by attending games or by viewing live or

- 7 -