recorded games or game highlights, as well as by buying Rangers-branded apparel and merchandise.

13.    As part of their legitimate and independent business efforts, the individual member clubs comprising the NHL, including the Rangers, have ownership rights in, and have registered, various copyrights, trademarks, trade dress and trade names (collectively, "marks") in logos and designs relating to their teams. Individual NHL member clubs, including the Rangers, have undertaken substantial efforts over the years to develop and enhance the value of their marks and the image of their teams as they compete with each other for fan interest.

14.    MSG's efforts and the loyalty of Rangers fans have created value for the New York Rangers brand and marks. MSG's aggressive efforts have created and increased consumer demand for products and services, including information, merchandise, apparel and memorabilia, containing the Rangers logo, as well as consumer demand for the opportunity to view Rangers games or game highlights. There remains great unexploited potential in this brand and these marks, and MSG intends and desires to exploit them further, in competition with the other clubs, to generate income from on-line, video and licensing opportunities and to generate and maintain fan interest in New York Rangers hockey.

15.    The NHL, however, seeks to ban independent competition in these areas by and among the individual clubs and to expropriate these competitive opportunities for itself. Such excessive centralization and aggrandizement of the NHL at the expense of the member clubs is not reasonably necessary for the success of the NHL venture or for any other legitimate procompetitive purpose, and because of that it is not permissible under state and federal antitrust law. Yet that is the course the NHL has taken. In addition, and notwithstanding the strenuous

- 8 -

objections of MSG (and occasionally other clubs), the NHL has chosen to enforce its anticompetitive regime through oppressive daily fines.

16.     Defendants have inappropriately and illegally claimed and usurped more and more centralized control over what have been and should be the independent competitive activities of the individual clubs, eliminating competition in a number of ways, including the following:

A.     Excessive League control over the licensing of NHL club marks and the marketing of club-branded apparel, merchandise and memorabilia. The NHL member clubs, acting collusively as the League and through the Commissioner, assert the power to control the licensing of individual NHL team marks for virtually all commercial purposes and to constrain the ability of individual teams to market apparel, merchandise and memorabilia both within and beyond the team's local area, imposing restrictions on sales through retailers and prohibiting sales of team-related video/DVD products. The NHL member clubs, acting collusively as the League and through the Commissioner, also claim the right to prohibit the sale of apparel, merchandise and memorabilia through online team stores, fining MSG for competing in that way, and permitting MSG to offer to consumers on its website only the inefficient, time-consuming option of downloading the team's mail order catalog. In addition, MSG faces significant NHL-imposed restrictions even in the sale of Rangers jerseys outside Madison Square Garden itself. This centralized control eliminates competition among individual clubs and is not reasonably necessary for any cognizable procompetitive purpose. Each member club is legally entitled to exploit its own intellectual property, including its marks and logos, and each individual club is legally required to decide independently whether and to what extent it will

authorize the NHL to act as a non-exclusive licensing agent in any particular instance in the marketing and promotion of club-branded apparel, merchandise and memorabilia.

B. **Excessive League restrictions on individual teams' relationships with advertisers and sponsors.** The NHL member clubs, acting collusively as the NHL and the Commissioner, claim the almost unlimited right to enter into advertising or sponsorship arrangements that automatically preempt individual clubs' abilities to sell advertising or sponsorship arrangements, even in the clubs' local home arenas. In addition, the NHL member clubs, acting collusively as the League and through the Commissioner, have eliminated competition for advertising sales between home and away clubs by prohibiting individual clubs from using virtual signage, *i.e.*, signage that can be electronically superimposed during telecasts of a club's games, even when such signage does not block or substitute for existing in-arena signage. By doing so, the NHL prohibits an innovative means of expanding advertisers' access to interested consumers. This prohibition is not reasonably necessary for the success of the NHL venture.

C. **Excessive League control over individual club broadcasting and other distribution opportunities.** Media revenues are critical to any professional sports franchise, and one of the core activities of a professional sports league is to develop and negotiate a national television contract. In most professional sports, national television revenues are an important means of balancing revenues between and among individual teams. The NHL, however, has been unsuccessful to date in its efforts to obtain significant national television revenues. At the same time, the NHL member clubs, acting collusively as the League and through the Commissioner, have restrained the individual clubs' broadcasting and other distribution opportunities, and in so doing eliminated competition among the clubs in ways that are not

CLI-1435955v31

reasonably necessary for the success of the NHL venture or for any other legitimate procompetitive purpose. In particular, the NHL member clubs, acting collusively as the League and through the Commissioner, claim the right to control jointly all broadcasting and other distribution rights, both inside and outside each club's local area, as well as internationally. In asserting this control, the League has acknowledged that it has allocated the geography of virtually all of North America among the various member clubs. By doing so, the League has illegally eliminated the ability of a club to broadcast its games into areas allocated to the other clubs, in competition with those clubs, except where multiple clubs are located in the same metropolitan area such as in the New York area. The League also unreasonably limits the extent to and terms on which a club can broadcast its games even in the area allocated to that club. In addition, the NHL member clubs, acting collusively as the League and through the Commissioner, have unreasonably restricted a team's ability to distribute its own live games through that team's website and/or the website of its local television rightsholder or through wireless devices, as well as rebroadcasts of its games over the internet or on a "video-on-demand" basis. These restraints on individual teams' competitive activities are clearly anticompetitive, not reasonably necessary to the success of the NHL joint venture or to any other legitimate procompetitive purpose, and far exceed the limited antitrust immunity afforded by the Sports Broadcasting Act.

        D.    <u>Excessive League control of all "new media" activities</u>.  The NHL member clubs, acting collusively as the League and through the Commissioner, have taken exclusive control of various "new media" activities and banned the individual clubs from competing independently in this area. As one example, the NHL has forced each team to turn over that team's individual website to the League, which now controls those sites through the

only League permitted website – "nhl.com." The League's elimination of independent competition between and among club websites goes well beyond any legitimate need to ensure the basic appearance and quality of individual clubs' websites or the clubs' other new media activities, and is not reasonably necessary for any legitimate procompetitive purpose. By banning teams from operating additional, independent websites, the NHL has unreasonably restricted the ability of teams such as the Rangers to use websites in unique and creative ways to communicate with existing fans, to develop new fans, and generally to compete for fans with other NHL clubs. Indeed, defendants have openly conceded their intention to eliminate what they viewed as the overly "tribal" nature of the various team websites – i.e., to eliminate the purported over-emphasis on team-against-team competition produced by independent competitors responding to consumer preferences and other market forces – and instead to use the League's centralized control to make the various team websites more League-centered and less "tribal." Pursuant to its "new media" policy, the NHL has also forced teams to give the League more attractive ad inventory on team home pages, irrespective of the adverse effect on the teams' ability to sell advertising and sponsorships in competition with each other and with the NHL, and has otherwise restrained the distribution of games and highlights through handheld technologies.

17. The NHL is the only provider of major league men's professional ice hockey contests in the United States, and MSG is subject to the NHL's Constitution and By-laws. Those League rules purport to require MSG to comply with the joint decisions of the member clubs and with decisions of the Commissioner, including decisions imposing the above-described restraints. League rules adopted by the NHL member clubs also give the Commissioner extraordinary and unregulated power to enforce the joint elimination of competition through massive monetary fines, and even possible expulsion from the NHL pursuant to provisions of the

- 12 -

NHL Constitution permitting the "involuntary termination" of member clubs that violate League rules. Such a termination would prevent MSG from continuing to provide major league men's professional ice hockey contests to its fans. Indeed, as explained above, the NHL sent a letter to MSG on April 18, 2007, fining MSG $100,000 per day for what the League described as conduct in "clear and blatant" violation of the NHL's anticompetitive rules and policies. Although MSG disagreed with the NHL's position in that letter, the NHL's anticompetitive demand that MSG cease competing on pain of a $100,000 per day fine left MSG with no choice but to comply even as MSG continued to try to find a way to resolve its differences with the NHL short of litigation. The NHL's subsequent letter, threatening MSG with further fines of $100,000 per day beginning on September 28, 2007 for continuing to operate a Rangers website outside of League control, reflects a continuation of the NHL's anticompetitive overreaching.

18.     The NHL's coercive actions require MSG to pursue this lawsuit in order to protect its investment in its marks and its efforts to compete in the marketplace. MSG's only goal is to end agreements that restrain and adversely affect competition among teams in areas where the elimination of independent competition is not reasonably necessary to produce major league men's professional ice hockey contests or to the achievement of any other cognizable procompetitive purpose. MSG therefore seeks no money damages, but only injunctive relief to restrain and prevent the NHL's continuing violations of federal and state antitrust laws.

## II.    NATURE OF CLAIMS, JURISDICTION AND VENUE

19.     MSG brings this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), for a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. This Court has subject matter jurisdiction over that claim pursuant to 28 U.S.C. §§ 1331 and 1337. MSG also brings this action pursuant to New York General Business Law § 340. This Court has jurisdiction over that claim pursuant to 28 U.S.C. § 1367 and the doctrine of pendent jurisdiction.

CLI-1435955v31

20.     Venue is proper pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 22.  The NHL,

National Hockey League Enterprises, L.P. ("NHLE"), and NHL Interactive CyberEnterprises,

LLC ("NHL ICE"), transact business, maintain their principal offices and are found in this

district, and a substantial part of the events or omissions giving rise to MSG's claims occurred in

this district.  NHL Enterprises Canada, L.P. ("NHLE Canada"), and NHL Enterprises, B.V.

("NHLE International"), transact business in New York and are subject to personal jurisdiction

in this district.

