UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

THOMAS LAUMANN, FERNANDA GARBER,
ROBERT SILVER, GARRETT TRAUB, DAVID
DILLON and PETER HERMAN, representing
themselves and all other similarly situated,

         Plaintiffs,

      - against -

NATIONAL HOCKEY LEAGUE, et al.,

        Defendants.

**OPINION AND
_____ORDER_____**

**12 Civ. 1817 (SAS)**

------------------------------------------------------------ X

FERNANDA GARBER, MARC LERNER, DEREK
RASMUSSEN, ROBERT SILVER, GARRETT
TRAUB, and PETER HERMAN representing
themselves and all other similarly situated,

        Plaintiffs,

      - against -

OFFICE OF THE COMMISSIONER OF BASEBALL,
et al.,

        Defendants.

**12 Civ. 3704 (SAS)**

------------------------------------------------------------ X

SHIRA A. SCHEINDLIN, U.S.D.J.:

I.      INTRODUCTION

      Plaintiffs bring this consolidated putative class action against the

National Hockey League ("NHL") and Major League Baseball ("MLB"), various clubs within the Leagues, regional sports networks ("RSNs") that televise the games, and Comcast and DirecTV, multichannel video programming distributors ("MVPDs").[1]  Plaintiffs challenge "defendants' . . . agreements to eliminate competition in the distribution of [baseball and hockey] games over the Internet and television [by] divid[ing] the live-game video presentation market into exclusive territories, which are protected by anticompetitive blackouts" and by "collud[ing] to sell the 'out-of-market' packages only through the League [which] exploit[s] [its] illegal monopoly by charging supra-competitive prices."[2]  Plaintiffs claim that these agreements "result in reduced output, diminished product quality, diminished choice and suppressed price competition" in violation of the Sherman Antitrust Act,[3] and request statutory damages and injunctive relief on behalf of themselves and the class.[4]  Defendants jointly move to dismiss all claims pursuant

---

[1]     This motion to dismiss arises out of two consolidated cases.  *Laumann v. National Hockey League, et al.*, No. 12 Civ. 1817 involves professional hockey telecasting, and *Garber v. Office of the Commissioner of Baseball, et al.*, No. 12 Civ. 3704, involves professional baseball telecasting.  There are no cross-league allegations.

[2]     *Laumann* Second Amended Complaint ("*Laumann* Compl.") ¶¶ 2, 8; *Garber* First Amended Complaint ("*Garber* Compl.") ¶¶ 2, 11.

[3]     *Laumann* Compl. ¶ 10; *Garber* Compl. ¶ 13.

[4]     *See Laumann* Compl. at 40-41; *Garber* Compl. at 41-42.  The Sherman Antitrust Act authorizes suit for an alleged antitrust violation in "any

to Federal Rule of Civil Procedure 12(b)(6).[5]

## II.      BACKGROUND[6]

### A.      The Agreements to Telecast Baseball and Hockey

Plaintiffs are subscribers to television[7] and/or Internet[8] services that

---

district court of the United States in the district in which the defendant resides or is found or has an agent" and provides for treble damages, interest, and attorneys fees and costs.  15 U.S.C. § 15(a).

[5]      Moving defendants in *Laumann* are the NHL, NHL Enterprises, L.P., NHL Interactive Cyberenterprises, LLC, and nine NHL clubs, Comcast Corporation and four of its affiliate Comcast SportsNet entities, DirecTV, LLC, DirecTV Sportsnetworks LLC and one of its affiliate Root Sports entities, and the Madison Square Garden Company.  Moving defendants in *Garber* are the MLB, Major League Baseball Enterprises, Inc., MLB Advanced Media, L.P., and MLB advanced Media, Inc., eight of the nine named individual club defendants, Comcast and three of its affiliated Comcast Sportsnet entities, DirecTV, DirecTV Sportsnetworks LLC and three of its affiliate Root Sports entities, and Yankees Entertainment & Sports Networks, LLC.  An additional named club, Chicago National League Baseball Club, LLC, filed a bankruptcy notice on June 28, 2012 (*Garber* Dkt. No. 53) and is not party to the motion to dismiss.

[6]      Unless otherwise noted, all facts are drawn from the *Laumann* Second Amended Complaint and *Garber* First Amended Complaint and are presumed true for the purposes of this motion.

[7]      Fernanda Garber purchased video service from Comcast, which included Comcast Sportsnet California and Comcast Sportsnet Bay Area.  *See Laumann* Compl. ¶ 13; *Garber* Compl. ¶ 16. Garrett Traub purchased video service from Comcast, which included channels carrying professional hockey games, and also purchased NHL Center Ice.  *See Laumann* Compl. ¶ 16; *Garber* Compl. ¶ 20. Robert Silver purchased satellite service from DirecTV, which included channels carrying professional hockey games, and also purchased NHL Center Ice.  *See Laumann* Compl. ¶ 15; *Garber* Compl. ¶ 19.  Peter Herman (together with Garber, Silver, and Traub the "Television plaintiffs") purchased, and continues to receive video service from DirecTV.  *See Laumann* Compl. ¶ 18.  The Television plaintiffs

include live hockey and baseball telecasts.  Defendant National Hockey League is an unincorporated association of thirty major league professional ice hockey clubs, nine of which are named as defendants in *Laumann*.[9]  Defendant Office of the Commissioner of Baseball, doing business as Major League Baseball, is an unincorporated association of thirty professional baseball clubs, nine of which are named as defendants in *Garber*.[10]  The Complaints also name subsidiaries of the

---

seek to represent individuals who purchased television service from DirecTV or Comcast that included live NHL or MLB games not available through a sponsored telecast.  *See Laumann* Compl. ¶ 36; *Garber* Compl. ¶ 41.

[8]      Thomas Laumann has been a subscriber to the NHL Gamecenter Live Internet package from the NHL League defendants since 2010.  *See Laumann* Compl. ¶ 14. David Dillon purchased NHL Gamecenter Live in 2011 and also subscribes to pay television service and "intends to purchase television and professional hockey programming services in the future."  *Id.* ¶ 17.  Marc Lerner and Derek Rasmussen (together with Laumann and Dillon, the "Internet plaintiffs") purchased the MLB.tv Internet package from the MLB League defendants.  *Garber* Compl. ¶¶ 17-18.  The Internet plaintiffs seek to represent classes of individual purchasers of NHL GameCenter Live (in Laumann) and MLB.TV (in Garber).  *See Laumann* Compl. ¶ 36; *Garber* Compl. ¶ 41.

[9]      *See Laumann* Compl. ¶ 19.  The clubs named as defendants are the Chicago Blackhawks Hockey Team, Inc.; Comcast-Spectacor, L.P. (d/b/a "Philadelphia Flyers"); Hockey Western New York, LLC (d/b/a "Buffalo Sabres"); Lemieux Group, L.P. (d/b/a "Pittsburgh Penguins"); Lincoln Hockey, LLC (d/b/a "Washington Capitals"); New Jersey Devils, LLC; New York Islanders Hockey Club, L.P.; New York Rangers Hockey Club; and San Jose Sharks, LLC. *See id.* at 10-11. The Complaint also lists other NHL member clubs that are not named as defendants.  *See id.* at 11-12.

[10]      *See Garber* Compl. ¶ 27.  The MLB clubs named as defendants are: Athletics Investment Group, LLC (Oakland Athletics); Baseball Club of Seattle, L.P. (Seattle Mariners); Chicago National League Ball Club, LLC (Chicago Cubs);

Leagues that pursue their commercial opportunities, including Internet operations (together with the NHL, MLB and the named individual clubs, the "League defendants").[11] Plaintiffs allege that "[p]ursuant to a series of agreements between and among Defendants, the League[s] ha[ve] obtained centralized control over distribution of live video programming of [hockey and baseball] games" and "the clubs have agreed not to compete in business matters related to the video presentation of live major-league men's professional [hockey and baseball] games."[12]

Both the NHL and MLB are "ultimately controlled by, and operate for the benefit of the clubs."[13]  "Though necessarily cooperating to produce inter-club games, each club operates as an independently owned and managed business,

---

Chicago White Sox, Ltd.; Colorado Rockies Baseball Club, Ltd.; New York Yankees Partnership; Phillies, L.P.; Pittsburgh Baseball, Inc. (Pittsburgh Pirates); and San Francisco Baseball Associates, L.P. (San Francisco Giants). *See id.* at 11-12. The Complaint also lists other MLB member clubs which are not named as defendants. *See id.* at 12-13.

[11]    Defendant NHL Enterprises, L.P., through its subsidiary, defendant NHL Interactive Cyberenterprises LLC, operates the NHL's website and streaming services. *See Laumann* Compl. ¶¶ 22-23.  Defendant MLB Advanced Media, L.P. operates the League's Internet streaming of live games, pursuant to rights granted by individual clubs. *See Garber* Compl. ¶¶ 25-26.

[12]    *Laumann* Compl. ¶ 5; *Garber* Compl. ¶ 8.

[13]    Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Complaints ("Pl. Mem.") at 4.

competing against each other in various markets."[14]  In both the NHL and MLB, each team owns the initial right to control telecasts of its home games, and keeps the revenues it generates from the sale of these rights.[15]  The teams in each League have mutually agreed to permit the visiting team to produce a separate telecast of the games.[16]

### 1.   "In-Market" Agreements

The vast majority of telecasts are produced by arrangement between individual teams and RSNs, a number of which are named as defendants.[17]  RSNs are local television networks that negotiate contracts with individual NHL or MLB clubs to broadcast the majority of the local club's games within that club's telecast territory.[18]  Several defendant RSNs are owned and controlled by defendant

---

[14]     *Laumann* Compl. ¶ 20; *Garber* Compl. ¶ 23.

