**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THOMAS LAUMANN, FERNANDA GARBER, ROBERT SILVER, and PETER HERMAN, representing themselves and all others similarly situated, | 12-cv-1817 (SAS) |
| Plaintiffs, | |
| v. | |
| NATIONAL HOCKEY LEAGUE, et al., | |
| Defendants | |
| MARC LERNER, FERNANDA GARBER, DEREK RASMUSSEN, and ROBERT SILVER, representing themselves and all others similarly situated, | 12-cv-3704 (SAS) |
| Plaintiffs, | |
| v. | |
| OFFICE OF THE COMMISSIONER OF BASEBALL, et al., | |
| Defendants | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION**
**TO THE TELEVISION DEFENDANTS' MOTIONS TO COMPEL ARBITRATION**
**AND STAY CLAIMS**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION .................................................................................................... 1

BACKGROUND ..................................................................................................... 2

DISCUSSION ........................................................................................................ 4

      I.      The Comcast RSNs Cannot Enforce Directv's Arbitration Clauses ...................... 6

      II.     Mr. Silver and Mr. Birbiglia Are Not Estopped From Denying the Applicability
            of the Directv Arbitration Clause to Their Claims Against Comcast .................... 8

      III.    The Television Defendants Cannot Enforce Arbitration Clauses in
            Unrelated Contracts ........................................................................................ 14

      IV.    The Application of Equitable Estoppel Is Not a Question for the Arbitrator. ...... 17

      V.     Directv Cannot Enforce an Arbitration Clause in an Unrelated Contract
            to which Marc Lerner is not a Party ................................................................... 20

      VI.    A Stay Would Not Save Resources or Promote the Efficient Resolution
            of These Disputes ........................................................................................... 23

CONCLUSION ...................................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Ahlers v. Ryland Homes Nevada, LLC*, No. 52511, 2010 WL 3276221 (Nev. Apr. 16, 2010)...... 9

*Am. Exp. Co. v. Italian Colors Rest.*, 133 S. Ct. 2304 (2013) .................................................... 1, 5

*Arthur Andersen LLP v. Carlisle*, 556 U.S. 624 (2009) ........................................................ 9

*AT & T Techs., Inc. v. Commc'ns Workers*, 475 U.S. 643 (1986)................................................. 18

*Blinco v. Green Tree Servicing LLC*, 400 F.3d 1308 (11th Cir. 2005)........................................... 7

*Comer v. Micor, Inc.*, 436 F.3d 1098 (9th Cir. 2006) ................................................................. 5

*Contec Corp. v. Remote Solution Co., Ltd.*, 398 F.3d 205 (2005) ................................................ 19

*Denney v. Jenkens & Gilchrist*, 412 F. Supp. 2d 293 (S.D.N.Y. 2005).............................. 9, 12, 13

*First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995)............................................... 4, 18

*Granite Rock Co. v. Int'l Bhd. of Teamsters*, 130 S. Ct. 2847 (2010) ....................................... 4, 5

*Grundstad v. Ritt*, 106 F.3d 201 (7th Cir. 1997)....................................................................... 5

*In re Humana Inc. Managed Care Litig.*, 285 F.3d 971 (11th Cir.2002) .................................... 10

*In re Jiffy Lube Int'l, Inc., Text Spam Litigation*, 847 F. Supp. 2d 1253 (S.D. Cal. 2012)..... 15, 18

*Laumann v. NHL*, 907 F. Supp. 2d 465 (S.D.N.Y. 2012) ........................................................... 17

*Laumann v. NHL*, No. 12-1817, 2013 WL 837640 (S.D.N.Y. Mar. 6, 2013) ................... 1, 12, 25

*Miron v. BDO Seidman, LLP*, 342 F. Supp. 2d 324 (E.D. Pa. 2004) .......................................... 10

*Oxford Health Plans LLC v. Sutter*, 133 S. Ct. 2064 (2013) ..................................................... 20

*Ragone v. Atlantic Video at Manhattan Center*, 595 F.3d 115 (2d Cir. 2010) ....................... 12, 13

*Rent-A-Ctr., W., Inc. v. Jackson*, 130 S. Ct. 2772 (2010) .................................................... 18, 19

*Ross v. Am. Exp. Co.*, 547 F.3d 137 (2d Cir. 2008) ................................................................. 2, 12

*Salkin v. Mastercard Int'l Inc.*, 77 Pa. D. & C.4th 39 (Ct. Com. Pl. Phila. 2005)....................... 10

*Sarhank Group v. Oracle Corp.*, 404 F.3d 657 (2d Cir. 2005)................................................... 13

*Sherer v. Green Tree Servicing LLC*, 548 F.3d 379 (5th Cir. 2008) ............................................. 7

*Silec Cable S.A.S. v. Alcoa Fjardaal, SF*, No. 12-01392, 2012 WL 5906535 (W.D. Pa. Nov. 26, 2012) ......................................................................................................................... 19

*Sleepy's LLC v. Escalate, Inc.*, No. 10-1626, 2010 WL 2505678 (S.D.N.Y. June 18, 2010) ...... 19

*Smith v. Steinkamp*, 318 F.3d 775 (7th Cir. 2003) ....................................................................... 15

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662 (2010)........................................... 20

*Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327 (11th Cir. 2005) ............... 19

*Truck Ins. Exch. v. Palmer J. Swanson, Inc.*, 189 P.3d 656 (Nev. 2008) ....................................... 9

*Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Jr. Univ.*, 489 U.S. 468 (1989)... 20

*Washington v. William Morris Endeavor Entm't, LLC*, No. 10-9647, 2011 WL 3251504 (S.D.N.Y. July 20, 2011) ........................................................................................................ 19

## INTRODUCTION

Defendants Comcast and Directv (the "Television Defendants") have filed motions to compel arbitration that go well beyond what any party has agreed to arbitrate. Unexpressed in their moving papers is the simple fact that only *one* of the plaintiffs they seek to force into arbitration signed a contract that encompasses the claims at issue in these cases. For each of the others, the Television Defendants are seeking to compel arbitration on the basis of other defendants' arbitration clauses, or arbitration clauses in separate contracts having nothing to do with the claims in these cases. Directv has gone so far as to attempt to enforce an arbitration clause against a plaintiff who has asserted only Internet-based claims on the basis of an unrelated television contract to which he is not even a signatory. Comcast's need to include a chart at the beginning of its memorandum, which lays out all of the supposedly relevant arbitration clauses and apparently includes any contract that any plaintiff ever entered into with either Comcast or Directv, illustrates the absurdity of the Television Defendants' position.

