**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THOMAS LAUMANN, ROBERT SILVER, GARRETT TRAUB, and DAVID DILLON, representing themselves and all others similarly situated, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| NATIONAL HOCKEY LEAGUE et al., | ) ) |
| Defendants. | ) ) ) |

12-cv-1817 (SAS)

ECF Case

<u>FILED UNDER SEAL</u>

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>NHL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................... iii

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF UNDISPUTED FACTS .................................................................3

ARGUMENT .................................................................................................................6

I.  SUMMARY JUDGMENT IS REQUIRED UNDER THE RULE OF REASON .............6

    A.  The Rule Of Reason Standard And Principles.........................................6

        1.  The Second Circuit's Burden Shifting Framework ....................6

        2.  Evolving Truncated Analyses Applicable Here...........................7

            a.  Justifications Alone Can Validate a Restraint on a Quick Look ........................................................................8

            b.  Absent Adequate Proof of a Substantially Less Restrictive Alternative That Can Achieve the Same Objectives, Summary Judgment Is Required.....................9

    B.  The NHL's Exclusive Broadcast Territories Have Numerous, Indisputable Justifications .........................................................................10

        1.  The NHL May Restrict Club Competition Against Venture Products.......................................................................................10

        2.  The Restrictions Are Essential to the Availability of the Venture's Broadcast Products.......................................................10

        3.  Other Procompetitive Justifications Are Well-Settled in the Law.............11

            a.  Exclusive Broadcast Territories Incentivize Local Investment...................................................................11

            b.  Exclusive Broadcast Territories Incentivize National Networks to Produce NHL Games with High Quality .................13

            c.  Exclusive Broadcast Territories Enable the NHL to Balance National Branding and Local Tribalism .......................................14

|  |  | d. | Exclusive Broadcast Territories Prevent Popular Clubs from "Free Riding" on the Efforts and Success of the League | 15 |
|  |  | e. | Exclusive Broadcast Territories Foster Local Fan Interest, Club Stability and, in Turn, Competitive Balance | 16 |
|  | C. |  | Plaintiffs Offer No Legitimate, Less Restrictive Alternative | 17 |
|  | D. |  | In Any Event, Plaintiffs Cannot Prove That League Rules Have Harmed Them or Injured Consumers | 18 |
|  |  | 1. | Even Absent the Restraints, Individual Clubs Could Not Distribute Their Games Nationally | 18 |
|  |  | 2. | The NHL's Territorial Restrictions Have Not Caused a Market-Wide Reduction in Output or Quality | 19 |
|  |  | 3. | There Is No Evidence That Market-Wide Consumers Would Be Better Off Absent the NHL's Territorial Restrictions | 21 |
| II. | PLAINTIFFS' SECTION 2 CLAIM FAILS FOR THE SAME REASONS | | | 22 |
| III. | TV PLAINTIFFS' DAMAGES CLAIMS ARE BARRED UNDER *ILLINOIS BRICK* | | | 22 |
| CONCLUSION | | | | 23 |

## TABLE OF AUTHORITIES

**Cases**                                                                                       **Page(s)**

*Agnew v. National Collegiate Athletic Association,*
    683 F.3d 328 (7th Cir. 2012) .......................................................................8

*American Needle, Inc. v. National Football League,*
    560 U.S. 183 (2010)..................................................................8, 10, 11, 16

*Association of Independent Television Stations, Inc. v. College Football Association,*
    637 F. Supp. 1289 (W.D. Okla. 1986) ............................................................13

*Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan,*
    203 F.3d 1028 (8th Cir. 2000) ......................................................................21

*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,*
    441 U.S. 1 (1979)..........................................................................................8

*Brooke Group v. Brown & Williamson Tobacco Corp.,*
    509 U.S. 209 (1993)......................................................................................21

*California Dental Association v. Federal Trade Commission,*
    526 U.S. 756 (1999).......................................................................................7

*Capital Imaging Associates, P.C. v. Mohawk Valley Medical Associates, Inc.,*
    996 F.2d 537 (2d Cir. 1993)..................................................................6, 7, 21

*Chicago Board of Trade v. United States,*
    246 U.S. 231 (1918).......................................................................................7

*Comcast Corp. v. Behrend,*
    133 S. Ct. 1426 (2013)...................................................................................21

*In re Dewey Ranch Hockey, LLC,*
    414 B.R. 577 (Bankr. D. Ariz. 2009)...............................................................12

*Durkin v. Major League Baseball,*
    No. 94-5315 (E.D. Pa. July 17, 1995), *aff'd mem.*, 85 F.3d 611 (3d Cir. 1996)................23

*E & L Consulting, Ltd. v. Doman Industrial, Ltd.,*
    472 F.3d 23 (2d Cir. 2006).............................................................................22

*Electronics Communications Corp. v. Toshiba America Consumer Products, Inc.,*
    129 F.3d 240 (2d Cir. 1997)...........................................................................19

*Hairston v. Pacific 10 Conference,*
    101 F.3d 1315 (9th Cir. 1996) ...........................................................................7, 17

*Illinois Brick Co. v. Illinois,*
    431 U.S. 720 (1977)............................................................................................22

*Independent Entertainment Group, Inc. v. National Basketball Association,*
    853 F. Supp. 333 (C.D. Cal. 1994) ...................................................................15

*JES Properties, Inc. v. USA Equestrian, Inc.,*
    No. 802-CV-1585T24(MAP), 2005 WL 1126665 (M.D. Fla. May 9, 2005)...................14

*K.M.B. Warehouse Distributors, Inc. v. Walker Manufacturing Co.,*
    61 F.3d 123 (2d Cir. 1995)...................................................................................6

*Kingray, Inc. v. National Basketball Association, Inc.,*
    188 F. Supp. 2d 1177 (S.D. Cal. 2002).............................................................23

*Kingray, Inc. v. NHL Enterprises, Inc.,*
    No. 00-CV-1544-L(BEN) (S.D. Cal. July 2, 2002) ...........................................20

*Laumann v. National Hockey League,*
    907 F. Supp. 2d 465 (S.D.N.Y. 2012)..................................................................1

*Los Angeles Memorial Coliseum Commission v. National Football League,*
    726 F.2d 1381 (9th Cir. 1984) .............................................................10, 12, 16

