USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/8/14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————— X

THOMAS LAUMANN, ROBERT SILVER,
GARRETT TRAUB, and DAVID DILLON,
representing themselves and all other similarly
situated,

                Plaintiffs,

      - against -

NATIONAL HOCKEY LEAGUE, et al.,

                Defendants.

**OPINION AND
ORDER**

**12-cv-1817 (SAS)**

————————————————————————— X

MARC LERNER, DEREK RASMUSSEN, and
GARRETT TRAUB, representing themselves and all
other similarly situated,

                Plaintiffs,

      - against -

OFFICE OF THE COMMISSIONER OF BASEBALL,
et al.,

                Defendants.

**12-cv-3704 (SAS)**

————————————————————————— X

SHIRA A. SCHEINDLIN, U.S.D.J.:

I.     INTRODUCTION

       Plaintiffs bring these putative class actions against the National

1

Hockey League ("NHL") and various individual clubs in the league (the "NHL Defendants"); Major League Baseball ("MLB") and various individual clubs in the league (the "MLB Defendants") (together the "League Defendants"); multiple regional sports networks ("RSNs") that produce and distribute professional baseball and hockey programming;[1] two multichannel video programming distributors ("MVPDs" or "distributors"), Comcast and DIRECTV (together with the RSNs, the "Television Defendants" or "broadcasters"); Madison Square Garden Company and the New York Rangers Hockey Club (the "MSG Defendants"); and New York Yankees Partnership and Yankees Entertainment & Sports Network, LLC ("YES") (together the "Yankee Defendants").  Plaintiffs allege violations under Sections 1 and 2 of the Sherman Antitrust Act (the "Sherman Act").

On July 27, 2012, the defendants jointly moved to dismiss the Complaints in both actions, *Garber v. Office of the Commissioner of Baseball ("Garber")* and *Laumann v. National Hockey League ("Laumann").*  In an Opinion and Order dated December 5, 2012, I granted the motion in part and

---

[1]     Several defendant RSNs are owned and controlled by defendant Comcast, several are owned and controlled by defendant DIRECTV, and two are independent of the MVPDs but share ownership with an individual club.

denied it in part.[2]  Plaintiffs Fernanda Garber and Peter Herman were dismissed

from both cases, and plaintiff Robert Silver was dismissed from the *Garber* case,

for lack of antitrust standing.  Additionally, I dismissed plaintiffs' claims under

Section 2 of the Sherman Act against the Television Defendants.[3]

On August 19, 2013, Comcast and its affiliated RSNs (the "Comcast

Defendants") filed a motion to compel arbitration against Garrett Traub, Silver,

Vincent Birbiglia, Thomas Laumann, and Derek Rasmussen, and to stay the claims

of David Dillon and Marc Lerner pending resolution of the arbitration.  Comcast's

motion was granted as to Traub, Laumann, and Rasmussen, but denied as to Silver,

Birbiglia, Dillon, and Lerner.  The same day, DIRECTV and its affiliated RSNs

(the "DIRECTV Defendants") filed a motion to compel arbitration against Lerner.

DIRECTV's motion was denied in full.[4]

The Comcast Defendants, the DIRECTV Defendants, the NHL

Defendants, and the MLB Defendants now move for summary judgment on the

---

[2]    *See Laumann v. National Hockey League,* 907 F. Supp. 2d 465
(S.D.N.Y. 2012).

[3]    *See id.* at 492.

[4]    *See Garber*, No. 12 Civ. 3704, Dkt. No. 222; *Laumann,* No. 12 Civ.
1817, Dkt. No. 167.

remaining claims.[5]  For the reasons that follow, all four motions are DENIED in full.

## II.    BACKGROUND

NHL is an unincorporated association of thirty major league professional ice hockey clubs, nine of which are named as defendants in *Laumann*.[6]  MLB is an unincorporated association of thirty professional baseball clubs, nine of which are named as defendants in *Garber*.[7]  The clubs within each League are competitors – both on the field and in the contest to broaden their fan bases.  However, the clubs must also coordinate in various ways in order to produce live sporting events, including agreeing upon the game rules and setting a

---

[5]     The Yankee Defendants and the MSG Defendants have joined in the other defendants' motions. *See Garber*, No. 12 Civ. 3704, Dkt. No. 280 (indicating that the New York Yankees "refer[] the Court to the memorandum of law and statement of material facts filed today by the other Major League Baseball club defendants in this action," and that "YES, which is a regional sports network ("RSN"), respectfully refers the Court to the memoranda of law and statements of material facts filed today by the other RSN defendants in this action").  *See also Laumann*, No. 12 Civ. 1817, Dkt. No. 217 (indicating the MSG Defendants' joinder in the NHL Defendants' revised motion for summary judgment).

[6]     *See* NHL Defendants' Motion for Summary Judgment ("NHL Mem.") at 3.

[7]     *See* Memorandum of Law in Support of the MLB Defendants' Motion for Summary Judgment ("MLB Mem.") at 4.

schedule of games for the season.[8]  Both leagues divide their member teams into

geographic territories and assign each team a home television territory ("HTT") for

broadcasting purposes.[9]  Neither the Comcast Defendants nor the DIRECTV

Defendants played a role in the initial creation of the Leagues' HTTs.[10]

The structure of the territorial broadcasting system is largely

uncontested.  By League agreement, each club agrees to license its games for

telecast only within its designated HTT.[11]  The clubs then contract with RSNs

through Rights Agreements.[12]  The Rights Agreements generally provide each

RSN the exclusive right to produce a club's games and telecast them in the HTT.[13]

---

[8]      *See* MLB Defendants' Rule 56.1 Statement of Undisputed Material Facts ("MLB 56.1") ¶¶ 4–5.  *See also* NHL Mem. at 3.

[9]      *See* Comcast's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ("Comcast 56.1") ¶ 2; NHL Mem. at 4–5; MLB 56.1 ¶ 68.

[10]      *See* Comcast 56.1 ¶ 4; The DIRECTV Defendants' Rule 56.1 Statement of Undisputed Facts ("DIRECTV 56.1") ¶ 4.

[11]      *See* MLB 56.1 ¶ 68; NHL Mem. at 5.

[12]      *See* NHL Mem. at 5; Comcast 56.1 ¶ 2.

[13]      MLB 56.1 ¶ 93; Comcast 56.1 ¶¶ 6, 14; DIRECTV 56.1 ¶ 6; NHL Mem. at 5.  Plaintiffs do not challenge the clubs' right to grant production and distribution rights for their own games to only one RSN (hereinafter "content exclusivity").  Such exclusivity is to be distinguished from the exclusivity established by the territorial rules, which prevent each RSN from televising its programming outside the HTT and protect it from competing with the programming of other teams' games within the HTT (hereinafter "territorial exclusivity").

The Agreements do not permit the RSNs to license telecasts for broadcast outside the HTTs.[14]  The Rights Agreements also require the RSNs to provide their telecasts to the Leagues without charge for use in the out-of-market packages ("OOM packages").[15]  The clubs keep the revenue from their respective Rights Agreements.  There are significant differences in the economic value of the various HTTs.[16]

In order to produce the telecasts of live games, the RSNs invest in equipment, production facilities, and a large staff.[17]  They also produce "shoulder" programming such as pre-game and post-game shows.[18]  The RSNs then sell their programming to MVPDs like Comcast and DIRECTV through Affiliation Agreements, and the MVPDs televise the programming through standard packages sold to consumers within the HTT.[19]  Even when an MVPD agrees to carry a RSN, it does not always distribute that RSN throughout its entire territory.[20]  The

---

[14]       *See* Comcast 56.1 ¶ 22.

[15]       *See* MLB 56.1 ¶¶ 68, 150; Comcast 56.1 ¶ 18; NHL Mem. at 6.

[16]       *See* MLB 56.1 ¶ 25; NHL Mem. at 4.

[17]       *See* MLB 56.1 ¶ 103; Comcast 56.1 ¶ 14.

[18]       *See* MLB 56.1 ¶ 104; DIRECTV 56.1 ¶¶ 17, 19; Comcast 56.1 ¶ 19.

[19]       *See* Comcast 56.1 ¶ 12; NHL Mem. at 5.

[20]       *See* MLB 56.1 ¶ 112; DIRECTV 56.1 ¶ 22.

MVPDs acquire the rights to broadcast the games subject to the territorial restrictions in the RSNs' agreements with the Leagues.[21]   The MVPDs black out games in unauthorized territories in accordance with those restrictions.

Fans can watch out-of-market games in one of two ways.  *First*, some games are televised nationally through contracts between the Leagues and national broadcasters like ESPN and Fox.[22]   The clubs have agreed to allow the Leagues to negotiate national contracts on their behalf.  The Leagues' agreements with national broadcasters contain provisions requiring the Leagues to preserve the HTTs.[23]   The revenues from national broadcasts are shared equally among the clubs.[24]

*Second,* the Leagues produce OOM packages in both television and Internet format.  The television packages – NHL Center Ice and MLB Extra Innings – are available for purchase through MVPDs, including Comcast and DIRECTV.[25]   The Internet packages – NHL GameCenter Live and MLB.tv – are

---

[21]     *See* Comcast 56.1 ¶ 22; DIRECTV 56.1 ¶ 21.

[22]     *See* MLB 56.1 ¶¶ 124–125; NHL Mem. at 4.

[23]     *See* MLB 56.1 ¶ 130; NHL Mem. at 2.

[24]     *See* MLB 56.1 ¶ 1; NHL 56.1 ¶ 14.

