USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/14/15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

THOMAS LAUMANN, ROBERT SILVER,
GARRETT TRAUB, and DAVID DILLON,
representing themselves and all other similarly
situated,

            **Plaintiffs,**

     - against -

NATIONAL HOCKEY LEAGUE, et al.,

            **Defendants.**

**OPINION AND
ORDER**

**12-cv-1817 (SAS)**

------------------------------------------------------------ X

MARC LERNER, DEREK RASMUSSEN, and
GARRETT TRAUB, representing themselves and all
other similarly situated,

            **Plaintiffs,**

     - against -

OFFICE OF THE COMMISSIONER OF BASEBALL,
et al.,

            **Defendants.**

**12-cv-3704 (SAS)**

------------------------------------------------------------ X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

       In a companion Opinion issued today, I held that the damages model

1

submitted by plaintiffs' expert, Dr. Roger Noll, must be excluded as unreliable under *Daubert*.[1]  The purpose of this Opinion (the "Certification Opinion") is to address whether the litigation may proceed on a class-wide basis.  Plaintiffs have moved to certify two classes — first, the class of consumers "who purchased [] 'out-of-market package[s]' . . . online" (the "Internet Class"),[2] and second, the class of consumers "who purchased [] 'out-of-market packages' . . . through their television provider" (the "TV Class").[3]  With respect to both classes, plaintiffs seek

---

[1]    *See Daubert* Opinion.

[2]    Amended Class Action Complaint and Jury Trial Demand ("Complaint") ¶ 15.  *Accord* Memorandum of Law in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Counsel ("Pl. Mem."), at 5.

[3]    Complaint ¶ 15.  *Accord* Pl. Mem. at 5.  Originally, plaintiffs identified a third class of plaintiffs — those who "purchased a cable package that includes a network that is protected from competition."  Complaint ¶ 15.  This class was dismissed from the case, however, in December 2012, when I held that "[p]ermitting any plaintiff who simply purchased cable or satellite programming to sue would create a class of plaintiffs for whom it is merely coincidental that they purchased [baseball and hockey programming] at all," and accordingly granted defendants' motion to dismiss as to "plaintiffs who merely subscribe to [a basic cable package], but do not subscribe to an out-of-market package."  *Laumann v. National Hockey League*, 907 F. Supp. 2d 465, 484 (S.D.N.Y. 2012).  Nevertheless, to say that consumers who purchased *only* a cable package are no longer in the case is not to say that no remaining plaintiffs have standing to challenge the allegedly elevated price of cable packages that stems from the complained-of restraints.  If territorial exclusivity is responsible for raising the prices of cable packages *in general* — in addition to the other harms that plaintiffs have alleged, which relate to the league-wide bundles, specifically — all of these harms will be remedied by the same injunctive relief, should plaintiffs prevail on the merits.  In other words, no independent class is necessary to address the

certification under Rule 23(b)(2) as well as Rule 23(b)(3).  For the reasons set forth below, plaintiffs' motion for (b)(2) certification is GRANTED, and their motion for (b)(3) certification is DENIED.

## II.    BACKGROUND

These actions — *Garber v.  MLB* and *Laumann v. NHL* — are antitrust challenges to sports broadcasting.  Both cases rest on the same legal theory.  Plaintiffs allege that Major League Baseball ("MLB") and the National Hockey League ("NHL"), along with the regional sports networks ("RSNs") that produce their games, have entered into agreements with multichannel video programming distributors ("MVPDs") — DirectTV and Comcast — that limit options, and increase prices, for baseball and hockey fans who want to watch teams from outside the home television territory ("HTT") where the fans live.  According to plaintiffs, defendants' multilateral agreements impose conditions of "territorial exclusivity" that restrain individual teams and RSNs — such as the Yankees Entertainment Sports Network ("YES Network") — from selling their content directly to fans outside the HTT (in the Yankees' case, New York and New

---

elevated price of cable packages.  Rather, the TV Class, by challenging the impact of territorial restraints on league-wide bundles, will simultaneously challenge the elevated cost of cable packages, if any, that stems from those same restraints.

Jersey).[4]

> According to plaintiffs, the ultimate consequence of this arrangement is that a Yankees fan living in Iowa who wants full access to a season's worth of Yankees games has to buy an "out-of-market package" ("OMP") — a bundle of *all* out-of-market games, from every team — instead of simply buying the YES Network.[5]  In plaintiffs' view, this restraint is unnatural and anticompetitive.  In its absence, RSNs would distribute their content nationwide in a la carte form, and an Iowa-based Yankees fan (for instance) would be able to choose between (1) buying the YES Network by itself, or (2) buying an OMP.[6]  Furthermore, the competition between these options would also push the price of the OMP down.[7]  For the Yankees fan in Iowa, therefore, the "but-for world" ("BFW") — the world without the complained-of restraints — would involve two distinct but mutually reinforcing benefits.  *First*, out-of-market fans would have more options for

---

[4]     *See* Pl. Mem. at 2, 4.

[5]     *See id.* at 4 ("Clubs and their RSN partners are prevented from distributing their games outside [HTTs] to prevent consumers from choosing to watch their programming instead of the programming of the protected broadcaster in the consumer's territory.  These restraints limit the choices that would [otherwise] be available to all class members.").

[6]     *See id.* at 4-5.

[7]     *See id.*

watching the games of their preferred teams.  *Second*, all fans, whether they primarily follow their home teams or out-of-market teams, would be able to pay less for the OMP.

Defendants have a less sanguine vision of the BFW.  Although they concede — as they must — that the complained-of restraints limit consumer choice, defendants argue that the restraints are what make it profitable for teams and RSNs to broadcast their games *at all*.  In this sense, plaintiffs' position overlooks the "incentives that drive the telecasting of MLB and NHL games in the actual world."[8]  Lift the restraints, defendants argue, and "[t]he end result would be that the [OMP] either would not be available at all in the BFW, or else [it] would be priced much higher than [it is] today."[9]  The implication here, according to defendants, is that the BFW would contain "winners and losers."  The winners would be out-of-market consumers who, given the choice, would prefer to buy an a la carte RSN (and, in the actual world, are unable to do so).  The losers would be consumers who, even given the choice to buy a la carte, would continue to prefer the OMP.  They would "lose" insofar as the OMP would either cost more or disappear.

---

[8]     Defendants' Corrected Joint Memorandum of Law in Opposition to Class Certification ("Def. Mem."), at 1.

[9]     *Id.* at 2.

With respect to class certification, defendants make essentially two arguments.[10]  *First*, they argue that the winners and losers hypothesis — the likelihood that the BFW would be favorable to some consumers and detrimental to others — makes the putative classes inherently fractious, frustrating certification. Put simply, "no class can be certified where a substantial number of class members [would be] worse off" absent the disputed conduct.[11]  *Second*, with respect to certification under Rule 23(b)(2), in particular, defendants argue that many members of the putative class have no standing to request injunctive or declaratory relief, because they no longer subscribe to OMPs, and therefore they are no longer consumers in the relevant market.

## A.    Different Forms of Exclusivity

Confusion persists — even this many years into the case — about the exact practices that plaintiffs are challenging.  Therefore, it will be helpful to begin by carefully distinguishing three different types of "exclusivity."

---

[10]    In addition to these arguments, defendants also argue that plaintiffs' damages model is not sufficiently related to their theory of liability, making (b)(3) certification inappropriate under *Comcast v. Behrend*.  *See* 133 S. Ct. 1426 (2013). *See also Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015) ("*Comcast* held that a model for determining class-wide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of injury.").  Because I conclude that (b)(3) certification is inappropriate on other grounds, the *Comcast* objection is moot.

[11]    Def. Mem. at 4.

### 1.     Territorial Exclusivity

*First*, there is "territorial exclusivity," which refers to the inability of individual teams and RSNs to sell their content directly to consumers outside of their HTTs.  Territorial exclusivity is a product of multilateral agreements among the leagues, the RSNs, and the MVPDs.  In the absence of such agreements, it would be in the interest of at least some (and perhaps all) RSNs to sell their content a la carte, either over the Internet or through the MVPDs.  Defendants do not dispute the existence of territorial exclusivity in the actual world; nor do they dispute that territorial exclusivity is the product of deliberate cooperation among actors in the supply chain.  Rather, the core dispute in this case — on the merits — is whether the procompetitive benefits of territorial exclusivity outstrip its anticompetitive effects, once all of its economic effects are taken into account.  There can be no question, however, that territorial exclusivity *is* anticompetitive — it reflects an explicit agreement among competitors, purposely designed to prevent competition.  The question is whether, by doing so, territorial exclusivity enhances consumer welfare overall.

### 2.     Content Exclusivity

*Second*, there is "context exclusivity," which refers to the ability of an individual RSN to "make its games available," if it sees fit, "only to an exclusive

producer in its home market."[12]  Unlike territorial exclusivity, which *constrains* RSNs, content exclusivity *empowers* RSNs.  Content exclusivity stems from the fact that individual RSNs hold broadcast rights to the games they produce — and under normal principles of intellectual property ("IP"), they are free to license or sell those rights as they see fit.  There is, in this sense, nothing anticompetitive about content exclusivity.[13]

### 3.    Game Exclusivity

*Third*, there is "game exclusivity," which refers to the monopolization of broadcast rights of a local team's games within its HTT.  Game exclusivity is similar to content exclusivity in that it concerns the ability of an RSN to control the flow of content within its HTT.  But game exclusivity is also different from content exclusivity — and more restrictive — insofar as it requires limiting the ability of *other* RSNs from controlling the flow of *their* content.[14]

---

[12]    Reply Memorandum in Support of Plaintiffs' Motion for Class Certification ("Reply Mem.") at 10.

[13]    To be clear, there is nothing anitcompetitive about content exclusivity beyond the *inherently* anticompetitive nature of the IP rights from which content exclusivity stems.  IP rights operate, conceptually and doctrinally, as an exception to the antitrust laws.  Content exclusivity falls within that exception.

[14]    *See id.* at 11 (distinguishing between the maintenance of "control over the distribution of particular content" — *i.e.*, content exclusivity — and the "right to constrain distribution of other broadcasts of that sport," which, in certain forms, can produce game exclusivity).

Practically speaking, this means that in the actual world, RSNs have both content exclusivity and game exclusivity within their HTT. The YES Network, for example, enjoys content exclusivity insofar as it can dictate how its productions of Yankees games are distributed within its HTT. YES is free to veto certain forms of distribution, or to condition the licensing of its productions on certain constraints — such as blackouts within the OMP. YES is free to do this because its productions are its IP, and, as with any IP-owner, it may do with its IP as it wishes. That would be equally true in the BFW.