21.     Jurisdiction over all defendants comports with the United States Constitution.

### III.   PARTIES

22.     MSG is a Delaware limited partnership with its principal offices at Two

Pennsylvania Plaza, New York, New York 10121-0091.  MSG owns the New York Rangers

men's professional ice hockey club and the mark "New York Rangers," a federally registered

trademark, as well as various registered and unregistered trademarks and trade names derived

from, and copyrights and trade dress in the form of logos associated with, that mark.  MSG also

owns Madison Square Garden, as well as two programming services, MSG Network and FSN

New York, which license the right to distribute Rangers games, as well as games of the New

York Islanders, New Jersey Devils and Buffalo Sabres NHL hockey clubs.  MSG is a member or

partner and beneficiary of the NHL, NHLE and NHL ICE, as well as related entities, including

NHLE Canada and NHLE International.

23.     Defendant NHL is an unincorporated association of the 30 major league men's

professional ice hockey teams in the United States and Canada, and is the dominant provider of

major league men's professional ice hockey contests in the world.  The NHL has its headquarters

at 1251 Avenue of the Americas, New York, New York 10020-1198.  The NHL owns valuable

marks relating to ice hockey and acts to facilitate the provision of major league men's

- 14 -

professional ice hockey contests. The NHL transacts business in the Southern District of New York by engaging in activities there relating to the business of major league men's professional ice hockey contests and the licensing of marks relating to that business. It also enters into contracts in this district.

24.      Each team, or club, that is a member of the NHL is a separate and independent business with a separate and independent owner and significant autonomy in its business operations. The NHL and its member clubs are independent entities that are capable of conspiring (and, in fact, have done so, as alleged in this Complaint) in the licensing of their respective marks and in other competitive areas not necessary for the provision of major league men's professional ice hockey competition.

25.      Defendant NHLE is a Delaware limited partnership with its principal place of business at 1251 Avenue of the Americas, New York, New York 10020-1198. NHLE is a limited partnership, the beneficial owners of which are the 30 NHL clubs or entities under their control. NHLE transacts business in the Southern District of New York by engaging in activities there relating to the business of major league men's professional ice hockey contests and the licensing of NHL and individual team marks relating to that business. It also enters into contracts in this district.

26.      Defendant NHL ICE is a Delaware limited liability company with its principal place of business at 1251 Avenue of the Americas, New York, New York 10020-1198. NHL ICE is a subsidiary of NHLE. NHL ICE transacts business in the Southern District of New York by engaging in activities there relating to the business of major league men's professional ice hockey contests and the licensing of NHL and individual team marks relating to that business. It

also enters into contracts and manages the online sale of NHLE-licensed products for the NHL.com website in this district.

27.     Defendant NHLE Canada is a Canada limited partnership with its principal place of business in Ontario, Canada. NHLE Canada is owned equally, directly or indirectly, by the owners of the 30 member clubs that constitute the NHL. NHLE Canada primarily conducts trade or commerce in Canada, relating to the business of major league men's professional ice hockey contests and the licensing of NHL and individual team marks relating to that business. Its conduct of trade or commerce in Canada, however, has had and continues to have direct, substantial and reasonably foreseeable effects on U.S. domestic and export commerce in ways that give rise to MSG's claims. NHLE Canada transacts business in New York by licensing marks owned by member clubs located in New York, by licensing marks owned by the NHL and/or NHLE, by remitting monies to New York member clubs, as well as to the NHL and/or NHLE, by remitting monies to all member clubs by means of accounts managed in New York by the NHL and/or NHLE, by engaging in joint advertising and marketing efforts with the NHL and NHLE, by frequent and regular contacts with the NHL and NHLE in this district, including contacts relating to contractual negotiations, and by engaging in other similar activities.

28.     Defendant NHLE International is a Netherlands private limited liability company with its principal place of business at Polakweg 14, 2288GG, Rijswijk, The Netherlands. NHLE International is owned equally, directly or indirectly, by the owners of the 30 member clubs that constitute the NHL. NHLE International primarily conducts trade or commerce outside North America, relating to the business of major league men's professional ice hockey contests and the licensing of NHL and individual team marks relating to that business. Its conduct of trade or commerce outside North America, however, has had and continues to have direct, substantial and

- 16 -

reasonably foreseeable effects on U.S. domestic and export commerce in ways that give rise to MSG's claims. NHLE International transacts business in New York by licensing marks owned by member clubs located in New York, by licensing marks owned by NHL and/or NHLE, by remitting monies to New York member clubs, as well as to the NHL and/or NHLE, by remitting monies to all member clubs by means of accounts managed in New York by the NHL and/or NHLE, by engaging in joint advertising and marketing efforts with the NHL and NHLE, by frequent and regular contacts with the NHL and NHLE in this district, including contacts relating to contractual negotiations, and by engaging in other similar activities.

## IV.   TRADE AND COMMERCE

29.     There are peculiar and unique characteristics that set major league men's professional ice hockey apart from other sports or leisure activities. Close substitutes do not exist, and watching (or participating as a fan in) major league men's professional ice hockey is not reasonably interchangeable with watching (or participating as a fan in) other sports or other leisure activities. So, too, the copyrights, trademarks, trade names, trade dress and logos of the major league men's professional ice hockey clubs have no reasonably close substitutes. There is a separate demand, and hence a relevant market, for the licensing of those marks to licensees for various uses. Also, arenas when used for major league men's professional ice hockey contests provide an outlet for or involving advertising to hockey fans for which there is a separate demand and no close substitutes.

30.     There is a relevant product or service market for the licensing of the trademarks, trade names, trade dress and copyrights (including logos) owned by the NHL clubs and the NHL itself. This market is comprised of several smaller segments that themselves constitute relevant markets or submarkets, including:

- 17 -

A.    A market or submarket for the licensing of NHL and NHL club marks for use on
apparel, merchandise and memorabilia.

B.    A market or submarket for the sale of NHL-branded and NHL club-branded
apparel, merchandise and memorabilia.

C.    A market or submarket for the licensing of NHL and NHL club marks for use in
corporate advertising and sponsorships.

D.    Markets or submarkets for the licensing of broadcasting, rebroadcasting or other
distribution rights to NHL games, either live or recorded, as well as game
highlights, footage and related ancillary programming, over media such as cable
and satellite television, the internet and wireless handheld devices, either by
licensing those rights to content aggregators or by offering programming directly
to consumers.

There is also a relevant product or service market consisting of the sale of advertising at or
involving venues when used as the setting for major league men's professional ice hockey
contests.

31.    At competitive prices, the rights to license or use the marks of the NHL and NHL
clubs for these various purposes, the rights to broadcast, rebroadcast or otherwise distribute NHL
games, and the rights to sell advertising rights at or involving venues when used as the setting for
NHL hockey contests, are not reasonably interchangeable with any other products, services or
rights. Defendants have the power to raise or maintain prices above the competitive level as a
result of: (i) the various restraints imposed by the NHL and the other defendants on the ability of
the individual clubs to exploit their individual marks, as well as apparel, merchandise and
memorabilia displaying those marks, for virtually all commercial purposes, and the various

- 18 -

broadcasting and other distribution restraints; (ii) the power to restrain the ability of individual clubs to promote and market their teams in competition with other teams through individual team websites; and (iii) the power to control the amount and type of advertising at or involving venues when exhibiting major league men's professional ice hockey contests.

32.     There is also a relevant product or service market defined as the provision of major league men's professional ice hockey contests in North America.  This market is characterized by high barriers to entry.  The NHL is the only significant, and therefore the dominant, provider of this product or service, and has market power.  As a result, MSG has had no choice but to comply with the competitive restraints that are the subject of this Complaint or face the risk of adverse consequences as described in this Complaint, but even its efforts to comply with the NHL's competitive restraints have not prevented the League from fining MSG for activities that the League has described as "clear and blatant" violations of the NHL's anticompetitive rules and policies.  The NHL, acting through and in combination with the separate and independent clubs that own the NHL, also exercises market power through the exclusive agreements and the other unnecessary and unjustified restraints on each club's competitive activities that are the subject of this Complaint.

33.     The relevant geographic market consists of North America, including the United States.  Various geographic submarkets also may exist.

34.     Defendants' conduct complained of herein has taken place in and affected, and directly, substantially, and foreseeably restrained, the interstate and foreign trade and commerce of the United States, and the effects in foreign trade and commerce have had and continue to have direct, substantial and reasonably foreseeable effects on U.S. domestic and export commerce in ways that give rise to MSG's claims. The referenced licensing, marketing and

- 19 -

advertising activities have taken place and continue to take place in such trade and commerce. The products and services containing, using or referencing the marks of the NHL and NHL clubs are also sold and/or licensed in such trade and commerce.

## V.   FACTS RELEVANT TO MSG'S CLAIMS

### A.   Licensing And Other Forms Of Competition.

35.     The Rangers and the NHL's other member clubs must cooperate to schedule and produce major league men's professional ice hockey contests.  That limited cooperation is fully consistent with the antitrust laws.  But there has not been a complete integration of the member clubs, which continue to exist as separate businesses with separate owners that retain significant degrees of autonomy in their operations.  In these operations, the clubs compete in businesses that are separate and distinct from the production of ice hockey contests.  One such area of competition is the sale of tickets to attend live major league men's professional ice hockey games.  MSG, for example, sells tickets to Rangers home games in competition with other NHL member clubs – including, but not limited to, the other two NHL teams in the New York area – that also seek to sell tickets to their teams' home games.

36.     There are other areas where the Rangers can and do compete with the other NHL clubs and with the NHL, including in the licensing of individual team marks and in the operation of an independent Rangers website for communicating with its fans and potential fans.  There is also a significant demand for the broadcasting, rebroadcasting and other distribution of live and recorded Rangers games, as well as game highlights and game footage, through various media. By satisfying that demand, MSG can generate and increase fan interest in Rangers hockey in competition with other NHL teams, reinforcing the marketing activities that MSG is undertaking through its website, and enabling marketing and licensing opportunities in other areas, including opportunities that would take place in the absence of the NHL's competitive restraints.