[15]     *See Laumann* Compl. ¶¶ 20, 61; *Garber* Compl. ¶¶  23, 64.  *See also* NHL Constitution § 4.4 ("*Property Rights of Home Club*. Each member hereby irrevocably conveys . . . all right, title and interest . . . to each hockey game played by its team as a visiting club . . . to the member in whose home territory said game is played."); MLB Constitution Art. X § 4 (granting to the commissioner "*acting as [the clubs'] agent*, the right to sell, on their behalf, throughout the United States . . . exclusive or non-exclusive television and radio or other video or audio media rights (including the Internet and any other online technology)") (emphasis added).

[16]     *See* Pl. Mem. at 6.

[17]     *See Laumann* Compl. ¶ 58; *Garber* Compl. ¶ 61.

[18]     *Id.*

Comcast,[19] several are owned and controlled by defendant DirecTV,[20] and two are

independent of the MVPDs, but share ownership with an individual club.[21]

RSNs produce the games and sell their programming to MVPDs

including Comcast, a cable distributor, and DirecTV, a satellite distributor (the

upstream market).[22]  MVPDs, in turn, sell programming to consumers (the

downstream market).[23]  Pursuant to agreements with the RSNs, MPVDs make RSN

---

[19]      The Comcast RSN defendants include Comcast Sportsnet Philly, L.P. (RSN for Philadelphia Phillies and Flyers), Comcast Sportsnet Mid-Atlantic, L.P. (RSN for Washington Capitals), Comcast Sportsnet Bay Area, L.P. (RSN for San Francisco Giants, Oakland Athletics and San Jose Sharks), Comcast Sportsnet Chicago, L.P. (RSN for Chicago Cubs, White Sox, and Blackhawks) all of which are owned and controlled by Comcast.  *See Laumann* Compl. ¶ 30; *Garber* Compl. ¶ 33.

[20]      The DirecTV RSN defendants include Root Sports Pittsburgh (RSN for Pittsburgh Pirates and Penguins), Root Sports Rocky Mountain (RSN for Colorado Rockies), Root Sports Northwest (RSN for Seattle Mariners) all of which are wholly-owned subsidiaries of DirecTV and/or its subsidiary DirecTV Sports Networks LLC. *See Laumann* Compl. ¶ 28; *Garber* Compl. ¶ 31.

[21]      Defendant Yankees Entertainment and Sports Networks, LLC ("YES") is the RSN for New York Yankees and is co-owned with the New York Yankees.  *See Garber* Compl. ¶ 34.  Defendant Madison Square Garden Company ("MSG") owns the New York Rangers as well as two RSNs, MSG Network and MSG Plus, which carry the games of the New York Rangers and Islanders, and the New Jersey Devils and Buffalo Sabres.  *See Laumann* Compl. ¶ 24.

[22]      *See Laumann* Compl. ¶¶ 70-71; *Garber* Compl. ¶¶ 74-75.  *See also Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1195 (9th Cir. 2011) (dividing the television market into upstream and downstream markets).

[23]      *See Laumann* Compl. ¶¶ 70-71; *Garber* Compl. ¶¶ 74-75.

programming available as part of standard packages sold to consumers within the RSN's designated territory, and black out games in unauthorized territories, in accordance with the agreements between the RSNs and the Leagues.[24]  The Complaints allege that the "regional blackout agreements," made "for the purpose of protecting the local television telecasters," are "[a]t the core of Defendants' restraint of competition."[25]  "But for these agreements," plaintiffs allege, "MVPDs would facilitiate 'foreign' RSN entry and other forms of competition."[26]  Plaintiffs argue that the "MVPDs also directly benefit from the blackout of Internet streams of local games, which requires that fans obtain this programming exclusively from the MVPDs."[27]

A small percentage of games are produced under national contracts between the Leagues (pursuant to rights granted by the individual teams) and national networks.[28]  These limited nationally televised games provide the only

---

[24]     *See id.*

[25]     *Laumann* Compl. ¶ 63-64; *Garber* Compl. ¶ 67-68.

[26]     *Laumann* Compl. ¶ 71; *Garber* Compl. ¶ 75.

[27]     Pl. Mem. at 10.

[28]     *See Laumann* Compl. ¶ 62; *Garber* Compl. ¶ 66.  A few national games in both Leagues are carried on broadcast television, but most are shown on national pay-television channels.  *See id.*  Three networks carry MLB games nationwide.  Turner Broadcast System ("TBS") is a nationwide cable and satellite television channel whose MLB presentations during the regular season are

opportunity for fans to watch a game not involving a local team without purchasing an out-of-market package.

### 2.    "Out-of-Market" Agreements

With the limited exception of nationally televised games, standard MVPD packages only televise "in-market" games (i.e., games played by the team in whose designated home territory the subscriber resides).  For a consumer to obtain out-of-market games, there are only two options – television packages and Internet packages – both of which are controlled by the Leagues.[29]  Television packages – NHL Center Ice and MLB Extra Innings – are available for purchase from MVPDs, in accordance with agreements between the MVPDs and the Leagues.  These packages require the purchase of all out-of-market games even if a consumer is only interested in viewing a particular game or games of one particular

---

typically blacked out in the local markets of the teams involved in the game being presented.  *See Garber* Compl. ¶ 38.  ESPN, another nationwide cable and satellite channel carries certain MLB games exclusively.  *See id.* ¶ 39.  Fox Broadcasting Company is an over-the-air television network whose MLB presentations are subject to nationwide exclusivity which prevents the presentation of non-Fox games in any market.  *See id.* ¶ 40.  The two most significant national producers of NHL games in the United States are both controlled by Comcast: NBC, an over-the-air network, that airs games nationwide, and NBC Sports Network, a pay-television sports channel available exclusively through cable and satellite providers.  *See Laumann* Compl. ¶ 31.  Fox Sports Net, Inc. owns and controls eleven RSNs that produce and present NHL games.  *See id.* ¶ 33.

[29]    *Laumann* Compl. ¶ 75; *Garber* Compl. ¶ 79.

non-local team.  They also require a subscription to the standard digital television package.[30]  Internet packages – NHL Gamecenter Live and MLB.tv – are available directly through the Leagues and also require the purchase of all out-of-market games.  Neither local games nor nationally televised games are available through these packages.[31]  Thus, "there is *no* authorized method for viewing [local] games on the Internet."[32]  For example, an NHL Gamecenter Live subscriber in New York cannot watch New York Rangers games through any Internet source, but instead must subscribe to MSG through an MVPD.  The alleged purpose of the limitation on Internet programming is to protect the RSNs' regional monopolies and insulate MVPDs that carry them from Internet competition.[33]

Plaintiffs allege that the market divisions and centralization of rights to distribute out-of-market games in the Leagues have "adversely affected and substantially lessened competition in the relevant markets" by reducing output of live MLB and NHL game presentations, raising prices, and rendering output

---

[30]     *See Laumann* Compl. ¶¶ 75, 80; *Garber* Compl. ¶¶ 79, 84.

[31]     *See Laumann* Compl. ¶ 78-81; *Garber* Compl. ¶ 82-86.  The New York Yankees, through YES, provides in-market streams, but only to consumers who already subscribe to YES through their television provider, and at additional cost.  *See Garber* Compl. ¶ 90.

[32]     Pl. Mem. at 13 (citing *Laumann* Compl. ¶ 83; *Garber* Compl. ¶ 86).

[33]     *See id.*

"unresponsive to consumer preference to view live [MLB and NHL] games, including local games, through both Internet and television media."[34]

### B.    The Alleged Markets and Products

The Complaints allege relevant product/service markets for "the provision of major league professional ice hockey [and baseball] contests in North America."[35]  In addition, and "[m]ost importantly for this action, there is a relevant market for live video presentations of [professional baseball and hockey] games over media such as cable and satellite television and the Internet."[36]  These markets are "characterized by high barriers to entry" in which the NHL and MLB, as the only providers of these games, acting through and with the independent clubs that own and control the Leagues, have market power.[37]  The NHL's and MLB's dominance in the production of professional hockey and baseball games respectively "give [them] the ability, together with [their] television partners, to exercise market power in the market for live video presentations of [professional baseball and hockey] games."[38]

---

[34]    *Garber* Compl. ¶ 97; *see also Laumann* Compl. ¶ 93.

[35]    *Laumann* Compl. ¶ 55; *Garber* Compl. ¶ 59.

[36]    *Garber* Compl. ¶ 60.  *See also Laumann* Compl. ¶ 56.

[37]    *Id.*

[38]    *Id.*

C.     The Claims

Based on the foregoing facts, plaintiffs allege four antitrust violations: (1) for Television plaintiffs, violation of Section 1 of the Sherman Antitrust Act based on agreements to "forbid[] the carrying or online streaming of any [NHL/MLB] game in any geographic market except those licensed by the [NHL/MLB] team in that geographic market" (Claim I);[39] (2) for Television plaintiffs, violation of Section 1 based on agreements "that [NHL/MLB] will be the exclusive provider of live 'out-of-market' games distributed through television providers" (Claim II);[40] (3) for Internet plaintiffs, violation of Section 1 based on agreements "that [NHL/MLB] will be the exclusive provider of live 'out-of-market' games over the Internet" (Claim III);[41] and (4) for all plaintiffs, violation of Section 2 for conspiracy to monopolize the "market for video presentations of major league [hockey/baseball] games and Internet streaming of the same" (Claim IV).[42]

Defendants make six arguments why plaintiffs' claims must be

---

[39]     *Laumann* Compl. ¶ 106; *Garber* Compl. ¶ 113.

[40]     *Laumann* Compl. ¶ 112; *Garber* Compl. ¶ 119.