This Court has already held that the defendants may not enforce their co-defendants' contracts, and thus has already rejected the premise of much of Comcast's motion. Following the resolution the defendants' motions to dismiss the complaints, Comcast and Directv moved to stay the litigation pending the outcome of the Supreme Court's decision in *American Express Co. v. Italian Colors Restaurant*,[1] which addressed one of the defenses Plaintiffs would have asserted to the enforcement of the arbitration clauses. In rejecting the request, the Court squarely held, "a Comcast RSN has no legal entitlement to require Silver, a DIRECTV subscriber, to arbitrate his antitrust claims against the Comcast RSNs and vice versa." *Laumann v. NHL*, No. 12-1817, 2013 WL 837640, at *2 (S.D.N.Y. Mar. 6, 2013); *see also Ross v. Am. Exp. Co.*, 547

_____

[1] The Supreme Court decided *Amex* on June 20, 2013. *See* 133 S. Ct. 2304 (2013).

F.3d 137, 148 (2d Cir. 2008) (relationship of coconspirators insufficient to permit enforcement of another conspirator's arbitration clause).

These motions are distractions. Plaintiffs have agreed to stay the claims that Robert Silver and Vincent Birbiglia have against Directv, the entity with whom they signed a contract for the television services at issue in this case. *See Laumann*, Docket No. 130; *Garber*, Docket No. 157. They have made a similar offer to Comcast, and do not contest Comcast's motion to stay Garrett Traub's claims against Comcast.[2] Instead of accepting this reasonable process, which would stay the claims that arose under the contracts that these individuals actually signed, the Television Defendants have filed sprawling motions that abandon basic contract principles in an attempt to force a wide range of unrelated claims into arbitration.

## BACKGROUND

Plaintiffs in these actions are consumers who purchased packages of live "out-of-market" hockey games (in *Laumann*) or baseball games (in *Garber*). Certain plaintiffs purchased Internet packages from the league defendants. Others purchased television packages through either Comcast or Directv.

Comcast and Directv—but not the leagues—have arbitration clauses in the customer agreements that purportedly govern their provision of service to the plaintiffs who obtained out-of-market packages from them. Plaintiffs Birbiglia and Silver entered into agreements with Directv containing arbitration clauses. Plaintiff Traub entered into an agreement with Comcast containing an arbitration clause.

While Plaintiffs continue to believe that Directv's arbitration clauses are not enforceable,

---

[2] While he will not contest Comcast's motion to stay his claims against Comcast in this forum, Mr. Traub continues to believe that Comcast's arbitration clause is unenforceable, and retains all defenses that he may choose to raise in any other forum.

in order to avoid unnecessary litigation over this issue, Plaintiffs entered into a stipulation with Directv that stayed the claims of Mr. Silver and Mr. Birbiglia against Directv. *See Laumann*, Docket No. 130; *Garber*, Docket No. 157. That agreement expressly contemplates that Mr. Silver and Mr. Birbiglia will continue to pursue their claims against the other defendants, and acknowledges that Directv cannot seek to enforce any other defendants' arbitration clauses. *Laumann*, Docket No. 130, at 4 ("The DIRECTV Defendants agree not to seek a stay or dismissal of claims by Plaintiffs Silver and Birbiglia against the non-DIRECTV Defendants based on enforcement of arbitration clauses in any agreements by which they purchased MLB Extra Innings and/or NHL Center Ice from DIRECTV, or by Plaintiff Traub against the DIRECTV Defendants based on enforcement of arbitration clauses in any agreement under which he purchased MLB Extra Innings and/or NHL Center Ice from Comcast.").

Plaintiffs made a similar offer to Comcast with respect to Mr. Traub, which Comcast declined. Comcast's present motion reveals why: it wishes to enforce not only Mr. Traub's arbitration clause as to his claims against Comcast, but also Directv's arbitration clauses with Mr. Silver and Birbiglia—even though Directv itself has already agreed that its arbitration clause does not permit Comcast to enforce it. Neither of the leagues nor any other defendant other than Comcast has sought to enforce an arbitration agreement in *another* defendant's contract. Comcast also seeks to subject any person's claims against Comcast to arbitration if that person ever entered into *any* unrelated contract with Comcast, such as a contract for Internet service.

While Comcast's attempts to compel arbitration of claims over which there is no agreement to arbitrate is a clear overreach, Directv's motion is even more so. Even though Directv entered into a stipulation to avoid disputes concerning arbitration, which was negotiated over the course of several weeks without ever mentioning Plaintiff Lerner, it nonetheless filed

3

the present motion. Directv served its pre-motion letter the day after the parties submitted the stipulation to the Court, arguing that Mr. Lerner was required to arbitrate his claims against Directv because his *wife* entered into an agreement with Directv for television service. In addition to not being a party to that agreement, Mr. Lerner's claims in this case concern only his purchase of the MLB Extra Innings *Internet* package from Major League Baseball. His claims do not implicate his wife's television service at all. Perhaps some comfort can be taken in the fact that Comcast has refrained from seeking to enforce Mr. Lerner's wife's agreement with Directv for services unrelated to Mr. Lerner's claims against Comcast. Directv's argument is apparently a step too far even for Comcast.

It is no secret that Comcast and Directv have both had some success using arbitration clauses to limit their exposure to class liability in a number of cases. This success appears to have gone to their heads, as they now seek to use these cases to explore new frontiers in the use of consumer arbitration to limit class remedies—frontiers in which arbitration is untethered from the most fundamental tenets of contract law.

## **DISCUSSION**

Arbitration is a matter of contract. The Television Defendants attempt to minimize the fact that arbitration is a matter of consent by elevating the federal policy favoring arbitration to new heights. Yet the Supreme Court has been clear that federal arbitration policy cannot trump contract principles: "[W]e have never held that this policy overrides the principle that a court may submit to arbitration 'only those disputes … that the parties have agreed to submit.'" *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 130 S. Ct. 2847, 2859 (2010) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)). "We have applied this presumption favoring arbitration … only where it reflects, and derives its legitimacy from, a judicial

conclusion that arbitration of a particular dispute is what the parties intended ….” *Id.*

Indeed, in *Amex*, the Court again stressed the importance of the “overarching principle that arbitration is a matter of contract. … [C]ourts must rigorously enforce arbitration agreements according to their terms, including terms that specify *with whom* the parties choose to arbitrate their disputes ….” *Am. Exp. Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2309 (2013) (quotations omitted).