*Madison Square Garden v. National Hockey League,*
    No. 07-cv-8455(LAP), 2007 WL 3254421 (S.D.N.Y. Nov. 2, 2007), *aff'd*, 270 F.
    App'x 56 (2d Cir. 2008).................................................................................10, 14

*Major League Baseball Properties, Inc. v. Salvino, Inc.,*
    542 F.3d 290 (2d Cir. 2008)........................................................3, 9, 10, 15, 16, 20

*Morris Communications Corp. v. PGA Tour, Inc.,*
    364 F.3d 1288 (11th Cir. 2004) .........................................................................15

*National Collegiate Athletic Association v. Board of Regents of University of Oklahoma,*
    468 U.S. 85 (1984)..............................................................................................19

*Paycom Billing Services, Inc. v. Mastercard International, Inc.,*
    467 F.3d 283 (2d Cir. 2006)..........................................................................19, 23

*Polk Brothers, Inc. v. Forest City Enterprises, Inc.,*
    776 F.2d 185 (7th Cir. 1985) .........................................................................11, 12

iv

*Race Tires America, Inc., et al. v. Hoosier Racing Tire Corp.,*
   614 F.3d 57 (3d Cir. 2010)...................................................................8, 11

*Ralph C. Wilson Industries, Inc. v. American Broadcasting Cos.,*
   598 F. Supp. 694 (N.D. Ca. 1984), *aff'd,* 794 F.2d 1359 (9th Cir. 1986)........................13

*Reading International, Inc. v. Oaktree Capital Management LLC,*
   No. 03 Civ. 1895(PAC), 2007 WL 39301 (S.D.N.Y. Jan. 8, 2007) ................................20

*Rock v. National Collegiate Athletic Association,*
   928 F. Supp. 2d 1010 (S.D. Ind. 2013) ...........................................................8

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,*
   792 F.2d 210 (D.C. Cir. 1986)...................................................................10

*Sterling Merchandising, Inc. v. Nestle, S.A.,*
   656 F.3d 112 (1st Cir. 2011)....................................................................19

*Texaco, Inc. v. Dagher,*
   547 U.S. 1 (2006).................................................................................6

*Thomsen v. Western Electric Co.,*
   680 F.2d 1263 (9th Cir. 1982) ..................................................................22

*Trans Sport, Inc. v. Starter Sportswear, Inc.,*
   964 F.2d 186 (2d Cir. 1992)..........................................................12, 13, 20

*United States v. Penn-Olin Chemical Co.,*
   378 U.S. 158 (1964)..............................................................................10

*United States Football League v. National Football League,*
   842 F.2d 1335 (2d Cir. 1988).....................................................................12

*Virgin Atlantic Airways Ltd. v. British Airways PLC,*
   257 F.3d 256 (2d Cir. 2001)..........................................................7, 9, 17, 18

*Washington v. National Football League,*
   880 F. Supp. 2d 1004 (D. Minn. 2012) .............................................................8

v

### PRELIMINARY STATEMENT

While this Court denied the NHL's motion to dismiss, it highlighted the Supreme Court's suggestion that challenges to certain restraints can be dismissed under the "quick look" paradigm for defendants described in *American Needle. Laumann v. Nat'l Hockey League*, 907 F. Supp. 2d 465, 479 & n.73 (S.D.N.Y. 2012). And, elsewhere, this Court highlighted, citing the Second Circuit's decision in *Salvino*, that while the reasonableness of the restraints at issue was not apparent from the face of the Amended Complaint, the NHL "may have little trouble justifying their agreements regarding distribution of out-of-market games." *Id.* at 490-91 & n.148.

The NHL Defendants[1] demonstrate in this Motion that they are entitled to summary judgment because (i) the NHL's exclusive broadcast territories are reasonable as a matter of law based on numerous well-established justifications supported here by the undisputed record; (ii) Plaintiffs offer no "less restrictive alternative" that even purports to meet the NHL's *same* legitimate objectives for the restraints; and (iii) even if the Court were inclined to consider the overall effects of the restraints (which is unnecessary given the lack of proffered adequate alternatives), Plaintiffs can offer no proof that consumers of live NHL hockey throughout the United States—not just perhaps some fans of a few popular Clubs—would be better off without exclusive broadcast territories than they are with them.

*First*, the NHL's exclusive broadcast territories have numerous, judicially-recognized justifications based on the following undisputed facts:

- The NHL and its Member Clubs jointly produce and market an entertainment product, NHL hockey;

- NHL Member Clubs are economically interdependent such that each Club's actions can affect other Clubs as well as the success of the NHL venture itself;

---

[1]     The moving Defendants are the National Hockey League, NHL Enterprises, L.P., NHL Interactive Cyberenterprises, LLC, Chicago Blackhawk Hockey Team, Inc., Comcast-Spectacor, L.P., Hockey Western New York LLC, Lemieux Group, L.P., Lincoln Hockey LLC, New Jersey Devils LLC, New York Islanders Hockey Club, L.P. and San Jose Sharks, LLC (collectively, "NHL Defendants").

- The NHL's exclusive broadcast territories enable the venture to obtain and maintain high quality national broadcast contracts and create out-of-market packages;

- Exclusive broadcast territories prevent—to the extent it might otherwise occur— individual Member Clubs from competing against the NHL venture's own national broadcast and out-of-market products;

- Exclusive broadcast territories incentivize the purchase of Clubs themselves as well as Clubs' ongoing investments and efforts to generate local fan interest in broadcasts and live attendance;

- Exclusive broadcast territories incentivize national broadcasters and regional sports networks ("RSNs") to produce and broadcast all NHL games and to invest in the quality of NHL broadcasts and related programming;

- Exclusive broadcast territories enable the NHL venture to strike a balance between the promotion of NHL hockey as a national game and the need to incentivize Clubs to build their local fan bases;

- Exclusive broadcast territories prevent the most popular Clubs from acting on the economic incentive to "free ride" on the popularity of the NHL venture itself as well as the investments of the NHL's national broadcasters and other Clubs; and

- The local fan interest and loyalty generated by exclusive broadcast territories fosters stable franchises, which in turn promotes competitive balance among the Clubs to the benefit of the NHL venture and consumers.