[25]     *See* Comcast 56.1 ¶ 30; Memorandum of Law in Support of the DIRECTV Defendants' Motion for Summary Judgment ("DIRECTV Mem.") at 7.

available for purchase directly from the Leagues.[26]  The OOM packages are comprised of local RSN programming from each of the clubs.[27]  As with the national broadcasts, revenues from the OOM packages are shared equally among the clubs.[28]

Each of the OOM packages requires the purchase of the full slate of out-of-market games, even if a consumer is only interested in viewing the games of one team.  The OOMs exclude in-market games to "avoid diverting viewers from local RSNs that produce the live game feeds that form the OOM packages."[29]

In sum, each RSN is the sole producer of its club's games[30] and the sole distributor of those games within the HTT aside from limited nationally broadcasted games.  The OOM packages do not show in-market games to avoid competition with the local RSN.  Additionally, the territorial broadcast restrictions allow each RSN to largely avoid competing with out-of-market games produced by other RSNs.

---

[26]     *See* Comcast 56.1 ¶ 31; DIRECTV Mem. at 4.

[27]     *See* MLB 56.1 ¶¶ 68, 150; Comcast 56.1 ¶ 18; NHL Mem. at 6.

[28]     *See* MLB 56.1 ¶ 153; NHL 56.1 ¶ 14.

[29]     MLB 56.1 ¶ 47.  *Accord* Comcast 56.1 ¶ 33.

[30]     One exception is that the teams in each League have agreed to permit the visiting team to produce a separate telecast of away games.

Internet streaming rights are owned by the Leagues and/or the clubs.[31] The RSNs have no right to license their programming for Internet streaming directly. The Internet OOM packages are the primary way for fans to view games on the Internet. Additionally, some MVPDs have negotiated with the Leagues to provide Internet streaming of out-of-market games to subscribers of the OOM television packages.[32] Internet streaming of in-market games remains largely unavailable to consumers.[33]

## III.   STANDARD OF REVIEW

Summary judgment is appropriate "only where, construing all the evidence in the light most favorable to the non-movant and drawing all reasonable inferences in that party's favor, there is 'no genuine issue as to any material fact

---

[31]     *See* MLB ¶ 157; DIRECTV 56.1 ¶ 29; Plaintiffs' Response to DIRECTV Defendants' Local Rule 56.1 Statement of Undisputed Material Facts ¶ 29.

[32]     *See* DIRECTV 56.1 ¶ 34. Fans must authenticate their OOM television subscription in order to access the games online.

[33]     *See* MLB 56.1 ¶ 171 (revealing that only three baseball clubs have reached agreements with MLB to permit in-market streaming of their games); DIRECTV 56.1 ¶¶ 32, 36, 38 (noting that no NHL team has conducted in-market streaming and only two baseball clubs have done so in the past, and also stating that DIRECTV has unsuccessfully tried to negotiate for in-market streaming with the Leagues).

and . . . the movant is entitled to judgment as a matter of law.'"[34]  "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[35]

"[T]he moving party has the burden of showing that no genuine issue of material fact exists and that the undisputed facts entitle him to judgment as a matter of law."[36]  To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts,"[37] and "may not rely on conclusory allegations or unsubstantiated speculation."[38]

In deciding a motion for summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual

---

[34]   *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 19 (2d Cir. 2014)  (quoting Fed. R. Civ. P. 56(c)) (some quotation marks omitted).

[35]   *Windsor v. United States*, 699 F.3d 169, 192 (2d Cir. 2012), *aff'd*, 133 S. Ct. 2675 (2013) (quotations and alterations omitted).

[36]   *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012) (citations omitted).

[37]   *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quotation marks and citations omitted).

[38]   *Id.* (quotation marks and citations omitted).

issues to be tried."[39] "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences'" are jury functions, not those of a judge.[40]

## IV.  APPLICABLE LAW

### A.    Section 1 of the Sherman Act

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States."[41]  "The crucial question in a Section 1 case is [] whether the challenged conduct stems from independent decision or from an agreement, tacit or express."[42] "In order to prove a conspiracy, the antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed

---

[39]    *Brod v. Omya, Inc.,* 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks and citations omitted).

[40]    *Barrows v. Seneca Foods Corp.,* 512 Fed. App'x 115, 117 (2d Cir. 2013) (quoting *Redd v. New York Div. of Parole,* 678 F.3d 166, 174 (2d Cir. 2012)).

[41]    15 U.S.C.A. § 1 (West 2014).

[42]    *Mayor & Council of Baltimore v. Citigroup, Inc.,* 709 F.3d 129 (2d Cir. 2013) (quotation marks and citations omitted).

to achieve an unlawful objective."[43] A business decision may be lawful when made

unilaterally but unlawful when made pursuant to an agreement.[44]

      "Parallel conduct can be probative evidence bearing on the issue of

whether there is an antitrust conspiracy.  However, parallel conduct alone will not

suffice as evidence of such a conspiracy, even if the defendants 'knew the other

defendant companies were doing likewise. . . .'"[45]  Parallel conduct must be

accompanied by "plus factors," such as "a common motive to conspire, evidence

that shows that the parallel acts were against the apparent individual economic

---

[43]    *Anderson News, LLC v. American Media, Inc.,* 680 F.3d 162, 184 (2d Cir. 2012) (quotation marks and citations omitted).

[44]    *See Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 229–30 (1939) (finding that "[t]he fact that the restrictions may have been of a kind which a distributor could voluntarily have imposed, but did not, does not alter the character of the contract as a calculated restraint" in violation of the Sherman Act); *In re Publication Paper Antitrust Litig.*, 690 F.3d 51, 68 (2d Cir. 2012) ("[T]he mere fact that following price increases announced by competitors may have been consistent with [defendant's] overall pricing strategy does not immunize [defendant] from liability if it had an illegal agreement with [a competitor] to adhere to that strategy."); *Levitch v. Columbia Broad. Sys., Inc.,* 495 F. Supp. 649, 672 (S.D.N.Y. 1980), *aff'd,* 697 F.2d 495 (2d Cir. 1983) ("So long as the refusal to deal is the product of an independent determination, rather than an unlawful understanding, tacit or expressed, the decision does not run afoul of the antitrust laws.").

[45]    *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987) (quoting *Modern Home Inst., Inc. v. Hartford Accident & Indemnity Co.*, 513 F.2d 102, 110 (2d Cir. 1975)).  *Accord Publication Paper*, 690 F.3d at 62 ("Conscious parallelism alone, however, does not establish an antitrust violation. Such behavior is consistent with both unlawful conspiracy and lawful independent conduct.").

self-interest of the alleged conspirators, and evidence of a high level of interfirm communications."[46]  If the "parties to vertical agreements [] have knowledge that other market participants are bound by identical agreements, and their participation is contingent upon that knowledge, they may be considered participants in a horizontal agreement in restraint of trade."[47]

The Supreme Court has clarified that Section 1 "outlaw[s] only *unreasonable* restraints."[48]  To establish a Section 1 violation, a plaintiff must demonstrate "concerted action between at least two legally distinct economic entities" that "constitute[s] an unreasonable restraint of trade either per se or under the rule of reason."[49]

Certain agreements that have "manifestly anti-competitive effects and

---

[46]     *Mayor & Council of Baltimore*, 709 F.3d at 136.

[47]      *Laumann*, 907 F. Supp. 2d at 486–87.  *Accord Modern Home,* 513 F.2d at 110 ("noting that "decisions [that are] interdependent . . . raise the inference of a tacit agreement"); *Levitch,* 495 F. Supp. at 674 ("It must be demonstrated that the parallel decisions were interdependent in order to raise the inference of a tacit agreement.").

[48]     *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (quotation marks and citations omitted).

[49]     *Primetime 24 Joint Venture v. National Broad., Co.,* 219 F.3d 92, 103 (2d Cir. 2000) (quotation marks and citations omitted).  *Accord E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 29 (2d Cir. 2006) ("A violation of Section 1 generally requires a combination or other form of concerted action between two legally distinct entities resulting in an unreasonable restraint on trade.").

lack . . . any redeeming virtue" are deemed *per se* violations of the Sherman Act.[50]

Outside this category of "necessarily illegal" restraints, "[t]he rule of reason is the

accepted standard for testing whether a practice restrains trade in violation of §

1."[51]  "The rule [of reason] distinguishes between restraints with anticompetitive

effect that are harmful to the consumer and restraints stimulating competition that

are in the consumer's best interest."[52]  In applying the rule of reason, courts "weigh

all of the circumstances surrounding the challenged acts to determine whether the

alleged restraint is unreasonable," taking into account "specific information about

the relevant business, the restraint's history, nature, and effect, and [w]hether the

businesses involved have market power."[53]  Certain challenged practices warrant

an "abbreviated or quick-look rule of reason analysis"[54] where "the great likelihood

---

[50]     *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 887 (2007) (internal quotations and citations omitted).  Categorizing a restraint as *per se* illegal "eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work."  *Id.* at 886.

[51]     *Id.* at 885–86.

[52]     *Id.* at 886.

[53]     *Gatt Commc'ns, Inc. v. PMC Assoc., L.L.C.,* 711 F.3d 68, 75 n.8 (2d Cir. 2013) (quotation marks and citations omitted).