In the actual world — *unlike* the BFW — the YES Network also enjoys game exclusivity over the broadcast of Yankees games in its HTT. Pursuant to multilateral agreement among the teams, the RSNs, and the MVPDs, OMPs currently black out the feeds of both (1) RSNs of the teams within the viewer's HTT and (2) RSNs of the teams that are *playing against* the teams within the viewer's HTT. Concretely, a baseball fan in Brooklyn who purchases an OMP will not be able to watch YES's content on the OMP; it will be blacked out, forcing her (if she cares about seeing the Yankees) to subscribe to a local cable package. In addition to this, however, the OMP will *also* black out the feed of whatever team the Yankees are playing. If the Yankees are playing the Red Sox, for example, the New England Sports Network ("NESN Network") feed will be

unavailable to the Brooklyn subscriber on her OMP.  This is what gives the YES

Network not just content exclusivity, but *game* exclusivity — it is the only RSN

that can broadcast Yankees games within the Yankees' HTT.

### 4.    The Nature of Plaintiffs' Challenge

Of these forms of exclusivity, plaintiffs are challenging territorial

exclusivity, but they are *not* challenging content exclusivity.[15]  Furthermore, as a

result of plaintiffs' challenge to territorial exclusivity, game exclusivity would also

evaporate in the BFW — not because plaintiffs directly challenge it, but because its

existence depends on the existence of territorial exclusivity.  In the BFW, all RSNs

would be able to (1) sell a la carte programming to out-of-market consumers, and

(2) distribute their content through the OMP without blackouts.  In practice, this

means that RSNs would no longer enjoy game exclusivity with respect to their

home team, because *another* RSN — the RSN of whichever team happens to be

playing against the home team on a given day — would also be able to broadcast

the same game (albeit with different announcers, and so on).

For example, if the Yankees are playing the Red Sox, in the actual

---

[15]     *See id.* at 10 ("Plaintiffs are not challenging each individual club's
ability to make its games available only to an exclusive producer in its home
market, and nothing in [plaintiffs' view of the BFW] assumes that clubs will cease
to maintain an exclusive relationship with a single RSN for each game in its local
territory.").

world a Yankees fan in Brooklyn would have to watch the game on the YES

Network. Even if she subscribed to the OMP, the NESN Network would be

blacked out, so as to preserve the YES Network's game exclusivity. And of course

the Yankees fan also would not be able to buy the NESN Network a la carte — that

is the point of this lawsuit. In the BFW, by contrast, a Brooklyn resident would be

able to watch the Yankees-Red Sox game on either the YES Network *or* the NESN

Network (assuming she had access to the latter through an a la carte channel or the

OMP). In this sense, even though the YES Network would still have content

exclusivity — it would be free to do as it pleases with the games it produces — it

would no longer have game exclusivity in the Yankees' HTT.

## B.  The Market for MLB and NHL Broadcasting in the Actual World

With the different forms of exclusivity in mind, this section provides

an overview of the Supply Side in the market for sports broadcasting, as it exists

today.

### 1.  The Supply Side Overall

RSNs produce baseball and hockey games, which are distributed to

consumers in two different ways. *First*, an individual RSN's productions are

included in local television programming. When a consumer purchases a cable

package from an MVPD, that will typically enable her to watch the RSN (or RSNs)

operating within her HTT.  *Second*, game productions — from all RSNs — are

bundled together in the OMP, which a consumer can purchase either online or

through her MVPD.

Ultimately, then, three different supply chains operate in parallel in

the actual world.[16]  In each supply chain, content flows to the right, and payment

flows to the left:


**Supply chain one (in-market telecasts)**

Individual team –> RSN –> MVPDs –> In-market consumers that purchase cable packages


**Supply chain two (out-of-market telecasts)**

All teams –> RSNs (bundled together) –> MVPDs –> Consumers that purchase OMPs


**Supply chain three (out-of-market Internet streaming)**

All teams –> RSNs (bundled together) –> Consumers that purchase OMPs


The question, then, is how these supply chains translate into concrete options for

different classes of consumers.  The following pair of examples should help answer

---

[16]     In-market *Internet* distribution is not addressed here.  For reasons
explained in previous opinions, in the actual world "there is no authorized method
for viewing local games on the internet."  *Laumann*, 907 F. Supp. 2d at 475.

this question.

###    2.    Case One — A Yankees Fan in Brooklyn

*First*, consider a Yankees fan who lives in Brooklyn. In the actual world, she can enjoy full access to Yankees games, through the YES Network, by purchasing a local cable package — because she lives within the HTT, that package will include YES. To watch other teams, however, she will have to purchase an OMP, either through her MVPD or over the Internet.[17] If she does, some of the OMP's RSN feeds will be blacked out. Specifically, for the entire season, she will be unable to watch the YES Network through the OMP; and on specific nights, she will be unable to watch the RSN of whatever team is playing against the Yankees. Therefore, if she wants access *both* to Yankees games *and* to the full slate of other teams' games, she will have buy a cable package in addition to an OMP.

###    3.    Case Two — A Yankees Fan in Iowa

*Second*, consider a Yankees fan who lives in Iowa. In the actual world, if she wants to watch the Yankees, she will have to buy an OMP.[18] There is

---

[17]    She will also be able to see games that are carried nationally — as is true of anyone with a basic cable package. Nationwide broadcasts have no bearing on these antitrust actions.

[18]    Of course, if the Iowa-based Yankees fan has a local cable package, she will be able to watch the Yankees play whenever the opposing teams hails

no way for an Iowa-based fan to get access to Yankees broadcasts through the YES

Network — the very same broadcasts that her counterpart in Brooklyn would be

able to access simply by virtue of buying a cable package — unless she purchases

an OMP.  Indeed, even if she subscribes to a local cable package, and the package

for some reason includes the YES Network, the actual games played by the

Yankees will be blacked out on that channel.[19]

## C.   The Market for MLB and NHL Broadcasting in the BFW

What is conspicuously lacking in this picture — and what plaintiffs

believe would exist in the absence of league-wide territorial restraints — is direct

distribution from RSNs to *out-of-market* consumers.  In essence, plaintiffs'

position is that two more supply chains should be added (and, in the BFW, would

be added) to the Supply Side.  Beyond the three supply chains outlined above, the

BFW would also include:

---

from the HTT of Iowa.  (Even then, she will have to watch *that team's* broadcast,
not the YES Network.)  The larger point, however, is that out-of-market fans are
forced to buy packages if they want consistent access to the games of their
preferred teams.

[19]    Both sides appear to agree that this state of affairs, though uncommon,
is possible.  *See, e.g.*, 3/19/15 Transcript of Proceedings, Dkt. 343, at 550 (where
plaintiffs' counsel explains that in the actual world, a small number of fans
subscribe to out-of-market RSNs as part of their local cable packages, with the
games are blacked out, because they "like to watch the shoulder programming").

**Supply chain four (a la carte out-of-market telecasts)**

Individual team —> RSN —> MVPDs —> Out-of-market consumers that buy a la carte channels

**Supply chain five (a la carte out-of-market Internet streaming)**

Individual team —> RSN —> Out-of-market consumers that buy a la carte channels

The next question, then, is what would be the result for consumers if these additional supply chains were, in fact, to emerge. Considering the same pair of examples as before will help answer this question.

### 1.   Case One — Yankees Fan in Brooklyn

In the BFW, the Yankees fan in Brooklyn will face similar conditions to the conditions she faces in the actual world. If she purchases an OMP, the YES Network will still be blacked out.[20] So if she wants access to both Yankees games *and* out-of-market games, she will have to buy a cable package in addition to an OMP. The one thing that *will* be different about the BFW, however, is that a Brooklyn-based Yankees fan that does not want to buy a cable package will have the option (unlike in the actual world) to watch the Yankees by (1) viewing the

---

[20] According to plaintiffs, there are economic grounds for hypothesizing that in-market blackouts will subside in the BFW. That may be so. For present purposes, however, the point is that nothing about plaintiffs' antitrust challenge *requires* the disappearance of in-market blackouts, because plaintiffs are not challenging content exclusivity.

RSN of the Yankees' *opposing* team (on any given day) through the OMP, or (2) buying the a la carte RSN of a different team (say, the Red Sox) that frequently plays against the Yankees.  But for the large majority of fans that live in the HTT of their preferred team, these changes are likely to be marginal — and practically irrelevant — departures from the status quo.

### 2.     Case Two — Yankees Fan in Iowa

The same is not true of out-of-market fans.  If the Brooklyn-based Yankees fan is likely to see little difference — and therefore little upside — from the transition to the BFW, the Iowa-based Yankees fan is likely to see a substantial upside.  For her, the BFW will include an option that is unavailable in the actual world — a la carte RSNs.  She will be able to purchase the YES Network, either through an MVPD (via her cable package) or directly over the Internet.  Furthermore, if she purchases an OMP, she will be able to watch the YES Network, through the OMP, even when the Yankees are playing against a team from her HTT.  In the actual word, such broadcasts are blacked out — in order to preserve game exclusivity for RSNs in the Iowa HTT .

### D.     The Class-Wide Challenge

Plaintiffs seek to certify the TV Class and the Internet Class on the same antitrust theory.  According to plaintiffs, every consumer in both classes

faced — and continues to face — a market for baseball and hockey broadcasting in which options are limited, and the prices of existing options are inflated, as a consequence of defendants' coordinated maintenance of territorial exclusivity.  For an in-market fan — a Yankees fan in Brooklyn — this injury takes the form of (1) paying a higher price for the OMP, (2) being subject to black-outs of competing broadcasts within the OMP (*e.g.*, the blacking out of the NESN network when the Yankees play the Red Sox), and (3) lacking the option of subscribing to another team's a la carte RSN (or multiple teams' RSNs) in lieu of buying the OMP.  For an out-of-market fan — a Yankees fan in Iowa — the injury takes the form of (1) paying a higher price for the OMP and (2) lacking the option of subscribing to another team's a la carte RSN (or multiple teams' RSNs) in lieu of buying the OMP.

## III.  APPLICABLE LAW

### A.     Class Certification

#### 1.      Rule 23(a)

Rule 23(a) permits individuals to sue as representatives of an aggrieved class.  To be certified, a putative class must first meet all four prerequisites set forth in Rule 23(a), generally referred to as numerosity,

commonality, typicality, and adequacy.[21]  District courts have broad discretion in

deciding whether to certify a proposed class under Rule 23.[22]  Here, numerosity is

not disputed.[23]

### a.   Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common

to the class."  Commonality thus requires plaintiffs "to demonstrate that the class

members 'have suffered the same injury.'"[24]  Commonality further requires that the

claims asserted "must depend upon a common contention . . . of such a nature that

---

[21]     *See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 201–02 (2d Cir. 2008).  In addition to these requirements — which are explicitly codified in Rule 23 — some courts have also added an "implied requirement of ascertainability" to the express requirements of Rule 23(a)."  *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 42 (2d Cir. 2006). *Accord* 7A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 1764 (3d ed. 2008) ("[T]he requirement that there be a class will not be deemed satisfied unless the class description is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.").  Here, however, neither of the proposed classes presents such problems.  Both classes are readily and precisely ascertained. Their definitions are tethered directly to a specific, easily-traceable economic decision — *i.e.*, to purchase OMPs.