CLI-1435955v31

37.     In short, MSG has sought to compete with the 29 other teams and the NHL to the limited extent permitted by the exclusive agreements challenged in this Complaint. In a fully competitive marketplace, the Rangers could and would compete to an even greater extent. In particular, by licensing the Rangers marks in creative ways and at lower costs, as well as by freely selling team-branded apparel and merchandise, by increasing the opportunity to view Rangers games throughout the country, whether through cable, satellite or on the internet (including on its own website, rather than on a website controlled by the NHL), and by exploiting the Rangers marks and engaging in other marketing efforts through the Rangers website, MSG would be able to generate and increase fan interest and excitement in Rangers hockey and Rangers-themed products, all in competition with the other NHL teams.

**B.      The Anticompetitive Exclusive Agreements.**

38.     Pursuant to a series of agreements beginning in the 1980s, and renewed several times since then, defendants purported to obtain the "exclusive" right to control for virtually all commercial purposes the individual clubs' marks and licensing opportunities. Defendants have exercised and enforced those rights in ways that have significantly restrained the competitive activities of the member clubs on a continuous basis since then.

39.     In June 2006, and over the objection of MSG and certain other clubs, the member clubs purportedly renewed and extended the "exclusive" agreements until 2016, which further eliminates competition and continues to injure MSG's ability to compete in the marketplace. Also over objection, the clubs additionally purported to grant defendants the exclusive opportunity to exploit team websites and other new media opportunities, eliminating competition among the teams and restraining one of the most effective competitive tools used by the Rangers in recent years to compete in the marketplace.

- 21 -

40.     These "exclusive" agreements, adopted by agreement between the independent member clubs of the NHL, place entirely – and illegally – in defendants' hands a wide range of otherwise competitive business activities where team cooperation is not reasonably necessary to produce major league men's professional ice hockey contests or to achieve any other cognizable procompetitive purpose, usurping the rights of the individual clubs to conduct their businesses independently and eliminating competition among the clubs and with the NHL in areas such as the following:

A.     Defendants assert the exclusive worldwide right to license team marks for use on team jerseys, practice wear, winter outerwear, products containing the player's name, number or image, and player photos, allowing each team to enter into licenses only for other, less lucrative products and only for sales within their arenas.  This necessarily eliminates competition that would otherwise exist among teams and between teams and the NHL.

B.     Defendants assert the right to control the sale of team apparel and merchandise, including through each team's direct-mail catalogs, requiring that 65% of the products offered through team catalogs must be produced by licensees selected by defendants and effectively prohibiting teams from offering for sale locally-licensed products through any outlet beyond, or in any catalog distributed outside of an area within, 75 miles of the team's home arena.  Defendants have prevented teams from selling team merchandise on the internet other than through an NHL-controlled store, even when a team restricts such internet sales to consumers residing within a 75-mile radius of the team's arena.  Defendants have also banned teams' efforts to create consumer-friendly online versions of their mail order catalogs, even though the League has otherwise permitted mail order catalogs as long as the merchandise in the catalogs complies with the League's additional anticompetitive requirement that no team seek

- 22 -

lower costs or better quality from alternative, non-NHL selected manufacturers. Banning a more efficient, online version of a team's mail order catalog makes it more difficult for a team such as the Rangers to compete in the sale of team merchandise, apparel and memorabilia even to the limited extent permitted by the NHL.

          C.      Defendants assert the right to control the broadcasting, rebroadcasting and other distribution of games, game highlights and game footage in media such as cable and satellite television, the radio, "video-on-demand," the internet and handheld technologies. Specifically, defendants have unreasonably restrained the broadcasting and other distribution rights of individual clubs by allocating the geography of virtually all of North America among the member clubs and prohibiting each club from transmitting its games, on television or over the internet, into territories allocated to other clubs or outside North America. The League keeps for itself the right to broadcast games into territories allocated to individual clubs, but the League exercises that right by selling only cable packages of all NHL games. Even in the area allocated to a club, defendants do not fully allow that club to distribute its games, (i) allowing cable distribution of only a limited number of that club's games in some portions of the area on a fee-for-subscriber basis established by the League, (ii) blacking out games while the NHL's broadcasters are providing nationwide coverage of an NHL game, precluding the blacked-out teams from broadcasting or otherwise distributing their own games through other outlets even locally on those occasions, and (iii) restraining the ability of a club to distribute its games on the club's website or on other internet sites and via "video-on-demand" even when such distribution has been gated and therefore limited to the area allocated to that club (although such a limitation itself is not permissible under the antitrust laws). All of these restraints are clearly more restrictive of competition than necessary to achieve any legitimate procompetitive purpose of the

- 23 -

NHL joint venture.  Defendants have also restricted output by limiting the ability of teams to license rebroadcasts of their games, permitting such rebroadcasts only within 48 hours of game endings and prohibiting teams altogether from licensing the rebroadcasts of historic games. Restraints also exist with respect to game highlights and footage.  Defendants, and not the individual teams, claim the exclusive right to market for commercial purposes all highlights and footage of NHL games, and defendants have stated their intention to create an NHL-controlled "hockey factory" to ensure that the offering of NHL highlights and game footage over the internet and wireless technologies is controlled through the NHL joint venture.  The teams, by contrast, are only permitted to use short segments of game highlights or game footage on team websites.  Recently, defendants have even proposed to remove free radio feeds from team and radio station websites.  In short, defendants have restrained and threatened to restrain competition in the broadcasting, rebroadcasting and other distribution of games, game highlights and game footage, seeking to control the delivery of content through all existing and future media platforms in ways that go well beyond what is reasonably necessary to any legitimate procompetitive purpose.

        D.      Defendants have restricted the ability of teams to sell advertising space on dasherboards, *i.e.*, the low partitions erected around the ice itself, and in the ice during games, regulating the size and spacing of such advertising and controlling the most desirable dasherboard and "in-ice" space during nationally broadcast games.  Defendants have increased their control of arena and "in-ice" advertising in recent years, in particular during the playoffs and championship games.  Defendants, moreover, have claimed the right to limit the output of advertising by prohibiting teams from using new technologies to offer virtual signage that can be electronically superimposed during telecasts of a club's games, even when such signage does not

delete or substitute existing in-arena signage, and the NHL fined MSG in 2007 for its efforts to sell such virtual signage over its own broadcasts of Rangers games.  The League is also requiring each hockey arena to display League-sponsored advertising in connection with League-provided, same-day, "out-of-town" highlights of other NHL games.

> E.  Defendants control the design, operation and exploitation of team websites, including products and services that can be offered on those sites.  By doing so, defendants in effect have seized control of one of the teams' best branding, competitive and outreach opportunities, converting individual team sites into standardized sites that will necessarily lack the originality and creativity of fully independent team sites, forcing teams to accept content that does not promote that team's efforts to market itself and restraining the ability of individual teams to use their sites to market and promote their teams in competition with each other.  Indeed, defendants concededly intend to eliminate what they deem overly "tribal" competition and instead to replace that competition with a League-centered focus that de-emphasizes competition among the independent clubs.  Defendants already have reduced competition in the sale of advertising by taking control of the sale of banner ads at the top of, and in the primary box of, team websites, and have further sought to take over an even greater percentage of the advertising space on team websites, especially on the inside pages where consumers are directed to visit and experience team-focused content.

41.   The NHL asserts the authority to sanction teams for engaging in independent activities in violation of the above-described agreements or otherwise in violation of rules that the NHL joint venture has developed over the years to implement these agreements.  MSG's recent, coerced decisions to stop competing or face $100,000 per day fines prove that MSG has no choice but to accede to the NHL's dictates.  Pursuant to the NHL Constitution and By-Laws,

- 25 -

MSG could be subject to additional, significant adverse consequences, including sanctions up to and including expulsion from the NHL, if MSG did not abide by the exclusive, anticompetitive agreements. MSG has invested significant sums in the Rangers, and no other major league men's professional ice hockey league exists in the United States for the Rangers to join. As a result, MSG is bound by these restraints on its ability to compete independently absent relief from this Court.

**C.      The Agreements Have Restrained Horizontal Competition And Have Had Anticompetitive Effects And Led To Consumer Harm.**

42.     The above-described agreements between the member clubs of the NHL, acting collusively as the League and through the Commissioner, have restrained horizontal competition between and among the NHL clubs and the NHL in various areas where the member clubs could and would compete with each other and with the NHL. In particular, in the absence of the exclusive agreements and other competitive restraints, NHL teams would compete with each other in the licensing of their teams' marks to a much greater extent than the limited opportunities that are now available and they also would compete with the NHL, which owns and licenses the NHL logo. Further, they would compete in the sale of team-branded merchandise, apparel and memorabilia. The teams also would compete with each other and with the NHL in the broadcasting, rebroadcasting and other distribution of NHL games (apart from any national broadcasting contract), game highlights and game footage in a variety of media and, further, in the operation of their websites. Moreover, the teams would compete with each other and with the NHL in the sale of advertising in arenas they own or lease during NHL ice hockey contests.

43.     The above-described agreements have adversely affected and substantially lessened competition in the relevant markets, in at least the following ways:

- 26 -

A.      Prices for the licensing of NHL and NHL team marks, including the Rangers marks, for use in merchandise, apparel and memorabilia are higher, and output is lower, than they would be in the absence of the "exclusive" agreements. Competition through the ability of individual teams to license their marks for such purposes would produce consumer benefits, such as lower prices, higher quality and more variety, including consumer benefits in the sale of products and services associated with NHL and individual team marks. Competition through the ability of individual teams to license their own marks would create greater incentives for individual teams to invest in and more fully exploit and maximize the value of their licensing activities, leading to greater levels of competition in the relevant markets and in the sale of NHL and NHL-club branded products and services, to the benefit of consumers.

B.      Prices for team-branded merchandise, apparel and memorabilia are higher, and output is lower, than they would be in the absence of the "exclusive" agreements. Consumer choice has been limited, and quality and availability of apparel, merchandise and memorabilia has suffered.