[41]     *Laumann* Compl. ¶ 118; *Garber* Compl. ¶ 125.

[42]     *Laumann* Compl. ¶ 123; *Garber* Compl. ¶ 130.

dismissed. *First*, plaintiffs have not alleged harm to competition.[43] *Second*, plaintiffs lack standing on the following grounds: (1) plaintiffs are "indirect purchasers;" (2) plaintiffs' injuries are "too attenuated and remote from the alleged horizontal conspiracy;" (3) the *Garber* plaintiffs lack standing to assert claims concerning the MLB Extra Innings television package, because none of them purchased that product; (4) five of six plaintiffs are "*former* subcribers who assert no intention to subscribe to any of the challenged television or Internet services in the future," and therefore lack standing to request injunctive relief.[44] *Third*, plaintiffs allege "no cognizable conduct by Comcast, DirecTV or any of the RSN Defendants" because "[t]he only plausible allegations as to these Defendants relate to their *vertical* distribution, which is presumptively legal."[45] *Fourth,* the alleged horizontal activities of the NHL and MLB defendants are "lawful on their face" as the "very core of what professional sports league ventures do – sell their jointly created product."[46] *Fifth*, plaintiffs' "proposed relevant market is insufficient as a matter of law" because plaintiffs fail to "allege facts regarding reasonable

---

[43]   *See* Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaints ("Def. Mem.") at 2.

[44]   *Id.* at 3-4.

[45]   *Id.* at 4.

[46]   *Id.* at 5.

interchangeability or cross-elasticity of demand."[47]  *Sixth,* plaintiffs' Section 2

claims must be dismissed for: (1) failure to allege any anticompetitive effect; (2)

failure to allege any plausible "conspiracy" among the Leagues, the clubs and the

RSNs and distributors; and (3) failure to allege any of the necessary elements of a

monopolization claim.[48]

## III.   LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides that a complaint

must be dismissed if it "fail[s] to state a claim upon which relief can be granted."

In deciding a motion to dismiss the court "accept[s] all factual allegations in the

complaint as true, and draw[s] all reasonable inferences in the plaintiff's favor."[49]

For the purposes of such a motion, "a district court may consider the facts alleged

in the complaint, documents attached to the complaint as exhibits, and documents

incorporated by reference in the complaint"[50] as well as "documents that, although

---

[47]     *Id.*

[48]     *See id.* at 6.  MSG and the Rangers join only those sections relating to
Television plaintiffs' standing, the RSN and television distributors' role in the
conspiracies, and the existence of monopoly power for purposes of the Section 2
claim.

[49]     *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 128 (2d Cir. 2011)
(quotation marks omitted).

[50]     *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

not incorporated by reference, are integral to the complaint."[51]

Under the "two-pronged approach" set forth by the Supreme Court in *Ashcroft v. Iqbal*, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to withstand a motion to dismiss.[52] However, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."[53] To survive a Rule 12(b)(6) motion to dismiss, the allegations in the complaint must meet a standard of "plausibility."[54] A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[55] Plausibility "is not akin to a probability requirement;" rather, plausibility requires "more than a sheer possibility that a defendant has acted unlawfully."[56]

---

[51]   *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004).

[52]   556 U.S. —, 129 S.Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

[53]   *Id.* at 1950.  *Accord Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir. 2010).

[54]   *Twombly*, 550 U.S. at 564.

[55]   *Iqbal*, 129 S. Ct. at 1949 (quotation marks omitted).

[56]   *Id.* (quotation marks omitted).

-15-

## IV.   APPLICABLE LAW

### A.   Antitrust Standing[57]

      The Clayton Act permits private parties to institute actions under the federal antitrust laws for damages and injunctive relief.[58]  However, a private plaintiff has standing to enforce Sections 1 and 2 of the Sherman Act only if he or she suffered "antitrust injury" and is a "proper party" to bring suit.[59]  In making this determination a court must "evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them."[60]  The Second

---

[57]     As in any federal case, plaintiffs must establish Article III standing before considering the substance of the antitrust claims.  *See Ross v. Bank of America, N.A.(USA)*, 524 F.3d 217, 222 n.1 (2d Cir. 2008) ("A court proceeds to an antitrust standing analysis only after Article III standing has been established.").  To establish Article III standing plaintiff "must allege and show that [he] personally ha[s] been injured, not that injury has been suffered by other, unidentified members of the class to which he belongs and which [he] purports to represent."  *Lewis v. Casey*, 518 U.S. 343, 357 (1996).

[58]     *See* 15 U.S.C. § 12 *et seq.*  Section 4 of the Clayton Act states, in relevant part, that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States . . . , and shall recover threefold the damages by him sustained." *Id.* § 15.  Section 16 states that "[a]ny person . . . shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws."  *Id.* § 26.

[59]     *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 110-11 (1986).

[60]     *Associated Gen. Contractors v. California State Council of Carpenters*, 459 U.S. 519, 535 (1983).

Circuit analyzes antitrust standing under a two part test.[61]  *First*, a "'plaintiff must show . . . injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'"[62]  *Second*, a plaintiff must show

> that he is a proper plaintiff in light of four 'efficient enforcer' factors: (1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries.[63]

## B.    Sherman Act Section 1

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce

---

[61]    *See In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009).

[62]    *Id.* (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).  *Accord Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 96 (2d Cir. 1998) (holding that a plaintiff must show that "the loss he asserts derives from activities that have a 'competition- *reducing*' effect.") (quoting *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342-44 (1990) (emphasis in original)).  *See also infra* Part IV.B (discussing requirement of harm to competition).

[63]    *Id.* (quoting *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 66 (2d Cir.1988)) (citing *Associated Gen. Contractors*, 459 U.S. at 540-45).

-17-

among the several States." The Supreme Court has clarified that Section 1

"outlaw[s] only *unreasonable* restraints."[64] To establish a Section 1 violation, a

plaintiff must allege: "(1) concerted action between at least two legally distinct

economic entities; (2) that constitute[s] an unreasonable restraint of trade either per

se or under the rule of reason."[65]

      Certain agreements which courts, after "considerable experience with

the type of restraint at issue," determine to have "manifestly anti-competitive

effects and lack any redeeming virtue," are deemed *per se* violations of the

Sherman Act.[66] Outside this category of "necessarily illegal" restraints, "[t]he rule

of reason is the accepted standard for testing whether a practice restrains trade in

violation of § 1."[67] "The rule [of reason] distinguishes between restraints with

---

[64]    *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (internal quotation marks omitted) (emphasis in original).

[65]    *Primetime 24 Joint Venture v. National Broad., Co., Inc*., 219 F.3d 92, 103 (2d Cir. 2000) (internal quotations omitted). *Accord E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 29 (2d Cir. 2006) ("A violation of Section 1 generally requires a combination or other form of concerted action between two legally distinct entities resulting in an unreasonable restraint on trade.").

[66]    *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 887 (2007) (internal quotations and citations omitted). Categorizing a restraint as *per se* illegal "eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work." *Id.* at 886.

[67]    *Id.* at 885-86.

anticompetitive effect that are harmful to the consumer and restraints stimulating

competition that are in the consumer's best interest."[68]   A court must "determine

whether the [] restriction is a naked restraint on trade, and thus invalid, or one that

is ancillary to the legitimate and competitive purposes of the business association

and thus valid."[69]

> Under the rule of reason
>
> > plaintiffs bear an initial burden to demonstrate the defendants'
> > challenged behavior had an *actual* adverse effect on competition
> > as a whole in the relevant market . . . evidence that plaintiffs have
> > been harmed as individual competitors will not suffice. . . . If the
> > plaintiffs satisfy their initial burden, the burden shifts to the
> > defendants to offer evidence of the pro-competitive effects of their
> > agreement. . . . Assuming defendants can provide such proof, the
> > burden shifts back to the plaintiffs to prove that any legitimate
> > competitive benefits offered by defendants could have been
> > achieved through less restrictive means. . . .[70]

Finally, certain challenged practices warrant an "abbreviated or quick-look rule of

---

[68]   *Id.* at 886.

[69]   *Dagher*, 547 U.S. at 7.

[70]   *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290,
317 (2d Cir. 2008) (internal quotation omitted).  In making this determination "the
factfinder weighs all of the circumstances of a case" including "specific
information about the relevant business . . . , the restraint's history, nature, and
effect . . . and [w]hether the businesses involved have market power."  *Leegin*, 511
U.S. at 886-87 (internal quotations and citations omitted).

reason analysis"[71] either "because the great likelihood of anticompetitive effects can be easily ascertained"[72] *or*, on the flip side, where "restraints on competition are essential if the product is to be available at all [such that] the agreement is likely to survive the Rule of Reason."[73]

### C. Sherman Act Section 2

Section 2 of the Sherman Act states that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony . . . ." In order to state a claim for monopolization under Section 2, plaintiffs must establish "'(1) the possession of monopoly power in the relevant market and (2) the

---

[71]   *Salvino*, 542 F.3d at 317 (internal quotations omitted).

[72]   *Id*.  The Supreme Court found an abbreviated analysis appropriate where a plan expressly limited the number of college football games that could be televised and fixed a minimum price for those games.  *See National Collegiate Athletic Ass'n v. Board. of Regents of the Univ. of Oklahoma*, 468 U.S. 85, 109-10 (1984) ("*NCAA*") (holding that no "detailed market analysis" was necessary to find that an NCAA plan to "commandeer[] the rights of its members and s[ell] those rights for a sum certain" had the effect of "utterly destroy[ing] free market competition.").