When determining whether a person is a party to an agreement containing an arbitration agreement, courts do not start their analysis by presuming that the claim must be sent to arbitration. The first step is to determine whether a valid contract exists, a question that does not involve any presumption in favor of arbitration. “To satisfy itself that such agreement exists, the court must resolve any issue that calls into question the formation or applicability of the specific arbitration clause that a party seeks to have the court enforce.” *Granite Rock*, 130 S. Ct. at 2856. “[C]ourts should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties’ arbitration agreement nor (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue.” *Id.* at 2857-58. For the same reason, there is no presumption applicable in determining who the parties are to an agreement. *See, e.g.*, *Comer v. Micor, Inc.*, 436 F.3d 1098, 1104 n.11 (9th Cir. 2006) (“The question here is not whether a particular issues is arbitrable, but whether a particular *party* is bound by the arbitration agreement. Under these circumstances, the liberal federal policy regarding the scope of arbitrable issues is inapposite.”); *Grundstad v. Ritt*, 106 F.3d 201, 205 n.5 (7th Cir. 1997) (“[T]he federal policy favoring arbitration applies to issues concerning the scope of an arbitration agreement entered into consensually by contracting parties; it does not serve to extend the reach of an arbitration provision to parties who never

5

agreed to arbitrate in the first place.").

## I.     The Comcast RSNs Cannot Enforce Directv's Arbitration Clauses.

Among the defendants, Comcast alone has taken the position that it can enforce another defendant's arbitration agreements. It contends that its RSNs can force Plaintiffs Silver and Birbiglia to arbitrate their claims against Comcast because of the agreements they entered into with Directv.

There is no dispute that none of the Comcast Defendants is a party to the Directv agreements. Nevertheless, Comcast argues that its RSNs can enforce those contracts.[3] It makes two arguments in support of this view: first, it argues that the terms of Directv's contract encompass claims against the Comcast RSNs, and second, it argues that Mr. Silver and Mr. Birbiglia are estopped from denying the application of the arbitration clause because their Directv service happens to carry programming owned by Comcast.[4]

These arguments are meritless. Nothing in Directv's arbitration agreements comes close to including Comcast in their terms. Not surprisingly, the word "Comcast" does not appear in any of these agreements. Nor is there any language that suggests that any part of the agreement applies to anyone other than Directv entities. Indeed, the customer agreement Comcast cites

---

[3] Or, more precisely, that it can enforce the arbitration clauses—the very idea of it enforcing any other provisions in the contract is so far-fetched that it highlights how far Comcast is stretching the limits of contract law.

[4] Comcast apparently believes that Directv's contract would cover any provider of programming carried by Directv. For this reason, it does not argue that Comcast Corp. itself is entitled to enforce the arbitration clause, just its Regional Sports Networks. Even with respect to the Comcast RSN Defendants, however, it is not true that they all provide programming to the plaintiffs. In particular, Comcast has refused to allow Directv to carry Comcast Sportsnet Philadelphia, and all baseball and hockey games on that channel are blacked out in Philadelphia. Thus, Mr. Silver, who lives in Philadelphia, never obtained *any* programming from CSN Philadelphia. In any event, because Comcast is a co-conspirator that is jointly and severally liable for all of the harms in this case, the practical effect of Comcast's position, even if accepted by the Court, is likely to be minimal.

expressly defines the relevant parties: the terms "we" and "DIRECTV" are defined as "DIRECTV and its affiliates, subsidiaries and employees." (McCarthy Dec., Ex. B. at 1 (*Garber* Docket No. 159, attachment 3)). The arbitration provision applies to "you" (the customer), "we," and "us." The only reference in the arbitration clause to other entities is the *prohibition* on consolidating claims in arbitration by *or against* "other individuals or entities." *Id*. at § 9(c). It is simply incomprehensible that Directv would have any interest in requiring Plaintiffs to arbitrate their claims against unrelated entities in separate arbitrations. Ultimately, the Directv customer agreements are just what they appear to be: terms and conditions governing the relationship between Directv and a customer regarding Directv's provision of television service to that customer.[5]

The initial question, as always, is what the parties intended. Plainly, no consumer could be said to have intended to subject claims against programming providers to arbitration. Nothing in the agreement supports that interpretation. No Directv subscriber could reasonably perceive his contract with Directv to encompass such claims – and yet that is Comcast's view. Nor did

---

[5] The cases Comcast cites do not support its position. Tellingly, they have found only two, both involving the same agreements and defendants. *Sherer v. Green Tree Servicing LLC*, 548 F.3d 379 (5th Cir. 2008); *Blinco v. Green Tree Servicing LLC*, 400 F.3d 1308 (11th Cir. 2005). Those cases involve the ability of loan servicers to invoke arbitration clauses associated with home loans. As an initial matter, borrowers typically understand that their obligations to servicers will be addressed in contracts they sign with lenders. And there, the language of the arbitration clauses expressly applied not only to the disputes related to the contract, but also to the "relationships which result from this contract." *Blinco*, 400 F.3d at 1310. While a cable subscriber does not develop any identifiable relationship with programming providers, a borrower unquestionably develops an ongoing relationship with a servicer as a result of the loan agreement. Also, the use of the plural in the *Green Tree* contracts suggests that it applies not only to the relationship with the lender. Consequently, there was a rational textual basis in those cases for applying the clause to the outside servicers that finds no analog here.

Moreover, the servicer, Green Tree Servicing, was affiliated with Green Tree Financing, which obtained the assets of the original lender. *Blinco*, 400 F.3d at 1310. By contrast, Comcast is in no way affiliated with Directv, and no Directv consumer could possibly expect that he was incurring legal obligations to Comcast entities in agreeing to Directv's contract.

Directv intend to include Comcast in its arbitration clause. There is no language to this effect in the contract and it would make no sense for Directv to extend protection to a rival without gaining anything in return.

In any event, Directv's own understanding is that it could not enforce Comcast's arbitration clause and *that Comcast and the other defendants could not enforce its arbitration clause*. The stipulation Directv reached with the Plaintiffs with respect to Mr. Silver and Mr. Birbiglia reflects this understanding. That agreement expressly provides that Mr. Silver's and Mr. Birbiglia's claims against Directv are stayed, but their claims against other defendants are not. *See Laumann*, Docket No. 130, at 4; *Garber*, Docket No. 157, at 4. In short, Comcast is arguing that the parties to the contracts—Directv and the Directv Plaintiffs—intended to include the Comcast RSNs in the arbitration clause even though *the parties themselves disclaim any such intent*, consistent with the plain language of the agreements.

It is also worth noting that none of the other defendants has joined Comcast in its attempt to enforce Directv's clauses, even though there is nothing special about Comcast in this regard. Nor, of course, have the other defendants attempted to insert themselves into Comcast's arbitration clauses. The reason is clear: it is impossible to interpret the terms of the agreements in the manner Comcast suggests.

## II.   Mr. Silver and Mr. Birbiglia Are Not Estopped From Denying the Applicability of the Directv Arbitration Clause to Their Claims Against Comcast.