Critically here, courts have had more than enough experience with all of these justifications such that their application to exclusive broadcast territories can be upheld without the need for a full rule of reason analysis—i.e., this is precisely the type of case that *American Needle* suggests is appropriate for summary disposition.

    *Second,* in light of the NHL's legitimate business justifications for the alleged restraint, an independent reason to grant summary judgment is that Plaintiffs have not offered any substantially less restrictive alternative that would achieve the NHL's legitimate objectives. Under *Virgin Atlantic*, this is an independent reason to grant summary judgment.

    *Third,* the territorial limitations upon Club broadcasts are express terms in the League's lawful and binding national broadcast contracts, which Plaintiffs have not challenged, and hence Plaintiffs cannot prove that invalidating internal League rules would have any effect upon competition. Further, Plaintiffs have not developed any record evidence that, absent the

2

restraints, *all* NHL fans in the United States—as opposed, theoretically, to certain fans dedicated solely to a few popular teams—would be able to view all the NHL games they desire and that those games would have at least the same quality (and at a lower price) than those now available from the national broadcasts and out-of-market packages.

This Memorandum is divided into three parts. First, we discuss the indisputable facts relating to the origins, rationale and application of the NHL's exclusive broadcast territories.[2] Second, we describe and apply the most current rule of reason principles, including those explained by the Supreme Court in *American Needle* and by the Second Circuit in *Virgin Atlantic*. Finally, we briefly address why, on the undisputed facts, the TV Plaintiffs' claims should also be dismissed under *Illinois Brick*.[3]

## STATEMENT OF UNDISPUTED FACTS

***The NHL.*** The NHL is an unincorporated association of thirty Member Clubs that produces and distributes a product—NHL hockey—on various media platforms (e.g. local, national and out-of-market packages). (Declaration of Gary Bettman ("Bettman Decl.") ¶ 2.) Each NHL season consists of 1,230 regular season games and four rounds of playoffs, including a Stanley Cup Final. No one Club could produce any form of NHL hockey by itself. Because the NHL and its Member Clubs jointly produce NHL hockey, their actions are economically interdependent—i.e., one Club's actions can affect another's as well as the overall venture. This interdependence also means that the NHL and all the Member Clubs share a common interest in promoting product quality, Club stability and fan interest, both for the "local" Club and for all of the other 29 Clubs (i.e., the League overall). (*Id.*) *Compare Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 296 (2d Cir. 2008).

---

[2]     All deposition excerpts cited in this Memorandum appear in the Joint Appendix in Support of Defendants' Motions for Summary Judgment.

[3]     While the NHL Defendants vigorously contest Plaintiffs' proposed market definition and the assertion that NHL Defendants possess market power in any cognizable market, they are not moving for summary judgment on these issues in this motion.

Historically, the NHL and its Clubs have had more success cultivating "tribal" fans who intensely follow their local team than attracting fans of the League itself. ███████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████ (*Id.* ¶ 3.) The challenge for the NHL, therefore, has been to continue cultivating local fan loyalty, which has been the driving force behind the success of individual Clubs, while at the same time broadening League-wide fan interest. (*Id.*)

The NHL's attempt to strike the right balance between cultivating passionate fans and developing broader interest in the NHL as a whole is complicated by the fact that the Clubs exist in demographically divergent markets. Some exist in large population centers while others exist in smaller markets. As a result, locally generated Club revenues vary widely depending on the amount of ticket sales, broadcast rights fees, and sponsorship revenue generated by these local markets. But unlike competitors in most other contexts, it is not in the interest of any individual Member Club to have another member of the joint venture fail or become so financially weak that it cannot field a competitive team. (*Id.* ¶¶ 2, 18-20.) Competitive balance and the financial stability of the Clubs are important goals to developing and maintaining NHL fans in each geographic region, and in producing entertaining contests that fans will have an interest in watching either in person or on television. (*Id.*) Competitive balance and Club stability (including, critically, a strong local fan base) also provide owners with incentives to make the initial and ongoing investments required to operate an NHL Club, which necessarily inures to the benefit of consumers.

***The NHL's broadcast arrangements.*** In order to promote itself as a "national" game and attract fans of NHL hockey as well as attract local fans loyal to their teams, the NHL makes games available for broadcast through several distribution mechanisms. First, the League itself handles national distribution of broadcasts. (Bettman Decl. ¶ 6.) Since 1984, NHL Clubs have agreed to market their national broadcast rights on a collective basis. (*Id.*) ██████████████

4



(*Id.* ¶¶ 8-9; Declaration of John Wildhack ("Wildhack Decl.") ¶ 20.) The number of games broadcast nationally pursuant to these contracts has expanded from 33 in 1985 to 116 in the current season. (Bettman Decl. ¶ 15.) Revenues generated by the League's national broadcast contracts are shared equally among all thirty Clubs. In addition to promoting competitive balance and Club financial stability within the League, the national contracts also serve to promote the League brand and generate more national interest in NHL hockey generally and in the League itself. (*Id.* ¶ 4.)

Second, the exclusive local broadcast rights provide incentives for the individual Clubs to invest in their team and the local market and to promote the game to local fans. (*Id.* ¶¶ 4, 11, 18, 21.) In order to attract and maintain loyal local fans, each Member Club arranges to broadcast its games within its local broadcast territory pursuant to a contract the Club negotiates with a local broadcast partner, typically a RSN. (*Id.* ¶ 11.) Each NHL Club has granted its RSN the exclusive right to broadcast its games within its local broadcast territory, which provides the RSN the added incentive to produce all the Club's games, create a high quality broadcast product, and produce related hockey programming. (*Id.*) Those rights also provide the RSNs the means to negotiate for carriage of their stations on local MVPDs. (*Id.*)[4]

Third, in the 1994-95 season, the NHL created a new product for consumers: an out-of-market subscription package pursuant to which the NHL offers all broadcasts produced by RSNs

---

[4]


to consumers outside of each of the participating Clubs' broadcast territories. (*Id.* ¶ 12.) ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The

NHL currently offers two out-of-market subscription packages, a television package (NHL

Center Ice) and an internet package (NHL GameCenter LIVE). (*Id.*) The NHL has negotiated to

make the feeds produced by both participating Clubs available for viewing by consumers on

NHL GameCenter LIVE and to its distribution partners on NHL Center Ice. Like the national

broadcast contracts, revenue from the out-of-market packages is shared equally among all thirty

Clubs. (*Id.* ¶ 21.)