[54]     *Major League Baseball Prop., Inc. v. Salvino, Inc.,* 542 F.3d 290, 317 (2d Cir. 2008) (quotation marks and citations omitted).

of anticompetitive effects can be easily ascertained."[55]

In applying the rule of reason, the Second Circuit employs a burden-shifting framework:

> [P]laintiffs bear an initial burden to demonstrate the defendants' challenged behavior had an *actual* adverse effect on competition as a whole in the relevant market . . . . If the plaintiffs satisfy their initial burden, the burden shifts to the defendants to offer evidence of the pro-competitive effects of their agreement. . . . Assuming defendants can provide such proof, the burden shifts back to the plaintiffs to prove that any legitimate competitive benefits offered by defendants could have been achieved through less restrictive means. . . . Ultimately, the factfinder must engage in a careful weighing of the competitive effects of the agreement – both pro and con – to determine if the effects of the challenged restraint tend to promote or destroy competition.[56]

Plaintiffs can meet their initial burden by showing that defendants had market power and that their actions had an adverse effect on price, output, or quality.[57]

## B.   Section 2 of the Sherman Act

---

[55]     *Id.*  The Supreme Court found an abbreviated analysis appropriate where a league agreement expressly limited the number of college football games that could be televised and fixed minimum prices for those games.  *See National Collegiate Athletic Ass'n v. Board of Regents of the Univ. of Oklahoma*, 468 U.S. 85, 109–10 (1984) ("*NCAA*") ("[W]hen there is an agreement not to compete in terms of price or output, no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement.").

[56]     *Salvino,* 542 F.3d at 317 (internal quotation omitted).

[57]     *See United States v. Visa U.S.A., Inc.,* 344 F.3d 229, 238 (2d Cir. 2003).

Section 2 of the Sherman Act states that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony . . . ."[58] In order to state a claim for monopolization under Section 2, plaintiffs must establish "'(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'"[59]  Specifically, plaintiffs must establish that the defendant "(1) engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power."[60]

## C.    The Baseball Exemption

In 1922, in *Federal Baseball Club of Baltimore v. National League of Professional Baseball Clubs,* the Supreme Court held that "the business [of] giving

---

[58]     15 U.S.C.A. § 2 (West 2014).

[59]     *In re DDAVP Direct Purchaser Antitrust Litig.,* 585 F.3d 677, 687 (2d Cir. 2009) (quoting *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002)).

[60]     *Affinity LLC v. GfK Mediamark Research & Intelligence, LLC,* 547 Fed. App'x 54, 57 (2d Cir. 2013).  *Accord PepsiCo,* 315 F.3d at 105.

exhibitions of baseball" was not subject to the Sherman Act.[61]  The plaintiff baseball club alleged that the defendants had destroyed the Federal League, a former competitor of the American and National Leagues, by poaching its constituent clubs.[62]  The Court affirmed dismissal and held that "exhibitions of base ball [] [were] purely state affairs" that did not constitute interstate commerce subject to the antitrust laws.[63]

In 1953, the Court again addressed the so-called "baseball exemption" in *Toolson v. New York Yankees, Inc.*[64]  In *Toolson*, a professional baseball player sued multiple baseball clubs and leagues for antitrust violations stemming from major league baseball's ineligibility rules, which permitted teams to transfer players without their consent.  Any player who refused to comply with an involuntary transfer was branded "ineligible" and banned from playing for any other team.[65]  The plaintiff also argued in his written submissions that the

---

[61]     259 U.S. 200, 208 (1922).

[62]     *See id.* at 207.

[63]     *Id.* at 208.

[64]     346 U.S. 356 (1953).  The Supreme Court in *Toolson* affirmed the decisions in three different cases on appeal from the Sixth and Ninth Circuits.  *See Corbett v. Chandler*, 202 F.2d 428 (6th Cir. 1953); *Kowalski v. Chandler*, 202 F.2d 413 (6th Cir. 1953); *Toolson v. New York Yankees*, 200 F.2d 198 (9th Cir. 1952).

[65]     *See Toolson v. New York Yankees*, 101 F. Supp. 93, 93 (S.D. Cal. 1951) ("*Toolson I*"), *aff'd*, 200 F.2d 198 (9th Cir. 1952) ("*Toolson II*"), *aff'd*, 346

17

defendants' territorial broadcasting restrictions constituted an illegal restraint of trade in violation of the Sherman Act.[66]

The district court addressed solely the plaintiff's allegations involving the ineligibility rules[67] and dismissed the case based on the Supreme Court's determination in *Federal Baseball* that the business of baseball did not constitute interstate commerce.[68]  The court discussed television broadcasting only in the context of evaluating the degree of baseball's interstate nexus.[69]  The Ninth Circuit affirmed the decision without comment.[70]

In *Toolson III's* two companion cases, *Kowalski v. Chandler* and

---

U.S. 356 (1953) ("*Toolson III*").

[66]    In his submissions to the Ninth Circuit, the plaintiff argued that defendants had agreed amongst themselves that "no Major League club shall authorize a broadcast or telecast of any of its games from a station outside its home territory and within the home territory of any other baseball club, without the consent of such other clubs." Petitioner's Opening Brief on Writ of Certiorari to the United States Court of Appeals for the Ninth Circuit, *Toolson II* (No. 13228), 1953 WL 78316, at *6.  As a result, plaintiff argued, the defendants had "greatly lessened and eliminated all competition in the exhibition of baseball games by means of broadcasting and televising among the several states." *Id.* at *9.

[67]    The district court's summary of the plaintiff's claims omits any mention of the broadcasting allegations.  *See Toolson I*, 101 F. Supp. at 93.

[68]    *See id.* at 94–95.

[69]    *See id.* at 94.

[70]    *See Toolson II.*

*Corbett v. Chandler*, the Sixth Circuit affirmed dismissal of antitrust claims against the League on interstate commerce grounds.  As in *Toolson*, television broadcasting was mentioned only in the context of deciding whether baseball had a sufficient interstate nexus.[71]

The Supreme Court affirmed all three decisions in one paragraph, reiterating *Federal Baseball's* holding that "the business of providing public baseball games for profit between clubs of professional baseball players [is] not within the scope of the federal antitrust laws."[72]  The Court noted that the business of baseball had developed for thirty years in reliance on *Federal Baseball*, and that "if there are evils in this field which now warrant application to it of the antitrust laws it should be by legislation."[73]  Thus, the Court affirmed the judgments below "on the authority of *Federal Baseball Club of Baltimore v. National League of Professional Baseball Clubs*, [] so far as that decision determine[d] that Congress had no intention of including the business of baseball within the scope of the federal antitrust laws."[74]

---

[71]    *See Kowalski,* 202 F.2d at 414; *Corbett,* 202 F.2d at 413.  In *Corbett,* the Sixth Circuit affirmed the district court without comment except to reference its decision in *Kowalski,* which was issued the same day.

[72]    *Toolson III,* 346 U.S. at 357.

[73]    *Id.*

[74]    *Id.*

In 1961, Congress enacted the Sports Broadcasting Act ("SBA"), which created an antitrust exemption for certain types of professional sports broadcasting agreements, particularly league-wide contracts for over-the-air broadcasts.[75]  Aside from that limited exception, the SBA did not change the applicability of the antitrust laws to professional sports.[76]  The Act expressly did not apply to any agreement that "prohibits . . . [the] televising [of] any games within any [geographic] area, except within the home territory of a member club of the league on a day when such club is playing at home."[77]  The Supreme Court noted that the SBA:

_____

[75]   *See* 15 U.S.C.A. § 1291 (West 2014) ("The antitrust laws . . . shall not apply to any joint agreement by or among persons engaging in or conducting the organized professional team sports of football, baseball, basketball, or hockey, by which any league of clubs participating in professional football, baseball, basketball, or hockey contests sells or otherwise transfers all or any part of the rights of such league's member clubs in the sponsored telecasting of the games of football, baseball, basketball, or hockey, as the case may be, engaged in or conducted by such clubs.").  *See also NCAA*, 468 U.S. at 104 n.28 (stating that the SBA "grant[ed] professional sports an exemption from the antitrust laws for joint marketing of television rights").

[76]   *See* 15 U.S.C.A. § 1294 (West 2014) ("Nothing contained in this chapter shall be deemed to change, determine, or otherwise affect the applicability or nonapplicability of the antitrust laws to any act, contract, agreement, rule, course of conduct, or other activity by, between, or among persons engaging in, conducting, or participating in the organized professional team sports of football, baseball, basketball, or hockey, except the agreements to which section 1291 of this title shall apply.").

[77]   *Id.* § 1292.

20

demonstrates Congress' recognition that agreements among league members to sell television rights in a cooperative fashion could run afoul of the Sherman Act, and in particular reflects its awareness of the decision in *United States v. National Football League*, 116 F.Supp. 319 (E.D. Pa. 1953), which held that an agreement among the teams of the National Football League [not to telecast games in certain geographic areas at certain times] violated § 1 of the Sherman Act.[78]

In 1972, the Supreme Court again addressed the baseball exemption in *Flood v. Kuhn*.[79] The plaintiff, a professional baseball player, challenged the "reserve system," which allowed teams to transfer players without their consent and precluded players from independently signing with new teams. The Court expressly held that baseball was "a business [] engaged in interstate commerce," undercutting the entire legal basis for the antitrust exemption as articulated in *Federal Baseball* and *Toolson*.[80] Nonetheless, the Court preserved the exemption as "an aberration that has been with us now for half a century, one heretofore deemed fully entitled to the benefit of stare decisis . . . ."[81] Because the exemption had been allowed to develop without any congressional interference despite "full

---

[78]     *NCAA*, 468 U.S. at 104 n.28.

[79]     *See* 407 U.S. 258 (1972).

[80]     *Id.* at 282.

[81]     *Id.*

21

and continuing congressional awareness,"[82] the Court held that "the remedy, if any

is indicated, is for congressional, and not judicial, action."[83]  The Court specifically

addressed the reserve clause in its discussion and holding, concluding that the

"*reserve system* enjoy[s] exemption from the federal antitrust laws," and "Congress

as yet has had no intention to subject baseball's *reserve system* to the reach of the

antitrust statutes."[84]

      Since *Flood,* the Court has expressly questioned the logic of the

baseball exemption, calling it "at best of dubious validity" and refusing to extend it

to other professional sports.[85]  The Court noted that, "were [it] considering the

question of baseball for the first time upon a clean slate," it would not adopt an

antitrust exemption.[86]

      In 1998, Congress passed the Curt Flood Act, which provided that

"conduct, acts, practices, or agreements of persons in the business of organized

professional major league baseball directly relating to or affecting employment of

major league baseball players" are "subject to the antitrust laws to the same extent"

---

[82]    *Id.* at 283.