[22]     *See Parker v. Time Warner Entm't Co. L.P.*, 331 F.3d 13, 28 (2d Cir. 2003).

[23]     *See* Pl. Mem. at 6 n.4 ("Defendants have indicated that they will not contest numerosity, which is indisputably satisfied.").

[24]     *Wal-Mart v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (quoting *General Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)).

it is capable of classwide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."[25]

### b.    Typicality

"Typicality 'requires that the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events[] and each class member makes similar legal arguments to prove the defendant's liability.'"[26]  The typicality requirement may be satisfied where "injuries derive from a unitary course of conduct by a single system."[27]  The purpose of typicality is to ensure that class representatives "have the incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions."[28]

### c.    Adequacy

"Adequacy is twofold: the proposed class representative must have an

---

[25]     *Id.*

[26]     *Central States*, 504 F.3d at 245 (quoting *Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001)).

[27]     *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997).

[28]     *Davis v. City of New York*, 296 F.R.D. 158, 164 (S.D.N.Y. 2013).

interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members."[29]  Thus, the question of adequacy "entails inquiry as to whether: 1) plaintiffs' interests are antagonistic to the interest of other members of the class and 2) plaintiffs' attorneys are qualified, experienced and able to conduct the litigation."[30]  In order to defeat a motion for certification, any conflicts between the class representative and members of the putative class must be "fundamental."[31]

### 1.    Rule 23(b)

If the requirements of Rule 23(a) are met, the court "must next determine whether the class can be maintained under any one of the three subdivisions of Rule 23(b)."[32]  Here, plaintiffs have moved for certification under Rule 23(b)(2) and Rule 23(b)(3).  The standards for each will be discussed in turn.

### a.    Rule 23(b)(2)

Under Rule 23(b)(2), plaintiffs must show that defendants "acted or

---

[29]    *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006).

[30]    *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000).

[31]    *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009).

[32]    *McLaughlin v. American Tobacco Co.*, 522 F.3d 215, 222 (2d Cir. 2008).

refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."[33]  As the Supreme Court explained in *Wal-Mart v. Dukes*,[34] with respect to 23(b)(2) classes in particular,

> When a class seeks an indivisible injunction benefitting all its members at once, there is no reason to undertake a case-specific inquiry into whether class issues predominate or whether class action is a superior method of adjudicating the dispute. Predominance and superiority are self-evident.[35]

There are, however, two additional hurdles that plaintiffs must clear in order to certify a (b)(2) class.  *First*, plaintiffs must demonstrate that the class is "cohesive."[36]  This requirement is similar, conceptually, to the commonality requirement under Rule 23(a).  *Second*, plaintiffs must demonstrate that class certification is, in the first instance, necessary.  Because the relief available under Rule 23(b)(2) is injunctive and declaratory — rather than monetary — certification is not always required to secure the rights in question.  As the Second Circuit has

---

[33]  Fed. R. Civ. P. 23(b)(2).

[34]  131 S. Ct. 2541 (2011).

[35]  *Id.* at 2558.

[36]  *See* Newberg on Class Actions § 4:34.  *See also Barnes v. American Tobacco Co.*, 161 F.3d 127, 143 (3d Cir. 1998) ("While 23(b)(2) class actions have no predominance or superiority requirements, it is well established that the class claims must be cohesive."); *In re MTBE Prods. Liab. Litig.*, 209 F.R.D. 323, 342-43 (S.D.N.Y. 2002).

explained, certification under Rule 23(b)(2) is unnecessary when "prospective relief will benefit all members of a proposed class to such an extent that the certification of a class would not further the implementation of the judgment."[37] This principle is typically reserved, however, to situations where the defendant has stipulated that, in practice, an injunction granted to one plaintiff will be observed on a more general basis — thereby defeating the need for formal certification.[38]

### b.     Rule 23(b)(3)

Under Rule 23(b)(3), certification is appropriate where "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and class litigation "is superior to other available methods for the fair and efficient adjudication of the controversy."

> The matters pertinent to these findings include the class members' interests in individually controlling the prosecution or defense of separate actions; the extent and nature of any litigation concerning the controversy already begun by or against class members; the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and the likely difficulties in

---

[37]     *Berger v. Heckler*, 771 F.2d 1556, 1566 (2d Cir. 1985) (citing *Galvan v. Levine*, 490 F.2d 1255, 1261 (2d Cir. 1973)).

[38]     *See Daniels v. City of New York*, 199 F.R.D. 513 (S.D.N.Y. 2001) (holding that certification was appropriate even when it was unclear whether a class-wide injunction would have substantially different effects than an individual injunction, because, *inter alia*, defendants continued to "deny that there [was] any [] policy to withdraw").

managing a class action.[39]

The predominance inquiry focuses on whether "a proposed class is 'sufficiently cohesive to warrant adjudication by representation.'"[40] It is akin to, but ultimately "a more demanding criterion than," the "commonality inquiry under Rule 23(a)."[41] Class-wide issues predominate "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."[42] The Second Circuit has emphasized that "Rule 23(b)(3) requires that common questions predominate, not that the action include only common questions."[43] In carrying out this inquiry, the court may "consider the '. . . improbability that large numbers of class members would possess the initiative to litigate individually.'"[44]

---

[39] Fed. R. Civ. P. 23(b)(3)(A)-(D).

[40] *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1196 (2013) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)).

[41] *In re Nassau County Strip Search Cases*, 461 F.3d 219, 225 (2d Cir. 2006) (citing *Amchem*, 521 U.S. at 623-24).

[42] *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 118 (2d Cir. 2013) (internal citations omitted).

[43] *Brown v. Kelly*, 609 F.3d 467, 484 (2d Cir. 2010).

[44] *D'Alauro v. GC Servs. L.P.*, 169 F.R.D. 451, 458 (E.D.N.Y. 1996) (quoting *Haynes v. Logan Furniture Mart, Inc.*, 503 F.2d 1161, 1165 (7th Cir.

### B.     Antitrust Injuries

Antitrust injuries come in two basic forms.  *First*, anticompetitive conduct is injurious if it results in higher prices.[45]  *Second*, anticompetitive conduct is injurious if it limits consumer options.[46]  Although these injuries often overlap in practice, they are economically and analytically distinct.  Some restraints raise prices without limiting the qualitative options available to consumers.  For example, price-fixing by oil companies would certainly inflate the price of gas, but it would be unlikely to diminish the type of products available to consumers (*i.e.*, whether or not the restraint existed, everyone would buy the same good — gas).  The converse is also true.  Some restraints limit the number of products in existence without having a significant effect on prices.  For example, if banks were to decide, collusively, to include stringent arbitration clauses in all credit card

-------

1974)).

[45]     *See Port Dock & Stone Corp. v. Oldcastle Northeast Inc.*, 507 F.3d 117, 123-24 (2d Cir. 2007) (explaining that the "danger" of antitrust violations is that they "raise prices and restrict output," and compiling case law to that effect).

[46]     *See Ross v. Bank of America*, 524 F.3d 217, 226 (2d Cir. 2008) (concluding that reductions in "consumer choice" and the "equality of [] services offered" are antitrust injuries); *United States v. Visa USA*, 344 F.3d 229, 243 (2d Cir. 2003) (explaining that restraints that discourage firms from "design[ing] . . . their products more competitively" can give rise to antitrust injury); *Laumann*, 907 F. Supp. 2d at 480 ("Reduced consumer choice . . . when [it is] the result of an anticompetitive practice, constitute[s] antitrust injury.").

contracts, this would be unlikely to affect the price of anything, but it would certainly diminish consumer choice — and constitute an antitrust injury on that basis alone.[47]

### C.    Standing

As discussed at length in my December 5, 2012 opinion — and rehearsed only briefly here — for an antitrust claim to be justiciable, a plaintiff (or class of plaintiffs) must demonstrate two distinct types of standing.[48]  *First*, as in all federal actions, a plaintiff must satisfy the threshold requirements of Article III. If those requirements are wanting, the Court lacks jurisdiction to adjudicate the dispute.  *Second*, a plaintiff must satisfy the requirements of "antitrust standing" — a more granular set of requirements fashioned by the Supreme Court to ensure that plaintiffs are well-situated to redress harm that, due to the nature of antitrust injuries, often impact the economy as a whole.

### 1.    Article III Standing

---

[47]    *See Ross*, 524 F.3d at 222-25.

[48]    *See Laumann*, 907 F. Supp. 2d at 480-85.  *See also Ross*, 524 F.3d at 223-25 (distinguishing between "adequately alleg[ing] antitrust injuries in fact," sufficient to trigger constitutional standing, and satisfying the requirements of antitrust standing, which "demands a much more detailed and focused inquiry into a plaintiff's [] claims"); *KSW Mechanical Serv., Inc. v. Mechanical Contractors Ass'n*, No. 11 Civ. 5100, 2012 WL 1027354, at *5 (S.D.N.Y. Mar. 27, 2012) (explaining the difference between constitutional and antitrust standing).

Because "Article III, Section 2, of the United States Constitution limits federal courts' jurisdiction to 'Cases' and 'Controversies,'" a party "seeking to bring suit in federal court must establish standing under Article III."[49]  To do so, the party must show, *inter alia*, that she "ha[s] suffered an 'injury in fact'— that is, 'an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.'"[50]

### 2.    Antitrust Standing

Not every party that satisfies the requirements of Article III standing may bring a private antitrust suit.  Because anticompetitive conduct, by its nature, often affects many different actors within a given market, the Supreme Court has erected two additional criteria to limit who has "antitrust standing."  *First*, under *Illinois Brick v. Illinois*,[51] a plaintiff must either (1) be a "direct purchaser" in the market where the antitrust violation is alleged, or (2) qualify for one of the recognized exceptions to the "direct purchaser" requirement.[52]  *Second*, under

---

[49]    *E.M. v. New York City Dep't of Ed.*, 758 F.3d 442, 449 (2d Cir. 2014).

[50]    *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  In addition to the injury-in-fact requirement, Article III standing also requires a party to show (1) that the injury was caused by defendant, and (2) that it can be redressed in court.  There is no dispute about these two elements here.

[51]    431 U.S. 720 (1977).

[52]    For background on these exceptions, see *Laumann*, 907 F. Supp. 2d at 480-83.

*Associated General Contractors of California v. California State Council of Carpenters*, a plaintiff must be "a consumer . . . in the market in which trade was restrained."[53]  Both requirements are designed to ensure that a plaintiff's injuries are not "too remote from the alleged conduct" to qualify as antitrust harms.[54]

## IV.   DISCUSSION

As discussed at length in a companion Opinion issued today, I find the

---

[53]     459 U.S. 519, 539 (1983).