C.      Prices for the licensing of NHL and NHL team marks, including the Rangers marks, for use in advertising and other sponsorships are higher, and output is lower, than they would be in the absence of the "exclusive" agreements. Competition through the ability of individual teams to license their marks for such purposes would produce consumer benefits, such as lower prices, higher quality and more variety.

D.      Output of broadcasts, rebroadcasts and internet and other distribution of NHL games, as well as output of game highlights and footage, is lower, and prices are higher, than they would be in the absence of the "exclusive" agreements. Adverse effects exist in distribution markets for licensing to content aggregators such as, but not limited to, MSG

- 27 -

Network and FSNY, which license the rights to broadcast the Rangers, Islanders, Devils and

Sabres ice hockey contests, as well as in end use markets for the sale of programming directly to

consumers.  Competition by individual clubs independently acting to exploit the broadcasting,

rebroadcasting and other distribution of their teams' games would produce consumer benefits,

such as an increase in the availability of broadcasts over a wider range of media, including cable,

the internet and wireless devices.

        E.      Defendants have restricted competition for the sale of advertising space at

NHL hockey games.  MSG's ability to license advertisers and sponsors in Madison Square

Garden has been restricted by the national licensing contracts negotiated by defendants, as well

as by other unreasonable restraints imposed by defendants.  Local advertisers and sponsors have

been denied access to valuable advertising space to the extent that defendants have exercised

control and licensed the space only to national advertisers, and advertisers and sponsors have

been forced to pay more than they would in the absence of the exclusive agreements.

        F.      The NHL's prohibition of independent team websites has eliminated the

independent competition that would exist but for these anticompetitive agreements among the

NHL member clubs, acting collusively as the League and through the Commissioner.  This has

led to a standardized approach to team sites to the detriment of the creative and individualized

approaches that otherwise would exist, limiting the ability of teams to communicate with, and

compete for, fans in ways that the individual teams believe are most effective and in their best

individual interests, reducing fan interest in the process.  In addition, NHL control of significant

portions of the advertising on team websites has restricted the ability of individual teams to

compete in the sale of such advertising.  An NHL-controlled approach to individual team

websites will be less responsive to competitive opportunities available to individual teams, and

CLI-1435955v31

consumers will be harmed by the reduction of the website competition that existed between and among the NHL member teams and the NHL prior to the NHL's recent exercise of control over individual team websites, as well as by the elimination of website output and competition that would exist in the absence of the NHL's anticompetitive ban on independent team websites.

44.      Other adverse competitive effects exist as well.  The "exclusive" agreements have adversely affected, and will continue to adversely affect, the incentives of individual clubs to invest in, and exploit, their marks.  Individual team efforts are competitively significant because the NHL distributes the income from its own exploitation of team marks equally to each member club regardless of the club's contribution (if any) to the value of its marks, the club's efforts (if any) to promote itself and its marks, and the club's investment (if any) in creating a positive association with its marks.  The result, again, is reduced output, diminished product quality, diminished choice and suppressed price competition.

45.      In the absence of the "exclusive" agreements, the various clubs, including MSG, would increase their licensing output, offering licensing and broadcast opportunities that they are not now able to offer, increasing competition between and among the individual teams and the NHL, and leading to lower prices in the relevant markets.

46.      There are no legitimate, procompetitive justifications for these "exclusive" agreements and other competitive restraints, which have harmed consumers in various ways, including in the above-described ways.

**D.     MSG Has Suffered Antitrust Injury.**

47.      MSG has been injured and threatened with loss or damage as a result of the anticompetitive effects of the challenged conduct, in at least the following ways:

A.      MSG has been denied the right to freely compete in the exploitation of the Rangers marks.  MSG has been unable to license the Rangers marks in ways that it believes are

- 29 -

most likely to maximize the value of those marks and hence increase and strengthen fan interest and excitement in the Rangers hockey club.  MSG has lost and will continue to lose profits and sales, including in domestic and export commerce, as a result of its inability to fully exploit the Rangers marks within and outside the United States.

B.    MSG is forced and will continue to be forced to overpay for League-licensed products.  MSG has been restricted in its ability to offer Rangers-logoed apparel, merchandise and memorabilia on the Rangers website and elsewhere, and the products that MSG is able to offer on the Rangers site through an NHL-controlled store are available only at artificially-inflated prices.  In addition, MSG has been restrained from offering products and services for sale to consumers through an online version of its team's mail order catalog.

C.    MSG has been and will continue to be unduly restricted in its ability to design and enter into efficient and fan-responsive relationships with merchandisers, advertisers and sponsors that may want to associate themselves with the Rangers.  MSG has been and will continue to be restrained from negotiating creative or other special relationships with sponsors and advertisers, in particular, across multiple advertising platforms, including the internet. Further, MSG is being threatened in its efforts fully to exploit recent and future technological opportunities that would allow MSG to offer sponsors in-game, on-air signage opportunities through the real-time, video insertion of computer-generated electronic images into broadcasts of Rangers and other NHL games.  In the absence of the challenged agreements, MSG would be able to provide increased opportunities to sponsors with respect to in-arena signage.

D.    MSG has been and will continue to be unable to distribute Rangers games, game highlights and game footage through cable, satellite, internet and otherwise in ways that it believes are best suited to reaching the Rangers fan base throughout the country and abroad in

- 30 -

order to generate fan interest and excitement in the Rangers. In addition, MSG, through MSG

Network and FSNY, has lost licensing and other revenues as the result of its inability fully to

exploit Rangers, Islanders, Devils and Sabres ice hockey contests.

        E.     MSG has been constrained and is being threatened still further in its ability

to communicate with Rangers fans and potential fans on the Rangers website, and to market an

individualized Rangers website that furthers MSG's ability to compete for fans and that

generates fan excitement in the Rangers and the experience of Rangers games at Madison Square

Garden, as well as Rangers game telecasts.

### COUNT ONE: SECTION 1 OF THE SHERMAN ACT

        48.     MSG incorporates the averments of paragraphs 1 through 47, above.

        49.     Defendants and the independent businesses that comprise the member clubs in the

NHL have engaged in a contract, combination or conspiracy with the purpose, intent and effect

of restraining horizontal competition among the NHL member clubs and between the clubs and

the NHL, and, in addition, with the purpose, intent and effect of restraining trade and commerce

in licensing activities in the relevant markets, in the distribution of NHL games, and in the sale

of advertising at venues when used as the setting for major league men's professional ice hockey

contests.

        50.     The foregoing contract, combination or conspiracy has restrained competition

between and among the NHL clubs and the NHL in violation of Section 1 of the Sherman Act. It

has led to anticompetitive effects in the relevant markets, as alleged above, and caused injury to

consumers and competition in those relevant markets and elsewhere.

        51.     Defendants' anticompetitive conduct has directly and proximately caused antitrust

injury and threatened loss or damage to MSG's business and property, as set forth above. MSG

- 31 -

will continue to suffer antitrust injury and threatened loss or damage unless defendants are enjoined from continuing to engage in the foregoing violations of law.

## COUNT TWO:  NEW YORK GENERAL BUSINESS LAW § 340

52.    MSG incorporates the averments of paragraphs 1 through 51, above.

53.    Defendants have engaged in a contract, agreement, arrangement or combination that has restrained the free exercise of competition in the above-described markets in this state and elsewhere or that has otherwise resulted in a monopoly, all in violation of New York General Business Law § 340.

## VI.  PRAYER

**WHEREFORE**, MSG prays for judgment against defendants as follows:

1.    Preliminary and permanent injunctive and declaratory relief against those collective activities, policies and rules of the NHL that are not reasonably necessary to the success of the NHL joint venture.  Without in any way limiting the foregoing, such relief should include at least the following specific items of relief:

     A.    Prohibiting defendants from (i) imposing or enforcing any restriction on MSG's use of the Rangers marks or the means, media or affiliations through which MSG promotes or markets the Rangers or otherwise exploits the Rangers marks, or (ii)  licensing or otherwise making use of or exercising control over the Rangers marks without MSG's express consent;

     B.    Prohibiting defendants from imposing or enforcing any restriction on the means by which MSG may distribute or sell apparel, merchandise, memorabilia, or any other items bearing a Rangers mark, including but not limited to (1) any restriction on MSG's choice of manufacturers for such apparel, merchandise, memorabilia or other items; (2) any geographic restriction; or (3) any restriction on sales through any outlet or by any means (including sales through the Rangers website);

     C.    Prohibiting defendants from imposing or enforcing any restriction on MSG's audio and/or video distribution of Rangers games, game footage or game highlights (including the sale of rights thereto) via any medium, now known or hereafter developed, including over-the-air broadcasting, cable,

satellite or broadband television, the internet or wireless devices, except to the extent reasonably necessary to achieving cognizable procompetitive efficiencies such as in the case of a national broadcasting agreement authorized by the Sports Broadcasting Act, 15 U.S.C. § 1291 *et seq.*;

D.   Prohibiting defendants from entering into any distribution agreement other than one or more agreements for the national distribution of games of all NHL member teams that, in the aggregate, permit the League-approved rightsholder(s) exclusive distribution of no more than eight Rangers games in any one season without the express written permission of the Rangers;

E.   Prohibiting defendants from entering into any advertising or sponsorship agreement that overrides, conflicts with, or preempts any MSG or Rangers local sponsorship agreement;

F.   Prohibiting defendants from imposing or enforcing any requirement that any in-arena or other advertising or sponsorship inventory be reserved for or provided to the League or its sponsors;

G.   Prohibiting defendants from imposing or enforcing any restriction on the existence, content, format, or design of an independent Rangers website except to the extent necessary and appropriate to ensure reasonable minimum quality standards;

H.   Prohibiting defendants from requiring MSG to participate in any joint effort relating to the internet or any other new media activities, except to the extent reasonably necessary to achieving cognizable procompetitive efficiencies through such joint efforts; and

I.   Prohibiting defendants from sanctioning, penalizing, or otherwise taking adverse action against the Rangers or any individuals or entities affiliated with the Rangers for the filing and prosecution of this lawsuit or any actions related thereto, or for failing to comply with any illegal NHL rules or practices.