[73]   *American Needle, Inc. v. National Football League*, 130 S. Ct. 2201, 2216-17 (2010) (noting that "the Rule of Reason can sometimes be applied in the twinkling of an eye" and that certain "features of the NFL may save agreements amongst the teams . . . for example . . . the interest in maintaining a competitive balance") (internal quotations and citations omitted).

willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'"[74]  Specifically, "a plaintiff must establish '(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'"[75]

## V.   DISCUSSION

### A.   Antitrust Standing[76]

---

[74]     *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 104 (2d Cir. 2002) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)).

[75]     *Id.* (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)).

[76]     In addition to arguing that plaintiffs lack antitrust standing, defendants assert that certain plaintiffs lack Article III standing to seek injunctive relief because they cannot show "'likelihood that [they] will again be injured in a similar way.'"  *Shain v. Ellison*, 356 F.3d 211, 215-16 (2d Cir. 2004) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)).  However, at least one plaintiff who has purchased each out-of-market package plausibly alleges continuing harm. Laumann "*has been* a subscriber to NHL Gamecenter Live since at least 2010," *Laumann* Compl. ¶ 14 (emphasis added); Traub purchased MLB Extra Innings in 2011 and NHL Center Ice in 2011-2012 and intends to purchase this programming in the future, *Garber* Compl. ¶ 20, *Laumann* Compl. ¶ 16; Dillon purchased NHL Gamecenter Live beginning in 2011 and intends to purchase it again in the future, *Laumann* Compl. ¶ 17; Lerner and Rasmussen subscribed to MLB.tv Internet streaming package during the 2011 season. *Garber* Compl. ¶¶ 17-18. Named plaintiffs' stated intent to purchase again and the fact that packages are purchased seasonally suggests that plaintiffs "are likely to suffer future [injury]" and thus have standing to pursue injunctive relief.  *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998).  *Accord Shain*, 356 F.3d at 215 (plaintiff must establish likelihood of a "future encounter").

While "[r]educed consumer choice and increased prices . . . *when they are the result of an anticompetitive practice*, constitute antitrust injury,"[77] the Supreme Court recognized that "Congress did not intend antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation."[78]  Defendants challenge Television plaintiffs' standing to sue on the grounds that they are indirect purchasers of the product in question, and that their injuries are too remote from the alleged conduct.[79]

### 1.    *Illinois Brick* Direct Purchaser Requirement

The Supreme Court's decision in *Illinois Brick Co. v. Illinois* established that "[g]enerally only direct purchasers have standing to bring civil antitrust claims."[80]  The rule serves to avoid the difficulties of "apportion[ing]

---

[77]      *Brantley*, 675 F.3d at 1202, 1202 n. 11.  *Accord id.* ("Had the plaintiffs succeeded in pleading an injury to competition, the complaint's allegations of reduced choice (due to the inability to purchase a la carte programming) and increased prices would sufficiently plead . . .  a Section 1 claim.").

[78]      *Associated Gen. Contractors*, 459 U.S. at 534.

[79]      *See* Def. Mem. at 26, 35.  Defendants do not challenge the standing of the Internet plaintiffs.

[80]      *Simon v. KeySpan Corp.*, 694 F.3d 196, 201-02 (2d Cir. 2012) (citing *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977)).  *Illinois Brick* bars only damages under Clayton Act § 4, not injunctive relief under § 16.  *See, e.g.*, *Dickson v. Microsoft Corp.*, 309 F.3d 193, 214 n. 24 (4th Cir. 2002) (citing cases); *In re Public Offering Antitrust Litig.*, No. 98 Civ. 7890, 2004 WL 350696, at *26 (S.D.N.Y. Feb. 25, 2004).

recovery among all potential plaintiffs . . . from direct purchasers to middlemen to ultimate consumers" and eliminate the possibility of duplicative recovery, and promotes enforcement by purchasers who have been most directly injured by the alleged violation.[81]  Because Television plaintiffs purchased programming from the MVPDs, they must show why *Illinois Brick* does not bar their claims for damages against the remaining defendants.[82]

Plaintiffs argue that these claims fall under two recognized exceptions to *Illinois Brick* – the "ownership or control exception" and the "co-conspirator exception."[83]  The Supreme Court expressly recognized an exception to *Illinois Brick* "where the direct purchaser is owned or controlled by its customer," [84] and courts have "expanded [the exception] to include instances where the defendant owns or controls the intermediary that sold the goods to the indirect-purchaser

---

[81]     *Illinois Brick*, 431 U.S. at 728-33, 741-47.  *Accord Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 216 (1990) (affirming *Illinois Brick* and cautioning that "the possibility of allowing an exception [to the direct purchaser requirement], even in rather meritorious circumstances, would undermine the rule").

[82]     Defendants argue that both Comcast and DirecTV *and* the RSNs are middlemen.  *See* Def. Mem. at 27-28.  Plaintiffs argue that the RSNs produce the relevant product, and that the market divisions occur at the retail level, therefore RSNs are not middlemen.  *See* Pl. Mem. at 49-50.

[83]     *See* Pl. Mem. at 50, 52.

[84]     *Illinois Brick*, 431 U.S. at 736 n.16.

plaintiff."[85]  Additionally, courts have held that "'*Illinois Brick* does not limit suits [where] [t]he consumer plaintiff is a direct purchaser from the dealer who . . . has conspired illegally with the manufacturer with respect to the very price paid by the consumer.'"[86]  The two exceptions share a common logic – where the relationship between the parties in a multi-tiered distribution chain is such that plaintiffs are the first or *only* victims of alleged anticompetitive agreements, the rationale for the *Illinois Brick* bar disappears.

The Second Circuit has not addressed the "co-conspirator exception,"[87] and those circuits that have addressed it have not taken a uniform view of its scope.  The Fourth and Ninth Circuits have limited the exception to situations in which "[d]efendants have conspired to fix the price that [p]laintiffs

---

[85]     *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90,101 (E.D.N.Y. 2012) (citing *In re Industrial Diamonds Antitrust Litig.*, 119 F. Supp. 2d 418, 421 (S.D.N.Y. 2000)).

[86]     *In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 750 (9th Cir. 2012) (quoting 2A Phillip E. Areeda et al., Antitrust Law ¶ 346h). *Accord Dickson*, 309 F.3d at 214-15 (conspiracy to fix the price paid by the consumer is an exception to *Illinois Brick*, because it is "grounded on the damages theory underlying the alleged conspiracy"—i.e., "no overcharge has been passed on to the consumer"). *See also Paper Sys. Inc. v. Nippon Paper Indus. Co., Ltd.*, 281 F.3d 629, 631-32 (7th Cir. 2002); *Howard Hess Dental Labs. Inc. v. Dentsply Intern., Inc.*, 424 F.3d 363, 383 (3d Cir. 2005).

[87]     Once again, the Second Circuit has not expressed an opinion on the expansion of the ownership or control exception.

paid directly"[88] – a requirement that, if adopted, would be fatal to the Television

plaintiffs' claims, as they do not allege that the Leagues or RSNs had any role in

setting prices for television programming.[89]  In contrast, in *Paper Systems Inc. v.

Nippon Paper Industries Co., Ltd.*, the Seventh Circuit eschewed the notion of a

"co-conspirator *exception*" instead stating simply that *Illinois Brick* "allocate[s] to

the first non-conspirator in the distribution chain the right to collect 100% of the

damages."[90]  Thus, where intermediate purchasers in the chain of distribution (here

the RSNs and MVPDs) are alleged to be participants in the conspiracy, the first

---

[88]     *In re ATM Fee Antitrust Litig.*, 686 F.3d at 751.  *Accord Dickson*, 309
F.3d at 214-15.  *Dickson* held that *Illinois Brick* barred allegations that a licensing
agreement between computer sellers and Microsoft resulted in supracompetitive
prices where computer purchasers did not allege any conspiracy between Microsoft
and the sellers to set the resale price of the software, but rather claimed that
overcharges were passed on to the consumers by the sellers when the consumers
purchased personal computers from the sellers.  *See id.* at 215.

[89]     *See In re ATM Fee Antitrust Litig.*, 686 F.3d at 751(holding co-
conspirator theory unavailable because "while Plaintiffs allege a conspiracy to set
interchange fees, they fail to show a conspiracy to set foreign ATM fees.  Plaintiffs
do not allege that [the ATM network] has control to set foreign ATM fees.
Further, Bank Defendants have no control over the foreign ATM fees of other
Bank Defendants or [ATM network] members.").

[90]     281 F.3d 629, 631-32 (7th Cir. 2002).  *Accord Lowell v. American
Cyanamid Co.*, 177 F.3d 1228, 1233 (11th Cir. 1999) ("*Illinois Brick* simply does
not apply where the complaint alleges a vertical conspiracy with no pass-on."); *In
re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 604 (7th Cir.
1997) ("[A]ny indirect-purchaser defense would go by the board since the
[plaintiffs] would then be direct purchasers from the conspirators.").

purchasers who are not part of the conspiracy "are entitled to collect damages from both the manufacturers and their intermediaries if conspiracy and overcharges can be established."[91]

> While mindful of the Supreme Court's admonition against even the "most meritorious of exceptions" to the direct purchaser requirement, the purpose of *Illinois Brick* was *not* to prevent the only non-conspirators in a multi-level distribution chain – consumers no less – from bringing a private antitrust suit.[92] Thus, holding that the first purchaser who is not party to the unlawful agreements to restrain trade has standing to sue is not an *exception* to *Illinois Brick*, but rather a recognition that *Illinois Brick* "bans Clayton Act lawsuits by persons who are not direct purchasers *from the defendant antitrust violator[s]*."[93]

> As discussed in depth below, plaintiffs have alleged complex arrangements in which the RSNs – the level at which the directly relevant market (for video presentation) is divided – are affiliated with the club for whom they

---

[91]   *Paper Sys. Inc.*, 281 F.3d at 632 (citing *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630 (1981)).