Comcast separately argues that the Court should estop Plaintiffs Silver and Birbiglia from denying application of the arbitration clause to their claims against the Comcast RSNs under the theory of "equitable estoppel." Comcast claims that it would be inequitable to permit the Directv Plaintiffs to proceed against Comcast in court rather than in arbitration. Again, Comcast does not assert this argument on behalf of Comcast Corp., and again, no other defendants have joined its

8

position.

In general, the equitable basis for requiring a signatory to arbitrate a claim against a non-signatory arises from the signatory's reliance on the underlying contract in making the claim against the non-signatory. As this Court has noted, "[t]he purpose of the doctrine of equitable estoppel is to prevent a plaintiff from, in effect, trying to have his cake and eat it too; that is, from relying on the contract when it works to his advantage by establishing the claim, and repudiating it when it works to his disadvantage by requiring arbitration." *Denney v. Jenkens & Gilchrist*, 412 F. Supp. 2d 293, 298 (S.D.N.Y. 2005) (quotations omitted). "At a very minimum, the signatory's claims must make reference to or presume the existence of the written agreement." *Id.* (quotations omitted).

Equitable estoppel is a matter of contract law that is governed by generally applicable state contract law. *See Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009). Directv's contracts specify that the law of the state in which the consumer receives service governs. (McCarthy Dec., Ex. B at §10(b) (*Garber* Docket No. 159, attachment 3).) The Nevada Supreme Court, whose law governs Mr. Birbiglia's contract, has interpreted the doctrine in the standard fashion: "The equitable estoppel doctrine prevents a plaintiff signatory to a contract that contains an arbitration provision from avoiding the agreement to arbitrate if the plaintiff's claims rely on the contract as the basis for relief." *Ahlers v. Ryland Homes Nevada, LLC*, No. 52511, 2010 WL 3276221 (Nev. Apr. 16, 2010); *see also Truck Ins. Exch. v. Palmer J. Swanson, Inc.*, 189 P.3d 656 (Nev. 2008).

The Pennsylvania Supreme Court, whose law governs Mr. Silver's contract, has not addressed the issue. The only Pennsylvania state court decision addressing the issue held that equitable estoppel could not apply at all in the absence of privity. *Salkin v. Mastercard Int'l Inc.*,

77 Pa. D. & C.4th 39, 45 (Ct. Com. Pl. Phila. 2005) ("There is no 'equitable estoppel' exception to the requirement of contractual privity to an agreement which would require this court to dismiss all class allegations in order to send this matter to arbitration."). Federal courts applying Pennsylvania law have adopted a traditional interpretation tied to the plaintiff's dependence on the underlying contract. In *Miron v. BDO Seidman, LLP*, for instance, the court held, "'[t]he plaintiff's *actual dependence* on the underlying contract in making out the claim against the nonsignatory defendant is therefore always the sine qua non of an appropriate situation for applying equitable estoppel.'" 342 F. Supp. 2d 324, 333 (E.D. Pa. 2004) (quoting *In re Humana Inc. Managed Care Litig.*, 285 F.3d 971, 976 (11th Cir.2002), *rev'd on other grounds*, *PacifiCare Health Sys. v. Book*, 538 U.S. 401 (2003)).

Comcast does not argue that Plaintiffs' claims rely on the contracts in any way, and for good reason. The contracts that contain the arbitration provisions are irrelevant to Plaintiffs' claims. Plaintiffs are not alleging that Directv or anyone else (much less Comcast), failed to fulfill any of the requirements of those agreements. They are not seeking to enforce the contracts in any fashion. Their claims do not require interpretation of the contracts. Nor, indeed, do their claims require the *existence* of the agreements at all. The defendants' actions to restrain trade—not the contract—determine their liability. Plaintiffs' right to recover turns only on the fact that they were denied market options and paid too much for their programming as a result of these actions, neither of which occurred as a result of anything in the contracts.[6] As the court in *Miron* noted, "[t]he essential question in situations such as these is whether Plaintiffs would have an independent right to recover against the non-signatory Defendants even if the contract containing the arbitration clause were void." 342 F. Supp. 2d at 333. In this case, that is unquestionably

---

[6] Indeed, the agreements do not even specify the programming packages purchased or prices paid.

true—the agreements are simply terms and conditions that have nothing to do with Plaintiffs' claims.

Comcast contends that Plaintiffs are estopped not because they have invoked the Directv contracts, but because their claims against the Comcast RSNs are "inextricably intertwined" with the contracts. They are not. As just discussed, the contracts are irrelevant to Plaintiffs' claims against both Comcast and, indeed, Directv itself. Comcast has no obligations under the contracts, fulfills none of the contracts' requirements, and obtains no benefits as a result of anything in the contracts. Its relationship to Directv is simply as a supplier of content that Directv packages and sells to consumers, along with large numbers of other such suppliers. Some customers received programming from the Comcast RSNs, others did not. In fact, Plaintiff Silver did not receive any RSN as part of his package, because CSN Philadelphia is not available on Directv, and it is the only Philadelphia RSN. All of its game programming was blacked out in Philadelphia as well. It is absurd to suggest that it would be inequitable for him to bring an action in court against CSN Philadelphia related to antitrust violations simply because it is a program provider whose content is ultimately viewed by some *other* Directv customers through the leagues' packages.

This example shows how contingent and "un-intertwined" Comcast's relationship is to the contracts in question. Programming comes and goes, and customers can change their programming choices at any time. There is nothing necessary about Comcast's involvement in any subscriber's service, and the contracts create no relationship between Comcast and any Directv subscriber. As Mr. Silver's example highlights, the reason the Comcast RSNs are defendants in this case is not because they provided programming, but because they joined conspiracies that restrained trade. Mr. Silver has a claim against CSN Philadelphia notwithstanding the fact that he never received *any* programming from CSN Philadelphia. No

11

other plaintiffs' claims against the Comcast RSNs turn on whether or not they received any particular programming from any Comcast Defendant either.[7]

The determinative relationship between Comcast and Directv in these cases is their relationships as co-conspirators—a relationship that this Court and the Second Circuit have squarely held does not support application of equitable estoppel. *Ross*, 547 F.3d at 148; *Laumann*, 2013 WL 837640 at *3 n.25; *Denney*, 412 F. Supp. 2d at 300. As the Eighth Circuit recently found in denying a request to require arbitration under the equitable-estoppel theory, "these antitrust conspiracy claims do not involve violation of the terms of the contract, the face of the contract does not provide the basis for the alleged injuries, and there is no evidence that the contract anticipated the precise type of relationship giving rise to the claims. Thus, the requisite relationship is lacking here." *Wholesale Grocery Prods. Antitrust Litig.*, 707 F.3d 917, 924 (8th Cir. Feb. 13, 2013).