**ARGUMENT**

As a threshold matter, it is important to understand that Plaintiffs are not challenging the

NHL's national broadcast contracts or out-of-market packages themselves—i.e., two venture

products that only the venture can create. (*See* Plaintiffs' July 8, 2013 Pre-Summary Judgment

Motion Letter, p 4.) Instead, the only alleged restraint is that individual Clubs may not offer

"competing" out-of-market broadcast products.

**I.     SUMMARY JUDGMENT IS REQUIRED UNDER THE RULE OF REASON**

    **A.     The Rule Of Reason Standard And Principles**

        **1.     The Second Circuit's Burden Shifting Framework**

To determine whether the alleged conduct constitutes an unreasonable restraint of trade,

the Court "presumptively applies rule of reason analysis, under which antitrust plaintiffs must

demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive

before it will be found unlawful." *Texaco, Inc. v. Dagher*, 547 U.S. 1, 5 (2006). First, the

plaintiff "'bears the initial burden of showing that the challenged action has had an *actual*

adverse effect on competition as a whole in the relevant market." *K.M.B. Warehouse

Distributors, Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 127 (2d Cir. 1995) (quoting *Capital Imaging

Assoc., P.C. v. Mohawk Valley Med. Assoc., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993)). Second, if

plaintiffs can prove such anticompetitive effects, "the burden shifts to the defendant to establish

6

the 'pro-competitive redeeming virtues' of the action." *Id.* (quoting *Capital Imaging*, 996 F.2d at

543). Third, should the defendants carry that burden of coming forward with justifications, "the

burden of proof then shifts back to [the plaintiff] to show the same procompetitive effect could

be achieved through alternative means that are less restrictive of competition." *Virgin Atl.*

*Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 264 (2d Cir. 2001); *see also Hairston v. Pac.*

*10 Conference*, 101 F.3d 1315, 1319 (9th Cir. 1996) (plaintiff must show that "any legitimate

objectives can be achieved in a substantially less restrictive manner" than the alleged restraint).

If plaintiffs can meet that burden, any anticompetitive effects and procompetitive justifications

are then balanced in the overall mix to determine "whether the restraint imposed is such as

merely regulates and perhaps thereby promotes competition or whether it is such as may

suppress or even destroy competition." *See Chicago Bd. of Trade v. United States*, 246 U.S. 231,

238 (1918).

### 2.    Evolving Truncated Analyses Applicable Here

Within this general framework, a more truncated version of the rule of the reason

continues to evolve. In *California Dental Association v. Federal Trade Commission*, 526 U.S.

756 (1999), the Supreme Court made clear that the particular application of the rule of reason

would vary with the circumstances. As the Court explained:

> What is required . . . is an enquiry meet [sic] for the case, looking to the
> circumstances, details, and logic of the restraint. The object is to see whether the
> experience of the market has been so clear, or necessarily will be, that a confident
> conclusion about the principal tendency of a restriction will follow from a quick
> (or at least quicker) look, in place of a more sedulous one.

*Id.* at 781. While *California Dental* was applied in the context of a *plaintiff's* quick look, two

important rule of reason principles favoring antitrust *defendants* have more recently emerged.

First, on a "quick look," justifications can in and of themselves validate certain restraints without

the need to consider less restrictive alternatives or balancing. This is particularly true for

economically interdependent ventures like sports leagues. Second, to survive summary judgment

as a matter of law, an antitrust plaintiff must propose a "less restrictive alternative" that would

achieve the *same* procompetitive benefits as the alleged restraint.

      a.      **Justifications Alone Can Validate a
Restraint on a Quick Look**

In *American Needle*, the Supreme Court made clear that restraints among the members of economically integrated sports leagues may qualify for truncated approval for *defendants* based on justifications alone. These qualifications would include, but are not limited to, whether the restraints are "essential" to the creation and marketing of a venture product *or* whether they otherwise serve a "legitimate and important" procompetitive interest such as, *inter alia*, "maintaining a competitive balance" or financial stability among teams. *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 203-04 (2010).

Since *American Needle*, several courts have upheld restraints involving sports organizations based on legitimate objectives for the restraints alone—i.e., without assessing "less restrictive alternatives" or an overall balancing of procompetitive and anticompetitive effects under *Chicago Board of Trade*. *See, e.g.*, *Rock v. Nat'l Collegiate Athletic Ass'n*, 928 F. Supp. 2d 1010, 1026 (S.D. Ind. 2013) (granting motion to dismiss and finding NCAA bylaw prohibiting Division III schools from offering athletics-based aid to be procompetitive "in the twinkling of an eye"); *Washington v. Nat'l Football League*, 880 F. Supp. 2d 1004, 1007 (D. Minn. 2012) ("[T]he Rule of Reason compels the conclusion that, even if there is concerted action to restrain trade in Plaintiffs' images, that agreement 'is necessary to market the product at all' and is therefore not illegal.") (quoting *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 23 (1979)); *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 341 (7th Cir. 2012) (concluding that under *American Needle*, certain restraints, particularly necessary venture activities, may be held procompetitive, and thus lawful, in the "twinkling of an eye"); *cf. Race Tires Am. Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 80 (3d Cir. 2010) (citing *American Needle*, refusing to consider less restrictive alternatives and granting summary judgment in upholding standard-setting restrictions for the sport).

These decisions are consistent with the Second Circuit's finding in *Salvino* that the restraints of economically-integrated sports leagues—including restrictions on individual team

"competition"—are assessed differently than those not involving economic interdependence. *See Salvino*, 542 F.3d at 323 (distinguishing *Broadcast Music* on the basis that Member Clubs of a sports league are economically interdependent). The critical addition now is that this Court has the benefit of applying the rule of reason in light of both *Salvino* and *American Needle*.