[83]    *Id.* at 285.

[84]    *Id.* at 282–83 (emphasis added).

[85]    *Radovich v. National Football League,* 352 U.S. 445, 450 (1957).

[86]    *Id.* at 452.

as other sports.[87]  In other words, the Act removed employment-related agreements from the common law baseball exemption.  The Act did not alter the applicability of the antitrust laws to "any conduct, acts, practices, or agreements other than . . . employment of major league baseball players."[88]

### D.    Antitrust Standing Under Illinois Brick

The Supreme Court's decision in *Illinois Brick Co. v. Illinois* established that "[g]enerally, only direct purchasers have standing to bring civil antitrust claims."[89]  The rule serves to avoid the difficulties of "apportion[ing] the recovery among all potential plaintiffs . . . from direct purchasers to middlemen to ultimate consumers," eliminates the possibility of duplicative recovery, and promotes enforcement by purchasers who have been most directly injured by the alleged violation.[90]  "[W]here intermediate purchasers in the chain of distribution . . . [are] participants in the conspiracy, the first purchasers who are not part of the

---

[87]     15 U.S.C.A. § 26b(a) (West 2014).

[88]     *Id.* § 26b(b).

[89]     *Simon v. KeySpan Corp.*, 694 F.3d 196, 201 (2d Cir. 2012) (citing *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977)).

[90]     *Illinois Brick*, 431 U.S. at 728–33, 741–47.  *Accord Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 216 (1990) (affirming *Illinois Brick* and cautioning that "the possibility of allowing an exception [to the direct purchaser requirement], even in rather meritorious circumstances, would undermine the rule").

conspiracy 'are entitled to collect damages from both the manufacturers and their intermediaries if conspiracy and overcharges can be established.'"[91]

## V.    DISCUSSION

### A.    The Baseball Exemption Does Not Apply to Territorial Broadcasting Restrictions

The continued viability and scope of the baseball exemption are far from clear.  The MLB Defendants argue that the territorial broadcasting restrictions at issue here fall under the exemption and preclude their liability.  They base their argument principally on the holding in *Toolson* and the language of the Curt Flood Act.[92]  Specifically, the MLB Defendants argue that the Supreme Court in *Toolson* affirmed dismissal of *all* of the plaintiff's claims, including the factual allegations related to territorial broadcasting restrictions.  Therefore, the Court must have found those restrictions to be covered by the exemption.

However, none of the published opinions in the *Toolson* cases – at the district, circuit, or Supreme Court levels – even mentioned the territorial broadcasting allegations.  Additionally, the Supreme Court expressly limited its

---

[91]     *Laumann*, 907 F. Supp. 2d at 482 (quoting *Paper Sys. Inc. v. Nippon Paper Indus. Co.,* 281 F.3d 629, 632 (7th Cir. 2002)).

[92]     *See* MLB Mem. at 10 (arguing that the Curt Flood Act and the official Senate Report indicate that Congress did not intend the antitrust laws to apply to broadcasting).

holding in *Toolson* to the contours of its decision in *Federal Baseball*, which rested entirely on interstate commerce grounds and did not involve broadcasting-related allegations.  Indeed, because television broadcasting is an interstate industry by nature, it cannot fall within the exemption defined by *Federal Baseball.*  It would be strange to read *Toolson* to expand *Federal Baseball's* holding to territorial broadcasting restrictions *sub silentio.*

Moreover, the language and structure of the SBA suggest that, as of 1961, Congress understood sports broadcasting agreements to fall *outside* the baseball exemption.  The provision of the SBA granting limited immunity to a narrow category of broadcasting agreements would be meaningless if all baseball broadcasting agreements were already covered by the common law exemption.[93] Moreover, the SBA expressly excluded from its safe harbor most agreements involving geographic broadcasting territories, suggesting that Congress intended such agreements to be subject to the antitrust laws.[94]

Congressional understanding is relevant because *Flood* replaced

---

[93]   The SBA expressly applies to professional football, baseball, basketball, and hockey.  *See* 15 U.S.C.A. § 1291.

[94]   *See id.* § 1292 ("Section 1291 of this title shall not apply to any joint agreement described in the first sentence in such section which prohibits any person to whom such rights are sold or transferred from televising any games within any area, except within the home territory of a member club of the league on a day when such club is playing a game at home.").

*Federal Baseball's* and *Toolson's* holdings based on interstate commerce with a

limited holding based only on stare decisis and inferred congressional intent.

Therefore, Congress's understanding of the scope of the baseball exemption before

*Flood* is highly persuasive.

Moreover, in rejecting the holdings in *Federal Baseball* and *Toolson*,

the *Flood* Court made specific reference to the reserve system throughout its

analysis, permitting a narrower reading of the exemption.[95]   One district court

concluded that "the antitrust exemption created by *Federal Baseball* is limited to

baseball's reserve system."[96]   Other courts have interpreted *Flood* to preserve a

broader exemption for professional baseball.[97]   However, defendants cite no case

---

[95]      *See* 407 U.S. at 282 ("With its reserve system enjoying exemption from the federal antitrust laws, baseball is, in a very distinct sense, an exception and an anomaly."); *id.* at 283 ("Congress as yet has had no intention to subject baseball's reserve system to the reach of the antitrust statutes.").

[96]      *Piazza v. Major League Baseball,* 831 F. Supp. 420, 438 (E.D. Pa. 1993).

[97]      *See, e.g., Charles O. Finley v. Kuhn,* 569 F.2d 527, 541 (7th Cir. 1978) (concluding that the Supreme Court in *Flood* "intended to exempt the business of baseball, not any particular facet of that business, from the federal antitrust laws"); *City of San Jose v. Office of Comm'r of Baseball*, No. C-13-02787, 2013 WL 5609346 (N.D. Cal. Oct. 11, 2013) (finding exemption applicable to club relocation); *Major League Baseball v. Butterworth,* 181 F. Supp. 2d 1316, 1332 (N.D. Fla. 2001), *aff'd on other grounds sub nom. Major League Baseball v. Crist,* 331 F.3d 1177 (11th Cir. 2003) ("It is difficult to conceive of a decision more integral to the business of major league baseball than the number of clubs that will be allowed to compete.").

that applied the exemption to broadcasting restrictions except one judge's

comments from the bench in granting a motion to dismiss several years before the

SBA was enacted.[98]   The only published federal court opinion to address the

question after the SBA, *Henderson Broadcasting Corp. v. Houston Sports

Association*, found the exemption inapplicable to a baseball club's radio

broadcasting agreements.[99]   *Henderson* reasoned as follows:

> [The Supreme Court] has implied that broadcasting is not central
> enough to baseball to be encompassed in the baseball exemption
> . . . Congressional action does not support an extension of the
> exemption to radio broadcasting . . . [and] lower federal courts
> have declined to apply the baseball exemption in suits involving
> business enterprises which, like broadcasting, are related to but
> separate and distinct from baseball.[100]

All of these arguments apply with equal force here.

---

[98]     *See Hale v. Brooklyn Baseball Club, Inc.*, No. 1294 (N.D. Tex. 1958),
Ex. 1 to MLB Mem.

[99]     *See* 541 F. Supp. 263 (S.D. Tex. 1982)*.*

[100]     *Id.* at 265.   As *Henderson* noted, a line of cases has found the
exemption inapplicable to club or player contracts with third parties.   *See Crist*,
331 F.3d at 1183 (noting that "the antitrust exemption has not been held to
immunize the dealings between professional baseball clubs and third parties");
*Postema v. National League of Prof'l Baseball Clubs,* 799 F. Supp. 1475, 1489
(S.D.N.Y. 1992), *rev'd on other grounds,* 998 F.2d 60 (2d Cir. 1993) (finding
baseball exemption inapplicable to League and club employment relations with
umpires).   In another case involving player contracts with third parties, the court
did not discuss the baseball exemption at all.   *See Fleer Corp. v. Topps Chewing
Gum, Inc.,* 658 F.2d 139 (3rd Cir. 1981) (addressing baseball card licensing
agreements between players' union and third party retailer).

Defendants argue that the Curt Flood Act reveals a congressional consensus that sports broadcasting agreements are covered by the baseball exemption.  They point to language from a Congressional Budget Office ("CBO") cost estimate suggesting that the Act would retain the antitrust exemption for a variety of topics, including "league expansion, franchise location, the amateur draft, and broadcast rights."[101]  However, a CBO cost estimate is not persuasive evidence of congressional intent.  The statutory language expressly does not change "the application of the antitrust laws" with respect to any topic other than "employment of major league baseball players," including but not limited to "the marketing or sales of the entertainment product of organized professional baseball and the licensing of intellectual property rights owned or held by organized professional baseball teams individually or collectively."[102]  It is a tenuous inference that Congress considered broadcasting exempt simply because "sales of the entertainment product of organized professional baseball" and "licensing of intellectual property rights" were included in a long list of topics that would remain unchanged by the Act.[103]  The Curt Flood Act adds little to the analysis of whether

---

[101]     MLB Mem. at 10 (quoting S. Rep. No. 105-118, at 6 (1997)).

[102]     15 U.S.C.A. § 26b(b)-(b)(3) (West 2014).

[103]     *Id.*

territorial broadcasting restrictions fall under the common law baseball exemption.