[54]     *Laumann*, 907 F. Supp. 2d at 480.  In my December 5, 2012 opinion, I explained that consumers who subscribe (or who previously subscribed) to television OMPs — *i.e.*, members of the TV Class — are not direct purchasers of baseball and hockey broadcasts, because they purchase such broadcasts from MVPDs.  Nevertheless, I held that members of the TV Class have standing to bring the present challenge, in light of the "co-conspirator" exception to *Illinois Brick*. Because the MVPDs are named as co-defendants to this suit, it would be perverse to conclude that their position in the market — sitting between the RSNs that produce broadcasts and the consumers who watch them — somehow strips consumers of antitrust standing.  The whole point of plaintiffs' challenge is that multiple actors in the supply chain, *including* the MVPDs, conspired to restrain trade.  Clearly, the "purpose of *Illinois Brick* was not to prevent the only non-conspirators in a multi-level distribution chain — consumers no less — from bringing a private antitrust suit."  *Id.* at 482.  *Accord In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009) ("[B]eing forced to pay supra-competitive prices as a result of the defendants' anticompetitive conduct [] . . . plainly is [an injury] 'of the type the antitrust laws were intended to prevent.'") (citing *Brunswick Corp. v. Pueblo Bowl-o-Mat, Inc.*, 429 U.S. 477, 489 (1977)).  Accordingly, I held that members of the TV Class satisfied the *Illinois Brick* requirement for antitrust standing.  This determination comports with Second Circuit and Supreme Court precedent; and it is also law of the case.  Thus, the only remaining question of antitrust standing — discussed below — is if *previous* OMP subscribers still qualify as consumers in the market where trade is restrained.

damages model submitted by plaintiffs' expert, Dr. Noll, to be inadmissible.  As a result, plaintiffs cannot prove their damages case on a class-wide basis.  As the Second Circuit has explained, while the need for individualized inquiry into damages does not defeat (b)(3) certification,[55] plaintiffs must nevertheless "show that they can prove, through common evidence, that all class members were . . . injured by the alleged conspiracy."[56]  Here, Dr. Noll's model *was* the common evidence — and the model has been excluded.[57]  Therefore, no (b)(3) class may be

---

[55]     *See Roach*, 778 F.3d at 405 ("[I]t [is] well-established in [the Second] Circuit that the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification.") (internal citations omitted).

[56]     *Sykes v. Mel S. Harris & Assoc.*, 780 F.3d 70, 82 (2d Cir. 2015) (internal citations omitted).  *Accord Comcast*, 133 S. Ct. at 1433 ("Without presenting [a model], respondents cannot show Rule 23(b)(3) predominance: Questions of individual damage calculations will inevitably overwhelm questions common to the class.").

[57]     *See In re Rail Freight Surcharge Antitrust Litig.*, 725 F.3d 244, 255 (D.C. Cir.  2013) ("[Plaintiffs' expert's] models are essential to the plaintiffs' claim [that] they can offer common evidence of class-wide injury.  No damages model, no predominance, no class certification.").  At the hearing, plaintiffs' counsel conceded that if the model was stricken on *Daubert* grounds, the case would have to proceed exclusively on an injunctive basis — under Rule 23(b)(2).  *See* 3/17/15 Transcript of Proceedings, Dkt. 339, at 4-5 ("THE COURT: If I struck [the model] based on the Daubert challenge, could you proceed?  COUNSEL: Could we prcoeed in this case?  Absolutely, your Honor.  THE COURT: Could you proceed as a class in this case?  COUNSEL: Absolutely, your Honor, because, remember, we are seeking not only damages but [also] injunctive relief.  And our theory of damages is [an overcharge theory].  If we fail to prove that there is an overcharge" — which would be impossible with the model — "then the result would be that the class members as a whole have not shown any calculable

certified.

But the issue of (b)(2) certification remains.  On that front, defendants make essentially two arguments.  *First*, they argue that the putative class consists of winners and losers.  In defendants' view, some purchasers of OMPs actually *benefit* from the restraints in dispute, which both defeats the commonality of injury and frustrates the ability of named plaintiffs to adequately represent the interests of all class members.  *Second*, defendants argue that because some members of the class no longer subscribe to OMPs, they have no legal interest in the prospective relief sought by named plaintiffs — *i.e.*, they are no longer "consumers in the market where trade is allegedly restrained,"[58] so they have no standing to seek injunctive or declaratory relief going forward.  The winners and losers argument is, according to defendants, germane both to the threshold criteria of Rule 23(a) and to the cohesion requirement of Rule 23(b)(2).  The standing argument, by contrast, bears exclusively on the cohesion requirement of Rule 23(b)(2).

## A.    Winners and Losers

---

damages.  THE COURT: Then would only have a (b)(2) class?  COUNSEL: Well, we would have a (b)(2) class certainly.  THE COURT: Without damages? COUNSEL: Without damages.").

[58]     *Daniel v. American Bd. of Emergency Medicine*, 428 F.3d 408, 451 (2d Cir. 2001).  *Accord Associated Gen. Contractors*, 459 U.S. at 539 (the question, for standing purposes, is whether a given plaintiff was "a consumer []or a competitor in the market in which trade was restrained").

According to defendants, putting an end to territorial exclusivity would likely result in either (1) consumers having to pay more for OMPs, or (2) the disappearance of OMPs entirely.  From this premise, defendants conclude that certain consumers are better off in the actual world than they would be in the BFW — specifically, those consumers that would prefer to buy an OMP, even assuming the availability of a la carte channels.  Given this ostensible conflict of interest among the class members, defendants argue that the relief sought by lead plaintiffs is "likely [to] harm a great many absent class members."[59]   Therefore, certification is inappropriate.

In response, plaintiffs offer two counterarguments — the first questioning defendants' premise, the second, attacking defendants' conclusion. *First*, plaintiffs disagree with defendants' portrait of the BFW.  According to plaintiffs, beyond the "self-serving affidavits of party witnesses," such as league executives, there is little reason to think that OMPs would be more expensive or non-existent in the BFW.[60]   Indeed, plaintiffs believe that copious evidence exists

---

[59]     Def. Mem. at 43.

[60]     Reply Mem. at 19.  *See also, e.g.*, Declaration of Gary B. Bettman, Commissioner of the National Hockey League, Exhibit ("Ex.") 10 to Joint Appendix in Support of Defendants' Daubert Motion and in Opposition to Plaintiffs' Motion for Class Certification ("Joint App'x"), ¶¶ 7-15 (arguing that the disappearance of territorial exclusivity would diminish the number of options available to consumers in the BFW).

to the contrary. *Second*, plaintiffs argue that even assuming, *arguendo*, that defendants are right about the composition of the BFW, class certification is still appropriate because "the supposed conflicts [defendants] identify are not fundamental [] and have never been accepted by any court."[61]

Because I agree with plaintiffs' second argument — that defendants' theory of intra-class conflict, even if true, is no basis for denying certification — there is no need to address which side has painted a more accurate portrait of the BFW.  In effect, defendants' position is that certain class members would prefer the status quo to persist, antitrust violation or no.  Put more bluntly, defendants believe that some class members, even if they are currently suffering an antitrust injury, would prefer to be injured than for the injury to be redressed — because the injury carries collateral benefits.[62]

Defendants' claim fails three times over.  *First*, it confuses the question of whether a common injury unites the class with the distinct question of whether all class members agree about how best to *respond* to the injury.  It is the

---

[61]    Reply Mem. at 23 (internal citations omitted).

[62]    Here, unlike most class certification disputes, the parties' papers do not follow the typical element-based analysis of Rule 23.  Rather, because defendants' winners and losers theory reaches multiple components of Rule 23(a) simultaneously, the parties have — understandably — addressed the viability of that theory *in general*, instead of trying to limit it to particular sub-parts of Rule 23. This Opinion follows suit.

former, not the latter, that drives the Rule 23 analysis — and there is no question

that here, a common injury exists in the form of diminished consumer choice.

*Second*, at a policy level, defendants' argument threatens the integrity of the

antitrust laws.  If the fact that illegal restraints operate to the economic advantage

of certain class members were enough to defeat certification, the efficacy of class-

wide antitrust suits — and the deterrence function they serve — would wither.

*Third*, defendants' argument subverts the purpose of Rule 23(b)(2).  When the

remedy sought is injunctive rather than monetary, divergent interests within the

class militate in *favor* of certification — because certification gives affected parties

a greater voice in the litigation.

### 1.    Class Certification Versus Merits Analysis

Defendants point to a number of antitrust cases where courts have

embraced a winners and losers argument against class certification.  For example,

defendants refer a number of times to *Valley Drug Company v. Geneva*

*Pharmaceuticals*,[63] in which the Eleventh Circuit reversed the district court's

certification of a class of drug distributors, who brought an antitrust challenge to a

pharmaceutical company's alleged effort to stymie the development of generic

alternatives to one of its patented drugs.  According to the plaintiff-distributors, the

---

[63]    350 F.3d 1181 (11th Cir. 2003).

absence of generic alternatives allowed defendant to command super-competitive prices, resulting in losses for the plaintiffs downstream.  In response, defendant argued that some class members actually saw an economic upside from the absence of generic alternatives — because they were able to pass on the super-competitive prices to their customers, and in some cases, even to charge further premiums *on top of* the super-competitive input costs.  According to defendant, this created a schism within the class — winners and losers — sufficient to render certification inappropriate.  The court agreed.[64]

        Further examples abound in defendants' papers.[65]  What all of them

---

        [64]     *See id.* at 1191 ("[Because some] class members appear to benefit from the effects of the conduct alleged to be wrongful by the named plaintiffs because their net economic situation is better off when branded drugs dominate the market [] . . . certification under these circumstances would be inappropriate.").

        [65]     *See, e.g.*, *Duchardt v. Midland Nat'l Life Ins. Co.*, 265 F.R.D. 436, (S.D. Iowa 2009) (holding that a challenge to a specific method of calculating insurance claims was not amenable to class-wide adjudication, because certain plan-holders benefitted financially from the method); *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp.*, 247 F.R.D. 156, 168-69 (C.D. Cal. 2007) (declining to certify a class-wide challenge to a medical device company's allegedly super-competitive prices, on the grounds that "many individual class members may have benefitted from discounts and deals on [defendant's] products" that were the result of anticompetitive conduct, and therefore "would be *unavailable to [class members] in the but-for world*") (emphasis in original); *Auto Ventures, Inc. v. Moran*, No. 92 Civ. 426, 1997 WL 306895, at *5 (S.D. Fla. Apr. 3, 1997) (holding that class certification was inappropriate in light of the allegation that defendants — a group of car dealerships — had perpetuated their coercive market position "through a rewards and punishment system, by which cooperating [entities] were befriended and rewarded, while resisting [entities] were penalized,"

have in common — and what sets them apart from this case — is the presence of class members who, in the actual world, suffered no injury.  In every case cited by defendants, the upshot of the court's analysis is that as a result of the disputed conduct, some class members either (1) saw no effect or (2) received a benefit without any downside.  Thus, some class members — because they were not injured — did not belong in the case.  They would have lacked standing to advance on their *own* behalf the very claim that was purportedly being advanced on their behalf by others.  For obvious reasons, this frustrated class certification — it would have required the named plaintiffs to represent the "interests" of unnamed parties who had no cognizable interests to begin with.[66]

The same is not true in this case.  Here, every class member has suffered an injury, because every class member, as a consumer in the market for baseball or hockey broadcasting, has been deprived of an option — a la carte channels — that would have been available absent the territorial restraints ("Injury One"). On top of this general injury, certain class members have also suffered the *additional* injury of having to pay too much for the content they wanted ("Injury

---

giving rise to a clear divergence of interests among class members).  For further examples, see Def. Mem. at 42-34; *id.* at 43 n.46.