2.   Such other relief as is necessary and appropriate to restore full and free competition in the relevant markets.

3.   Its attorneys fees and cost of suit, and such other and further relief as may be just and proper.

CLI-1435955v31

March 31, 2008                          JONES DAY

                                        By: _____
                                            Meir Feder  (MF-2574)
                                            Robert W. Gaffey  (RG-4004)
                                            William J. Hine (WH-6766)
                                            222 East 41st Street
                                            New York, NY  10017-6702
                                            Telephone:  (212) 326-3939
                                            Facsimile:  (212) 755-7306

OF COUNSEL:

Thomas F. Cullen, Jr.
Joe Sims
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700

Thomas Demitrack
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH  44114-1190
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

CLI-1435955v31

## CERTIFICATE OF SERVICE

I declare that on March 31, 2008, I caused the attached FIRST AMENDED

COMPLAINT FOR INJUNCTIVE RELIEF to be served via U.S. Mail on the following counsel:

Shepard Goldfein
James A. Keyte
Skadden, Arps, Slate, Meagher & Flom LLP and Affiliates
Four Times Square
New York, New York 10036
Tel. 212.735.3000
Fax. 212.735.2000

*Attorneys for Defendants*

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York          JONES DAY
       March 31, 2008

By: _____
    Meir Feder  (MF-2574)
    Robert W. Gaffey  (RG-4004)
    William J. Hine (WH-6766)
    Tracy V. Schaffer (TS-4952)
    222 East 41st Street
    New York, NY  10017
    Telephone:  (212) 326-3939
    Facsimile:  (212) 755-7306

    *Attorneys for Plaintiff*

OF COUNSEL:

Thomas F. Cullen, Jr.
Joe Sims
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113

Thomas Demitrack
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH  44114-1190

NYI-4075462v2

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

MADISON SQUARE GARDEN, L.P.,                )
                                            )
            Plaintiff,                      )          No. 07 CIV. 8455 (LAP)
                                            )
            v.                              )          ECF Case
                                            )
NATIONAL HOCKEY LEAGUE, NATIONAL            )
HOCKEY LEAGUE ENTERPRISES, L.P., NHL        )
INTERACTIVE CYBERENTERPRISES, L.L.C.,       )
NHL ENTERPRISES CANADA, L.P., and NHL       )
ENTERPRISES, B.V.,                          )
                                            )
            Defendants.                     )
                                            )
                                            )
-------------------------------------------------------------- x


## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO TO DISMISS OR IN THE ALTERNATIVE FOR PARTIAL SUMMARY JUDGMENT



JONES DAY
222 East 41st St.
New York, NY  10017-6702
(212) 326-3939

*Attorneys for Plaintiff Madison
Square Garden, L.P.*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES .................................................................................. iii

PRELIMINARY STATEMENT ........................................................................ 1

MSG'S ALLEGATIONS, AND THE CASE SUPPORTING THEM ........................... 5

    A.    The Structure Of The League, And Competition Between The Teams ...................... 5

    B.    The Relevant Markets ........................................................................ 6

    C.    The NHL's Restrictions On Competition ........................................... 7

        (1)    Licensing and Merchandising ................................................. 7

        (2)    Broadcasting and Streaming ................................................... 8

        (3)    New Media ........................................................................... 9

        (4)    Advertising and Sponsorship ................................................. 10

STANDARD OF REVIEW ............................................................................. 11

I.    THE NHL'S CLAIM THAT ITS RESTRICTIONS ARE EXEMPT FROM ANTITRUST SCRUTINY BORDERS ON THE FRIVOLOUS ................................... 11

    A.    The Second Circuit And Other Courts Have Repeatedly Rejected Claims That Sports Leagues Are Single Entities .................................. 11

        (1)    The Single Entity Argument Is Foreclosed By Precedent ............................. 12

        (2)    Even Aside From Binding Precedent, The NHL's Request For Exemption From Section 1 Scrutiny Has No Merit .............................. 15

    B.    The Argument That *Dagher* Frees The NHL From The Obligation To Comply With The Antitrust Laws Is Also Without Merit ...................... 20

    C.    The NHL's Claim That Joint Ventures' Restrictions On Competition By Their Members Are Exempt From Scrutiny Is Demonstrably Wrong .................... 22

II.    THE NHL'S LEGAL ARGUMENTS REGARDING ANTITRUST INJURY ARE WITHOUT MERIT ............................................................................... 25

III.    THE NHL'S OTHER PURPORTED BARS TO SCRUTINY OF ITS ACTIONS ARE WITHOUT MERIT ........................................................................... 31

    A.    The Consent Agreement Cited By The NHL Cannot Insulate The NHL's Actions From Antitrust Scrutiny ............................................... 31

        (1)    The Consent Agreement Does Not Cover Conduct That Occurs Following The Date Of The Agreement ................................... 32

        (2)    A Prospective Release Of The Right To Sue For An Injunction Against Antitrust Violations Would Be Unenforceable ................... 33

    B.    MSG's Claims Are Not Barred By Laches ................................................ 36

## <u>TABLE OF CONTENTS</u>
### (continued)

**Page**

C.   MSG's Claim Regarding Exclusive Broadcast Territories Is Not Barred By
Judicial Estoppel ........................................................................................ 39

CONCLUSION ........................................................................................................ 40

## TABLE OF AUTHORITIES

Page

### CASES

*AXA Marine & Aviation Ins. (UK) Ltd.*,
    84 F.3d 622 (2d Cir. 1996) ...................................................................................39, 40

*Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*,
    910 F.2d 139 (4th Cir. 1990) ...............................................................................15

*Am. Needle, Inc. v. New Orleans La. Saints*,
    496 F. Supp. 2d 941 (N.D. Ill. 2007) ..................................................................14

*Arizona v. Maricopa County Med. Soc'y*,
    457 U.S. 332 (1982) .............................................................................................20

*Bell Atlantic Corp. v. Twombly*,
    127 S. Ct. 1955 (2007) ...............................................................................5, 11, 26

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
    603 F.2d 263 (2d Cir. 1979) .................................................................................37

*Bernstein v. Universal Pictures, Inc.*,
    517 F.2d 976 (2d Cir. 1975) .................................................................................38

*Blackburn v. Sweeney*,
    53 F.3d 825 (7th Cir. 1995) .................................................................................23

*Bolt v. Halifax Hosp. Med. Ctr.*,
    891 F.2d 810 (11th Cir. 1990) .............................................................................15

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
    441 U.S. 1 (1979) ............................................................................................24, 31

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*,
    996 F.2d 537 (2d Cir. 1993) ...........................................................................15, 16

*Cellar Door Prods., Inc. v. Kay*,
    897 F.2d 1375 (6th Cir. 1990) .............................................................................33

*Chapdelaine Corporate Sec. & Co. v. Depository Trust & Clearing Corp.*,
    No. 05 Civ. 10711, 2006 WL 2020950 (S.D.N.Y. July 13, 2006) .....................25

*Chicago Prof'l Sports Ltd. P'ship v. NBA*,
    95 F.3d 593 (7th Cir. 1996) .................................................................................14

## TABLE OF AUTHORITIES
### (continued)

Page

*Chicago Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n,*
    961 F.2d 667 (7th Cir. 1992) ........................................................................4, 19

*Citizen Publ'g Co. v. United States,*
    394 U.S. 131 (1969) ........................................................................................22

*City of Mt. Pleasant v. Associated Elec. Coop., Inc.,*
    838 F.2d 268 (8th Cir. 1988) ...................................................................17, 18

*Clarett v. NFL,*
    369 F.3d 124 (2d Cir. 2004) ..........................................................................14

*Columbia Broad. Sys., Inc. v. Am. Society of Composers, Authors & Publishers,*
    620 F.2d 930 (2d Cir. 1980) ..........................................................................21

*Columbia Steel Casting Co. v. Portland Gen. Elec. Co.,*
    111 F.3d 1427 (9th Cir. 1996) .......................................................................37

*Condit v. Dunne,*
    No. 06 Civ. 13126, 2008 WL 2676306 (S.D.N.Y. July 8, 2008) ....................11

*Conopco, Inc. v. Campbell Soup Co.,*
    95 F.3d 187 (2d Cir. 1996) ............................................................................38

*Copperweld Corp. v. Independence Tube Corp.,*
    467 U.S. 752 (1984) ................................................................................ *passim*

*Daniel v. Am. Bd. of Emergency Med.,*
    428 F.3d 408 (2d Cir. 2005) ......................................................................2, 25

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.,*
    129 F.3d 240 (2d Cir. 1997) ..........................................................................31

*Erickson v. Pardus,*
    127 S.Ct. 2197 (2007) ....................................................................................11

*Festa v. Local 3 Int'l Bhd. of Elec. Workers,*
    905 F.2d 35 (2d Cir. 1990) ............................................................................11

*Fishman v. Estate of Wirtz,*
    807 F.2d 520 (7th Cir. 1986) .........................................................................15

*Fitzpatrick v. Sony-BMG Music Entm't, Inc.,*
    No. 07-2933, 2008 WL 84541 (S.D.N.Y. Jan. 8, 2008) ...........................38, 39

**TABLE OF AUTHORITIES**
(continued)

Page

*Fourth Toro Family Ltd. P'ship v. PV Bakery, Inc.,*
    88 F. Supp. 2d 188 (S.D.N.Y. 2000).............................................................4, 39

*Fox Midwest Theatres, Inc. v. Means,*
    221 F.2d 173 (8th Cir. 1955) ...................................................................34, 35