[92]   *See NCAA*, 468 U.S. at 106-07 ("Congress designed the Sherman Act as a consumer welfare prescription.") (citation omitted); *Stamatakis Indus., Inc. v. King*, 965 F.2d 469, 471 (7th Cir. 1992) ("[A]ntitrust laws, [] protect consumers from suppliers rather than suppliers from each other.").

[93]   *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 158–60 (3d Cir.2002) (emphasis added).

provide programming and/or are owned by the MVPDs which ultimately sell the

programming to consumers.[94]  In addition, plaintiffs allege that the MVPDs benefit

directly from the agreements that limit Internet broadcasting of games.[95]  Even if

the RSN and MVPD defendants could hypothetically "change sides and align

themselves as plaintiffs," they have shown no inclination to do so, and plaintiffs

allege that doing so would run counter to their interests in maintaining the

challenged agreements.[96]  Where all middlemen are alleged to be co-conspirators,

---

[94]     *See supra* nn.21-22, discussing RSN affiliations.  *See also infra* Part V.B. (discussing agreements among defendants); Pl. Mem. at 51 (arguing that because the MVPDs control their subsidiary RSNs "it is inconceivable that Comcast and DirecTV would sue their own subsidiaries").  Because I find the "co-conspirator exception" applicable for purposes of antitrust standing, I need not determine whether plaintiffs have plausibly alleged "such functional economic or other unity [between the RSNs and MVPDs] that there effectively has been only one sale between the defendant and the indirect purchaser."  *In re Vitamin C Antitrust Litig.*, 279 F.R.D. at 101-02.

[95]     To the extent that the MVPDs compete with the Leagues (vis-a-vis Internet sales) for distribution of games, the Second Circuit's holding that *Illinois Brick* is inapplicable where the alleged middleman "[could] not be characterized solely as a customer" of the primary seller, but "was also a competitor . . . in the retail market" provides another reason that plaintiffs here are not barred by *Illinois Brick*.  *Law Offices of Curtis V. Trinko, L.L.P. v. Bell Atlantic Corp.*, 305 F.3d 89, 106 (2d Cir. 2002)(*rev'd on other grounds in Verizon Comms. Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004).  *See also Verizon Comms. Inc.*, 540 U.S. at 416-18 (Stevens, J. concurring) (stating that he would have reversed the Second Circuit on standing grounds, analyzed under *Associated General Contractors*).

[96]     *See Paper Sys. Inc.*, 281 F.3d at 631-32.  While it is true that Madison Square Garden Company, a defendant in this case, did sue the NHL in 2007 for antitrust violations arising out of the very agreements at issue here, it sought only

the problems of apportioning recovery among all potential plaintiffs and duplicative recovery simply do not arise, and the principle of permitting the purchasers who have been most directly injured is honored.[97]

## 2.   Standing Under *Associated General Contractor* Factors

Although they are not barred by the specific *Illinois Brick* rule, plaintiffs must still establish that they are "efficient enforcers" of the antitrust laws under the factors set forth in *Associated General Contractors*.[98]  Defendants argue that plaintiffs' claims are based on "[s]ome unidentified overcharge in the price TV plaintiffs pay Comcast or DirecTV for television service generally, regardless of

---

injunctive relief and ultimately settled.  *See* 3/3/09 Stipulation and Order of Dismissal, *Madison Square Garden v. National Hockey League*, 07-cv-08455 ("*MSG v. NHL*") (dismissing MSG's case against the NHL with prejudice). It would be ironic if "a cartel-member plaintiff seek[ing] to remove [a] restraint – such that the member's interest coincides with the public interest in vigorous competition" could sue but the public (consumers) could not.  *Daniel v. American Bd. of Emergency Medicine*, 428 F.3d 408, 440 (2d Cir. 2005).

[97]      *See Illinois Brick*, 431 U.S. at 728-33, 741-47.  The fact that numerous RSNs and MVPDs are not joined as defendants is not a problem because, under the the principal of joint and several liability, "each member of a conspiracy is liable for all damages caused by the conspiracy's entire output." *Paper Sys. Inc.*, 281 F.3d at 632 (citing *Texas Indus., Inc.*, 451 U.S. 630).

[98]      *See* 459 U.S. at 535 (in determining whether a plaintiff has antitrust standing, courts must "evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them").  The standing analysis under *Associated General Contractors* also applies to claims for injunctive relief.  *See Daniel*, 428 F.3d at 451 ("The extent to which these factors apply when plaintiffs sue for injunctive relief depends on the circumstances of the case.").

whether they have ever watched, or even desired to watch an NHL or MLB game."[99]  Moreover, "the allegedly overpriced RSN channel itself includes more than just MLB or NHL programming and is but one channel among tens or hundreds of channels included in the general television packages offered by Comcast and DirecTV" and therefore "it would be impossible to ascertain what effect, if any at all, the alleged violation had on the pricing of the various packages sold by Comcast and DirecTV to consumers."[100]

    Here the relevant markets are for professional hockey and baseball programming.  While plaintiffs argue that "'consumers . . . generally *do* meet [the standing] test,'"[101] only "consumers *in the market where trade is allegedly restrained* are presumptively the proper plaintiffs to allege antitrust injury."[102] Purchasers of the out-of-market packages, whether television or Internet, are clearly consumers in the relevant market of professional hockey and baseball games, and allege not only increased price, but also reduced consumer choice from

---

[99]  Def. Mem. at 36.

[100]  *Id.* at 37.

[101]  Pl. Mem. at 55 (quoting *Daniel*, 428 F.3d at 451 (Katzmann, J., dissenting in part)).

[102]  *Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 10 (1st Cir. 1999) (emphasis added).

lack of competition.[103]  Moreover, because no innocent parties stand between them and the alleged agreements, they are the most efficient enforcers.

In contrast, plaintiffs who merely subscribe to Comcast and DirecTV, but do not subscribe to an out-of-market package, allege that they are consumers of television generally, not that they are consumers of professional hockey or baseball games.[104]  Neither Garber nor Herman alleges that she or he was prevented from viewing games as a result of the black-out agreements, nor do they claim that they were charged supracompetitive prices for games that they wished to view.  These plaintiffs' only claims are based on some unidentified increased price of their overall cable package allegedly stemming from the absence of competition from out-of-market baseball clubs and their RSNs.  Their alleged injuries are both speculative and difficult to identify and apportion in light of the packaged nature of

---

[103]     *See Laumann* Compl. ¶ 10; *Garber* Compl. ¶ 13; *see also* MSG Br. at 27 (noting that fans "are deprived of alternatives that could be offered by individual clubs – such as the ability to purchase single games or the games of a single team – and of the lower prices that would result from such competition with the Center Ice package").  Furthermore, aside from the fact that television purchasers of out-of-market packages purchased from MVPDs rather than directly from the League, as in the case of Internet purchasers, their positions within the alleged antitrust scheme are largely analogous.  As I have already declined to dismiss plaintiffs based on their indirect purchaser status, and defendants do not argue that Internet plaintiffs lack standing, it follows logically that purchasers of out-of-market television packages should be permitted to remain in the suit.

[104]     *See Garber* Compl. ¶ 60.  *See also Laumann* Compl. ¶ 56.

television services, not to mention their remoteness from the primary agreements among League defendants, which makes determination of the causal connection even more difficult.[105]  Permitting any plaintiff who simply purchased cable or satellite programming to sue would create a class of plaintiffs for whom "it is merely coincidental that they purchased [MLB and NHL programming] at all."[106] Thus, plaintiffs Garber and Herman are dismissed for failure to establish that they are "proper plaintiffs" under the *Associated General Contractor* factors.[107]  Silver is dismissed from the *Garber* case, because he does not allege that he subscribed to

---

[105]     The fact that plaintiffs' remoteness from the first level of the alleged conspiracy did not mandate dismissal under *Illinois Brick* does not mean the Court cannot consider it under the more general antitrust standing inquiry.  *See Illinois Brick*, 431 U.S. at 728 n.7 ("[T]he question of which persons have been *injured* by an illegal overcharge for purposes of § 4  is analytically distinct from the question of which persons have sustained *injuries too remote* to give them standing to sue for damages under § 4.") (emphasis added).

[106]     *Kloth v. Microsoft Corp.*, 444 F.3d 312, 324 (4th Cir. 2006) (dismissing plaintiffs claims where "it is merely coincidental that they purchased Microsoft products at all" and "[i]t would be even more speculative to determine the relevant benefits and detriments that non-Microsoft products would have brought to the market and the relative monetary value . . . to a diffuse population of end users").

[107]     It is worth noting that the remaining Television plaintiffs are just as capable of raising any meritorious arguments that general Comcast and DirecTV subscribers would have raised because, as a prerequisite to purchasing out-of-market packages, they must subscribe to the general television package.

an out-of-market baseball package.[108]

## B.   Section One Claims Regarding "In-Market" and "Out-of-Market" Agreements

### 1.   Agreements Among Defendants

As discussed briefly in the context of standing, plaintiffs allege a multi-level conspiracy consisting of horizontal and vertical agreements implicating the League defendants, the RSNs and the MVPDs.  "The question whether an arrangement is a contract, combination, or conspiracy is different from and antecedent to the question whether it unreasonably restrains trade."[109]

### a.   League Defendants

Plaintiffs' allegations arise initially out of agreements by the individual clubs, as a league, to establish exclusive local telecast territories for each club and to grant the Leagues the exclusive rights to market those games outside the local territories.  In *American Needle, Inc. v. National Football League* the Supreme Court held that when it comes to "marketing property owned by the separate teams," individual sports teams that together comprise a league "do not possess either the unitary decisionmaking quality or the single aggregation of

---

[108]    *See Garber* Compl. ¶ 19.  Because Silver is a former purchaser of NHL Center Ice, he may proceed with the *Laumann* suit.