The contrast with *Ragone v. Atlantic Video at Manhattan Center*, 595 F.3d 115 (2d Cir. 2010), on which Comcast relies, is stark. There, the plaintiff was hired by, and entered into an employment contract with, AVI, to provide services at an AVI studio to personnel of ESPN, which was not a signatory. She was, in other words, hired to work for ESPN personnel. "[S]he understood ESPN to be, to a considerable extent, her co-employer." *Id.* at 127. "[S]he knew from the date of her employment by AVI that she would work with and be supervised by ESPN personnel in the ordinary course of her daily duties." *Id.* at 128. The contract was fairly described as a contract for employment with AVI and ESPN. The court concluded that her "knowledge that she would extensively treat with ESPN personnel is sufficient to demonstrate the existence of a

---

[7] In fact, for many years, CSN Philadelphia did not provide programming for inclusion in the out-of-market packages at all. At that time, *no* Directv customer could get any CSN Philadelphia programming at all. Yet this fact would have absolutely no bearing on CSN Philadelphia's liability in these cases.

relationship between Ragone and ESPN that allows the latter to avail itself of the arbitration agreement between Ragone and AVI." *Id.*

Courts have not permitted non-signatory parties whose relationship was less integrated into an underlying contract to compel arbitration. In *Denney*, for example, the underlying contracts were consulting agreements for creating a tax strategy that the plaintiffs alleged the defendants knew to be unlawful. Defendant Deutsche Bank "promoted the strategy, counseled plaintiffs, and carried out the underlying securities transactions on plaintiffs' behalf." Nevertheless, this Court found that Deutsche Bank could not invoke the equitable-estoppel doctrine where the underlying agreements were "only collaterally related to plaintiffs' claims against Deutsche Bank." *Id.* at 301.

Here, there is nothing remotely like even the kind of relationship in *Denney*, much less the tightly-integrated relationship in *Ragone*. In fact, neither Mr. Silver nor Mr. Birbiglia had *any* cognizable relationship with Comcast through their subscriptions with Directv.

Ultimately, any application of equitable estoppel based on claims that are said to be "inextricably intertwined" with an agreement must be founded on the conclusion that the parties intended to arbitrate such claims. As the Second Circuit stated in *Ross*, "the application of estoppel in the context of conspiracy allegations is problematic … because arbitration is of course a matter of contract 'under general principles of contract law' parties should not be compelled to arbitrate unless 'the totality of the evidence supports an objective intention to agree to arbitrate.'" 547 F.3d at 148 (quoting *Sarhank Group v. Oracle Corp.*, 404 F.3d 657, 662 (2d Cir. 2005)).

There is no evidence of either a subjective or objective intention by either Directv or Plaintiffs to subject Plaintiffs' claims against Comcast or any other programming provider to

arbitration. As already discussed, Directv has disavowed any claim that the parties intended to permit Comcast to arbitrate Directv customers' claims against Comcast. Nor would it have had any reason to do so. In short, nothing in Directv's contracts would lead any consumer to believe that he or she was entering into any kind of legal relationship with Comcast. The other defendants have recognized this by declining to join Comcast's position.

## III. The Television Defendants Cannot Enforce Arbitration Clauses in Unrelated Contracts.

Comcast also argues that it is entitled to enforce arbitration clauses contained in unrelated contracts for services not involved in this case. Comcast is apparently seeking to arbitrate *all* claims by anyone who *ever* entered *any* agreement with Comcast that contained an arbitration clause. Thus, for example, a plaintiff who asserts claims based on a purchase from DirecTV would be subject to arbitration with Comcast for those claims if he subsequently entered into an unrelated contract for services with Comcast for television, Internet, phone, home security or anything else. Under this theory, Comcast seeks to arbitrate claims with Plaintiffs Laumann, Rasmussen, and Silver.

The scope of this position is breathtaking. Under Comcast's agreements, its "Arbitration Provision shall survive the termination of your Service(s) with Comcast." That provision may be rational to the extent the arbitration covers disputes over the services provided pursuant to the agreement. But Comcast's argument is that it would apply to all claims a person may have against Comcast regardless of whether they are related to those services. Under this interpretation, a person struck by a Comcast truck ten years after cancelling a cable contract would be subject to arbitration. Such a claim would not arise from the person's "relationship with Comcast," unless "relationship" were construed so broadly as to include any basis for a legal claim—like being hit by a truck—rather than by the "relationship" that arises under the

14

contract for the covered services.

Comcast cites no case in which such an arbitration clause was given such expansive reach. The cases are, not surprisingly, to the contrary. In *Smith v. Steinkamp*, for example, Judge Posner recognized that arbitration clauses untethered to the underlying contract (which involved a payday loan) would lead to "absurd results." 318 F.3d 775, 777 (7th Cir. 2003):

> [I]f Instant Cast murdered Smith in order to discourage defaults and her survivors brought a wrongful death suit against Instant Cash …, Instant Cast could insist that the wrongful death claim be submitted to arbitration. For that matter, if an employee of Instant Cash picked Smith's pocket when she came in to pay back the loan, and Smith sued the employee for conversion, he would be entitled to arbitration of her claim. It would make no difference that the conversion had occurred in Smith's home 20 years after her last transaction with Instant Cash.

Judge Posner further noted that, "[c]onsidering who the borrowers are, an agreement requiring them to arbitrate disputes arising out of future agreements (unless perhaps they were merely rollovers, that is, renewals or extensions of previous loan agreements) might be thought unconscionable." *Id.* at 777-78. In another case in which a defendant attempted to enforce an arbitration clause in a contract unrelated to the claims in the case, the plaintiffs brought an action for damages for a Jiffy Lube franchisee's allegedly illegal text-message spam. The defendant attempted to enforce an arbitration clause against one of the plaintiffs who had previously visited one of the defendant's Jiffy Lube locations. Although the language in the clause was "incredibly broad" and "purport[ed] to apply to 'any and all disputes'" between the plaintiff and Jiffy Lube, the court declined to enforce the arbitration clause, noting that a clause that applied to disputes not related to the contract "would clearly be unconscionable." *In re Jiffy Lube Int'l, Inc., Text Spam Litigation*, 847 F. Supp. 2d 1253, 1262-63 (S.D. Cal. 2012).

Attempting to find some plausible connection between the Plaintiffs' claims and their Comcast contracts, Comcast makes two arguments. First, for Plaintiffs Laumann and Rasmussen, both of whom assert only claims based on their purchases of Internet packages from the leagues,

Comcast argues that their claims are related because they purchased Internet service from Comcast over which it says they streamed the games.