> **b.   Absent Adequate Proof of a Substantially Less Restrictive Alternative That Can Achieve the Same Objectives, Summary Judgment Is Required**

Another important rule of reason limiting principle applied by the Second Circuit—even assuming *arguendo*, a traditional "full" rule of reason otherwise applies—is that, absent proof of a less restrictive alternative that could achieve the defendants' legitimate objectives, summary judgment still is required as a matter of law. This is precisely what the *Virgin Atlantic* court held after finding "nothing in the record" suggesting an alternative program that, as required, would achieve the "same" procompetitive benefits of the alleged illegal incentive agreements. *Virgin Atlantic*, 257 F.3d at 265. If this Court determines the need to consider less restrictive alternatives—which we believe is unnecessary here—this principle should be equally dispositive.

As described below, we apply this rule of reason framework without first starting with an assessment of anticompetitive effects because the procompetitive justifications here are so numerous and well-recognized that they indeed can be upheld in a truncated "twinkling of an eye." This means that, irrespective of effects and potential less restrictive alternatives, the Court should uphold as a matter of law the exclusive broadcast territories at issue here. However, even if the Court were to move on to the more "full" rule of reason, that analysis itself ends with Plaintiffs' failure to offer a substantially less restrictive alternative that meets all of the League's legitimate objectives. Finally, if the Court were to consider Plaintiffs' proof of anticompetitive effects, Plaintiffs can offer no actual factual evidence that all consumers of NHL broadcasts (the alleged relevant market) would be better off without exclusive territories than with them.

9

**B.    The NHL's Exclusive Broadcast Territories Have Numerous, Indisputable Justifications**

**1.    The NHL May Restrict Club Competition Against Venture Products**

The law is well settled that a legitimate joint venture may restrict competition from its members concerning products created and sold by the venture itself. *See, e.g., Madison Square Garden, L.P. v. Nat'l Hockey League*, No. 07-CV-8455(LAP), 2007 WL 3254421, at *7 (S.D.N.Y. Nov. 2, 2007) ("*MSG*") (collecting "cases upholding agreements among parents of a joint venture not to compete in the market in which the joint venture operates"), *aff'd*, 270 F. App'x 56 (2d Cir. 2008); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 214 (D.C. Cir. 1986) (upholding Atlas Van Lines rule prohibiting member of joint venture from competing with the venture using Atlas equipment); *United States v. Penn-Olin Chem. Co.*, 378 U.S. 158, 169 (1964). This principle is especially apt for professional sports leagues where, as a matter of venture structure, teams are economically interdependent. *See Salvino*, 542 F.3d at 323 (distinguishing *BMI* on the basis that "members of a sports league['s . . .] interests are interdependent"); *Am. Needle*, 560 U.S. at 185 (recognizing that teams "share an interest in making the entire league successful and profitable, and that they must cooperate" in a variety of ways); *see also Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381, 1395 (9th Cir. 1984) ("*Raiders*") (discussing shared interests of all NFL teams in NFL venture).

Here, there is no dispute that both the exclusive national broadcast contracts and the out-of-market packages are "venture products," developed based on the interdependence of the Clubs. *Supra* pp. 3-6. Accordingly, even without delving deeper into each of the NHL's various justifications, the League has the right as a matter of law to preclude competition by individual Clubs against these venture products, which alone requires the grant of summary judgment.

**2.    The Restrictions Are Essential to the Availability of the Venture's Broadcast Products**

The Supreme Court also has made clear that where a venture's product—here the exclusive national broadcast contracts and out-of-market packages—may not be available at all without the restraints, the reasonableness of the restraints may be upheld without full rule of

10

those investments, which has led to virtually all available games being produced at a high quality level and broadcast within a Club's exclusive broadcast territory by the Club's RSN.[6]

### b.   Exclusive Broadcast Territories Incentivize National Networks to Produce NHL Games with High Quality

Courts, again, have long-recognized that exclusive broadcast rights incentivize producers of broadcast products to undertake significant investments in producing and marketing high-quality products. *See, e.g., Ass'n of Indep. Television Stations, Inc. v. College Football Ass'n*, 637 F. Supp. 1289, 1304 (W.D. Okla. 1986) ("Exclusive licenses in the television industry have commonly been found to advance competition by providing incentives to telecasters to invest in promotion and development of programs. Without exclusivity it is doubtful that many licensees could afford to develop programs fully."); *Ralph C. Wilson Indus., Inc. v. Am. Broad. Cos.*, 598 F. Supp. 694, 700-01 (N.D. Ca. 1984) ("[E]xclusive licenses . . . further competition by providing an incentive to the station to invest in promotion and development of the program product."), *aff'd*, 794 F.2d 1359 (9th Cir. 1986); *see also Trans Sport*, 964 F.2d at 190 (finding "valid business rationales [] sufficient to establish a *prima facie* case of lawful conduct" where exclusivity policies made sellers "willing to make the long-term investments in advertising, point-of-purchase displays and promotions to promote sales growth").

On the undisputed record here, the League's national broadcast contracts—which provide for games to be broadcast nationwide on over-the-air or basic cable channels with no cost to consumers beyond what they pay for basic television—are premised on the rights being exclusive, which ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████ (Litner Decl. ¶¶ 31; *see also id.* ¶ 32.) ███████████████████████

---

[6]     Bettman Decl. ¶ 11; Leonsis Decl. ¶¶ 3, 5; Litner Dep. at 214-215 ███████

███████████████████████████████; Bettman Dep. at 62 ███████████

███████; *see also id.* at 131, 186-87, 233-35; Tortora Dep. at 51, 252-253, 263-264.