Exceptions to the antitrust laws are to be construed narrowly.[104]

Moreover, the Supreme Court has expressly questioned the validity and logic of

the baseball exemption and declined to extend it to other sports.[105]  I therefore

decline to apply the exemption to a subject that is not central to the business of

baseball, and that Congress did not intend to exempt — namely baseball's

contracts for television broadcasting rights.

### B.    The League Defendants Are Not Entitled to Summary Judgment

While territorial divisions of a market are normally per se

violations,[106] the Supreme Court has held that a per se approach is inappropriate in

the context of sports broadcasting restrictions due to the necessary interdependence

---

[104]    *See Square D Co. v. Niagara Frontier Tariff Bureau, Inc.,* 476 U.S. 409, 421 (1986) ("[E]xemptions from the antitrust laws are strictly construed and strongly disfavored. . . ."). *See also F.T.C. v. Phoebe Putney Health Sys., Inc.,* 133 S. Ct. 1003, 1010 (2013) ("But given the fundamental national values of free enterprise and economic competition that are embodied in the federal antitrust laws, state-action immunity is disfavored, much as are repeals by implication.") (quotation marks and citations omitted).

[105]    *See Radovich,* 352 U.S. at 451–52 (football); *United States v. International Boxing,* 348 U.S. 236, 242–43 (1955) (boxing).

[106]    *See Salvino,* 542 F.3d at 315 ("Among the practices that have been held to be per se illegal are geographic division of markets. . . .") (citing *United States v. Topco Assoc., Inc.,* 405 U.S. 596 (1972)).

of the teams within a League.[107]  On the other hand, the procompetitive benefit of the challenged scheme here is not so obvious that the case can be resolved in favor of defendants in the "'twinkling of an eye.'"[108]  Therefore the rule of reason is the appropriate standard in this case.[109]

Plaintiffs have carried their initial burden of showing an actual impact on competition.  The clubs in each League have entered an express agreement to limit competition between the clubs – and their broadcaster affiliates – based on geographic territories.  There is also evidence of a negative impact on the output, price, and perhaps even quality of sports programming.  Plaintiffs' expert, Dr. Roger G. Noll, attests that consumers pay higher prices for live game telecasts, and have less choice among the telecasts available to them, than they would in the absence of the territorial restrictions.[110]  Similarly, Dr. Noll estimates that the price

---

[107]    *See NCAA,* 468 U.S. at 117 ("Our decision not to apply a per se rule to this case rests in large part on our recognition that a certain degree of cooperation is necessary if the type of competition that petitioner and its member institutions seek to market is to be preserved.").

[108]    *American Needle, Inc. v. National Football League,* 560 U.S. 183, 203 (2010) (quoting *NCAA*, 468 U.S. at 109 n.39).  *Accord Salvino,* 542 F.3d at 316 ("Per se treatment is not appropriate . . . where the economic and competitive effects of the challenged practice are unclear.").

[109]    The facts of this case could conceivably be amenable to a "quick look" in favor of the plaintiffs.  However, it is unnecessary to consider this alternative given that the defendants' motions fail under the rule of reason.

[110]    *See* Declaration of Roger G. Noll ("Noll Decl.") at 6–8.

of OOM packages would decrease by about fifty percent in a world without the restrictions.[111]  Finally, defendants have not argued in these motions that the Leagues lack market power.[112]

Defendants respond by identifying various procompetitive effects of the territorial broadcast restrictions.  They claim that the rules: 1) prevent free riding, 2) preclude competition with joint venture products, 3) incentivize investment in higher quality telecasts, 4) maintain competitive balance, 5) preserve a balance between local loyalty and interest in the sport as a whole, and 6) increase the overall number of games that are telecast.  Plaintiffs deny that the territorial rules serve the above interests and also challenge the validity of the interests in light of the territorial rules' overall economic impact on competition.

*First,* defendants argue that the territorial rules prevent free riding. Although avoiding free riding can be a legitimate procompetitive goal in certain contexts, it is not clear how free riding would pose a threat in this case. Defendants argue that the clubs would "free ride" on the popularity and publicity

---

[111]     *See id.* at 104.

[112]     *See* MLB Mem. at 12 n.22 (preserving the MLB Defendants' right to challenge plaintiffs' definition of relevant market and market power although "not addressed in this motion"); NHL Mem. at 3 n.3 ("While the NHL Defendants vigorously contest Plaintiffs' proposed market definition and the assertion that NHL Defendants possess market power in any cognizable market, they are not moving for summary judgment on these issues in this motion.").

of the Leagues if they were permitted to license their games nationally.[113]

However, the same argument could be made for any revenue-producing activity

that an individual team undertakes, including local ticket sales.  Defendants also

claim that the clubs would "free ride" off the OOM packages by nationally

licensing individual club broadcasts, but it is the clubs and RSNs who create the

programming in the first place.  If anything, the OOM packages benefit from the

labor and investment of the clubs and RSNs, not the other way around.

Defendants' theory of free riding is unclear and unpersuasive.

   *Second,* defendants argue that the Leagues have an unassailable right

to prevent the clubs from competing with the "joint venture."  However, no case

cited by defendants stands for the proposition that a joint venture may always

prevent its members from competing with the venture product regardless of

anticompetitive consequences.  Rather, in each case, the court concluded based on

the facts presented that the restraint in question caused no actual harm to

competition.[114]  "If the fact that potential competitors shared in profits or losses

---

[113] *See* MLB Mem. at 18; NHL Mem. at 15–16.

[114] *See United States v. Penn-Olin Chem. Co.,* 378 U.S. 158, 169 (1964)
(observing that "[i]f the parent companies are in competition, or might compete
absent the joint venture, it may be assumed that neither will compete with the
progeny in its line of commerce," but specifically noting that this aspect of a joint
venture "often creates anticompetitive dangers")*; Rothery Storage & Van Co. v.
Atlas Van Lines, Inc.,* 792 F.2d 210, 214 (D.C. Cir. 1986) (holding that defendant's

from a venture meant that the venture was immune from § 1, then any cartel could evade the antitrust law simply by creating a joint venture to serve as the exclusive seller of their competing products."[115]

> *Third,* defendants argue that territorial exclusivity encourages the RSNs to invest in higher-quality telecasts, including high-definition cameras, announcers, audio-visual effects, and related pre-game and post-game programming. However, the incentive for added investment is inflated profit stemming from limited competition. "[T]he Rule of Reason does not support a defense based on the assumption that competition itself is unreasonable."[116] To the extent that the Leagues defend *content* exclusivity rather than territorial

---

"market share [was] far too small for the restraint to threaten competition or to have been intended to do so"); *Madison Square Garden, L.P. v. National Hockey League,* No. 07 Civ. 8455, 2007 WL 3254421, at *7 (S.D.N.Y. Nov. 2, 2007), *aff'd,* 270 Fed. App'x 56 (2d Cir. 2008) (noting in dicta that some courts have "[upheld] agreements among parents of a joint venture not to compete in the market in which the joint venture operates" without suggesting that all such agreements are lawful).

[115]   *American Needle,* 560 U.S. at 201 (quotation marks and citations omitted).

[116]   *National Soc'y of Prof'l Eng'rs v. United States,* 435 U.S. 679, 695–96 (1978) ("The Sherman Act reflects a legislative judgment that ultimately competition will produce not only lower prices, but also better goods and services."). *Cf. FTC v. Superior Ct. Trial Lawyers Ass'n,* 493 U.S. 411, 423 (1990) (rejecting argument that otherwise unlawful boycott to increase lawyer fees is justifiable by improved quality of representation).

exclusivity, Dr. Noll predicts that increased competition would overall improve output and consumer satisfaction, an argument that applies with equal force to the quality of telecasts.[117]

*Fourth,* defendants argue that the territorial restrictions foster competitive balance between the teams and prevent excessive disparities in team quality. Maintaining competitive balance is a legitimate and important goal for professional sports leagues.[118] However, it is unclear whether the territorial restrictions at issue here really serve that purpose. On the one hand, the restrictions protect less popular clubs from competition with more popular teams in their own HTTs. On the other hand, the system requires small market teams to refrain from broadcasting in larger, more populous markets, while big market teams forego only smaller, less populous markets.[119] It is not immediately clear whether the restrictions help or harm competitive balance overall.[120]

---

[117]    *See* Noll Decl. at 107, 109.

[118]    *See American Needle,* 560 U.S. at 204 (noting that "'the interest in maintaining a competitive balance' among 'athletic teams is legitimate and important'") (quoting *NCAA*, 468 U.S. at 117). *See also Salvino,* 542 F.3d at 331 (stating that "the need for competitive balance among the Clubs is essential to the well-being of [professional sports] Leagues").

[119]    *See* Noll Decl. at 117.

[120]    *See id.* ("Economic research provides no reason to believe that restrictions in competition for television rights contribute to competitive balance, no matter how balance is defined, and some reason to believe that these restrictions

Defendants also claim that the revenue sharing aspects of the OOM packages and national broadcasts foster competitive balance. However, there is support in the economic community for the theory that revenue sharing in fact exacerbates competitive imbalance.[121] Even accepting the premise that revenue sharing is beneficial, defendants have not explained why broadcasting contracts are a better mechanism than more direct, limited forms of revenue sharing.[122]

*Fifth*, defendants claim that they have a legitimate pro-competitive interest in maintaining "a balance between the promotion of [hockey and baseball] as [] national game[s] and the need to incentivize Clubs to build their local fan bases."[123] Aside from the fact that these two goals appear to conflict, defendants have not explained what the ideal balance would be, or how they might quantify it. There is no objective measure the Leagues could aspire to attain. Therefore defendants cannot establish that this particular balance between local and national interests is better for consumers, or for demand, than the balance that would prevail in a free market. Moreover, the Leagues purport to bolster regional interest and

---

actually make balance worse.").

[121]    *See id.* at 118–19.