[66]     *See Kohen v. Pacific Invest. Mgmt. Co.*, 571 F.3d 672, 678 (7th Cir. 2009) ("[A] class should not be certified if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant[s].").

Two"). Plaintiffs and defendants disagree about how many class members fall into the latter category. In plaintiffs' view, every class member does — Injury Two is universal, because all prices would go down in the BFW. In defendants' view, by contrast, only some class members suffered Injury Two. Other class members — those who are interested in watching many teams and would therefore be likely to buy the OMP, even in the BFW ("league-wide fans") — suffered no price-based injury. In fact, according to defendants, league-wide fans derived a price-based *benefit* from the restraints. That is the point of their winners and losers argument.

Regardless of which side is ultimately correct about the scope of Injury Two — a question that depends not only on economic analysis, but also on speculation about consumer psychology — Injury One unites the class.[67] The

---

[67]     Plaintiffs would draw the distinction (between this case and other cases where defendants successfully invoked the winners and losers logic) somewhat differently. In plaintiffs' view, the key issue is that in the instant case, "all class members were treated equally in the real world," whereas in "in every one of [defendants'] cases, [] some class members received a direct and concrete benefit from the challenged conduct that others did not." Reply Mem. at 23-24. In other words, plaintiffs would focus on the equality (or lack thereof) of class members' treatment by entities allegedly engaged in an antitrust violation. Here, all class members received the same treatment — paying a uniform subscription fee for the OMP — whereas in defendants' examples, different class members received disparate treatment. For example, in *Allied Orthopedic Appliances*, some class members were afforded "discounts and deals" that other class members were not. 247 F.R.D. at 169. And this meant that the identification of disparities within the class was not merely a hypothesis about how, in the BFW, the market *might* operate — it was a reflection of how, in the actual world, the market *did* operate.
        There are two problems with this formulation — the first is factual,

restriction of consumer options is an *ipso facto* antitrust harm, and conversely, the creation of new options is a benefit to the market as a whole.  This is true for *all* consumers — even consumers, like league-wide fans, who are not interested in new options.  The mere existence of new options increases the dynamism of the marketplace, spurring innovation and maintaining downward pressure on prices. Put simply, Injury One is universal.

Against this backdrop, there are two ways to understand defendants' position.  *First*, defendants might be arguing that Injury One is outweighed, on

---

the second, conceptual.  *First*, it is unclear (and seemingly disputed) to what extent all class members here actually receive the same treatment in the actual world. Defendants have repeatedly suggested that different consumers pay *different* prices for the OMP — a fact that casts doubt on plaintiffs' claim that here, unlike other winners and losers cases, every class member faces the same treatment from defendants.  *See, e.g.*, Declaration of Daniel L. McFadden (Dkt. No. 358), ¶ 38. *Second*, even if all class members here *did* receive the same treatment — or effectively the same treatment — from defendants, it is unclear if the "equal treatment" principle can shoulder its analytic burden. In some cases, even if all class members were treated the same way, no injury unites the class.  Indeed, *Valley Drug Co. v. Geneva Pharmaceuticals* — defendants' prime example — may well be that kind of case.  There, the court declined to certify the class on the basis that certain distributors saw no economic downside (and some possibly saw an upside) from defendant's anticompetitive conduct.  This was so in spite of the fact that all distributors were treated the same way.  All of them were forced to pay the same (allegedly super-competitive) input costs for brand-name drugs.  But there was nevertheless a schism within the class, because some distributors were able to pass on the super-competitive costs to consumers, or even to hike up the label price further, while other distributors were not.  In this sense, the holding in *Valley Drug* is difficult to square with the proposition that equal treatment, rather than *unity of injury*, is the wedge separating defendants' use of the winners and losers logic here from its application in earlier cases.

balance, by the procompetitive benefits of the territorial restraints for league-wide

fans — *i.e.*, that the absence of a la carte options, despite constituting an antitrust

injury, is justified by the availability and (comparatively) low price of OMPs.  If

this is true, it would make the territorial restraints lawful under the Rule of

Reason.[68]  *Second*, defendants might be arguing that even if the complained-of

restraints are illegal — even if the anticompetitive harm of the complained-of

restraints is *not* outweighed by their procompetitive benefits — league-wide fans

would nonetheless prefer for Injury One to persist unremedied, in light of the

collateral benefits they derive from defendants' injurious conduct.

One or both of these arguments may be correct, but neither is an

argument against class certification.  The first is a merits argument.  Defendants

believe that the complained-of restraints, though anticompetitive to the extent that

they preclude the existence of a la carte channels, are also procompetitive to the

extent that they facilitate the existence of a well-priced OMP.  If defendants can

convince the trier-of-fact of this point, they will have a strong defense against

---

[68]        *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877,
885 (2007) ("The rule of reason is the accepted standard for testing whether a
practice restrains trade in violation of § 1 [of the Sherman Act]. . . . 'Under this
rule, the factfinder weighs all of the circumstances of a case in deciding whether a
restrictive practice should be prohibited as imposing an unreasonable restraint on
competition.'") (citing *Continental T. V., Inc. v. GTE Sylvania*, 433 U.S. 36, 49
(1977)).  *See also Laumann*, 907 F. Supp. 2d at 478-79 (providing further
background on the Rule of Reason standard).

antitrust liability — a strong argument for why the restraints satisfy the Rule of Reason and may continue to exist.  If this is true, it is true across the class.  Indeed, far from creating intra-class conflict, the question of whether the restraints are more procompetitive than anticompetitive is exactly the question of whether a class-wide antitrust injury exists.

Defendants' effort to cast the balance of economic effects as an issue of adequacy under Rule 23(a), rather than a merits issue, is unavailing.  In *Freeland v. AT&T*,[69] Judge Denise Cote of this District considered — and rejected — an analogous argument against class certification.  There, the allegation was that AT&T had unlawfully tied the sale of telephones to the sale of wireless service.  At the certification stage, AT&T argued, *inter alia*, that "many, [] perhaps most, class members actually benefit from the subsidization that accompanies the [tying] that the named plaintiffs claim is illegal," and that certain class members "benefit from the deployment of newer, more efficient [phones], which is encouraged by defendants' . . . tying practices."[70]  In light of this, AT&T argued that "the interest[s] of the named plaintiffs [were] antagonistic to the interests of other class

---

[69]    238 F.R.D. 130 (S.D.N.Y. 2006).

[70]    *Id.* at 141.

members."[71]  Judge Cote rejected this logic in *Freeland* for the same reason that I

reject defendants' logic here.  Ultimately, the argument "reduce[s] to a claim that

most plaintiffs actually benefit from the defendants' [] practices," which is not

properly addressed to the adequacy of the named plaintiffs to represent the class.[72]

Rather, it is "a repackaging of the defendants' claim that their . . . practices have

not caused an antitrust injury on a class-wide basis."[73]

---

[71]    *Id.*

[72]    *Id.*  In defendants' opposition papers, they argue that "[i]n *Freeland*,
Judge Cote, denied [(b)(2)] certification . . . because some proposed class members
may have benefitted from the allegedly anticompetitive bundling of products."
Def. Mem. at 44.  This interpretation strains the limits of good faith.  In fact, it is
crystal clear from Judge Cote's opinion that intra-class conflict had nothing to do
with the disposition of the (b)(2) issue.  Rather, the problem was that plaintiffs had
failed to establish a necessary element of their tying claim — coercion — on a
class-wide basis.  Because coercion would have to be proven in an individualized
manner, "even if the named plaintiffs succeed on the merits of their claims, only
they would be entitled to injunctive relief."  *Freeland*, 238 F.R.D. at 157.  This
outcome flowed from the absence of proof as to an element of the claim, *not* from
the fact that "some [] class members may have benefitted from the [complained-of
conduct]."  Def. Mem. at 44.

[73]    *Freeland*, 238 F.R.D. at 142.  Judge Cote's reasoning also
underscores why the Second Circuit's holding in *In re Literary Works in
Electronic Databases Copyright Litigation* does not control — indeed, does not
even bear on — this case.  There, the question was whether a class-wide settlement
of copyright claims, brought by freelance authors whose works had been
reproduced without their permission, was adequately protective of the class as a
whole.  The central issue concerned copyright holdings whose infringement only
gave rise to damages, as a matter of law, insofar as the underlying copyrights were
registered with the Copyright Office.  Although these subordinate holdings
comprised the vast majority of the total claims, they were, by a significant

The second way to parse defendants' argument is not that the

territorial restraints are lawful on the merits, but rather, that even if they are

*unlawful*, "some class members have an interest in preserving the status quo,

antitrust violation or no."[74]  So formulated, defendants' position is not about what

the fate of the restraints *will be*, but rather what their fate *should be*.  The

argument, in other words, is that even if the restraints are illegal, some class

members would nonetheless prefer for the restraints to exist — *i.e.*, they would

_____

measure, the least valuable holding in the case.  After much negotiation, a class-
wide settlement was formulated, which treated the subordinate holdings as nearly
valueless — triggering objections from class members with predominately
subordinate holdings.  The Second Circuit ultimately agreed with the objectors,
determining that "the interests of class members who hold only [subordinate
holdings] fundamentally conflict with those of class members who hold [lucrative]
claims."  654 F.3d 242, 254 (2d Cir. 2011).  In light of this, the Court was not
satisfied that "[n]amed plaintiffs," to the extent they held lucrative copyrights, "had
[an] incentive to maximize the recovery for [] plaintiffs [with subordinate
holdings]."  *Id.* On that basis, the settlement was vacated, and the case was
remanded with instructions to delineate subclasses based on category of holding.
*See id.* at 257-58.

      *In re Literary Works* is inapplicable to the instant case.  There, unlike
here, it was undisputed that every class member's rights had been violated.  The
question was how to divide the recovery — and whether the process for doing so
safeguarded the interests of the class as a whole.  In this sense, *In re Literary
Works* raised an issue distinctive to (b)(3) actions, and in particular, to the
settlements of (b)(3) actions — when the named plaintiffs negotiated settlement
terms, did they allocate too large a share of damages to themselves?  This question
has no analogue with respect to (b)(2) classes.  In that setting, it is nonsensical to
speak of some class members getting a greater or lesser "share" of injunctive or
declaratory relief.  By its nature, the relief is uniform across the class.

      [74]     Reply Mem. at 23.

prefer for the restraints *not* to be illegal, much as that result might clash with existing antitrust doctrine.