*Fraser v. Major League Soccer, L.L.C.,*
    284 F.3d 47 (1st Cir. 2002).............................................................14, 16, 17

*Freeman v. San Diego Ass'n of Realtors,*
    322 F.3d 1133 (9th Cir. 2003) .......................................................15, 17, 18

*Gaines v. Carrollton Board of Trade, Inc.,*
    386 F.2d 757 (6th Cir. 1967) ....................................................................34

*Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n,*
    744 F.2d 588 (7th Cir. 1984) ..............................................................19, 24

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.,*
    392 U.S. 481 (1968)..................................................................................37

*Higgins v. N.Y. Stock Exch. Inc.,*
    942 F.2d 829 (2d Cir. 1991).....................................................................37

*Hunt v. Mobil Oil Corp.,*
    654 F. Supp. 1487 (S.D.N.Y. 1987).........................................................34

*Hunter Douglas, Inc. v. Comfortex Corp.,*
    No. 98-CV-0479, 1999 U.S. Dist. LEXIS 10906 (N.D.N.Y. Mar. 11, 1999) ..................35

*Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp.,*
    449 F. Supp. 1158 (D. Hawaii 1978) .......................................................38

*In re Intel Corp. Microprocessor Antitrust Litig.,*
    496 F. Supp. 2d 404 (D. Del. 2007)..........................................................26

*Iqbal v. Hasty,*
    490 F.3d 143 (2d Cir. 2007).....................................................................11

*KFC Corp. v. Marion-Kay Co.,*
    620 F. Supp. 1160 (S.D. Ind. 1985) .........................................................38

**TABLE OF AUTHORITIES**
(continued)

Page

*Kaiser Steel Corp. v. Mullins,*
  455 U.S. 72 (1982)..................................................................................34

*Kassner v. 2nd Avenue Delicatessen Inc.,*
  496 F.3d 229 (2d Cir. 2007)...............................................................11, 26

*Kingray, Inc. v. NHL Enters., Inc.,*
  No. 00-CV-1544-L (BEN), slip op. (S.D. Cal. July 2, 2002) ....................29, 30

*Klehr v. A.O. Smith Corp.,*
  521 U.S. 179 (1997)................................................................................36

*L.A. Mem'l Coliseum Comm'n v. NFL,*
  726 F.2d 1381 (9th Cir. 1984) ........................................................1, 4, 13

*Law v. Nat'l Collegiate Athletic Ass'n,*
  134 F.3d 1010 (10th Cir. 1998) ................................................................24

*Lawlor v. Nat'l Screen Serv. Corp.,*
  349 U.S. 322 (1955)..........................................................................32, 33

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,*
  127 S. Ct. 2705 (2007)............................................................................29

*Lyons P'ship, L.P. v. Morris Costumes, Inc.,*
  243 F.3d 789 (4th Cir. 2001) ...................................................................38

*MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.,*
  161 F.3d 443 (7th Cir. 1998) ...................................................................36

*Major League Baseball v. Crist,*
  331 F.3d 1177 (11th Cir. 2003) ...........................................................1, 18

*McNeil v. NFL,*
  790 F. Supp. 871 (D. Minn. 1992)............................................................18

*Mitchell v. Washingtonville Cent. Sch. Dist.,*
  190 F.3d 1 (2d Cir. 1999) .......................................................................40

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,*
  473 U.S. 614 (1985)................................................................................34

*Mktg. Assistance Plan, Inc. v. Associated Milk Producers, Inc.,*
  338 F. Supp. 1019 (S.D. Tex. 1972) ...............................................33, 34, 35

**TABLE OF AUTHORITIES**
(continued)

Page

*Mulvaney Mech., Inc. v. Sheet Metal Workers Int'l Ass'n,*
    288 F.3d 491 (2d Cir. 2002), *vacated on other grounds*, 123 S. Ct. 1572 (2003) ............40

*Murray-Gardner Mgmt., Inc. v. Iroquois Gas Transmission Sys., L.P.,*
    646 N.Y.S.2d 418 (N.Y. App. Div. 1996) ........................................................32

*N. Am. Soccer League v. NFL,*
    670 F.2d 1249 (2d Cir. 1982)..............................................................12, 13

*NCAA v. Board of Regents,*
    468 U.S. 85 (1984)...................................................................... *passim*

*NFL v. N. America Soccer League,*
    459 U.S. 1074 (1982).....................................................................14

*NHL Players' Ass'n v. Plymouth Whalers,*
    419 F.3d 462 (6th Cir. 2005) ............................................................13

*N.Y. Medscan LLC v. N.Y. Univ. Sch. of Med.,*
    430 F. Supp. 2d 140 (S.D.N.Y. 2006).................................................25, 26

*Palmer v. BRG of Ga., Inc.,*
    498 U.S. 46 (1990)........................................................................23

*Perma Life Mufflers, Inc. v. Int'l Parts Corp.,*
    392 U.S. 134 (1968)...................................................................34, 38

*Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc.,*
    351 F. Supp. 462 (E.D. Pa. 1972) ....................................................2, 6

*Polk Bros., Inc. v. Forest City Enters., Inc.,*
    776 F.2d 185 (7th Cir. 1985) ..........................................................23

*Polygram Holding, Inc. v. FTC,*
    416 F.3d 29 (D.C. Cir. 2005) ..........................................................21

*Record Club of Am., Inc. v. United Artists Records, Inc.,*
    611 F. Supp. 211 (S.D.N.Y. 1985).....................................................36

*Redel's Inc. v. Gen. Elec. Co.,*
    498 F.2d 95 (5th Cir. 1974) ........................................................33, 35

## TABLE OF AUTHORITIES
(continued)

Page

*Richard's Lumber & Supply Co. v. U.S. Gypsum Co.,*
    545 F.2d 18 (7th Cir. 1976) ............................................................................36

*Ross v. Bank of Am., N.A.,*
    524 F.3d 217 (2d Cir. 2008).............................................................................30

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,*
    792 F.2d 210 (D.C. Cir. 1986) ........................................................................23

*Sanjuan v. Am. Board of Psychiatry & Neurology, Inc.,*
    40 F.3d 247 (7th Cir. 1994) .......................................................................33, 34

*Schering-Plough Corp. v. FTC,*
    402 F.3d 1056 (11th Cir. 2005) ......................................................................23

*Seabury Mgmt., Inc. v. Prof'l Golfers Ass'n of Am., Inc.,*
    878 F. Supp. 771 (D. Md. 1994), *aff'd in part, rev'd in part on other grounds,* 52
    F.3d 322 (4th Cir. 1995) ..................................................................................17

*Sullivan v. NFL,*
    34 F.3d 1091 (1st Cir. 1994)......................................................................13, 15

*Texaco Inc. v. Dagher,*
    547 U.S. 1 (2006)................................................................................... *passim*

*Three Rivers Motor Co. v. Ford Motor Co.,*
    522 F.2d 885 (3d Cir. 1975).......................................................................34, 36

*U.S. Fid. & Guar. Co. v. Treadwell Corp.,*
    58 F. Supp. 2d 77 (S.D.N.Y. 1999).................................................................40

*United States v. Addyston Pipe & Steel Co.,*
    85 F. 271 (6th Cir. 1898), *aff'd,* 175 U.S. 211 (1899) ....................................23

*United States v. NFL,*
    116 F. Supp. 319 (E.D. Pa. 1953) .........................................................1, 8, 27

*United States v. N. Improvement Co.,*
    814 F.2d 540 (8th Cir. 1987) ..........................................................................37

*United States v. Penn-Olin Chem. Co.,*
    378 U.S. 158 (1964).........................................................................................24

## TABLE OF AUTHORITIES
### (continued)

Page

*United States v. Topco Assocs., Inc.,*
405 U.S. 596 (1972)....................................................................................................22

*United States v. Visa U.S.A., Inc.,*
344 F.3d 229 (2d Cir. 2003)................................................................................ *passim*

*Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council,*
857 F.2d 55 (2d Cir. 1988)......................................................................................13, 25

*Westmoreland Asbestos Co. v. Johns-Manville Corp.,*
39 F. Supp. 117 (S.D.N.Y. 1941)......................................................................33, 34, 35

*Willsea v. Theis,*
No. 98 Civ. 6773, 1999 WL 595629 (S.D.N.Y. Aug. 6, 1999) ........................................36

*In re WorldCom, Inc. Sec. Litig.,*
308 F. Supp. 2d 236 (S.D.N.Y. 2004)........................................................................40

*Xerox Corp. v. Media Scis. Int'l, Inc.,*
511 F. Supp. 2d 372 (S.D.N.Y. 2007).......................................................................25, 26

*Zenith Radio Corp v. Hazeltine Research, Inc.,*
401 U.S. 321 (1971)................................................................................................37

### STATUTES

Sports Broadcasting Act of 1961, 15 U.S.C. §§ 1291 *et seq.* ..........................................8

### MISCELLANEOUS

PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW (2d ed. 2004) .................... *passim*

Marc Edelman, *Single Entity Ruling: 'Needle' in Haystack*, 239 N.Y.L.J. 4 (Jan. 2, 2008).........14

Marc Edelman, *Why the Single Entity Defense Can Never Apply to NFL Clubs: A Primer
on Property-Rights Theory in Professional Sports*, 18 FORDHAM INTELL. PROP.
MEDIA & ENTM'T L.J. 891 ........................................................................................13

Brandon L. Grusd, *The Antitrust Implications of Professional Sports' League-Wide
Licensing And Merchandising Arrangements*, 1 VA. J. SPORTS & LAW 1
(1999)..............................................................................................1, 8, 27, 35

## TABLE OF AUTHORITIES
### (continued)

Page

William J. Hoffman, *Dallas' Head Cowboy Emerges Victorious in a Licensing Showdown with the N.F.L.: National Football League Properties v. Dallas Cowboys Football Club*, 7 SETON HALL J. SPORT L. 255 (1997) ........................................4

Stephen F. Ross, *Antitrust Options To Redress Anticompetitive Restraints And Monopolistic Practices By Professional Sports Leagues,* 52 CASE W. RES. L. REV. 133 (2001) ...................................................................................................... *passim*

Stephen F. Ross & Stefan Szymanski, *Antitrust and Inefficient Joint Ventures: Why Sports Leagues Should Look More Like McDonald's and Less Like the United Nations*, 16 MARQ. SPORTS L. REV. 213 (2006) ....................................................5, 11, 15

James D. Weinberger, *Baseball Trademark Licensing and the Antitrust Exemption: An Analysis of New York Yankees Partnership v. Major League Baseball Enterprises, Inc.*, 23 COLUM.-VLA J.L. & ARTS 75 (1999)................................................4

## PRELIMINARY STATEMENT

There is no "sports league" or "joint venture" exemption from the antitrust laws.  Sports

leagues, like other collective efforts, produce benefits that cannot be achieved by firms acting

alone.  But such concerted action is not invariably beneficial:  when it exceeds its proper scope,

it causes harm that is "well documented" — *i.e.,* "welfare losses stemming from the potentially

anticompetitive agreements among professional sports clubs." *Major League Baseball v. Crist,*

331 F.3d 1177, 1188 (11th Cir. 2003).  Accordingly, the courts require scrutiny of *all* agreements

restricting competition between participants in joint ventures — including sports leagues.