[109]    *American Needle*, 130 S. Ct. at 2206.

economic power" of a single entity and "their objectives are not common."[110]

Where teams compete against each other in the relevant market, their concerted

action may "deprive the marketplace of independent centers of decisionmaking and

therefore of actual or potential competition."[111]  Like the intellectual property at

issue in *American Needle*, the rights at issue here belong initially to the individual

clubs.[112]  Plaintiffs have alleged that absent these agreements the clubs would

compete against each other in the markets for hockey and baseball programming.[113]

The fact that the NHL and MLB are lawful joint ventures does not

preclude plaintiffs from challenging the Leagues' particular policies under the rule

of reason.[114]  Defendants' argument that the teams cannot unlawfully conspire

with respect to out-of-market games because only the Leagues can own those

---

[110]     *Id.* at 2212-14.

[111]     *Id.*

[112]     *See Pittsburgh Athletic Co. v. KQV Broad. Co.*, 24 F. Supp. 490, 492
(W.D. Pa. 1938) (holding that the Pittsburgh Athletic Company, owner of the
Pittsburgh Pirates, could grant "the exclusive right to broadcast, play-by-play,
descriptions or accounts of the games played by the 'Pirates' at this and other
fields").

[113]     *See Laumann* Compl. ¶ 71; *Garber* Compl. ¶ 75.

[114]     *See Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 326 (2d Cir.
2010) (holding that claims that agreements by a lawful joint venture were "actually
anticompetitive and unreasonable" reviewable under the rule of reason)  (citing
*Dagher*, 547 U.S. at 7).

games assumes the legality of the very agreements challenged here.  There is no

distinction between in-market and out-of-market games other than that the clubs

have agreed to cede to the Leagues the right to market the games, to which they

have initial rights, outside their local territories.[115]  *American Needle* conclusively

established that these kinds of arrangements are subject to Section 1 scrutiny.

### b.    Role of RSNs

Plaintiffs argue that the RSNs have participated in a conspiracy to

divide the market for professional baseball and hockey programming.[116]  They

assert that RSNs do not merely "pass through" the relevant product unchanged

from the Leagues to the consumers: rather, RSNs purchase *rights* from the clubs,

and produce video presentations of the games – the product in question – subject to

anticompetitive agreements not to sell programming for a given hockey or baseball

club outside the defined territory surrounding that club.[117]  Plaintiffs argue that

"[t]he fact that the clubs have a central role in orchestrating this horizontal

---

[115]    Defendants cite *Washington v. National Football League* in support of
their argument that "a 'league' game is necessarily a 'league' product."  Def. Mem.
at 47.  But that case is involved "historical football game footage, something that
the individual teams do not separately own, and have never separately owned."
*Washington*, No. 11 Civ. 3354, 2012 WL 3017961, at *2 (D. Minn. June 13, 2012).

[116]    *See* Pl. Mem. at 43.

[117]    *See id.*  Plaintiffs note that "[t]he conspiracies are . . . to divide the
consumer markets for live sports *programming*."  *Id.* at 42 (emphasis in original).

agreement" does not negate the horizontal character of the alleged agreements by the RSNs, because "each RSN plainly understood that it was getting a regional monopoly in exchange for an agreement to respect other RSN's regional monopolies."[118]  Thus, "[e]ven when the focus is on the horizontal agreement at the club level, the RSNs are still liable, as their role in carrying out the clubs' division of the market is not innocent."[119]

Plaintiffs do not plausibly allege that the RSNs entered into actual agreements with one another to enforce the territorial market divisions established by the League defendants, but it is not necessary that they do so in order to implicate the RSNs in the conspiracy to divide the market.  First of all, courts have recognized that "vertical agreements can [] injure competition by facilitating horizontal collusion."[120]  It is well established, for example, that a distributor's coordination of horizontal agreements in restraint of trade at the next distribution level by entering into a series of identical vertical agreements with multiple parties

---

[118]     *Id.* at 44-45.

[119]     *Id.* at 45.

[120]     *Brantley*, 675 F.3d at 1198 (citing *Leegin*, 551 U.S. at 893).  *Accord Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 59 (1977) (vertical agreements between a manufacturer and distributors restricting retail locations are analyzed under the rule of reason).

-35-

may subject all participants to antitrust liability.[121]  Moreover, where parties to

vertical agreements have knowledge that other market participants are bound by

identical agreements, and their participation is contingent upon that knowledge,

they may be considered participants in a horizontal agreement in restraint of

trade.[122]  It defies reason to suggest that the RSNs lack knowledge that all other

RSNs have analogous agreements with the respective individual clubs, and it is at

least plausible that the terms of the agreement between the clubs and the RSNs are

contingent upon that knowledge.  Plaintiffs have therefore adequately alleged

---

[121]     *See, e.g.*, *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 226
(1939) (inferring agreement among film exhibitors where a movie distributor sent
letters to each film exhibitor placing limitations on exhibition and advising that
others were participating and that cooperation was essential); *Toys "R" Us, Inc. v.
Federal Trade Comm'n,* 221 F.3d 928, 930 (7th Cir. 2000) (finding that a
manufacturer coordinated a horizontal agreement in restraint of trade through
signing identical vertical agreements with a number of toy manufacturers whereby
manufacturer agreed to restrict the distribution of its products to low-priced
warehouse club stores on the condition that the other manufacturers would do the
same).  *Cf. Leegin*, 551 U.S. at 893 (holding the possibility that "a group of
retailers might collude to fix prices to consumers and then compel a manufacturer
to aid the unlawful arrangement" to be a "legitimate [antitrust] concern").

[122]     *See Interstate Circuit*, 306 U.S. at 227 ("Acceptance by competitors,
without previous agreement, of an invitation to participate in a plan, the necessary
consequence of which, if carried out, is restraint of interstate commerce, is
sufficient to establish an unlawful conspiracy under the Sherman Act.'); *Howard
Hess Dental Labs, Inc. v. Dentsply Intern., Inc.*, 602 F. 3d 237, 255 (3d Cir. 2010)
(suggesting that plaintiffs may plead a hub-and-spoke conspiracy by making
"factual allegations to plausibly suggest" that the distributor defendants – the
spokes – "had knowledge" of the conspiracy).

participation on the part of the RSNs in the conspiracy to geographically divide the market for professional hockey and baseball games.[123]

### c.   Role of MVPDs

Plaintiffs claim that Comcast and DirecTV are active participants in the challenged schemes in two ways.  "*First,* they actively control their subsidiary RSN's in the very matters that are the subject of this lawsuit . . . [and] *second,* the MVPDs are the only parties that can actively implement the geographical divisions for television programming . . . [and] have agreed to do just that."[124]  In addition, plaintiffs claim that "MVPDs are the direct beneficiaries of restrictions that prevent Internet streaming of local games."[125]

---

[123]   To be clear, plaintiffs do not contend that the RSNs' liability arises out of their exclusive agreements to telecast the games of the clubs with which they contract.  *See* Pl. Mem. at 45 (conceding that clubs "are entitled to enter into an exclusive relationship with [an RSN]" to produce telecasts, and even to "limit [the RSN's] distribution geographically so long as that decision is unilateral").  Rather, the RSNs' role arises out of their alleged participation in *agreements* to geographically divide the market for baseball and hockey programming.  Defendants' argument that the Supreme Court "has approved precisely such restrictions because they 'often promote interbrand competition,'" does not render the RSN defendants' vertical agreements automatically lawful – it merely means that they are subject to rule of reason analysis.  *See* Consolidated Reply Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaints ("Def. Rep.") at 7 (citing *Continental T.V.*, 433 U.S. at 53).

[124]   Pl. Mem. at 46.

[125]   *Id.*

Plaintiffs do not allege that the MVPDs have agreed amongst themselves in any way, and in fact, it is clear that MVPDS compete with each other to sell packages containing hockey and baseball programming.  However, plaintiffs allege that Comcast and DirecTV own and control a number of RSNs, and that the League restrictions on Internet dissemination of hockey and baseball games benefit both the RSNs and the MVPDs.  These allegations indicate that the MVPD defendants are doing more than passively implementing the agreements among the Leagues and the RSNs.[126]  They suggest "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement" sufficient to allege an agreement between the MVPDs and the RSNs and League Defendants to restrain trade.[127]  Thus, while plaintiffs have not alleged horizontal agreements among the MVPDs, they have plausibly alleged vertical agreements that not only facilitate, but are essential to the horizontal market divisions.[128]

---

[126]   *See also In the Matter of Applications of Comcast Corp., General Elec. Co., and NBC Univ., Co.*, 26 F.C.C.R. 4252, 4293 (2011) (noting that "vertical integration of certain video program networks [including RSNs] with a particular MVPD [c]ould harm MVPD competition and enhance the integrated MVPD's market power").

[127]   *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984) (holding that "a § 1  agreement may be found when the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement") (internal quotation omitted).

[128]   *See* Pl. Mem. at 48 ("The market division is not complete until Comcast and DirecTV prevent viewers from watching telecasts.").