The problem with this argument is that it is entirely irrelevant to this case how the plaintiffs accessed the Internet. Comcast's provision of Internet service is no more relevant to the claims here than is the manufacturer of the computer, television, or other device on which the plaintiffs may have viewed the games. These claims have nothing to do with Plaintiffs' contracts or their contractual relationships with Comcast. Whether it provided Internet service or not plays no roll in assessing Comcast's liability. Indeed, it does not even follow from the fact that Plaintiffs purchased Internet service from Comcast that they streamed any games over their Comcast service at all. Many people purchase streaming packages for use while traveling, while at work, or otherwise. While it is likely that most subscribers do view at least some games over their home Internet service, that this is not necessary to their use of the out-of-market packages highlights how irrelevant the provider of Internet service is to this case. Plaintiffs' claims, in other words, have nothing to do with the contractual "relationship" on which Comcast relies.

Plaintiffs Laumann, Rasmussen, and Silver also all subscribed to Comcast television service.[8] They do not, however, assert any claims in this case on the basis of that relationship. It falls far short of limits of plausibility to suggest that their claims are related to that relationship simply because they would prefer to have the ability to choose to watch some of the games that are only available on television on the Internet. Their claims do not depend in any way on the

---

[8] The lengths to which Comcast is stretching things is highlighted by the fact that Comcast seeks to subject Plaintiff Silver's claims against Comcast to arbitration under both Directv's arbitration clause and under arbitration clauses in his subsequent agreements to obtain television service. Because neither of them applies to Mr. Silver's claims against Comcast arising from his purchase of service from Directv on their face, it is entirely unclear which one should govern. Comcast apparently envisions a world in which numerous past and future agreements with Comcast or other parties can be invoked at any time to force any and all claims into arbitration.

fact that they subscribed to a pay-television service. Much less do they depend in any way on the fact that they obtained their television service from Comcast rather than from another provider. Comcast states that the claims are covered because the involve out-of-market packages that include some programming produced by Comcast RSNs, but fails to argue why that has anything to do with their separate contract for television services.

Indeed, this Court has ruled that Comcast subscribers who did not purchase an out-of-market package do not even have standing to challenge the exclusionary practices in these cases, accepting the argument of Comcast and the other defendants. *Laumann v. NHL*, 907 F. Supp. 2d 465, 484-85 (S.D.N.Y. 2012). Comcast cannot now argue that the same relationship that was too remote from the challenged conduct to permit a person to even make a claim now provides a basis for arbitrating claims that do not even arise in connection with that remote relationship.

In short, the claims of Laumann and Rasmussen (Internet packages) and Silver (Directv) do not arise from or relate to their separate contracts with Comcast or the relationships that are created by those contracts. In fact, their claims against Comcast do not involve any cognizable relationship with Comcast. They arise from relationships that the plaintiffs have with other defendants and the relationships that Comcast has with the other defendants as co-conspirators— a relationship that does not support application of the equitable-estoppel doctrine.

## IV.     The Application of Equitable Estoppel Is Not a Question for the Arbitrator.

Nor can Comcast rely on an argument that the scope of the arbitration clause is for the arbitrator to decide. As an initial matter, Comcast's claim that the arbitrator must resolve arbitrability disputes cannot mean that any dispute of any kind—no matter how implausible its arbitrability—is thereby thrown into arbitration. The person who got hit by Comcast's truck (or for that matter, Judge Posner's murder victim) could not seriously be made to present to the

arbitrator the argument that his ancient arbitration agreement does not govern the dispute. A dispute over arbitrability, in other words, must, at the very least, be a genuine one.

In any event, when assessing whether a question of arbitrability should be resolved by the arbitrator or the court, there is a strong presumption that the issue is one for the court, not the arbitrator. "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *First Options*, 514 U.S.at 944 (quoting *AT & T Techs., Inc. v. Commc'ns Workers*, 475 U.S. 643, 649 (1986)). Any presumption of arbitrability, in other words, is reversed. *Id.*

Here, it is not only not clear and unmistakable that the parties referred this issue to the arbitrator, the terms of Comcast's own provision precludes its argument. The contract only refers "disputes"—including disputes over arbitrability—to the arbitrator if they are related to the customer's "relationship with Comcast." (*See, e.g.*, McGinty Decl., Ex. D at §13(b) (*Garber* Docket No. 162).) Whether *that* provision applies and is enforceable is unquestionably one for the Court. *See Rent-A-Ctr., W., Inc. v. Jackson*, 130 S. Ct. 2772, 2778 (2010).

Any provision that purported to refer arbitrability disputes to the arbitrator regardless of the underlying claims' connection to the underlying contract "would clearly be unconscionable," *Jiffy Lube*, 847 F. Supp. 2d at 1253, for the same reason that requiring arbitration of the underlying disputes would be unconscionable. It would allow Comcast to force any dispute into arbitration, at least for this initial determination, with any person who had ever touched a Comcast contract, regardless of the claim. And it would require arbitration that would necessarily result in a conclusion that requiring arbitration would be unconscionable.

In any event, under the terms of the arbitration clause, disputes over whether people must arbitrate claims that are unrelated to the contracts they have entered are not subject to arbitration.

At the very least, it is anything but "clear and unmistakable" that the parties agreed to arbitrate the arbitrability of claims unrelated to their underlying contracts or the "relationships" that result from those contracts. It is enough that Plaintiffs' interpretation is plausible to prevent referral to the arbitrator under the reversed presumption, and it is much more than that.

Second Circuit cases holding that incorporation of arbitration rules that permit arbitration of arbitrability disputes does not change this because all of the cases Defendants cite in support of that proposition involved disputes that were unquestionably related to the underlying contract.[9] Nothing in them suggests that the Second Circuit would embrace the absurd consequences that would result from applying the rule to disputes about the arbitrability of consumer claims not related to or arising from the underlying contract.[10] To hold otherwise

---

[9] In *Contec Corp. v. Remote Solution Co., Ltd.*, 398 F.3d 205 (2005), the dispute concerned the failure to fulfill the requirements of an indemnification contract. *Sleepy's LLC v. Escalate, Inc.*, No. 10-1626, 2010 WL 2505678 (S.D.N.Y. June 18, 2010), involved an alleged breach of the contract containing the arbitration clause at issue. *See also Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327 (11th Cir. 2005) (breach of contract and other claims related to termite protection services); *Silec Cable S.A.S. v. Alcoa Fjardaal, SF*, No. 12-01392, 2012 WL 5906535 (W.D. Pa. Nov. 26, 2012) (defective product sold in breach of purchase order containing arbitration clause); *Washington v. William Morris Endeavor Entm't, LLC*, No. 10-9647, 2011 WL 3251504 (S.D.N.Y. July 20, 2011) (employment discrimination claims subject to arbitration clause in employment agreement).