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓ (Bettman Decl. ¶¶ 8-9; Litner Decl. ¶ 30; Wildhack Decl. ¶ 20.)[7]

### c. Exclusive Broadcast Territories Enable the NHL to Balance National Branding and Local Tribalism

The restraints also are critical to the NHL—at the venture level—in attempting to strike the delicate balance between generating local fan interest and "tribalism" and attempting to expand the NHL as a "national" game and brand. As courts have specifically recognized, this is critical to the NHL, which historically has struggled to gain fans of the sport as a whole rather than just one team. *MSG*, 2007 WL 3254421, at *6 (finding restraints procompetitive where they were a "key element" of the "NHL's 'national brand'" and allowed the NHL "to compete better against other sports and entertainment products"); *see also JES Props., Inc. v. USA Equestrian, Inc.*, No. 802-CV-1585T24(MAP), 2005 WL 1126665, at *16 (M.D. Fla. May 9, 2005) (association rule procompetitive because it "aids [association] in fostering the development of equestrian sport across the United States, not just in former regional centers such as the Northeast."). The record evidence is indisputable on this point as well.[8]

---

[7] *See also* Bettman Decl. Ex. 3 at NHL3223824 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓; Bettman Decl.
Ex. 4 at NYI0071046 ("A national cable contract would have little value if geographically-distant Clubs could rob the national broadcaster of exclusivity or free ride on its efforts. Absent some clear evidence to the contrary, I cannot simply assume that ESPN would have consented to the virtually unrestricted expansion of telecasts by individual Clubs at the same time as it was attempting to develop a national market for NHL telecasts."); Bettman Decl. Ex. 5 at NHL1407171 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓; Bettman Decl. Ex. 2 at NHL1404252-53 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓; Bettman Dep. at 173 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓; *id.* at 62, 181, 185-86, 187, 232; Tortora Dep. at 50.

[8] Bettman Decl. ¶¶ 2-4, 14; Leonsis Decl. ¶ 6; Bettman Dep. at 43-44 ▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

*(cont'd)*

### d. Exclusive Broadcast Territories Prevent Popular Clubs from "Free Riding" on the Efforts and Success of the League

Perhaps the most established justification for the restraints is the prevention of "free-riding"—i.e., the removal of the "externality" of a venture member that may otherwise wish to exploit the popularity of the NHL venture that it did not alone create. Indeed, as Plaintiffs readily concede, absent the restraints, certain Clubs may have a strong incentive to try and cash in on the NHL's and the Club's current popularity by offering their own, nationwide out-of-market broadcasts.

This however, is precisely the free-riding problem long recognized by the courts, especially for interdependent sports ventures. *See, e.g., Salvino,* 542 F.3d at 340 ("Because of the interdependence of the Clubs within the setting of a sports league, free riding would occur if one of the Clubs is able to benefit disproportionately from the actions of Major League Baseball or other Clubs in the licensing of products."); *Indep. Entm't Grp., Inc. v. Nat'l Basketball Ass'n,* 853 F. Supp. 333, 340 (C.D. Cal. 1994) (granting summary judgment for NBA and finding rule prohibiting NBA players from staging televised basketball games outside the NBA joint venture was reasonable as a matter of law and that plaintiffs should not be able "to free-ride on the NBA's investment in its star players"); *see also Morris Commc'ns Corp. v. PGA Tour, Inc.,* 364 F.3d 1288, 1298 (11th Cir. 2004) (plaintiffs' proposed activity constituted a "classic example of 'free-riding,' the prevention of which, under antitrust law, constitutes a legitimate pro-competitive reason for imposing a restriction").

Moreover, free-riding concerns are particularly acute for sports leagues that may have a major imbalance in the relative popularity of teams. Such an imbalance of "popularity" creates a

---

*(cont'd from previous page)*

████████████████████████████████████████████████████ *id.* at 244
███████████████████████████████████████████████████████████

████████████████████████; *see also id.* at 245-246; Daly Dep. at 241-42 (discussing the value of building the national brand and increasing the popularity of the sport); *id.* at 257.

significant free-riding incentive and "externality." *See Salvino*, 542 F.3d at 340. In this context, the Second Circuit's distinction of *BMI* is particularly apt:

> [I]t is true, as Salvino argues, that the rights of the individual MLB Clubs to license their own respective intellectual property are more limited than the unfettered direct licensing rights of the copyright owners in *Broadcast Music*. We conclude that this distinction is insignificant, however, in light of the fact that the MLB Clubs exist as members of a sports league, and their interests are interdependent. That interdependence and Major League Baseball's need for competitive balance among the Clubs distinguish the Clubs from the individual composers and publishers [in] *Broadcast Music*.

*Salvino*, 542 F.3d at 323.

That same analysis applies here with equal, if not greater, force. There is no dispute that, absent the League possessing exclusive national broadcasting rights for all of the NHL Clubs, the most popular Clubs would have strong financial incentives to exploit the NHL venture's popularity and license their own out-of-market rights. (Bettman Decl. ¶¶ 7-8, 10, 16; Bettman Dep. at 233-34.)[9] As the *Salvino* court explained, however, this is precisely the type of free-riding externality that could undermine competitive balance, which may properly be addressed through an exclusive venture-level distribution arrangement.

### e.    Exclusive Broadcast Territories Foster Local Fan Interest, Club Stability and, in Turn, Competitive Balance

Finally, there can be no dispute that the maintenance of fan interest, team viability and, ultimately, competitive balance, is an important and procompetitive interest of the League. *See, e.g., Am. Needle*, 560 U.S. at 204 ("[T]he interest in maintaining a competitive balance . . . is legitimate and important."). Nor can there be any dispute that fan interest and team viability contribute to competitive balance. *See Raiders*, 726 F.2d at 1396. Moreover, the Second Circuit

---

[9]     The League itself has long recognized the prevention of free-riding as a rationale for the League's broadcasting rules. ██████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
██████████████████ (Bettman Decl. Ex. 4 at NYI0071046.)

has already found that unfettered competition by individual teams with the venture's product would lead to a competitive imbalance, as it "would result in the more popular Clubs granting more licenses and receiving more income" than less popular Clubs. *Salvino*, 542 F.3d at 332. In the court's view, the resulting "inequality" in licensing income would "overcompensate" popular Clubs and, thus, "foster a competitive *imbalance* among the Clubs." *Id.* at 333 (emphasis added).

The record here, as well, confirms that exclusive broadcast territories foster the competitive balance that is so important to all sports leagues. (Bettman Decl. ¶¶ 18-23.)[10]

*     *     *

Whether considered individually or collectively, these justifications more than qualify for the truncated treatment contemplated by the unanimous Supreme Court in *American Needle*. The justifications are rudimentary, have been judicially recognized to apply to professional sports leagues, and are confirmed several times over by the undisputed, contemporaneous evidence in this case.