[122]    *See id.* at 119–20 ("Both leagues already share revenues. . . . If the leagues wish to share revenue more equally, simply increasing the share of total revenue that is shared is a much simpler mechanism for achieving this goal. . . .").

[123]    NHL Mem. at 2. *Accord* MLB Mem. at 15–16.

team loyalty by consciously depriving consumers of out-of-market games they would prefer, which is generally not a permissible aim under the antitrust laws.[124]

Finally, defendants argue that the number of telecasts created and broadcast is greater under the territorial restrictions than it would be in the plaintiffs' "but-for" world.  According to defendants, while almost every game is currently available to consumers in one format or another (national broadcast, local RSN, or OOM package), a system dependent on consumer demand could not guarantee that every game would be available everywhere because less popular teams would struggle to get their games produced or televised on their own.[125] Destroying the HTTs would also destroy content exclusivity because OOMs and both competing teams would be able to sell the same game in the same areas.[126]  As a result, RSNs would be loathe to give their telecasts to the Leagues to create OOM packages, depriving consumers of the ability to access any and all out-of-market

---

[124]     *See NCAA,* 468 U.S. at 107 n.34 ("Perhaps the most pernicious aspect is that under the controls, the market is not responsive to viewer preference. . . . Many games for which there is a large viewer demand are kept from the viewers, and many games for which there is little if any demand are nonetheless televised.") (quotation marks and citations omitted).

[125]     *See* MLB Mem. at 14, 19–20; NHL Mem. at 13 n.6, 21–22.  *See also* MLB Mem. at 19 (arguing that "certain currently less popular or less successful clubs inevitably will be inherently unable to compete fully effectively on their own in the national market for the sale of live game video rights" (quotations omitted)).

[126]     *See* MLB Mem. at 13.

games as they do now.[127]  Similarly, national broadcasters would refuse to enter into national contracts without the assurance of exclusivity.[128]  Because plaintiffs do not challenge the legality of the OOM packages or national broadcasts, defendants argue, the territorial system is also immune from challenge as a matter of law.

These arguments are far from compelling.  Just because plaintiffs do not directly challenge the legality of the OOM packages and national broadcasts does not mean that preserving them is sufficient justification for the territorial rules.[129]  Even the complete disappearance of OOM packages would not necessarily cause consumer harm if the same content could be distributed in another form (such as by RSNs nationwide).  The OOMs are simply one form of delivering the content to consumers – a form made necessary by the territorial rules themselves.  Moreover, it is certainly conceivable that the OOMs would continue to exist absent the territorial restrictions, given the low added cost of creating the

---

[127]     *See id.* at 14 n.28.

[128]     *See* NHL Mem. at 11, 14 n.7.

[129]     The same argument applies to content exclusivity, which, although not directly offending the antitrust laws, may nonetheless fail to justify a range of other anticompetitive effects.

packages and the convenience of bundling to many consumers.[130]

Defendants' assumption that market demand would be insufficient to ensure access to the same number of games is questionable.[131]  Indeed, the Television Defendants insist that the sports rights are so valuable that they would compete for those rights vigorously even in the absence of the territorial rules.[132]  Moreover, "[a] restraint that has the effect of reducing the importance of consumer preference in setting price and output is not consistent with th[e] fundamental goal of antitrust law."[133]  While defendants have identified some conceivable procompetitive effects from the territorial rules, plaintiffs have produced equally plausible (if not more plausible) arguments in opposition.  It certainly cannot be said that defendants have established procompetitive benefits to the economy as a matter of law.

Defendants cite *Virgin Atlantic Airways Ltd. v. British Airways PLC*

---

[130]     *See* Noll Decl. at 114 ("Because the profit margin of the league package is so large, the league could lose a very large share of the customers for its league package and still profit from continuing to offer it.  Likewise . . . [t]he continued existence of national telecasts of games in college sports demonstrates that such national packages are financially viable even when the broadcaster does not enjoy exclusive rights to broadcast a particular sport in a particular time period.").

[131]     *See id.* at 95–97, 110.

[132]     *See* Comcast Mem. at 7; DIRECTV Mem. at 13–14.

[133]     *NCAA*, 468 U.S. at 107.

for the proposition that plaintiffs must identify a less restrictive alternative for any procompetitive effect defendants can identify, even if the overall effect on the economy is overwhelmingly anticompetitive.[134]  Such an interpretation, however, is inconsistent with the Supreme Court's mandate that "the essential inquiry [under the rule of reason] . . . [is] whether or not the challenged restraint enhances competition."[135]  Indeed, in *United States v. Visa U.S.A., Inc.*, the Second Circuit balanced the alleged procompetitive and anticompetitive effects of the exclusivity rules before requiring the Government to propose any less restrictive alternatives.[136]

Most of defendants' claimed pro-competitive effects are disputable, and the overall effect on the economy is even less conclusive, especially in light of Dr. Noll's testimony that abolishing the territorial restrictions would decrease the cost of sports programming without diminishing output.[137]  Far from being

---

[134]     *See* 257 F.3d 256, 264 (2d Cir. 2001).

[135]     *NCAA,* 468 U.S. at 104.  *Accord Leegin Creative Leather Prod., Inc. v. PSKS, Inc.,* 551 U.S. 877, 886 (2007) ("The rule of reason is designed and used to ascertain whether transactions are anticompetitive or procompetitive.").

[136]     *See* 344 F.3d 229, 243 (2d Cir. 2003) (affirming district court's finding of Section 1 liability after non-jury trial because "the defendants have failed to show that the anticompetitive effects of their exclusionary rules are outweighed by procompetitive benefits").

[137]     *See* Noll Decl. at 104, 109–10.

implausible, plaintiffs' "but-for" world is at least as likely as defendants' prognostications.  Plaintiffs have raised a genuine issue of material fact regarding the overall competitive impact of the territorial rules, foreclosing the possibility of summary judgment for the Leagues under the rule of reason.

### C. The Television Defendants Are Not Entitled to Summary Judgment

#### 1. Liability for the Vertical Agreements

The Television Defendants argue that downstream distributors who simply implement the restrictions of an upstream conspiracy through vertical agreements, without further involvement, cannot be deemed participants in the conspiracy as a matter of law.[138]  They argue that the RSNs and MVPDs played no role in creating the territorial restrictions, which were presented to them on a non-negotiable basis, and have never sought to enforce the restrictions against other horizontal participants.  Therefore, they have not engaged in any "concerted action" and cannot be held liable for the territorial limits in the Rights Agreements even if those limits violate the Sherman Act.

The Television Defendants cite *Bowen v. New York News, Inc.,*[139]

---

[138]    *See* Comcast Mem. at 1; DIRECTV Mem. at 10–12, 18.

[139]    522 F.2d 1242 (2d Cir. 1975).

*Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*,[140] *Levitch v. Columbia Broadcasting System, Inc.*,[141] and *Virgin Atlantic*[142] for the proposition that a downstream entity must either request the restraint or attempt to enforce the restraint in order to be liable.  However, none of these cases support the Television Defendants' assertions.  The courts in *Fuchs*, *Virgin Atlantic*, and *Levitch* found insufficient evidence of *any* agreement between the downstream and upstream entities.  In all three cases, the upstream entity implemented a unilateral policy change that did not require assent, participation, or forbearance of any kind by the alleged conspirators.[143]  Here, contracts with the downstream entities explicitly incorporate the challenged restrictions.  The Leagues require the assent and assistance of the RSNs to implement the restrictions, and the RSNs require the same level of

---

[140]    602 F.2d 1025 (2d Cir. 1979).

[141]    495 F. Supp. at 649.

[142]    257 F.3d at 256.

[143]    *See id.* at 263 (airline's unilateral decision to offer discounts and incentives to corporate partners and travel agents did not constitute concerted action with the partners and agents); *Fuchs,* 602 F.2d at 1031 (finding that sugar manufacturer made unilateral decision to change its policy in a manner that benefitted the defendant brokers, but without any involvement by the brokers); *Levitch*, 495 F. Supp. at 673 (finding no agreement between broadcast networks and affiliate television stations where networks made unilateral decision to use only documentaries produced in-house, and "nothing contained in any of the affiliation agreements, or any of the other contractual agreements executed by the network defendants and their affiliates, [] preclude[d] the affiliates from purchasing independently produced documentary or news programs").

participation from the MVPDs.

The Television Defendants also cite *Bowen,* in which a newspaper publisher switched to a system of exclusive franchise dealers instead of the many competing independent dealers it had previously employed.  The newspaper limited each franchise dealer to a specified exclusive territory, and attempted to cut off supply to the independent dealers to prevent competition.  The court mused in dicta that "unilateral establishment and enforcement [by an upstream entity] of exclusive territories and customer limitations . . . might conceivably be upheld."[144] However, the court refrained from deciding the question given that the newspaper and the franchise dealers had agreed to cut off supply to the independent dealers, which the court found to be a violation of the Sherman Act.  Although the court noted that the dealers had asked the newspaper to cut off supply to the independents, it did not necessarily rely on that fact in reaching its conclusion. Instead, it emphasized that the newspaper's conduct was "undertaken pursuant to an agreement with the franchise dealers and for the purpose of restricting" competition.[145]

None of the decisions relied on by the Television Defendants held that

---

[144]     *Bowen,* 522 F.2d at 1256.