Needless to say, the role of this Court is to apply the antitrust laws, not to rewrite them.  It is possible, as defendants suggest, that many baseball and hockey fans would prefer for the complained-of restraints to be deemed lawful rather than unlawful.  Indeed, it is even possible that many such fans would have preferred that the instant lawsuit not be brought.  But the fundamental point remains.  The restraints are either illegal or they are not — and whether they are is a merits question.  To properly analyze that question, the preferences of class members — including class members who would prefer for the restraints to remain in place — will certainly be relevant.  Those preferences are one consideration for the jury (or, in the case of a (b)(2) class, the Court) as it assesses the restraints' procompetitive benefits.  But if the trier-of-fact decides that the restraints' procompetitive benefits are insufficient to overcome their anticompetitive effects, that will be the end of the matter.  An arrangement that unlawfully restrains the market as a whole cannot be salvaged by the preferences, however fervent, of a subset of class members.

### 2.    Enforcing the Antitrust Laws

Furthermore, even if this case were indistinguishable from others

41

where courts have embraced the winners and losers logic, there is still good reason to reject that logic.  Defendants' argument sweeps much too broadly.  If it prevails, *all* anticompetitive conduct — regardless of the particular market in which it occurs — would be immunized from class-wide scrutiny on the basis that certain members of the class derive benefits from the conduct.  For example, consider the argument championed by defendants' class certification expert — Dr. Janusz Ordover — that territorial restraints generate super-competitive profits for the teams and RSNs, which in turn provides them with the "incentive[] to produce live-game content."[75]  Lift the territorial restraints, in other words, and defendants believe that fewer broadcasts will be produced.

This argument suffers the fatal defect of universal applicability.  A monopolist could *always* argue that being forced to operate at competitive rather than super-competitive margins — *i.e.*, being forced to comply with the antitrust laws — would staunch the creation of capital-intensive goods.  Operating competitively diminishes profits; diminished profit generates less disposable capital; less disposable capital means that fewer projects get funded.  The problem with this reasoning is that it applies to all industries, at all times.  Because it is in the nature of anticompetitive conduct to afford beneficiaries greater stores of

---

[75]     Declaration of Dr. Janusz Ordover ("Ordover Decl."), Ex. 3 to Joint App'x, ¶ 32.

capital, it is also in the nature of anticompetitive conduct to produce the sort of

"conflicts" that defendants identify here.  If such "conflicts" were to preclude class

certification, it would become all but impossible to adjudicate antitrust actions on a

class-wide basis — meaning, in practice, that it would become all but impossible to

adjudicate antitrust actions, *period*.[76]

      This result is unacceptable.  Moreover, although the result may be

especially clear in antitrust cases, it is by no means unique to that setting.  It is

likely to be true in many cases where defendants' conduct, despite being unlawful,

works to the economic benefit of some class members.  An analogy to employment

---

[76]     Dr. Ordover's argument — that the OMP might not exist at all in the BFW — is but one variant of the idea that antitrust violations are in the consumer interest.  Another example (also set forth by defendants, and bolstered by Dr. Ordover's analysis) is that the OMP, if it *did* exist in the BFW, would include fewer broadcasts, because some RSNs rely on the protection conferred by territorial exclusivity to maintain profitability.  If the territorial restraints are lifted, defendants argue that "RSNs for less popular clubs . . . would have [] difficulty obtaining carriage, both nationally and even on MVPDs within their local market." Def. Mem. at 26.  In that case, out-of-market fans of less popular clubs might find themselves in the doubly-unfortunate situation of being unable to purchase an OMP that includes their favorite team's broadcasts, but *also* unable to watch their favorite team's broadcasts on an individual RSN — because the broadcasts would not exist.  This is a similar but distinct sense in which, according to defendants, the BFW might create winners and losers.  This theory falls prey to the same problem as the theory that OMPs might not exist in the BFW — at bottom, both are arguments about the economic virtues of defendants' conduct.  Ultimately, of course, it may be that defendants' conduct *does have* economic virtues — but that is a merits issue.  Incorporating it into the Rule 23 analysis would hobble the ability of federal courts to effectively enforce the antitrust laws.

law underscores the point.  Imagine that workers bring a class action against their

employer — Company X — for failure to pay adequate wages.  The allegation is

very simple.  Company X flouted state and federal labor laws by paying all hourly

workers two dollars less, per hour, than the minimum wage.  At the class

certification stage, Company X makes the following argument.  If it loses the

lawsuit — if its workers were not, in fact, receiving minimum wage — the

outcome will be (among other things) that Company X will lay off twenty-five

percent of its workforce.  This result, the company argues, is one that many

workers would prefer to avoid — even if the only way to avoid it is to avoid

exercising their legal rights.  In light of this, the company maintains that

certification is inappropriate, because some class members would prefer that the

lawsuit not be brought.

Indulging this argument would stand Rule 23 on its head.  Instead of

serving as an "efficient means of compensating victims" by permitting the redress

of common injuries,[77] Rule 23 would become an efficient means of immunizing

wrongdoing — by allowing defendants to invoke the positive effects of their illegal

conduct to fend off liability.  But even if it has positive effects, illegal conduct

remains illegal.  When Company X paid its workers, it either complied with the

---

[77]     *Amchem*, 521 U.S. at 628.

minimum wage laws or it did not.  If Company X was non-compliant, then all class members were injured in the same way — they all were paid less than what they were owed.  And if Company X *was* compliant, then no injury occurred.  Either way, certification is warranted.

        This example, while hypothetical, has plenty of real-world analogues. For instance, the Central District of California recently rejected a nearly identical argument in the context of a fraud suit against an insurance company.[78]  Plaintiffs alleged that the company had misrepresented the actual benefits of certain life insurance policies by failing to disclose hidden fees.  At the class certification stage, defendant argued that charging hidden fees allowed them to keep policy prices low (by making up the difference in fees), which is something that at least *some* class members likely preferred.  Therefore, defendant argued that "intra-class conflict" — born of the fact that certain class members would prefer to maintain the status quo, irrespective of the fraud — precluded certification.

        The court flatly rejected this argument.  Even if defendant was right that its assessment of (fraudulent) fees was "altering the economic fundamentals of the annuities group-wide" in a way that worked to the benefit of certain class

---

[78]    *See Vaccinaro v. Midland Nat'l Life Ins. Co.*, No. 11 Civ. 5858, 2013 WL 3200500 (C.D. Cal. June 17, 2013).

members, that was "irrelevant" to the legal question.[79]  "An unlawful charge," the

court wrote, "is an unlawful charge."[80]  And being unlawful, it "could not

[possibly] give rise to intra-class conflicts."[81]  Other courts have also rejected the

winners and losers argument in the context of employment disputes,[82] law

enforcement searches,[83] and the regulation of public unions.[84]

---

[79]     *Id.* at *9.

[80]     *Id.*

[81]     *Id.*

[82]     *See In re FedEx Ground Package Sys., Inc., Employment Practices Litig.*, 273 F.R.D. 424, 438 (N. D. Ind. 2008) (permitting a class-wide challenge to FedEx's practice of selectively categorizing employees as "contractors," despite the fact that some employees categorized as contractors might *prefer* that categorization due to the "favorable relationship" it allows them to cultivate with the company).

[83]     *See Horton v. Goose Creek Ind. School Dist.*, 677 F.2d 471, 487-88 (5th Cir. 1982) (rejecting the government's argument that because some students might want canine "sniff" searches to be used at a school, whether or not the searches were lawful, the action should not adjudicated on a class-wide basis).  The *Horton* court offered a helpful analogy — along the same lines as the minimum wage analogy — to emphasize the point.  One familiar setting in which the winners and losers issue arises, the court argued, are "suit[s] [] in which one or more taxpayers of a community, suing on behalf of all, challenge the validity of a proposed public expenditure."  *Id.* at 490.  Under such circumstances, it is very likely that "a good many taxpayers would not [] prefer[] to have their rights enforced, because of their interest in having the expenditure made," but "no one has ever doubted the propriety of bringing such a suit as a class action."  *Id.*

[84]     *See Stolz et al. v. United Brotherhood of Carpenters and Joiners*, 620 F. Supp. 396, 405 (D. Nev. 1985) (holding that plaintiffs could bring a class-wide challenge to the propriety of voting procedures used to enact wage increases,

These results are not surprising.  In a legal system where most individuals lack either the means or the will (or both) to enforce their rights, class actions serve important deterrence goals.  They rein in bad behavior.  This function is especially pressing in the context of antitrust claims brought by consumers, as opposed to antitrust claims brought by competitors.  The former typically involve two dynamics that frustrate individual adjudication. *First*, from the consumer's perspective, antitrust injuries often have wide but slight economic effects, which means that individual class members might suffer few tangible damages.  This does not mean, however, that antitrust violations generate correspondingly little benefit for the entities that perpetrate them.  To the contrary, anticompetitive conduct can be highly lucrative.  And it is this asymmetry — that the very same conduct can reap enormous gain for the perpetrators, while simultaneously causing every individual consumer a small amount of harm — that makes class actions such an important enforcement device.[85]

---

despite the fact that many class members would favor implementation of the wage increase, *regardless* of whether the proper procedures were followed).

[85]    *See, e.g.*, *In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100 (S.D.N.Y. 2010) (certifying a nationwide class of credit card users on the theory that card companies conspired to charge a uniform "currency conversion fee" for transactions outside the United States — the monetary harm of which was in the single digits and for many consumers).  *See also* Newberg on Class Actions § 4:66 (noting that "class actions are the primary vehicle in modern jurisprudence for the effective enforcement of the antitrust, securities laws, discrimination, and

*Second*, antitrust actions are very expensive to litigate.  To make out a plausible antitrust claim — much less to convince a trier-of-fact that illegal conduct occurred — it is often necessary to retain an expert whose fees resemble, and might even dwarf, those of counsel.[86]  In many circumstances, this makes it practically impossible for individual plaintiffs to pursue antitrust suits.[87]  It is one thing if no common injury has occurred.  In that case, class certification is inappropriate regardless of the underlying claim.  But it is quite another thing to allow antitrust defendants to shut down class actions — even if a class-wide injury *has* occurred — because of speculation about what certain consumers might hypothetically prefer.

If this became the default rule, the consequences are not hard to imagine.  Fewer antitrust suits would be brought, because would-be plaintiffs (and their attorneys) would have less incentive to initiate them.  Litigants would be afraid of being told, many years and millions of dollars into a case, that the class

---

other key bodies of law").

[86]    *See Italian Colors v. American Express*, 133 S. Ct. 2304, 2316 (2013) (J. Kagan, dissenting) (explaining that an expert report for a garden variety tying case can easily "cost between several hundred thousand and one million dollars").

[87]    *See id.* ("No rational actor would bring a claim worth tens of thousands of dollars if doing so meant incurring costs in the hundreds of thousands.").

could not be certified because it failed the all-important winners and losers test.

Meanwhile, firms — appreciating this reconfiguration of incentives — would feel

less compunction, due to diminished risk, about engaging in anticompetitive

conduct in the first place.  This is not an acceptable outcome.