To be sure, some such agreements easily pass muster — on-field/ice rules, for example

— but only because their obvious pro-competitive benefits easily outweigh any anticompetitive

effects.  MSG, however, is not challenging the validity of the NHL joint venture, or rules

governing on-ice competition.  MSG challenges only specific horizontal agreements that go far

beyond what is reasonably necessary to operating a professional hockey league — agreements

that severely restrict individual team competition, and consumer choice, in areas such as

broadcasting and licensing.  Such agreements are at the opposite pole from on-ice or on-field

rules:  they are not necessary to the operation of a sports league, have rarely been upheld, and

have long been regarded as suspect. *See, e.g., L.A. Mem'l Coliseum Comm'n v. NFL,* 726 F.2d

1381 (9th Cir. 1984) (upholding challenge to NFL rule creating exclusive territories); *United

States v. NFL,* 116 F. Supp. 319 (E.D. Pa. 1953) (limits on team broadcasts of games unlawful).[1]

MSG's First Amended Complaint ("Complaint") is extraordinary only in that sports

league members have rarely been willing to challenge their leagues' actions; from the standpoint

---

[1] *See also, e.g.,* Stephen F. Ross, *Antitrust Options To Redress Anticompetitive Restraints And Monopolistic Practices By Professional Sports Leagues,* 52 CASE W. RES. L. REV. 133, 143-44 (2001) (restrictions on out-of-market broadcasting unlawful); Brandon L. Grusd, *The Antitrust Implications of Professional Sports' League-Wide Licensing And Merchandising Arrangements,* 1 VA. J. SPORTS & LAW 1 (1999) (exclusive league-wide merchandising and licensing arrangements unlawful).

of antitrust law, MSG's challenge to these agreements breaks no new ground.  The complaint rests on four fundamental, but unexceptional, propositions:

(1)     Exclusivity requirements imposed by joint ventures like the NHL are not simply a matter of contract law or venture internal rules, but instead are highly suspect agreements under the antitrust laws.  Indeed, agreements among joint venturers not to compete individually, "[f]ar from being 'presumptively legal' . . . are exemplars of the type of anticompetitive behavior prohibited by the Sherman Act."  *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 242 (2d Cir. 2003) (citing three sports league antitrust cases);

(2)     There are distinct, hockey-specific relevant markets — both local and national — in which the NHL has market power, as other courts have repeatedly held with respect to various sports leagues, including the NHL itself.  *See Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc.*, 351 F. Supp. 462, 501-02 (E.D. Pa. 1972); Ross, *Antitrust Options*, 52 CASE W. RES. L. REV. at 140 n.16 (citing cases);

(3)     The restraints at issue here necessarily harm competition, raise prices, and reduce consumer options in those markets.  Because this conduct also harms the Rangers, who are foreclosed from competing, MSG is a proper "private attorney general" under the antitrust laws. *See, e.g., Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 440 (2d Cir. 2005) (suit by member of alleged cartel challenging restraints necessarily establishes antitrust injury); and

(4)     The NHL cannot carry the heavy burden of justifying these anticompetitive effects — particularly on a motion to dismiss.  The restraints are not reasonably necessary (*i.e.*, "ancillary") to achieving any pro-competitive purpose, let alone one that outweighs the harms they create.  *See, e.g., Visa U.S.A.*, 344 F.3d at 238, 243 (restraint must be "reasonably necessary" and its benefits must outweigh its "anticompetitive effects").  Simply repeating that

no team can play hockey on its own does not suffice, much less provide a blanket justification for decisions by the NHL's member clubs, in whatever area, to cease competing independently.

The NHL's motion makes little effort to defend these anticompetitive agreements on their merits. Instead, the NHL seeks a way to avoid that challenge entirely. But its various attempts to evade antitrust scrutiny of its members' actions are uniformly without merit.

In particular, the NHL's long-discredited claim that it is a "single entity" under *Copperweld*, and therefore exempt from compliance with Section 1 of the Sherman Act, has been overwhelmingly rejected by the courts, including the Second Circuit. Precedent aside, the NHL fails to identify any benefit that this exemption would offer to offset the consumer harm caused by immunizing anticompetitive league practices.

Likewise, the NHL's attempt to construe *Texaco Inc. v. Dagher*, 547 U.S. 1 (2006), as giving NHL clubs *carte blanche* to agree not to compete with each other in any area in which the League operates misreads *Dagher*, is contrary to binding Second Circuit law, *see Visa U.S.A.*, 344 F.3d at 242, and would overturn more than a century of settled joint venture case law. [2]

The NHL's various attempts to avoid scrutiny by attacking MSG as a plaintiff are also without merit. *First*, the claim that eliminating independent competition — and thereby producing higher prices, reduced output, and fewer consumer options in hockey-specific markets — does not establish antitrust injury is demonstrably wrong. *Second*, the contention that a combination of competitors can insulate itself from antitrust scrutiny by entering into agreements not to sue is untenable — and, in any event, the agreements on which the NHL relies do not even purport to release claims based on ongoing or prospective antitrust violations. *Third*, the NHL's

---

[2] As explained in detail *infra, Dagher* only determined how, not whether, the antitrust laws would be applied to a *fully integrated* joint venture's own activities. The NHL is not such an integrated joint venture; in addition, the claims here relate to restrictions on the independent activities of venture participants, not the activities of the joint venture itself; and, in any event, *Dagher* holds only that the Rule of Reason, not the *per se* rule, should be used in applying the antitrust laws to the challenged conduct.

invocation of judicial estoppel based on its prior litigation of a completely different claim misrepresents the other lawsuit, and misstates judicial estoppel doctrine. *Fourth*, the NHL cannot invoke laches against a suit to enjoin its continuing antitrust violations, let alone on a motion to dismiss.

Finally, the NHL's *ad hominem* attempt to avoid the merits by describing this suit as the "specious tactic" of a "disgruntled owner," is pointless. Most antitrust plaintiffs have their own motives for going to court; indeed, Congress sought to stimulate such motives by offering treble damages. And, in the sports league context, it is almost by definition owners whom others might regard as "disgruntled" who are most likely to overcome pressures to conform, and thus carry out the "private attorney general" role that is critical to the American antitrust system. In the NHL itself, MSG is aware of numerous owners who have objected strongly to anti-competitive practices, but have been unwilling to pursue antitrust litigation. In the rare instances when a "disgruntled" owner has dared to challenge league practices or rules in court, the leagues have been unable to establish their legality.[3]

This record of lack of success may explain why the NHL seeks an exemption from antitrust scrutiny. But the NHL's various arguments for escaping such scrutiny are all contrary to well-settled law, and the NHL's motion should therefore be denied.

---

[3] Al Davis's challenge to an NFL exclusive territory rule was successful, *L.A. Mem'l Coliseum Comm'n*, 726 F.2d 1381, as was Jerry Reinsdorf's challenge to the NBA's limits on superstation broadcasts, *Chicago Prof. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 961 F.2d 667 (7th Cir. 1992) ("*Bulls I*"). And Jerry Jones and George Steinbrenner settled on favorable terms with the NFL and Major League Baseball, respectively. *See* William J. Hoffman, *Dallas' Head Cowboy Emerges Victorious in a Licensing Showdown with the N.F.L.: National Football League Properties v. Dallas Cowboys Football Club*, 7 SETON HALL J. SPORT L. 255 (1997); James D. Weinberger, *Baseball Trademark Licensing and the Antitrust Exemption: An Analysis of New York Yankees Partnership v. Major League Baseball Enterprises, Inc.*, 23 COLUM.-VLA J.L. & ARTS 75 (1999).

## MSG'S ALLEGATIONS, AND THE CASE SUPPORTING THEM

### A.    The Structure Of The League, And Competition Between The Teams

The NHL is a joint venture created to schedule and produce ice hockey games. Complaint ¶ 2. It facilitates "on ice" activities by, among other things, setting the rules of play, organizing the season, and handling administrative responsibilities. *Id.* ¶ 8. It is thus a joint venture producing a product: major league men's professional ice hockey competition. *Id.* ¶ 6.