## 2.      Harm to Competition

Plaintiffs do not argue that the agreements to divide the geographic market and cede control over out-of-market games to the Leagues constitute *per se* antitrust violations.[129]  The question is whether these agreements have "anticompetitive effect that are harmful to the consumer" or whether they "stimulat[e] competition . . . in the consumer's best interest" – in other words, whether they survive the rule of reason.[130]  In order to overcome defendants' motion to dismiss, plaintiffs' "allegations must 'raise a reasonable expectation that discovery will reveal evidence of' an injury to competition."[131]

Defendants argue that because the NHL and MLB are legitimate joint ventures, and some cooperation with respect to the production of games is necessary, that the conduct here – the production and distribution of live telecasts of games – is "core activity" immune from antitrust scrutiny.[132]  However, the notion that "the *exhibition* of [] league games on television and the Internet" is

---

[129]      *See id.* at 24 ("If this case involved anything other than sports, it would present a clear *per se* violation of Section 1 of the Sherman Act.") *id.* at 34 n.43 (acknowledging that "per se treatment is not appropriate" in considering sports leagues' restraints).  *Accord Salvino*, 542 F.3d at 316, 334.

[130]      *Leegin*, 511 U.S. at 886.

[131]      *Brantley*, 675 F.3d at 1198 (quoting *Twombly*, 550 U.S. at 556).

[132]      *See* Def. Mem. at 5.

clearly a "league issue"[133] is contrary to longstanding precedent that agreements

limiting the telecasting of professional sports games are subject to antitrust

scrutiny, and analyzed under the rule of reason.[134]  Even if *certain* agreements by

sports leagues with respect to telecasting games may be "essential if the product is

to be available at all" this does not give league agreements regarding television

rights blanket immunity from antitrust scrutiny.[135]  To the contrary, the Supreme

Court has held that an agreement that "define[s] the number of games that may be

televised, establish[es] the price for each exposure, and . . . the basic terms of each

contract between the network and a home team" with the result that "[m]any games

for which there is a large viewer demand are kept from the viewers, and many

---

[133]     *Id.* at 47.

[134]     *See NCAA*, 468 U.S. at 99 (holding that "[b]y participating in an
association which prevents member institutions from competing against each other
on the basis of price or kind of television rights that can be offered to broadcasters,
the NCAA member institutions have created a horizontal restraint — an agreement
among competitors on the way in which they will compete with one another" that
is subject to scrutiny under the rule of reason); *United States v. National Football
League*, 116 F. Supp. 319, 322 (E.D. Pa. 1953) (holding that an agreement among
the teams of the NFL that no team would permit stations to telecast its games into
the home territory of another team on a day when that team was not playing at
home and was televising its game into its home territory, violated Section 1 of the
Sherman Act).

[135]     *NCAA*, 468 U.S. at 114 (internal quotation omitted) (rejecting this
very argument with respect to an agreement by the NCAA restricting broadcast of
college football games).

games for which there is little if any demand are nonetheless televised" may constitute an antitrust violation.[136]

### a.     "In-Market" Agreements

Plaintiffs allege that the Leagues' arrangements define the territory in which each individual team may televise its games, meaning that individual clubs are prohibited from telecasting their baseball and hockey games outside the designated home territory, irrespective of consumer demand for those games. Plaintiffs echo defendants MSG and the New York Rangers' argument, as plaintiffs in a different case, that "'[i]n a fully competitive marketplace, the [individual clubs] could and would . . . increas[e] the opportunity to view [their] games throughout the country, whether through cable, satellite or on the Internet.'"[137]   In other words, the agreements result in an arrangement by which the

---

[136]     *Id.* at 108.  *Accord MSG v. NHL*, No. 07 Civ. 8455, 2008 WL 4547518, at *11 (S.D.N.Y. Oct. 10, 2008) (MSG's allegations that it "'has been and will continue to be unable to distribute Rangers games . . . through cable, satellite, Internet and otherwise in ways that it believes are best suited to reaching the Rangers fan base' . . . plead harm to competition as a whole. . . [b]ecause it is plausible that the . . . prohibition on independent websites constitutes a form of output reduction.").

[137]     Pl. Mem. at 24-25 (quoting MSG Compl. ¶ 37).  *See also id.* at 1 ("'[T]he serious harm to competition from a sports league's division of broadcasting territories has long been established as an antitrust violation.'") (quoting MSG Br. at 27).

clubs have authority over the output of their own games in their home territory, but must "forego their own output" outside their home territory and cede to the Leagues' authority over out-of-market games.  As numerous courts have recognized, "a horizontal agreement that allocates a market between competitors and restricts each company's ability to compete for the other's business may injure competition."[138]

### b.    "Out-of-Market" Agreements

Defendants argue that the fact that the market division is part of a larger joint-selling arrangement, which makes all games available to the vast majority of viewers as "all-or-nothing" out-of-market packages, eliminates any harm to competition.[139]  In contrast, plaintiffs allege that the agreements to centralize control of all baseball and hockey out-of-market programming in the Leagues, as exclusive distributors, are themselves unreasonable restraints of trade.[140]  While Congress has exempted these types of joint agreements from

---

[138]    *Brantley*, 675 F.3d at 1198 (internal quotation and citation omitted).

[139]    *See* Def. Mem. at 16-20.

[140]    *See Laumann* Compl. ¶¶ 112-113, 117-118; *Garber* Compl. ¶¶ 119-120, 125-126 (alleging antitrust violations based on agreements granting Leagues exclusive rights to distribute out-of-market games).

antitrust scrutiny in *sponsored telecasting*, that exemption is inapplicable to the telecasts of the hockey and baseball games at issue here.[141]

        Contrary to defendants' argument, *Brantley v. NBC Universal, Inc.* does not sanction the alleged out-of-market "all or nothing" packages as a replacement for individual competition among the clubs.  In *Brantley*, the court rejected allegations of unlawful tying where the tied television programs were owned in the first instance by the programmers who chose to market the programs as a package.[142]  The court analogized to the professional sports context noting that there is no question that individual teams may package desirable and undesirable

---

[141]    Under the Sports Broadcasting Act ("SBA"), the antitrust laws "shall not apply to any joint agreement [involving] professional team sports of football, baseball, basketball, or hockey, by which any league of clubs . . . sells or otherwise transfers all or any part of the rights of such league's member clubs in the *sponsored telecasting* of the games of football, baseball, basketball, or hockey, as the case may be, engaged in or conducted by such clubs.  15 U.S.C. § 1291 (emphasis added).  However, the term "'[s]ponsored telecasting' under the SBA pertains only to network broadcast television and does not apply to non-exempt channels of distribution such as cable television, pay-per-view, and satellite television networks."  *Kingray, Inc. v. NBA, Inc.*, 188 F. Supp. 2d 1177, 1183 (S.D. Cal. 2002).

[142]    The allegations in *Brantley* were that "each programmer defendant, because of its full or partial ownership of a broadcast channel and its ownership or control of multiple important cable channels" exploited its market power by requiring distributors as a condition to purchasing "must have" channels, to also acquire and resell all the rest of the programmer's less popular cable channels.  675 F.3d at 1195.  Plaintiffs here do not allege unlawful tying.

game tickets as part of a season package.[143]  However, the arrangement here is more akin to the League commandeering the individual clubs' rights to sell tickets to sports fans outside their home territory, and, as a replacement, conditioning the purchase of a popular team's tickets on the purchase of other teams' tickets.

The Second Circuit established in *Major League Baseball Properties, Inc. v. Salvino*, that agreements by individual clubs to grant the League the exclusive right to license use of certain rights originally held by the individual clubs are analyzed under the rule of reason.[144]  At issue in *Salvino* was an agreement by MLB clubs to grant the League "the exclusive right – subject to limited exceptions – to license Club names and logos for use on retail products for national and international (*i.e.* not merely local) distribution . . . and to be sold at retail within the Clubs' respective local markets."[145]  The court concluded that the

_____

[143]    *See Driskill v. Dallas Cowboys Football Club, Inc.*, 498 F.2d 321, 323 (5th Cir. 1974) (rejecting a claim that the Dallas Cowboys had unlawfully tied the sale of undesirable preseason tickets to the sale of season ticket packages because the Cowboys had a lawful monopoly in the market for the tied product – i.e. preseason tickets).

[144]    542 F.3d at 309.

[145]    *Id.* at 297.  The court rejected the claim that the agreement reduced output because the "Clubs' agreement to make [a wholly owned-subsidiary of MLB] their exclusive licensor does not by its express terms restrict or necessarily reduce the number of licenses to be issued; it merely alters the identity of the licenses' issuer."  *Id.* at 318.

-44-

agreement was lawful, but only after careful consideration of the district court's factual conclusions concerning the impact of the licensing agreement on output, and the viability of MLB's justifications for its decision to consolidate licensing rights in the League. *Salvino* suggests that granting the Leagues exclusive rights to distribute out-of-market programming, and the Leagues' decision to do so largely in the form of blanket licensing, may very well be reasonable and in compliance with antitrust law.[146] However, plaintiffs have alleged the anticompetitive effect of "forc[ing] . . . consumers to forego the purchase of [these games] from other distributors [the individual clubs]" resulting in decreased consumer choice and increased price – an allegation that states an injury to competition.[147] Defendants have not even alleged that these restraints on trade are justified, for example, by arguing that "'individual [teams] are inherently unable to compete fully effectively'" or that the agreements are "necessary to maintain a competitive balance."[148]

_____

[146]    *Accord Broadcast Music*, 441 U.S. at 1551 ("Not all arrangements among actual or potential competitors that have an impact on price are . . . unreasonable restraints.") (discussing blanket licensing agreement).

[147]    *Brantley*, 675 F.3d at 1201.