[10] Moreover, the Second Circuit's law cannot be squared with recent arbitration jurisprudence in the Supreme Court. In *Rent-A-Center*, for example, Justice Scalia noted that arbitrability issues are referred to the arbitrator only when "*the text of the Agreement* was clear and unmistakable on this point." 130 S. Ct. at 2778. And just recently, in *Oxford Health Plans LLC v. Sutter*, 133 S. Ct. 2064 (2013), where the clause also invoked the rules of the American Arbitration Association, like the Comcast clauses, the Court held that it was appropriate for the arbitrator to determine whether the claims could be resolved on a class basis, but made clear it would have addressed it had the issue been presented as one of arbitrability.

The Supreme Court's recent cases do not support the view that a parties' intent can be gleaned by the terms of incorporated arbitration rules. The fact that arbitration rules permit class arbitration, for example, has not been enough to support a conclusion that the parties intended to submit their claims to class arbitration. *See, e.g.*, *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662 (2010), *Oxford*, 133 S. Ct. at 2067. There is no reason that permissive (but not mandatory) rules regarding arbitrability should be able to overcome the "reverse presumption" against arbitration of such issues.

would be to abandon the contractual basis for arbitration, and turn it into a matter of coercion, rather than of consent. *See Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Jr. Univ.*, 489 U.S. 468, 479 (1989) ("Arbitration … is a matter of consent, not coercion.").

**V.     Directv Cannot Enforce an Arbitration Clause in an Unrelated Contract to which Marc Lerner is not a Party.**

Directv has taken a reasonable path with respect to Plaintiffs Silver and Birbiglia. It has agreed to enter into a stipulation that stays their claims against Directv, but rejects any attempt to broaden the applicability of their arbitration clauses to other defendants, and rejects any attempt to enforce other defendants' arbitration clauses. Despite this, Directv has inexplicably taken a position with respect to Marc Lerner that is frivolous.[11]

Mr. Lerner asserts claims in the *Garber* case solely on the basis of his purchase of the MLB Extra Innings Internet package. Nevertheless, Directv now seeks to require him to arbitrate his claims against Directv because *his wife* signed up for *unrelated* Directv service. He is not a subscriber to Directv, he is not a signatory to any contract with Directv, he has not attempted to enforce any rights under any Directv contract, and his claims do not have anything to do with his wife's service in any event.

Even leaving aside the fact that Mr. Lerner is not a party to any Directv contract, any attempt to rely on a contract for television services to force arbitration of claims based entirely on a purchase of an Internet package from Major League Baseball (MLB) must fail for the same reason that Comcast's similar attempt fails. If anything, Directv's argument that its contract governs Mr. Lerner's claims is even weaker. The agreement Directv cites is expressly limited to "any legal or equitable claim relating to this Agreement, any addendum or your Service." DTV,

---

[11] It is all the more inexplicable because, during the extended negotiation of the stipulation regarding Silver and Birbiglia, Directv never mentioned that it had any intention of seeking to require Lerner to arbitrate.

at 5.[12] Mr. Lerner's claims have nothing to do with his wife's Directv contract or service. The fact that he might sometimes watch baseball games through Directv, at friends' houses, at work, at bars, or wherever else has no bearing on his legal claims, which arise entirely as a result of his own purchase of Internet programming from MLB.

In any event, all of this is beside the point, because the simple fact is that Mr. Lerner is *not* a Directv subscriber at all.[13] Hiding in footnote 3 in its brief is Directv's only acknowledgement that it is Mr. Lerner's wife, and not he, who is a subscriber to Directv. Directv attempts to extract blood from a stone here by pointing to his so-called "admissions" that he subscribes to Directv. He cannot admit to being a subscriber because he is not one, as Directv plainly knows. In any event, nothing Directv cites comes close to being such an "admission." In his answer to interrogatories, Mr. Lerner stated that "Plaintiff" has subscribed to MLB Extra Innings, the television package, only because the interrogatories defined "Plaintiff" to include anyone in the Plaintiffs' "immediate families." (Declaration of Edward Diver, Ex. A, at 2, ¶3.) Mr. Lerner simply answered the question that the Television Defendants asked.[14] In any event, even if Mr. Lerner described himself informally as a Directv subscriber, that does not mean that he is a party to a contract with Directv as a legal matter. He did not sign the agreement.

Indeed, the Directv contract itself defines "notice" of contractual terms as having

---

[12] Directv cites to a version of its agreement that it sent to its subscribers after this action was filed, which would not be applicable even if Mr. Lerner were a party to a contract with Directv. Mr. Lerner obviously never had notice of any change.

[13] As noted above, there is no presumption that favors a finding of arbitration where there is a dispute about whether an individual is a party to any agreement containing an arbitration clause at all.

[14] Directv's other asserted "admissions" scarcely deserve a response. The fact that he wishes that other options were available for watching games obviously does not mean that he entered into any legally binding contract with anyone. Mr. Lerner has not anywhere asserted that he was charged supra-competitive prices for his television service. He alleges that he was charged supra-competitive prices for his MLB.tv Internet package and that he was denied market options that would otherwise exist.

occurred by mail when it is "addressed to you."[15] Needless to say, no Directv contract was ever noticed to Mr. Lerner by this or any other means specified in the contract.

Far from conceding that he is a party to any contract with Directv, Mr. Lerner's actions have been consistent with the reality that he is not. If he were a Directv subscriber and subscribed to a relevant out-of-market package, he would have asserted claims on that basis. The reason he did not is that he has no claims under any Directv contract. His wife may have such claims, but she has not chosen to assert them as a representative plaintiff in this action.

To be sure, if Mr. Lerner had attempted to assert claims under his wife's contract, notwithstanding that he was not a signatory, then Directv would have had a serious argument that he was equitably estopped from simultaneously denying the application of the arbitration clause. But he has not done so, because he has no claims under that contract. And because he has not done so, there is no serious argument that equity requires that he be subject to the arbitration clause. Far from any "admissions" or inconsistent positions, Mr. Lerner has consistently recognized that he is not a party to any contract with Directv. He has not asserted any rights under any such contract and he is not subject to any of its obligations.