### C.   Plaintiffs Offer No Legitimate, Less Restrictive Alternative

Should the Court even need to assess the subject of less restrictive alternatives, the most important principle to consider in reviewing a proffered less restrictive alternative is that it must achieve the "same" objectives. *Virgin Atlantic*, 257 F.3d at 265. If none is (or can be) offered that is capable of meeting those legitimate venture objectives, then summary judgment is required. *Id.* at 273; *see also Hairston*, 101 F.3d at 1319 (plaintiff must show that "*any* legitimate objectives can be achieved in a *substantially* less restrictive manner" than the alleged restraint) (emphasis added).

---

[10]   *See also* Leonis Decl. ¶¶ 5-6; Weinberg Dep. at 63 ("I think that having an exclusive territory, among other things, is important to competitive balance."); *id.* at 62; Bettman Dep. at 166-68 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Daly Dep. at 232-34 (system furthers competitive balance because "it allows clubs a territory to help build a fan base, which allows it to help generate a local business").

17

In *Virgin Atlantic*, the court explained that the proffered less restrictive alternative must achieve all of the procompetitive justifications of the alleged restraint—failure to provide robust alternative means of achieving those same justifications warrants judgment in for the defendant:

> We find nothing in the record in which Virgin suggests an alternative program that would achieve the same procompetitive effect as the incentive agreements. Since the ultimate goal of our § 1 analysis is to determine whether restrictions in an agreement among competitors have a potential to harm consumers, *Clorox Co.*, 117 F.3d at 56, *Virgin's failure to address this point leaves intact the evidence that British Airways' incentive agreements are good for competition.*

*Virgin Atlantic*, 257 F.3d at 265 (emphasis added).

Here, the only alternative that the Plaintiffs have identified is eliminating territorial restrictions altogether and, perhaps, attempting to address any negative effects on individual Clubs through increased revenue sharing. But that so-called alternative would not satisfy any of the League's legitimate procompetitive justifications, much less all of them. Most importantly, it would undermine the League's ability to negotiate exclusive national broadcast contracts and the ability of Clubs to provide their RSNs the incentives they need to justify the investments they make in the League's broadcast products (Bettman Decl. ¶¶ 16-17), and it does not address the delicate balance between the League's national branding strategy and local team fan tribalism. (Bettman Decl. ¶¶ 2-4, 14.)

## D. In Any Event, Plaintiffs Cannot Prove That League Rules Have Harmed Them or Injured Consumers

Even if this Court determined that it must conduct a full rule of reason analysis, the undisputed evidence is that Plaintiffs cannot offer any evidence of actual anticompetitive effects in the first place; hence, summary judgment is required for this reason as well.

### 1. Even Absent the Restraints, Individual Clubs Could Not Distribute Their Games Nationally

The undisputed record evidence demonstrates that ▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬ (Bettman Decl. ¶ 8; Wildhack Decl. ¶ 20.) ▬▬▬▬▬

18

███████████████████████████████████████████████ (Bettman Decl. ¶ 9,

Ex. 3 at NHL 3223824; Litner Decl. ¶ 30.)

Because these national broadcast contracts are not challenged by Plaintiffs and by their

terms—████████████████████████████████████

███████████████████████████████████████████ Plaintiffs

would suffer the same injury with or without the restraints. This undisputed fact precludes any

assertion of injury in fact or "antitrust injury." *See Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d

112, 123 n.5 (1st Cir. 2011) (affirming summary judgment based on lack of injury and antitrust

injury where plaintiff's "damages model assumes that the proper 'but-for' market is one without

any exclusive agreements. That assumption is erroneous, as these agreements are often efficient

and pro-competitive . . . [and] are not illegal in this case. In a market devoid of any exclusivity

agreements, Sterling may perform better, but Sterling is not entitled to such a market."). Because

of this lack of harm in the alleged market, summary judgment should be granted.

### 2.     The NHL's Territorial Restrictions Have Not Caused a Market-Wide Reduction in Output or Quality

In any event, Plaintiffs have developed no evidence demonstrating that, in the absence of

the alleged restraints, output would be greater or prices would be lower. The law in this Circuit is

clear that, to implicate the antitrust laws, any harm to an antitrust plaintiff must coincide with

"market-wide" injury to consumers rather than to individual competitors or their customers.

*Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 290 (2d Cir. 2006); *Elecs.*

*Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 245 (2d Cir. 1997).

Absent such harm to overall market output, price or quality, any harm to plaintiffs would not be

an "antitrust injury."

For alleged markets involving the broadcast of sports games, the antitrust injury

requirement has meant that the alleged harm must restrict the overall output, price or quality of

games in the overall market. *See, e.g., Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ.*

*of Oklahoma*, 468 U.S. 85, 99 (1984) ("*NCAA*"). However, where an alleged restraint, on the

facts, does not reduce the overall output, price or quality of games, no market-wide harm can be found as a matter of law. *See Kingray v. NHL Enterprises, Inc.*, No. 00-CV-1544-L(BEN) at 12-13 (S.D. Cal. July 2, 2002); *Salvino*, 542 F.3d at 325; *Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, No. 03 Civ. 1895(PAC), 2007 WL 39301, at *13-14 (S.D.N.Y. Jan. 8, 2007) (granting summary judgment on claim based on exclusive distribution agreements, holding that fact that agreements prevented consumers from watching movies at first choice theatre was not actionable restraint).

In this respect, *NCAA* is easily distinguished. Whereas *NCAA* involved an agreement prohibiting distribution of most games on television, this case involves an agreement as to how games shall be distributed with national distribution being handled by the League and its national broadcast partners and local distribution being handled by the Clubs and their local broadcast partners. Thus, while the restraints here—███████████████████████████████—prohibit Clubs from broadcasting their games on a national basis, that is not the type of restriction of output that the Supreme Court found unreasonable in *NCAA*.[11] To the contrary, the allocation of exclusive distribution rights by geographic territory to different distributors is lawful and procompetitive. *See Trans Sport, Inc.*, 964 F.2d at 190.