[145]     *Id.*

42

a downstream entity must request or enforce a restraint in order to be liable for

adopting it through agreement.[146]  Nor did they indicate that each party to an

allegedly unlawful agreement must have equal or even substantial negotiating

power in adopting the agreement's terms.[147]  Moreover, a downstream entity need

---

[146]     The Television Defendants cite dicta from *Fuchs* for the proposition that both parties to an unlawful agreement in restraint of trade must have "knowing and active participation . . . in a scheme to coerce compliance with anticompetitive activity." *Fuchs,* 602 F.2d at 1032.  The Television Defendants argue that "mere acceptance of vertical distribution rights" is insufficient to meet that standard.  Reply Memorandum of Law in Support of Television Defendants' Motions for Summary Judgment at 2.  However, *Fuchs* based its holding on the fact that the alleged co-conspirators were not independent entities, and that the challenged action was unilateral rather than the product of agreement.  It did not hold that "mere acceptance" of contractual terms was insufficient participation to establish concerted action.

          Additionally, a fact finder could reasonably conclude that the Television Defendants actively participated in a "scheme to coerce compliance" by signing the Rights Agreements knowing their competitors would be subject to the same terms, even if they did not personally attempt to enforce the restrictions.  Moreover, there is evidence that the RSNs and MVPDs have on some occasions tried to protect and preserve the territorial structure.  *See infra* Part V.C.2.

[147]     The Television Defendants also cite *Toscano v. Professional Golfers' Ass'n*, 258 F.3d 978 (9th Cir. 2001), in which the Ninth Circuit found no concerted action between a sports league and its sponsors because the league independently imposed certain contractual restrictions and the sponsors merely accepted them.  *See id.* at 985 ("The [sponsor] defendants played no role in the creation or enforcement of those rules and regulations. . . .").  However, *Toscano* is not binding law in the Second Circuit.  Moreover, there was no evidence in *Toscano* that the "sponsors [had] an economic interest in the eligibility and participation rules challenged." *Toscano v. PGA Tour, Inc.,* 70 F. Supp. 2d 1109, 1117 n.10 (E.D. Cal. 1999), *aff'd sub nom. Toscano v. Professional Golfers Ass'n,* 258 F.3d 978 (9th Cir. 2001).  In fact, the district court noted that the rules might actually contravene the sponsors' economic interests.  *See id.* at 1117.

not participate in the initial creation of the restraints in order to be liable for

adopting them later.  "It is elementary that an unlawful conspiracy may be and

often is formed without simultaneous action or agreement on the part of the

conspirators."[148]

Indeed, it would defy common sense to require proof that the

Television Defendants enforced the territorial restrictions when they knew that the

structure would be secured through a series of parallel contracts effectively policed

by the Leagues.  Nevertheless, plaintiffs have produced some evidence that the

Television Defendants have defended the territorial structure on the rare occasions

that it has been threatened.  In 2008, MLB attempted to adjust the territorial lines

to serve customers who could not watch local games, which would have required

clubs and RSNs to cede some territory to the OOM packages.  The Comcast RSNs

vehemently opposed the proposal and sent the following letter to MLB:

If MLB were to adopt any new MLB rule permitting MLB Extra

---

[148]     *Interstate*, 306 U.S. at 227 (finding that "each distributor early
became aware that the others had joined, [and] [w]ith that knowledge [] renewed
the arrangement and carried it into effect for the two successive years").  *Accord
United States v. Masonite Corp.*, 316 U.S. 265, 275 (1942) (Even if it were "not
clear at what precise point of time each [defendant] became aware of the fact that
its contract was not an isolated transaction but part of a larger arrangement . . . it is
clear that as the arrangement continued each became familiar with its purpose and
scope."); *Ross v. American Exp. Co.,* No. 04 Civ. 5723, 2014 WL 1396492, at *26
(S.D.N.Y. Apr. 10, 2014) ("Indeed, interdependent parallel conduct may be
simultaneous or sequential.").

Innings and/or MLB.TV to be distributed in unserved or underserved portions of a club's exclusive home television territory, the scope of the exclusivity purchased by the RSN would be unilaterally changed and the financial impact on the prospects and performance of the Comcast RSNs (and, by implication, on the clubs whose rights they hold) would likely be immediate and significant. Accordingly, the Comcast RSNs are unlikely to consider favorably the release of any portion of a home television territory as to which an RSN currently has exclusive rights.  In providing distribution information herewith, the Comcast RSNs specifically reserve all of their respective rights and remedies with respect to any change in MLB's current rules and practices that negatively impacts the clubs' respective home television territories and the breadth of the exclusive rights heretofore granted to their corresponding Comcast RSNs.[149]

Moreover, the MVPDs' 2007 contracts with MLB for the television OOM package have clauses that read in part: "[t]he Home Television Territory of any Club shall not be materially expanded by [MLB] except in connection with and directly related to any increase or decrease in the number of franchises . . . or in connection with any club relocation."[150]  While the clause does not permit the MVPDs to

---

[149]    Re: Request for Information – MLB Extra Innings and MLB.TV, Ex. 24 to 5/24/14 Declaration of Edward A. Diver, plaintiffs' counsel ("Diver Decl."), at 2.  Defendants argue that Comcast was simply preserving its exclusive right to broadcast local games through its entire in-market territory, rather than protecting itself from the broadcasts of out-of-market games.  Nonetheless, the letter reveals one mechanism by which the Television Defendants can "enforce" the various forms of exclusivity they have purchased from the League Defendants.

[150]    MLB Contract with DIRECTV for Extra Innings, Ex. 11 to Diver Decl., at 22–23; MLB Contract with iN Demand for Extra Innings, Ex. 12 to Diver Decl, at 16.  According to plaintiffs, iN demand's majority owner is Comcast, and

enforce the territorial restrictions against competitors, it applies pressure on the Leagues to retain the current territorial restrictions or face monetary repercussions. Similarly, former MLB President Robert DuPuy testified that the RSNs "insist" on "changed circumstances" clauses in the Rights Agreements that permit the RSNs to pay less if their exclusivity is abridged.[151] The above examples indicate that the Television Defendants are more than passive participants in a unilaterally imposed restriction.

### 2.     The Existence of a Horizontal Agreement

The Television Defendants argue that there are no plus factors that might signal interdependent action among the RSNs and MVPDs as opposed to merely parallel conduct.  They point out that the Rights Agreements with the various RSNs are staggered and often have terms of several years, making coordinated action difficult.[152] They further argue that plaintiffs have produced no evidence of a high volume of interfirm communications among the Television Defendants.[153] Finally, they argue that it is in the economic interest of an RSN to

---

Comcast CEO Brian Roberts played a central role in determining iN demand's carriage of Extra Innings. *See* Pl. Mem. at 70.

[151]     10/23/13 DuPuy Dep., Ex. 42 to Diver Decl., at 74:24-75:5.

[152]     *See* DIRECTV Mem. at 2.

[153]     Plaintiffs have produced one email exchange indicating that in 2010, Comcast asked DIRECTV's Pittsburgh RSN to lift its blackout of Flyers games in

enter into a Rights Agreement regardless of what the other RSNs do.[154]  In the

absence of plus factors, parallel conduct is insufficient to survive summary

judgment on a theory of horizontal conspiracy.

However, the potential for significantly increased profits from the

restraint is a "strong motive for concerted action."[155]  "This plus factor speaks to

whether [the Television Defendants] also had a 'rational economic motive' to

adopt those clauses jointly, as opposed to going it alone."[156]  The Television

Defendants argue that the plaintiffs' alleged conspiracy makes no economic sense

because it would inflate the sports rights fees paid by the Television Defendants to

the Leagues, and no entity would "conspire[] to *pay more* than they would

otherwise pay."[157]  This argument ignores the fact that the Television Defendants

pay higher rights fees because their revenues from consumers are correspondingly

---

Penguin territory in exchange for increased distribution of a DIRECTV RSN on
Comcast systems in Pennsylvania. DIRECTV apparently declined the offer. *See*
Pl. Mem. at 62; 7/9/10–7/14/10 Email Exchange, Ex. 13 to Diver Decl.

[154]     *See* Comcast Mem. at 7; DIRECTV Mem. at 1–2.

[155]     *Interstate,* 306 U.S. at 222.

[156]     *Ross*, 2014 WL 1396492, at *28 (citing *Matsushita Elec. Indus. Co.,
Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 596 (1986)).

[157]     Comcast Mem. at 1.

greater.[158]

Indeed, plaintiffs have presented ample evidence that the territorial restrictions are valuable to the Television Defendants. Boston Red Sox owner John Henry stated that the "primary benefit" of the territorial restrictions is "not to have to compete with other clubs or with [] baseball itself in your home television territory."[159] According to Henry, such exclusivity is "very valuable to broadcasters" and therefore "important to all clubs."[160] Similarly, John Tortora, former NHL Director of Team Television, testified that RSNs would be harmed by "bringing another club's games into another team's sphere of influence" because "the benefit of [the RSNs'] bargaining with [the clubs] [is] exclusivity in the marketplace."[161] In fact, the League Defendants claim that the territorial restrictions are so central to the profitability of broadcasting that the RSNs would stop producing many telecasts without them.[162] The potential for higher revenues

---

[158]   *See* Noll Decl. at 84, 104–105.

[159]   1/12/14 Henry Dep., Ex. 43 to Diver Decl., at 63:19-64:1.

[160]   *Id.* at 63:18, 64:10. Henry also testified that he was not aware of any other purpose for the territorial restrictions aside from protecting the clubs from competition in their home territories.

[161]   10/8/13 Tortora Dep., Ex. 45 to Diver Decl., at 253:1-10.

[162]   *See* MLB Mem. at 13–14, 19; NHL Mem. at 13 n.6, 21–22.

stemming from collective action constitutes a strong motive to collude.[163]

Additionally, plaintiffs plausibly argue that the terms of the Rights Agreements and Affiliation Agreements would contravene the individual economic interests of the Television Defendants in the absence of the territorial restrictions. Although the Television Defendants would likely continue to purchase broadcasting rights without the restrictions, plaintiffs have adduced evidence that they would not do so *at the same price.* In that sense their behavior is contingent on the knowledge that other RSNs and MVPDs are bound by the same contractual limits. Given the clear existence of parallel conduct and several plausible plus factors, a fact-finder could permissibly conclude that the RSNs' and MVPDs' decisions to enter the contracts – at the prices negotiated – were interdependent rather than unilateral.