### 3.      The Purpose of Rule 23(b)(2)

The final counterpoint to defendants' winners and losers logic is more

specifically tethered to Rule 23(b)(2), and more overtly practical.  Given the

prospective relief contemplated by Rule 23(b)(2) — as opposed to the retrospective

redress contemplated by Rule 23(b)(3) — divergent interests among the class

members is a reason to *certify* the class, not to avoid certification.  It is only by

allowing an injunctive action to proceed class-wide that consumers whose interests

differ in some respects from those of the named plaintiffs will have an opportunity

to steer the course of the litigation.  Absent certification, "losing" class members

would likely be *worse* off — they would be at the mercy of individual plaintiffs

seeking declaratory and injunctive relief that is likely to have sweeping effects on

the market as a whole.

In this respect, injunctive classes are fundamentally different than

damages classes.  With regard to the latter, Rule 23 provides safeguards to protect

against coercion.  Specifically, Rule 23(c) erects stringent notice and opt-out

49

requirements that must be satisfied as a condition of certification under Rule (b)(3).[88]  In the absence of such requirements, (b)(3) certification would run the risk of usurping the rights of class members who would prefer (1) to pursue their own claims for damages, or (2) to maintain standing to bring future challenges.

With regard to injunctive classes, by contrast, coercion is harder to avoid.  Indeed, in many settings the pursuit of structural remedies is *inherently* coercive — insofar as the outcome of the litigation often bears on the interests of many unnamed parties, whether or not the suit has been formally designated as a class action.  When it comes to certain kinds of prospective relief — relief that aims to change policy, or, as here, to transform the dynamics of an entire market — "[t]here is no realistic sense of [class members] 'opting out.'"[89]  Indeed, this is why certification operates to the advantage, not the detriment, of class members with divergent interests from the named plaintiffs.  As a leading treatise puts it, "[i]n (b)(2) situations, an individual litigant's case is likely to have an impact on

---

[88]     *See* Fed. R. Civ. P. 23(c)(2)(b).  *See also* The American Law Institute Principles of the Law of Aggregate Litigation § 3.10 (outlining the notice requirements, codified in Rule 23(c)(2), that must be satisfied as a prerequisite of certification under Rule 23(b)(3)); *id.* § 3.11 (outlining the procedure for "second opt-out" rights in the event of a (b)(3) settlement).

[89]     Newberg on Class Actions § 4:36.

similarly situated parties,"[90] which means that "certification [likely] *helps* the absent parties," because it "guarantee[s] that their interests will be adequately represented."[91]

### B.   Cohesion and Standing

Putting the winners and losers issue to one side, defendants also argue that plaintiffs cannot satisfy the "cohesion" requirement of Rule 23(b)(2), because certain class members — indeed, even some named plaintiffs — are previous subscribers, but not current subscribers, to the OMP.  According to defendants, previous subscribers lack standing to challenge the complained-of restraints on prospective grounds.  Because they are no longer "consumer[s] . . . in the market in which trade was restrained,"[92] their injuries are speculative,[93] and they are not "efficient enforcers" of the antitrust laws.[94]

In other words, defendants argue that even assuming, *arguendo*, that all class members *were* injured by the complained-of restraints, it does not follow

---

[90]     *Id.* § 4:34.

[91]     *Id.*

[92]     *Associated Gen. Contractors*, 459 U.S. at 539.

[93]     *See* Def. Mem. at 44-46.

[94]     For background on the "efficient enforcer" standard, see *Laumann*, 907 F. Supp. 2d at 480-85.

that all class members will *continue* to be so injured.  The continuity of injury

depends on whether "each former subscriber among the absent class members

intends to purchase an OMP in the future," a question that defendants believe

"impossible to ascertain . . . [using] objective criteria."[95]  On that basis, defendants

conclude that "many putative class members . . . would not benefit from an

injunction,"[96] rendering the class non-cohesive.[97]

     This argument rests on a mistaken view of the injuries alleged in this

case.  Defendants are correct, of course, that a plaintiff who can *only* claim past

injuries — who faces neither an ongoing injury nor a realistic chance of future

injury — lacks standing to seek prospective relief.  The problem with defendants'

argument does not lie with this unremarkable proposition.  It lies with the implicit

premise that past subscribers to OMPs, because they no longer subscribe, are no

longer injured.  That is false.  Short of death, cognitive illness, or a complete loss

of interest in baseball and hockey, previous subscribers to OMPs are still

---

[95]     Def. Mem. at 46.

[96]     *Id.* at 45.

[97]     It has already been established — in my December 5, 2012 opinion —
that previous subscribers to the OMP satisfy the "direct purchaser" requirement of
*Illinois Brick.  See Laumann*, 907 F. Supp. 2d at 480.  *See also supra* note 54.
Defendants do not question that holding here.  Instead, they focus exclusively on
the "efficient enforcer" issue.

"consumer[s] . . . in the market in which trade [is] restrained" — here, the market for hockey and baseball broadcasting.

Put simply, if a consumer in the market for baseball and hockey broadcasting discontinues her subscription to an OMP, that decision does not remove her from the market for baseball and hockey broadcasting. Rather, it is precisely *as* a consumer in the market for baseball and hockey broadcasting that she chooses to discontinue her subscription. After all, one of the choices that consumers make is declining to buy products. There are various reasons that might happen. A product might be too expensive — as David Dillon, one of the named plaintiffs here, concluded of the OMP.[98] Or a product might fail to meet a consumer's specific needs — as the OMP did for Marc Lerner, another of the named plaintiffs.[99]

But regardless of what *motivates* a consumer to decide not to purchase a particular product, the point is that on the basis of that decision alone, there is no reason to infer — as defendants ask the Court to infer here — that the consumer is not in the market for such goods. Indeed, on the face of it, an explanation like the one offered by Plaintiff Dillon — that he chose not to renew his OMP subscription

---

[98]   *See* Def. Mem. at 46.

[99]   *See id.*

53

because it "wasn't worth the money" — suggests that if the antitrust injury in this case were redressed, and Dillon had the option (1) to subscribe to a more affordable OMP or (2) to buy an a la carte RSN, he might well make a different choice.  If he did so, he would be making that choice *as a consumer in the market for hockey broadcasting*.

Ultimately, defendants' argument depends on the proposition that discontinuing one's subscription to an OMP bespeaks a lack of interest in baseball and hockey broadcasting.  There is little reason to think so.  For support, defendants point to deposition testimony from named plaintiffs (such as Dillon), indicating that such plaintiffs "do not currently subscribe to an OMP [and] *do not [] plan* to purchase such a package."[100]  But all this demonstrates is that some consumers, in the face of constrained options and artificially high prices, choose not to buy goods.  That is not surprising.  It is just what common sense — and economic theory — would predict.[101]  For the purpose of determining which class members have standing to seek prospective relief, the relevant question is not how

---

[100]    Def. Mem. at 46 (emphasis added).

[101]    It is axiomatic that one result of anticompetitive conduct is that output diminishes within the relevant market.  *See, e.g.*, *Business Elec. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 723 (1988) (explaining that monopolization — and other per se antitrust violations — "always or almost always tend to restrict competition and decrease output").

consumers respond to a market infected by anticompetitive restraints.  It is how

consumers would behave if those restraints were lifted — *i.e.*, what choices they

would make in the BFW.

      With respect to *that* question, defendants have offered no reason to

think, much less any evidence to show, that previous subscribers are less interested

than current subscribers in seeing the restraints lifted.  Both groups have the same

interest — they want the market for baseball and hockey broadcasting to be as

competitive as possible.[102]  And both groups, likewise, suffer the same ongoing

injury — a market for baseball and hockey broadcasting in which choice is

diminished, and prices elevated, by territorial restraints.

      The same reasoning also disposes of any concern about Article III.

According to defendants, even if previous subscribers qualify as consumers in the

---

    [102]    In fact, it is not just previous subscribers and current subscribers that share this interest.  Everyone that watches hockey and baseball — all fans that have *some* appetite for viewing baseball and hockey broadcasts remotely — are consumers in the market for baseball and hockey broadcasting, with interests adversely affect by the complained-of restraints.  In this respect, the class of individuals interested in the outcome of this litigation include a large swath of baseball and hockey fans who have *never* subscribed to OMPs, but who nevertheless enjoy watching baseball and hockey through currently-available channels and, in the BFW, might consider subscribing to an OMP (if it were cheaper) or might be interested in purchasing a la carte RSNs.  If anything, the sheer size of the population whose interests are at stake in this litigation makes class-wide adjudication all the more appropriate.  For the reasons set forth above, one of the purposes of (b)(2) certification is to expand the number of parties that have an opportunity to steer the course of litigation.

market for baseball and hockey broadcasting, they have suffered no injury that is amenable to prospective relief, rendering them constitutionally unqualified to bring a claim — and frustrating class certification.[103]   In support of this argument, defendants point to two recent Supreme Court cases — *Walmart v. Dukes*,[104] and *Clapper v. Amnesty International*.[105]  In *Dukes*, current and former female employees of Walmart brought a class action under Title VII, alleging that the company had engaged in systematic sex-based discrimination in their hiring and promotional decisions.  After holding that the class lacked commonality — thus precluding certification under Rule 23(a) — the Court went on to note that (b)(2) certification was inappropriate on other grounds.  Namely, former employees of Walmart "lack[ed] standing" — by which the Court meant Article III standing — "to seek injunctive or declaratory relief against [Wal-Mart's] employment practices," because they were no longer affected by those practices.  Thus, they could not properly be included in a (b)(2) class.[106]

The *Clapper* Court echoed this reasoning two terms later, when it held

---

[103]    *See Denney*, 443 F.3d at 263-64 ("[N]o class may be certified that contains members lacking Article III standing").

[104]    *See* 131 S. Ct. 2541 (2011).

[105]    See 133 S. Ct. 1138 (2013).

[106]    *See* 131 S. Ct. at 2560.

that Amnesty International lacked standing to bring a constitutional challenge to section 702 of the Foreign Intelligence Surveillance Act ("FISA").  According to Amnesty International, because it tends to interact with individuals who are subject to overseas telephonic surveillance (as authorized by FISA), the organization faced "an objectively reasonable likelihood that [its] communications will be acquired . . . at some point in the future" — conferring standing on the organization to bring a constitutional claim.[107]  The Court disagreed, maintaining that a "*future* injury is too speculative to satisfy the well-established requirement that threatened injury must be certainly impending."[108]  Therefore, the organization was not in a position to secure the prospective relief that it sought.

A common principle underlies *Dukes* and *Clapper*.  It is the same principle that motivated *City of Los Angeles v. Lyons*[109] — an older case that is not cited in defendants' papers, but that nevertheless bolsters its position.  There, the Court held that the plaintiff, who had been subject to a choke-hold by an officer of the Los Angeles Police Department, lacked standing to enjoin the general *practice* of using choke-holds, because he was unlikely to suffer a similar injury in the

---

[107]   *Clapper*, 133 S. Ct. at 1143.

[108]   *Id.* (emphasis in original).

[109]   461 U.S. 95 (1983).