The NHL clubs are not simply an extension of the League; rather, the NHL is an artificial creation of its member clubs and subject to their collective control. *Id.* ¶ 9. The clubs are separately owned and operated entities that have retained their autonomy in running their day-to-day businesses. *Id.* ¶¶ 7, 35. They have separate assets, stadium rights, employees, and ownership rights in various copyrights, trademarks, trade dress, and trade names (collectively, "marks") in team logos and designs. *Id.* ¶ 13. Moreover, the clubs vary in their ability to generate attendance (both for home and road games), sell merchandise, and market broadcasting rights, and team valuations reflect those differences. *See* Declaration of Jerry A. Hausman, July 17, 2008 ("Hausman Decl.") ¶¶ 15-17.[4] Ultimate authority over the League rests with the NHL Board of Governors, which is controlled by the votes of the individual clubs, each of which has its own interests. Complaint ¶ 9. Accordingly, the teams control the league, not the other way around. *See* Hausman Decl. ¶ 21.[5]

The NHL clubs compete vigorously off the ice in all of the ways they have not collectively agreed to prohibit:  they independently set ticket prices; compete for players and

---

[4] Professor Hausman's affidavit is not submitted not as a means of supplementing the complaint, but rather for the sole purpose of illustrating, pursuant to *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007), that the allegations in the Amended Complaint, as pled, form the basis of a more than plausible antitrust claim.

[5] Collective control by clubs acting in their own interests produces "significant economic difference[s]" — including different, and less efficient, decisionmaking incentives— "compared to a league controlled by a single entity." Stephen F. Ross & Stefan Szymanski, *Antitrust and Inefficient Joint Ventures: Why Sports Leagues Should Look More Like McDonald's and Less Like the United Nations*, 16 MARQ. SPORTS L. REV. 213, 238 (2006); *see id.* at 222-37.

coaches; create and manage marketing and promotional programs, including the sale of advertising; and develop, license, and market their respective trademarks. Complaint ¶ 2. For example, there is fierce competition between the three New York metropolitan area clubs to attract fans and sponsors, and to sell merchandise. *See* Hausman Decl. ¶¶ 35-39. Individual clubs, including the Rangers, have undertaken substantial efforts over the years to enhance the value of their marks and the images of their teams as they compete with each other for fan interest both locally and nationally. Complaint ¶ 13.

As a result of MSG's substantial investments in developing and marketing the Rangers franchise, the Rangers' following extends well beyond the New York area. *Id.* ¶ 12. MSG's aggressive efforts have created and increased consumer demand for products and services, including information, merchandise, apparel, and memorabilia containing the Rangers logo, as well as consumer demand for the opportunity to view Rangers games and highlights. *Id.* ¶ 14.

**B.    The Relevant Markets**

Major league men's professional ice hockey has unique characteristics that set it apart from other sports or leisure activities. Complaint ¶ 29. At competitive prices, the rights to license or use the marks of the NHL and NHL clubs, the rights to broadcast or otherwise distribute NHL games, and the rights to sell advertising rights at or involving NHL venues are not reasonably interchangeable with any substitutes. *Id.* ¶ 31. As a result — and as numerous courts have found regarding the NHL and other major sports leagues, *see, e.g., Philadelphia World Hockey Club,* 351 F. Supp. at 501-02; *see also* cases cited in Ross, *Antitrust Options,* 52 CASE W. RES. L. REV. at 140 n.16 — major league men's professional ice hockey products and services are a distinct market, in various local and national geographic areas, over which the NHL has market power. Complaint ¶ 32; *see* Hausman Decl. ¶¶ 30-45.

For example, the NHL clubs have agreed to ban out-of-market broadcasting of a team's games, which gives the NHL Center Ice cable package substantial pricing power. For fans of NHL hockey, other forms of entertainment are not reasonably interchangeable, leading such consumers to pay higher prices for the Center Ice package — and/or to purchase the entire Center Ice package rather than individual games or the games of a single team — than they would if individual clubs were not foreclosed from offering their own games as a competing alternative. *See* Hausman Decl. ¶¶ 36, 44, 48; Ross, *Antitrust Options*, 52 CASE W. RES. L. REV. at 143-44.

### C.    The NHL's Restrictions On Competition

The NHL clubs, acting through the League, have agreed to limit off-the-ice competition among the clubs, and between the NHL itself and the clubs, in numerous ways that are not reasonably necessary to any efficiency produced by the NHL joint venture. Complaint ¶ 3.

#### (1)    Licensing and Merchandising.

The NHL clubs have agreed to give the purported "exclusive" right to control the individual clubs' marks and licensing opportunities, for virtually all commercial purposes, to the League. *Id.* ¶ 38. This eliminates each club's ability to compete to sell, among other things, clothing and other products containing a player's name, number, or image. *Id.* ¶ 40A. In addition, the clubs have agreed to require that 65% of the products offered through team catalogs be produced by licensees selected by the League and have effectively prohibited teams from selling locally-licensed products outside of the team's home arena. *Id.* ¶ 40B. They have also prevented teams from selling team merchandise on the internet other than through an NHL-controlled store. *Id.*

As a result, individual clubs like the Rangers are precluded from seeking out lower-cost or higher-quality manufacturing arrangements than those entered into by the League, and from

offering consumers merchandise options not offered by the League.  In addition, because of the absence of reasonably interchangeable alternatives to NHL-themed merchandise, the restrictions on competition necessarily result in higher prices, lower quality, and reduced responsiveness to consumer preferences.  *See, e.g.*, Grusd, *Antitrust Implications*, 1 VA. J. SPORTS & LAW at 38 ("[I]t appears that each league has sufficient market power to adversely affect the market."); Hausman Decl. ¶¶ 4, 44-47, 58.

### (2)   Broadcasting and Streaming.

Longstanding precedent holds that a sports league's allocation of broadcasting territories violates the Sherman Act, *United States v. NFL*, 116 F. Supp. 319 — precedent that prompted the Sports Broadcasting Act of 1961, 15 U.S.C. §§ 1291 *et seq.*, which provides limited antitrust immunity for certain over-the-air broadcasting agreements.[6]  Yet the NHL member teams have agreed to prohibit each club from transmitting its games, on television or over the Internet, outside defined territories.  Complaint ¶¶ 16C, 40C.  The only alternative provided for fans is the Center Ice cable package — a package of *all* non-local NHL games.  *Id.* ¶ 40C.  Even within each club's area, these agreements allow cable distribution of only a limited number of games in some portions of the area — on a fee-for-subscriber basis centrally determined by the League — and prevent the club from distributing games on the internet.  *Id.* ¶ 40C.  The agreements also limit the ability of teams to license rebroadcasts of their games, permitting them only within 48 hours of game endings and prohibiting teams from licensing the rebroadcasts of historic games. *Id.*

The necessary effect of these agreements to restrict competition, in the distinct market for professional ice hockey broadcasts, is higher prices and reduced consumer welfare.  "If

---

[6] Although the SBA creates a limited exception to the rule of *United States v. NFL*, there is no contention that the NHL rules challenged here fall within the protection of the SBA.

consumers were able to contract for out-of-market games on a per-team basis, for example, there would still be a market for the league's blanket license, but the price would be lower, and many consumers who are primarily interested in watching the games of a single out-of-market team would be able to obtain the desired product at vastly reduced cost." Ross, *Antitrust Options*, 52 CASE W. RES. L. REV. at 143-44.

### (3) New Media.

The NHL member clubs have centralized control of various "new media" activities and agreed to ban the individual clubs from competing independently in this area. *Id.* ¶ 16D. As one prominent example, the NHL member teams have agreed to require each team to place individual team websites under centralized control on a central server. They have also agreed to reduce competition in the sale of Internet advertising by giving the League control of the sale of banner ads at the top of, and in the primary box of, team websites. *Id.* ¶ 40E. The teams are limited to providing "local content," and a limited amount of advertising, for inclusion on those sites — subject to strict rules governing design and placement of content — and the sites include new non-local content that was not previously present. *Id.* Concurrently, the NHL clubs have prohibited teams from launching independent sites to compete with the NHL-controlled sites. *Id.*

The result of these new rules is a reduction in output in the distinct markets in which the NHL has market power. For example, by banning independent websites, the NHL teams have necessarily restrained the number of competing sites, and output, at a minimum, includes "the number of units" available to consumers and advertisers. XI PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 1901d, at 205-06 (2d ed. 2004). In addition, the NHL's common template qualitatively restricts output, in that restraining any of the relevant features of a product "is an 'output reduction,' just as certainly as is an agreement increasing . . . price." *Id.* Indeed, the NHL itself views the website changes as affecting consumers, in that they are

designed to ensure that — instead of the varied and largely "provincial" websites that consumers demanded, and the unrestrained market produced — all team websites "articulate a single NHL brand persona and voice." Declaration of John Collins in Support for Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction ¶ 7 & Ex. A at 21 (Oct. 11, 2007).

        (4)      **Advertising and Sponsorship.**

      The clubs have agreed to give the League the right to enter into advertising or sponsorship arrangements that automatically preempt individual clubs from selling advertising or sponsorships. *Id.* ¶ 16B. For example, teams are restrained in selling advertising space in the ice or on dasherboards, *i.e.*, the low partitions erected around the ice itself, because the League regulates the size and number of the boards and is given the most desirable space during national broadcasts. *Id.* ¶ 40D. Moreover, the NHL clubs have prohibited teams from using virtual signage that can be electronically superimposed during game telecasts. *Id.* These rules eliminate competition that would otherwise exist for businesses seeking to advertise or promote to the distinct demographic of NHL hockey fans. *See* Hausman Decl. ¶¶ 14, 47.

      In sum, numerous horizontal restrictions on member team competition have caused higher prices and lower output, and have precluded teams from increasing consumer options, for NHL-related products and services. *See* Complaint ¶ 43. Absent the exclusive agreements and other restraints, NHL teams would compete in these areas to a much greater extent. *Id.* Indeed, until it was fined by the NHL, MSG had operated its own team website, and had made Rangers-branded merchandise available through the website. *Id.* ¶ 4. MSG had also sold virtual advertising on MSG's television broadcasts of Rangers home games, and made Rangers games available to local cable subscribers through broadband Internet distribution limited to the Rangers' local area. *Id.*