[148]    *Salvino*, 542 F.3d at 323, 327 (discussing possible justification for agreements in restraint of trade based on *Broadcast Music* and *NCAA*). To be sure defendants may have little trouble justifying their agreements regarding distribution of out-of-market games. *See NCAA*, 486 U.S. at 117 (noting that the need to promote competitive balance among the teams may justify horizontal

-45-

Plaintiffs have adequately alleged harm to competition with respect to the horizontal agreements among individual hockey and baseball clubs, as part of the NHL and MLB, to divide the television market.  Making all games available as part of a package, while it may increase output overall, does not, as a matter of law, eliminate the harm to competition wrought by preventing the individual teams from competing to sell their games outside their home territories in the first place.[149]  And plaintiffs in this case – the consumers – have plausibly alleged that they are the direct victims of this harm to competition.[150]

### C.    Section 2 Claim for Conspiracy to Monopolize the Market for Video Presentation and Internet Streaming of Games

---

restraints on competition); *Madison Square Garden, L.P. v. National Hockey League*, 270 Fed. App'x 56, 58 (2d Cir. 2008) (agreeing that "[i]t is far from obvious that [the NHL's ban on independent websites] has no redeeming value"). However, the reasonableness of the agreements alleged is not so apparent that the claims warrant dismissal without further inquiry.

[149]    *See Clarett v. National Football* League, 306 F. Supp. 2d 379, 399 (S.D.N.Y. 2004) ("[A]n effect on price or output is a sufficient but not a necessary element of antitrust injury. Antitrust injury may arise from other anticompetitive effects, including barriers to market entry." ), *rev'd on other grounds*, 369 F.3d 124 (2004).

[150]    There is no question that Internet plaintiffs adequately alleged reduced choice resulting from the allegedly anti-competitive League agreements, insofar as "in-market" games are not available from *any* seller over the Internet.  And Television plaintiffs have alleged that they pay higher costs and have fewer choices as a result of the same types of agreements for television programming.  *See also* MSG Compl. at 26 (alleging that preventing competition among teams in television and Internet marketing harms consumers); MSG Br. at 27 (same).

The final claim, brought on behalf of all plaintiffs, is a Section 2 claim for conspiracy to monopolize the "market for video presentations of major league [hockey/baseball] games and Internet streaming of the same" and "use of that power for the purposes of unreasonably excluding and/or limiting competition."[151] Defendants argue that the Section 2 claims must be dismissed for failure to allege any of the necessary elements of a monopolization claim.[152]

It is well established that "[t]here are peculiar and unique characteristics that set major league men's ice hockey [and baseball] apart from other sports or leisure activities, . . . that [c]lose substitutes do not exist"[153] and that the Leagues possess monopolies of their respective sports.[154]  It is also established

---

[151]    *Laumann* Compl. ¶ 123; *Garber* Compl. ¶ 130.

[152]    *See* Def. Mem. at 6.  Defendants argue "failure to allege any anticompetitive effect [and] failure to allege any plausible conspiracy among the leagues, the clubs and the RSN's and distributors."  *Id.*

[153]    *Laumann* Compl. ¶¶ 54-56; *Garber* Compl. ¶¶ 58-60.  *See, e.g.*, *Fishman v. Estate of Wirtz*, 807 F.2d 520, 531 (7th Cir. 1986) (professional basketball); *L.A. Mem'l Coliseum Comm'n v. National Football League*, 726 F.3d 1381, 1393 (9th Cir. 1984) (professional football); *U.S. Football League v. National Football League*, 644 F. Supp. 1040, 1056 (S.D.N.Y. 1986) (professional football), *aff'd*, 842 F.2d 1335 (2d Cir. 1988); *Philadelphia World Hockey Club v. Philadelphia Hockey Club*, 351 F. Supp. 462, 501 (E.D. Pa. 1972) (major league hockey).

[154]    *See Board. of Regents of Univ. of Okla. v. National Collegiate Athl. Ass'n*, 546 F. Supp. 1276, 1323 (W.D. Okla. 1982) (holding "that the relevant market for testing whether the NCAA exercises monopoly power is live college football television").

that "[a] monopolist may not . . . use its market power, whether obtained lawfully or not, to prevent or impede competition in the relevant market."[155] Having defined the relevant market as the market for television broadcasting of professional hockey and baseball games, plaintiffs have adequately alleged that NHL and MLB exercise monopoly power defined as "'[w]hen a product is controlled by one interest, without substitutes available.'"[156] Finally, as already discussed, plaintiffs have plausibly alleged that the NHL and MLB have used their monopoly power to restrict the broadcast of television programming in a manner that harms competition.[157] However, plaintiffs have not alleged any monopoly power on the part of RSNs or MVPDs in the market for production of baseball and hockey games, nor have they alleged facts in support of a conspiracy to monopolize the market. Claim Four is therefore dismissed against the RSNs and MVPDs.

## VI.   CONCLUSION

For the foregoing reasons, Plaintiffs Garber and Herman are dismissed from both cases, and Silver is dismissed from the *Garber* case, for lack of antitrust

---

[155]   *U.S. Football League v. National Football League*, 842 F.2d at 1360–61 (citations omitted).

[156]   *Board of Regents of Univ. of Okla.*, 546 F. Supp. at 1323 (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 394 (1956)).

[157]   *See supra* Part V.B.2 (discussing harm to competition).

standing.  The Section Two claim (Claim Four) is dismissed against the RSN and

MVPD defendants, but may proceed against the League defendants.  The Section

One claims may proceed against all defendants.  A conference in this matter is

scheduled for December 18, 2012 at 5:00 p.m.  The Clerk of the Court is directed

to close these motions [Docket Entry No. 74, 12 Civ. 1817 and Docket Entry No.

65, 12 Civ. 3704].


SO ORDERED:


Shira A. Scheindlin
U.S.D.J.


Dated:        December 5, 2012
              New York, New York

## - Appearances -

**For Plaintiffs**:

Kevin M. Costello, Esq.
Gary E. Klein, Esq.
Kevin R. Costello, Esq.
Klein Kavanagh Costello, LLP
85 Merrimac St., 4th Floor
Boston, Massachusetts 02114
(617) 357-5034

Edward A. Diver, Esq.
Howard I. Langer, Esq.
Peter E. Leckman, Esq.
Langer Grogan & Diver, P.C.
Three Logan Square, Suite 4130
1717 Arch Street
Philadelphia, Pennsylvania 19103
(215) 320-5663

Michael Morris Buchman, Esq.
John A. Ioannou, Esq.
Pomerantz Haudek Block Grossman & Gross LLP
600 Third Avenue
New York, New York 10016
(212) 661-1100

Alex Schmidt, Esq.
Mary Jane Fait, Esq.
Wolf Haldenstein Adler Freeman & Herz LLP
270 Madison Avenue
New York, New York 10016
(212) 545-4600

Robert LaRocca, Esq.
Kohn, Swift & Graf, P.C.
One South Broad Street
Suite 2100
Philadelphia, Pennsylvania 19107
(215) 238-1700

J. Douglas Richards, Esq.
Jeffrey Dubner, Esq.
Cohen, Milstein, Sellers & Toll, PLLC
88 Pine Street
New York, New York 10005
(212) 838-7797

**For Defendants Office of the Commissioner of Baseball, Major League Baseball Enterprises Inc., MLB Advanced Media L.P., MLB Advanced Media, Inc., Athletics Investment Group, LLC, The Baseball Club of Seattle, L.L.P., Chicago White Sox, Ltd., Colorado Rockies Baseball Club, Ltd., The Phillies, Pittsburgh Baseball, Inc., and San Francisco Baseball Associates, L.P.**

Bradley I. Ruskin, Esq.
Carl Clyde Forbes, Esq.
Helene Debra Jaffe, Esq.
Jennifer R. Scullion, Esq.
Robert Davis Forbes, Esq.
Proskauer Rose LLP
11 Times Square
New York, New York 10036
(212) 969-3465

Thomas J. Ostertag, Esq.
Senior Vice President and General Counsel
Office of the Commissioner of Baseball
245 Park Avenue
New York, New York 10167

(212) 931-7855

**For Defendants National Hockey League, NHL Enterprises, L.P., NHL Interactive Cyberenterprises, LLC, Chicago Blackhawk Hockey Team, Inc., Comcast-Spectacor, L.P., Hockey Western New York LLC, Lemieux Group, L.P., Lincoln Hockey LLC, New Jersey Devils LLC, New York Islanders Hockey Club, L.P. and San Jose Sharks, LLC**

Shepard Goldfein, Esq.
James A. Keyte, Esq.
Paul M. Eckles, Esq.
Matthew M. Martino, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036-6522
(212) 735-3000

**For Defendants DirecTV, LLC, DirecTV Sports Networks, LLC, DirecTV Sports Net Pittsburgh, LLC a/k/a Root Sports Pittsburgh, DirecTV Sports Net Rocky Mountain, LLC a/k/a Root Sports Rocky Mountain, and DirecTV Sports Net Northwest, LLC a/k/a Root Sports Northwest**

Andrew E. Paris, Esq.
Joann M. Wakana, Esq.
Louis A. Karasik, Esq.
Alston & Bird LLP
333 South Hope Street
Los Angeles, California 90071
(213) 576-1000

**For Defendants Comcast Corporation, Comcast SportsNet Philadelphia, L.P., Comcast SportsNet Mid-Atlantic L.P., Comcast SportsNet California, LLC, and Comcast SportsNet Chicago, LLC**

Arthur J. Burke, Esq.
James W. Haldin, Esq.

Davis Polk & Wardwell
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

**For Yankees Entertainment and Sports Networks, LLC and New York Yankees Partnership**

Jonathan D. Schiller, Esq.
Alan Vickery, Esq.
Christopher Duffy, Esq.
Boies, Schiller & Flexner LLP
575 Lexington Avenue, 7th Floor
New York, New York 10022
(212) 446-2300

**For Defendants The Madison Square Garden Company and New York Rangers Hockey Club**

Stephen R. Neuwirth, Esq.
Richard I. Werder, Jr., Esq.
Ben M. Harrington, Esq.
Quinn Emanuel Urquhart Oliver and Sullivan LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000