It is the combination of the two independent flaws with Directv's argument that makes its position truly astounding. Directv is essentially arguing that Mr. Lerner can be subject to arbitration for all claims against Directv of any kind on the basis of a contract that has nothing to do with his claims and that he was not a party to. Under this theory, all of the members of the households of Directv's 20 million current subscribers (in addition to the many millions of

---

[15] "Notices to you will be deemed given when personally delivered, addressed to you at your last known address and deposited in the U.S. Mail (which may include inclusion in your billing statement), or sent via internet to the e-mail address you provided us or sent via satellite to your receiver or delivered when a voice message is left at the telephone number on your account." (McCarthy Dec., Ex. B. at §10(a) (Garber Docket No. 159, attachment 3).)

former subscribers) would be bound to arbitrate all of their claims against Directv forever, all on the basis of contracts they had no notice of and no reason to know the terms of. Principles of contract law are nowhere to be found in Directv's sweeping vision of arbitration.[16]

## VI.   A Stay Would Not Save Resources or Promote the Efficient Resolution of These Disputes.

Plaintiffs have agreed to stay the claims of Plaintiffs Silver and Birbiglia against Directv. Mr. Traub is also not contesting Comcast's position that his claims against Comcast should be stayed, even though he does not believe that Comcast's arbitration clauses are enforceable. These agreements avoid expending resources on arbitration claims that are subject to genuine disputes. As discussed above, the Television Defendants attempts to stay claims on the basis of other contracts amounts to aggressive overreaching. Comcast takes it a step further, however, in arguing that the Court should stay the Directv Plaintiffs' claims against Comcast and also, incredibly, the claims of plaintiffs who *Comcast admits are not subject to any arbitration clause*—Plaintiffs Lerner and Dillon.[17]

Notably, none of the other Defendants have requested stays pending arbitrations. Directv has sought stays only of those customers who (it contends) are its customers. It has agreed not to seek a stay of the Comcast Plaintiffs' claims, or a stay of its customers' claims against Comcast.

Consequently, these cases will proceed in this Court regardless of any arbitration stays. All plaintiffs' claims will proceed against the leagues and league defendants. The Comcast

---

[16] The fact that Directv contends that all issues of arbitrability are for the arbitrator merely because the rules of JAMs permit arbitration of such issues only compounds things. Accepting that view would allow Directv to raise an issue of "arbitrability" for anyone who raises a claim, even if the closest they ever came to Directv is being a non-signatory who happens to be related to someone who entered into a Directv contract. In any event, this argument fails for the same reason as Comcast's similar argument discussed above.

[17] Comcast acknowledges Directv's motion to compel Lerner to arbitrate, Comcast Br. 24 n.21, but rightly treats him as a plaintiff without an arbitration clause with either Comcast or Directv.

Plaintiffs' and Internet Plaintiffs' claims will proceed against Directv. These cases have been proceeding, without substantial delay, for a year-and-a-half. Depositions are starting this week, and discovery will be completed by the end of the year. Interrupting the litigation at this point would be anything but just and efficient.

A stay of claims against Comcast makes no sense. The Plaintiffs would proceed against the leagues and the other defendants, but would be required to stay their claims against Comcast. They would not be doing so in order to await the outcome of an arbitrator's determination of their claims, but only to await the outcome of other plaintiffs' claims. If Comcast wished to have a single tribunal issue a consistent ruling as to all consumers' claims, it would not have prevented consolidated adjudication by requiring individual arbitration that is, by its nature, not binding on other claimants.

Not surprisingly, Comcast does not cite a single case supporting the proposition that it is appropriate to stay the claims of a plaintiff who is not subject to arbitration pending the outcome of other plaintiffs' claims against the same defendants. There is none. The opinions cited by Comcast are cases in which a single plaintiff had claims against some defendants who were subject to arbitration clauses and others who were not. Comcast Br. at 24-25. These cases provide no support for the proposition that plaintiffs who are not subject to arbitration clauses at all can be forced to await the outcome of other claimants' arbitrations.

Moreover, there is no justification for staying the claims against Comcast of the plaintiffs whose claims are stayed pending arbitration against Directv. While those claims could be stayed, as this Court has noted, that decision is discretionary. *Laumann*, 2013 WL 837640 at *2. It would make no sense to do so here, where only one Defendant seeks a stay. There is no more reason, for example, that Mr. Silver's claims against Comcast should be stayed in order to align them

24

with the resolution of his claims against Directv than there is to align them with the resolution of his claims against the other defendants.

In any event, given the advanced stage of the litigation in these cases, there would be no benefit to staying claims in these cases in favor of arbitrations that have yet to be filed.

Plaintiffs reserve any rights they may have to proceed in arbitration. Nevertheless, as Comcast is well aware, arbitration of individual claims by the plaintiffs have not occurred and remain highly unlikely to ever do so.[18] Comcast is effectively asking the Court to stay the claims of certain plaintiffs in order to avoid imaginary duplication and inconsistency. And it is doing so in the context of a case that will proceed to resolve these issues regardless of any arbitration. This is not an attempt to promote efficient and consistent adjudication—it is a transparent attempt to extinguish claims not subject to arbitration despite the fact that resolution in this forum is unquestionably the most efficient way to resolve those claims.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the Television Defendants' motions to compel arbitration and stay claims.

Dated: September 18, 2013                              Respectfully submitted,

                                                      */s/ Edward Diver*

                                                      Edward Diver
                                                      Howard Langer
                                                      Peter Leckman
                                                      **LANGER, GROGAN & DIVER, P.C.**
                                                      1717 Arch Street, Suite 4130
                                                      Philadelphia, PA 19103
                                                      Telephone: (215) 320-5660
                                                      Facsimile: (215) 320-5703

---

[18] If any such arbitration is filed, and Comcast believes, at that time, that it would be more efficient to interrupt this litigation with stays of certain claims, then it should do so at that time.

Michael M. Buchman
**POMERANTZ GROSSMAN
HUFFORD DAHLSTROM &
GROSS LLP**
600 Third Avenue
New York, NY 10016
Telephone: 212-661-1100
Facsimile: (212) 661-8665

Kevin Costello
Gary Klein
**KLEIN KAVANAGH
COSTELLO, LLP**
85 Merrimac Street, 4th Floor
Boston, MA 02114
Telephone: (617) 357-5500
Facsimile: (617) 357-5030

J. Douglas Richards
**COHEN, MILSTEIN, SELLERS &
TOLL, PLLC**
88 Pine Street
14th Floor
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-7745

Robert LaRocca
**KOHN, SWIFT & GRAF, P.C.**
One South Broad Street
Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700
Facsimile: (215) 238-1968

***Attorneys for Plaintiffs Fernanda
Garber, Marc Lerner, Derek
Rasmussen, Robert Silver, and Garrett
Traub***

26

Fred Isquith
Alex Schmidt
**WOLF HALDENSTEIN ADLER**
**FREEMAN & HERZ LLP**
270 Madison Avenue
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653

*Attorneys for Plaintiff Peter Herman*