Here, consistent with NCAA, the facts are indisputable that (i) the NHL makes virtually all NHL games available for viewing; (ii) that the games are produced at a high quality; and (iii) that, as a new product that only the League can offer, the price of the packages is a matter of consumer demand as determined by the League. Further, the NHL has priced the product based on the assumption that most fans are primarily interested in watching the games of a single team. (Bettman Decl. ¶ 14.) Accordingly, on these undisputed facts, there is no factual basis for

---

[11]     In distinguishing *NCAA*, the Second Circuit in *Salvino* also noted that the NCAA did not act as a selling agent for school's broadcast rights—rather, it simply defined the number of games each school could broadcast on both a national and local basis. Here, ████████████████

Plaintiffs to assert that output or quality is "lower," or prices are higher, than they would be "but for" the restraints. This, alone, is another reason to grant summary judgment.

### 3. There Is No Evidence That Market-Wide Consumers Would Be Better Off Absent the NHL's Territorial Restrictions

Finally, even if this Court were to consider the relevant market-wide "output" to be the collective output of potential *individual* Club packages, this is of no help to Plaintiffs. Plaintiffs would need to have developed admissible evidence that, "but for" the restraints, *all* Clubs would produce the same (or more) output at the same (or better) quality and at a lower price for each Club's potential customers. *See Capital Imaging*, 996 F.2d at 547; *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433-34 (2013) (defining antitrust harm as the difference between a "'but-for' baseline" and actual price and output levels during the relevant time period).

Plaintiffs, however, chose not even to try and develop such a record. Specifically, they have no evidence from Clubs, RSNs, MVPDs, or anyone else supporting their contentions that, absent exclusive broadcast territories, all the games of all of the Clubs would be produced and distributed across the country; that they all would be produced at the same quality as today; or that they would be priced lower than what is currently available through the out-of-market packages. Moreover, to the extent Plaintiffs intend to reply upon speculation from their expert witness, as a matter of law his theoretical musings cannot create a factual dispute supporting the denial of summary judgment. *Brooke Grp. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict."); *Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1037-38 (8th Cir. 2000) (summary judgment proper because plaintiffs' expert report failed to consider lawful, non-conspiratorial events that could have explained defendants' prices).

By contrast, what evidence does exist in the record confirms that, absent the restraints, consumers in the alleged market would in fact be substantially harmed because not all games of

21

all the Clubs would be produced, or certainly not at the same quality.[12] This, in turn, would substantially change or eliminate national broadcast contracts and the out-of-market packages themselves, leaving smaller Clubs without nationwide (or even local) distribution. ██████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████ (Leonsis

Decl. ¶ 7.) Finally, there is no evidence that in the free-for-all suggested by Plaintiffs, the Clubs that could and would offer packages to its most rabid fans would do so at a price per game that is lower than the current out-of-market packages. (Bettman Dep. at 246 ("[C]arte blanche do whatever you want . . . would be nothing but destructive.").)

## II.    PLAINTIFFS' SECTION 2 CLAIM FAILS FOR THE SAME REASONS

Plaintiffs' Section 2 claim fails for the same reasons as their Section 1 claim. *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 31 (2d Cir. 2006) (conduct that fails to give rise to a claim under Section 1 "cannot be the basis of a monopolization scheme under Section 2."); *see also Thomsen v. W. Elec. Co.*, 680 F.2d 1263, 1267 (9th Cir. 1982) ("[A] § 1 claim insufficient to withstand summary judgment cannot be used as the sole basis for a § 2 claim.").

## III.    TV PLAINTIFFS' DAMAGES CLAIMS ARE BARRED UNDER *ILLINOIS BRICK*

If the MVPD Defendants' motions for summary judgment are granted, TV Plaintiffs are "indirect purchasers" who do not have standing to sue for damages. *See Illinois Brick Co. v. Illinois*, 431 U.S. 720, 736 (1977). The denial of the NHL Defendants' motion to dismiss based on the *Illinois Brick* doctrine was based on the fact that the middlemen were purportedly

---



[12]    Leonsis Decl. ¶ 8; Bettman Decl. ¶ 17; Bettman Dep. at 245-46 ██████████

██████████████; *id.* at 232-33 ████████████

██████████████████████████████████

██████████████████████████████████

██████████████; Daly Dep. at 246 ██████████

██████████████; *see also* Bettman Dep. at 241, 246; Litner Dep.

at 214-15; Tortora Dep. at 263-64.

participants in the conspiracy, such that consumers were the first innocent parties in the chain of distribution. But if the MVPD Defendants were not parties to any unlawful conspiracy that is not true and TV Plaintiffs' damage claims are hence barred as a matter of law under *Illinois Brick*. *See Kingray v. Nat'l Basketball Ass'n*, 188 F. Supp. 2d 1177, 1198-99 (S.D. Cal. 2002) (holding that as indirect purchasers, plaintiffs lacked standing to maintain horizontal conspiracy claim against NBA defendants); *Durkin v. Major League Baseball*, No. 94-5315 (E.D. Pa. July 17, 1995), *aff'd mem.*, 85 F.3d 611 (3d Cir. 1996); *Paycom Billing Servs.*, 467 F.3d at 291-92.

## CONCLUSION

For the foregoing reasons, the NHL Defendants respectfully request an order granting summary judgment and dismissing Plaintiffs' claims with prejudice.

Dated: May 19, 2014                                Respectfully submitted,

                                                   Shepard Goldfein
                                                   James A. Keyte
                                                   Paul M. Eckles
                                                   Matthew M. Martino
                                                   **SKADDEN, ARPS, SLATE,**
                                                   **MEAGHER & FLOM LLP**
                                                   Four Times Square
                                                   New York, New York  10036-6522
                                                   Telephone: (212) 735-3000
                                                   Facsimile: (212) 735-2000
                                                   shepard.goldfein@skadden.com
                                                   james.keyte@skadden.com
                                                   paul.eckles@skadden.com
                                                   matthew.martino@skadden.com

                                                   *Attorneys for Defendants National Hockey*
                                                   *League, NHL Enterprises, L.P., NHL Interactive*
                                                   *Cyberenterprises, LLC, Chicago Blackhawk*
                                                   *Hockey Team, Inc., Comcast-Spectacor, L.P.,*
                                                   *Hockey Western New York LLC, Lemieux Group,*
                                                   *L.P., Lincoln Hockey LLC, New Jersey Devils*
                                                   *LLC, New York Islanders Hockey Club, L.P. and*
                                                   *San Jose Sharks, LLC*

23