Defendants cite *PepsiCo, Inc. v. Coca-Cola Co.* to argue that a series of parallel vertical restrictions, even coupled with knowledge that the restrictions will be uniformly enforced, is insufficient to establish the existence of a horizontal agreement. In *PepsiCo*, Coca-Cola prohibited its distributors from distributing

---

[163]    While plaintiffs have produced little direct evidence at this stage that the MVPDs profit from the territorial restrictions, it is a plausible inference that each entity in the chain of distribution negotiates for some share of the revenue generated through limited competition and increased prices. At this stage all reasonable inferences must be drawn in favor of the non-moving party. *See Rivera*, 743 F.3d at 19.

Pepsi products.[164]  Although Coca-Cola assured the distributors that it would enforce the same restriction against the other distributors and encouraged them to report violations, the court found insufficient evidence of a horizontal agreement.[165]  However, in *PepsiCo* there was no evidence that the distributors benefitted from the restriction or paid higher prices to Coca-Cola to obtain it. Here, by contrast, the combination of parallel conduct, knowledge of assured enforcement, strong motive to conspire, attempts to protect the restrictions, and evidence that the Television Defendants would not have entered the contracts at the prices prescribed but for the territorial restrictions, is sufficient evidence from which a fact finder could infer a tacit horizontal agreement among the RSNs and MVPDs.

Whether plaintiffs have presented sufficient evidence to demonstrate concerted action between the Television Defendants and the League Defendants, or a tacit agreement among the Television Defendants, is difficult to discern at this stage.  Consequently, these questions are not suitable for disposition as a matter of law and are properly reserved for the fact finder in light of the totality of the evidence presented at trial.  It is an unfortunate trend that judges increasingly

---

[164]    *See* 315 F.3d at 104 (affirming district court's grant of summary judgment in favor of Coca-Cola).

[165]    *See id.* at 110.

> resolve trial-worthy disputed fact issues or characterize cases as implausible, thereby disposing of them on motion rather than allowing them to proceed to trial. . . . [A] motion designed simply for identifying trial-worthy issues has become, on occasion, a vehicle for resolving trial-worthy issues. . . . The effect is to compromise the due process underpinnings of the day-in-court principle and the constitutional jury trial right without any empirical basis for believing that systemic benefits are realized that offset these consequences.[166]

Because plaintiffs have presented sufficient evidence to raise a genuine dispute of material fact, the Television Defendants' motion for summary judgment is denied.

### D.   *Illinois Brick* Does Not Bar the Television Plaintiffs' Suit

I previously held that the first non-conspirator in the chain of distribution is entitled to collect damages from all of the co-conspirators.[167]  The television plaintiffs purchased the relevant sports programming from the MVPDs. Therefore, their standing to sue the other defendants is contingent on the MVPDs'

---

[166]    Arthur R. Miller, *Simplified Pleading, Meaningful Days in Court, and Trials on the Merits: Reflections on the Deformation of Federal Procedure,* 88 N.Y.U. L. Rev. 286, 312 (2013) (discussing the increasing use of summary judgment and other trends in federal civil procedure).  *Accord S.E.C. v. EagleEye Asset Mgmt.*, 975 F. Supp. 2d 151, 159 (D. Mass. 2013) ("Too often, judges substitute their own judgment for that of the jury. . . . This cognitive illiberalism has been rightly condemned as a form of judicial arrogance. . . . Juries have not only the duty, but also the right to decide cases.  Encroaching upon the province of juries to decide questions of fact, such as the determination of a defendant's state of mind, violates not only the constitutional rights of the parties in a suit, but also the constitutional rights of the jurors themselves.").

[167]    *See Laumann*, 907 F. Supp. 2d at 481–83.

role in the conspiracy.  As discussed previously, the television plaintiffs have produced sufficient evidence that a reasonable fact-finder could find the MVPDs complicit in the alleged conspiracy.  Therefore, the television plaintiffs' claims are not barred at this stage.

###    E.    The Section 2 Claim

The League Defendants do not address the merits of plaintiffs' monopolization claim under Section 2 of the Sherman Act.  The MLB Defendants do not address the Section 2 claim at all, and the NHL Defendants argue only that the Section 2 claim must be dismissed because the Section 1 claim fails.[168] Because the League Defendants' motion for summary judgment on the Section 1 claim is denied, their sole argument for dismissal of the Section 2 claim has no merit.

## VI.    CONCLUSION

For the foregoing reasons, all four motions for summary judgment are DENIED in full.  The Clerk of the Court is directed to close these motions [Dkt. Nos. 180, 183, 212, 216, 224 in *Laumann*, 12 Civ. 1817, and Dkt. Nos. 239, 240, 241, 261, 271, 275, 280 in *Garber*, 12 Civ. 3704].  A conference is scheduled for

---

[168]    *See* NHL Mem. at 22 ("Plaintiffs' Section 2 claim fails for the same reasons as their Section 1 claim. . . . [C]onduct that fails to give rise to a claim under Section 1 cannot be the basis of a monopolization scheme under Section 2.") (quotation marks and citations omitted).

August 20, 2014 at 4:30 pm.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      August 4, 2014
            New York, New York

**- Appearances -**

**For Plaintiffs:**

Edward A. Diver, Esq.
Howard I. Langer, Esq.
Peter E. Leckman, Esq.
Langer Grogan & Diver, P.C.
Three Logan Square, Suite 4130
1717 Arch Street
Philadelphia, Pennsylvania 19103
(215) 320-5663

Kevin M. Costello, Esq.
Gary E. Klein, Esq.
Klein Kavanagh Costello, LLP
85 Merrimac St., 4th Floor
Boston, Massachusetts 02114
(617) 357-5034

Michael Morris Buchman, Esq.
John A. Ioannou, Esq.
Pomerantz Haudek Block Grossman & Gross LLP
600 Third Avenue
New York, New York 10016
(212) 661-1100

Alex Schmidt, Esq.
Mary Jane Fait, Esq.
Wolf Haldenstein Adler Freeman & Herz LLP
270 Madison Avenue
New York, New York 10016
(212) 545-4600

Robert LaRocca, Esq.
Kohn, Swift & Graf, P.C.
One South Broad Street

Suite 2100
Philadelphia, Pennsylvania 19107
(215) 238-1700

J. Douglas Richards, Esq.
Jeffrey Dubner, Esq.
Cohen, Milstein, Sellers & Toll, PLLC
88 Pine Street
New York, New York 10005
(212) 838-7797


**For Defendants Office of the Commissioner of Baseball, Major League
Baseball Enterprises Inc., MLB Advanced Media L.P., MLB Advanced
Media, Inc., Athletics Investment Group, LLC, The Baseball Club of
Seattle, L.L.P., Chicago White Sox, Ltd., Colorado Rockies Baseball Club,
Ltd., The Phillies, Pittsburgh Baseball, Inc., and San Francisco Baseball
Associates, L.P.**

Bradley I. Ruskin, Esq.
Carl Clyde Forbes, Esq.
Helene Debra Jaffe, Esq.
Jennifer R. Scullion, Esq.
Robert Davis Forbes, Esq.
Proskauer Rose LLP
11 Times Square
New York, New York 10036
(212) 969-3465

Thomas J. Ostertag, Esq.
Senior Vice President and General Counsel
Office of the Commissioner of Baseball
245 Park Avenue
New York, New York 10167
(212) 931-7855


**For Defendants National Hockey League, NHL Enterprises, L.P., NHL
Interactive Cyberenterprises, LLC, Chicago Blackhawk Hockey Team, Inc.,**

**Comcast-Spectacor, L.P., Hockey Western New York LLC, Lemieux Group, L.P., Lincoln Hockey LLC, New Jersey Devils LLC, New York Islanders Hockey Club, L.P. and San Jose Sharks, LLC**

Shepard Goldfein, Esq.
James A. Keyte, Esq.
Paul M. Eckles, Esq.
Matthew M. Martino, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036-6522
(212) 735-3000

**For Defendants DIRECTV, LLC, DIRECTV Sports Networks, LLC, DIRECTV Sports Net Pittsburgh, LLC a/k/a Root Sports Pittsburgh, DIRECTV Sports Net Rocky Mountain, LLC a/k/a Root Sports Rocky Mountain, and DIRECTV Sports Net Northwest, LLC a/k/a Root Sports Northwest**

Andrew E. Paris, Esq.
Joann M. Wakana, Esq.
Louis A. Karasik, Esq.
Alston & Bird LLP
333 South Hope Street
Los Angeles, California 90071
(213) 576-1000

**For Defendants Comcast Corporation, Comcast SportsNet Philadelphia, L.P., Comcast SportsNet Mid-Atlantic L.P., Comcast SportsNet California, LLC, and Comcast SportsNet Chicago, LLC**

Arthur J. Burke, Esq.
James W. Haldin, Esq.
Davis Polk & Wardwell
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

**For Yankees Entertainment and Sports Networks, LLC and New York
Yankees Partnership**

Jonathan D. Schiller, Esq.
Alan Vickery, Esq.
Christopher Duffy, Esq.
Boies, Schiller & Flexner LLP
575 Lexington Avenue, 7th Floor
New York, New York 10022
(212) 446-2300

**For Defendants The Madison Square Garden Company and New York
Rangers Hockey Club**

Stephen R. Neuwirth, Esq.
Richard I. Werder, Jr., Esq.
Ben M. Harrington, Esq.
Quinn Emanuel Urquhart Oliver and Sullivan LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000