57

future.  Therefore — the *Lyons* Court reasoned — the plaintiff could not seek

prospective relief.[110]

The principle uniting these cases is that, for purposes of Article III,

neither a previously-inflicted injury nor a hypothetical future injury is sufficient to

confer standing to pursue forward-looking remedies.  To enjoy such standing, a

plaintiff must show either that she currently *is* injured, or that a future injury is

"certainly impending."[111]

Here, for the reasons set forth above, all class members — including

previous subscribers to the OMPs — are consumers in the market for baseball and

hockey broadcasting.  All class members, therefore, suffer an ongoing injury in

connection with the complained-of restraints — a dearth of choice in the market

for baseball and hockey broadcasting.  Accordingly, all class members have Article

---

[110]   *See id.* at 104-10.

[111]   *Clapper*, 133 S. Ct. at 1143.  *Accord Susan B. Anthony List v. Driehaus* 134 S. Ct. 2334, 2341 (2014); *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990).  For an example of what constitutes an impending injury, see, for example, *Deshawn E. v. Safir*, 156 F.3d 340, 344-45 (2d Cir. 1998) (holding that plaintiffs had standing to seek an injunction against the involuntary coercion of statements by police officers because there was evidence of a department-wide policy in favor of coerced statements in *all* cases, whereas in *Lyons*, the City's policy afforded individual officers discretion in the use of choke-holds); *Aguilar v. Department of Homeland Sec.*, 811 F. Supp. 2d 802, 826-27 (S.D.N.Y. 2011) (holding that plaintiffs had standing to seek prospective relief from searches by Immigration and Customs Enforcement ['ICE'] officials, because those officials, having searched plaintiffs' property once, threatened to return).

III standing.

### C.     The Necessity of Certification

Having disposed of all affirmative obstacles to certification under

(b)(2), the final question the Court must address is whether such certification is

*necessary*.  Under Second Circuit law, there is no need for (b)(2) certification when

a defendant is willing to "represent[]" that it "ha[s] no intention of reinstating" a

challenged policy, even if the policy has only been challenged on an individual

basis.[112]  In other words, if the right in question can be secured on a class-wide

basis through individual adjudication — if all class members' interests will be

protected *whether or not* the class is certified — certification should be denied.

Assuming, *arguendo*, that this principle generally applies in cases

where defendants are private corporations rather than state officials,[113] it is

---

[112]     *Daniels*, 198 F.R.D. at 420.  *Accord Davis v. Smith*, 607 F.2d 535, 540
(2d Cir. 1978) ("[When] the prospective benefits of declaratory and injunctive
relief will benefit all members of a proposed class to such an extent that []
certification . . . would not further the implementation of the judgment, a district
court may decline certification."); *Galvan v. Levine*, 490 F.2d 1255, 1261 (2d Cir.
1973) (holding that (b)(2) certification would be "largely a formality" when
defendant "has made clear that it understands the judgment [as to one claimant] to
bind it with respect to all claimants [and that] even before entry of the judgment,
[defendant] withdrew the challenged policy . . . and stated it did not intend to
reinstate the policy").

[113]     The Second Circuit has indicated that the reasoning of *Galvan* might
be exclusive to civil rights actions, due to the "assum[ption]," in those cases, that it
would be "unthinkable" for "public officials, mindful of their responsibilities," not

inapposite here.  Defendants have made no representation that if the territorial

restraints are declared unlawful as applied to the named plaintiffs, defendants will

implement that holding across the board.  In practice, of course, it is probable that

defendants *would* do so; that their response to a merits verdict in plaintiffs' favor

will be to abolish territorial restraints universally, across the United States.  But

taking the momentous step of concluding that certification is unnecessary requires

more than probability.  The case law makes clear that a defendant's representations

must be "express,"[114] or otherwise "explicit,"[115] before it is appropriate to forgo

certification.  Here, no such representation has been made.  And although it may

not be likely, it is nonetheless *possible* that defendants could respond to an adverse

merits verdict by lifting some, but not all, territorial restraints — in a manner that

---

[114]   to "apply [an adverse] determination . . . equally to all persons similarly situated."
*Berger v. Heckler*, 771 F.2d 1556, 1566-67 (2d Cir. 1985).  *Accord Hurley v.
Ward*, 584 F.2d 609, 611-12 (2d Cir. 1978) ("Since it is ordinarily assumed that
state officials will abide by the court's judgment, where the State has admitted the
identity of issues as to all potential class litigants class certification is indeed
unnecessary.").  Because it is unclear from these precedents how widely *Galvan*
applies, I assume for present purposes that it applies here.

[114]   *Cutler v. Perales*, 128 F.R.D. 39, 46-47 (S.D.N.Y. 1989) (expounding
on the importance of a defendant's "express [] commitment to apply the judgment
of the court in the single action to all similarly situated persons," and noting that in
*Galvan*, "the defendant had withdrawn the challenged policy *prior* to class
certification") (emphasis added).

[115]   *Dajour B. ex rel. L.S. v. City of New York*, No. 00 Civ. 2044, 2001
WL 1173504, at *10 (S.D.N.Y. Oct. 3, 2001).

resolves the named plaintiffs' injuries but does not reconfigure the market for baseball and hockey broadcasting.  However slight that risk may be, it is one I decline to take.[116]  The legality of the territorial restraints should be adjudicated on a class-wide basis pursuant to Rule 23(b)(2).

## VI.   CONCLUSION

For the reasons set forth above, plaintiffs' motion is GRANTED in part and DENIED in part.  The Clerk of the Court is directed to close this motion, Dkt. No. 266 in 12 Civ. 1817, and Dkt. No. 339 in 12 Civ. 3704.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            May 14, 2015

---

[116]    Moreover, even if defendants *did* explicitly represent that the territorial restraints would be lifted across the entire market in the event that plaintiffs prevail, this would still leave unaddressed the interests of absent class members who potentially stand to "lose" in the BFW — and who might, on that basis, prefer to exercise some voice in the litigation.  Because (b)(2) certification "*helps* [] absent parties," concern for unnamed class members is an independent reason for certification.  Newberg on Class Actions § 4:34 (emphasis in original).  Even if defendants were — hypothetically — to assure the Court that certification is unnecessary to secure class-wide relief, it would still be necessary to ensure optimal representation.

**- Appearances -**

**For Plaintiffs:**

Edward A. Diver, Esq.
Howard I. Langer, Esq.
Peter E. Leckman, Esq.
Langer Grogan & Diver, P.C.
Three Logan Square, Suite 4130
1717 Arch Street
Philadelphia, Pennsylvania 19103
(215) 320-5663

Kevin M. Costello, Esq.
Gary E. Klein, Esq.
Klein Kavanagh Costello, LLP
85 Merrimac St., 4th Floor
Boston, Massachusetts 02114
(617) 357-5034

Michael Morris Buchman, Esq.
John A. Ioannou, Esq.
Motley Rice, LLC
600 Third Avenue
New York, New York 10016
(212) 577-0040

Marc I. Gross, Esq.
Adam G. Kurtz, Esq.
Pomerantz, LLP
600 Third Avenue
New York, New York 10016
(212) 661-1100

Robert LaRocca, Esq.
Kohn, Swift & Graf, P.C.
One South Broad Street
Suite 2100

Philadelphia, Pennsylvania 19107
(215) 238-1700

J. Douglas Richards, Esq.
Jeffrey Dubner, Esq.
Cohen, Milstein, Sellers & Toll, PLLC
88 Pine Street
New York, New York 10005
(212) 838-7797

Michael J. Boni, Esq.
Joshua D. Snyder, Esq.
Boni & Zack, LLC
15 St. Asaphs Road
Bala Cynwyd, Pennsylvania 19004
(610) 822-0200

**For Defendants Office of the Commissioner of Baseball, Major League Baseball Enterprises Inc., MLB Advanced Media L.P., MLB Advanced Media, Inc., Athletics Investment Group, LLC, The Baseball Club of Seattle, L.L.P., Chicago White Sox, Ltd., Colorado Rockies Baseball Club, Ltd., The Phillies, Pittsburgh Baseball, Inc., and San Francisco Baseball Associates, L.P. :**

Beth A. Wilkinson, Esq.
Samantha P. Bateman, Esq.
Paul, Weiss, Rifkind Wharton & Garrison LLP
2001 K St. NW
Washington, D.C. 20006
(202) 223-7300

Bradley I. Ruskin, Esq.
Helene Debra Jaffe, Esq.
Jennifer R. Scullion, Esq.
Colin Kass, Esq.
Proskauer Rose LLP
11 Times Square
New York, New York 10036

(212) 969-3465

Thomas J. Ostertag, Esq.
Senior Vice President and General Counsel
Office of the Commissioner of Baseball
245 Park Avenue
New York, New York 10167
(212) 931-7855

**For Defendants National Hockey League, NHL Enterprises, L.P., NHL
Interactive Cyberenterprises, LLC, Chicago Blackhawk Hockey Team, Inc.,
Comcast-Spectator, L.P., Hockey Western New York LLC, Lemieux Group,
L.P., Lincoln Hockey LLC, New Jersey Devils LLC, New York Islanders
Hockey Club, L.P., and San Jose Sharks, LLC:**

Shepard Goldfein, Esq.
James A. Keyte, Esq.
Paul M. Eckles, Esq.
Matthew M. Martino, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
(212) 735-3000

**For Defendants Comcast Corporation, Comcast SportsNet Philadelphia, L.P.,
Comcast SportsNet Mid-Atlantic L.P., Comcast SportsNet
California, LLC, and Comcast SportsNet Chicago, LLC:**

Arthur J. Burke, Esq.
James W. Haldin, Esq.
Davis Polk & Wardwell
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

**For Defendants DIRECTV, LLC, DIRECTV Sports Networks, LLC,
DIRECTV Sports Net Pittsburgh, LLC a/k/a Root Sports Pittsburgh,
DIRECTV Sports Net Rocky Mountain, LLC a/ka/a Root Sports Rocky**

**Mountain, and DIRECTV Sports Net Northwest, LLC a/ka/a Root Sports Northwest:**

Louis A. Karasik, Esq.
Andrew E. Paris, Esq.
Stephanie A. Jones, Esq.
Alston & Bird LLP
333 South Hope Street, 16th Floor
Los Angeles, California 90071
(213) 576-1000

**For Defendant New York Yankees Partnership:**

Jonathan Schiller, Esq.
Alan Vickery, Esq.
Christopher Duffy, Esq.
Boies, Schiller & Flexner LLP
575 Lexington Avenue
New York, New York 10022
(212) 849-2300

**For Defendants The Madison Square Garden Company and New York Rangers Hockey Club:**

Stephen R. Neuwirth, Esq.
Deborah Brown, Esq.
Richard I. Werder, Jr., Esq.
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

**For Defendant Yankees Entertainment Sports Network, LLC:**

John E. Schmidtlein, Esq.
Kenneth Charles Smurzynski, Esq.
James Harris Weingarten, Esq.
William Jefferson Vigen, Esq.

Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000