UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THOMAS LAUMANN, et al., representing themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>         v.<br><br>NATIONAL HOCKEY LEAGUE, et al.,<br><br>                    Defendants. | 12-cv-1817 (SAS)<br><br>ECF Case |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**

Plaintiffs Thomas Laumann, David Dillon, Robert Silver, and Garrett Traub ("Plaintiffs"), on behalf of themselves and the Class certified by this Court on May 14, 2015,[1] respectfully move the Court for preliminary approval of their Settlement Agreement ("Agreement") with all Defendants in *Laumann v. National Hockey League*. *See* Declaration of Howard I. Langer ("Langer Dec."), Ex. 1. If approved, the Agreement would fully resolve the *Laumann* litigation.[2]

The Plaintiffs request that the Court grant preliminary approval of the Settlement and enter the proposed Order Preliminarily Approving Proposed Settlement, Scheduling Hearing for Final Approval Thereof, and Approving the Proposed Form and Program of Notice to the Class ("Proposed Order") attached as Exhibit A to the Agreement. Because key provisions of the settlement anticipate implementation in advance of the 2015-2016 National Hockey League

---

[1] As discussed below, the Court certified two separate classes, an Internet Class and a Television Class. For purposes of this motion, Plaintiffs will refer to them jointly as the "Class," unless otherwise specified.

[2] The proposed settlement has no effect on *Garber v. Major League Baseball*.

1

season, the parties request that the settlement be considered on an expedited basis, as described more fully below.

## I.  INTRODUCTION

The Agreement follows three years of hard-fought litigation and several months of intense negotiation. The Agreement provides relief for Class members and the broader public through increased consumer choice and lower prices. The NHL will offer an unbundled Game Center Live Internet package ("GCL") for the next five years – allowing for the purchase of single-team packages for a price at least twenty percent below the price of the bundled package.[3] For the first time in any major-league sport in the United States, consumers will be able to choose between a season-long package of an individual team from outside their local markets, or they can choose to purchase the league-wide out-of-market bundle. For both packages, the league's territorial structure will otherwise remain unchanged.

The Agreement also requires lower prices. For the 2015-2016 GCL season, the NHL will discount early-bird, renewal and full season prices by 17.25% over the prior year's prices. As a result of this and the discounted single team stream, a fan of a particular team who presently pays $159 for a full season package (at the discounted "early bird" price) will be able obtain a single team stream of his favorite team for approximately $105. In addition, Comcast and DirecTV will provide three weeks of free access to NHL Center Ice for their subscribers for the next two seasons, thereby reducing the package price by 12.5%.

The Parties believe that the Agreement is fair, reasonable, and adequate. If approved, Class members would be entitled to the benefits of the settlement immediately, rather than facing the risk of ongoing litigation. This settlement is in the best interest of Class members, but time is

---

[3] The NHL will also offer the MVPD Defendants the ability to offer Center Ice television packages as single-team unbundled products.

of the essence for implementing the settlement. The NHL preseason will start in mid-September 2015, with the regular season opening on October 7, 2015. The NHL has agreed to implement a significant component of the relief – the unbundled packages – in this coming season if final approval is granted by September 15, even if objector appeals are pending. Accordingly, Plaintiffs respectfully request that the Court expedite consideration of this motion so that Class members can receive notice and the heart of the settlement can be implemented in advance of the 2015-2016 NHL season.

## II.     NATURE OF THE CASE

The Court is well versed in the factual background of this case. *See, e.g., Laumann v. Nat'l Hockey League*, 56 F. Supp. 3d 280 (S.D.N.Y. 2014) ("S.J. Order"). The following facts are only those most relevant to preliminary approval of the settlement.

### A.     Plaintiffs' Claims

Plaintiffs represent a class of purchasers of league-wide "out-of-market" packages. They claim the price of the packages are inflated and consumer choices diminished as a result of the NHL's broadcasting territories, which create local monopolies for each club and its television partner in exchange for an agreement not to compete against the broadcasts of other clubs. By league-wide agreement, the clubs include these market-dividing restrictions in their contracts with their broadcast partners. *See generally* S.J. Order, 56 F. Supp. 3d at 286-89. As a result, the markets for live-hockey programming are subject to horizontal, geographical market divisions. Plaintiffs allege that these agreements violate the Sherman Act.

As Plaintiffs have previously argued, the challenged restraints limit consumer choice and reduce output and increase prices. *See Laumann* Am. Compl., Docket No. 87 at ¶ 100; *Laumann v. Nat'l Hockey League,* No. 12-cv-1817, 2015 WL 2330107, at *11 (S.D.N.Y. May 14, 2015)

("Class Cert. Order"). These harms impact all Class members. As the Court held, "all class members — including previous subscribers to the OMPs ["Out-of-Market" Packages] — are consumers in the market for baseball and hockey broadcasting. All class members, therefore, suffer an ongoing injury in connection with the complained-of restraints — a dearth of choice in the market for baseball and hockey broadcasting." Class Cert. Order, 2015 WL 2330107, at *18.

### B. The Procedural History of the Litigation

Plaintiffs filed their original complaint on March 12, 2012. [Docket No. 1]. The Court ruled on Defendants' motion to dismiss on December 5, 2012, *Laumann v. Nat'l Hockey League,* 907 F. Supp. 2d 465, 472-75 (S.D.N.Y. 2012), allowing Plaintiffs who had purchased out-of-market bundles from one of the Defendants to proceed with their claims.

Nearly 18 months of discovery followed. The resulting record consisted of hundreds of thousands of documents and dozens of depositions. During this same time period, the Court oversaw motion practice aimed at limiting the scope of the litigation in various ways. *See, e.g. Laumann v. Nat'l Hockey League,* No. 12 Civ. 1817, 2013 WL 837640 (S.D.N.Y. Mar. 6, 2013) (denying motion to stay litigation); Docket No. 167 (granting in part and denying in part motion to compel arbitration and stay certain claims). In April 2014, each of the Comcast, DirecTV, and NHL Defendants moved separately for summary judgment. The Court denied all of Defendants' summary judgment motions in full. *See generally* S.J. Order.

The litigation produced lengthy expert declarations and depositions. In March 2015, the Court held a three-day evidentiary hearing to consider Plaintiffs' motion for class certification and Defendants' *Daubert* challenge to Plaintiffs' expert's damages model. Docket Nos. 242, 269, 326. On May 14, 2015, the Court granted in part and denied in part the Defendants' *Daubert* motion and certified a class of purchasers of the OMPS, seeking injunctive relief under Federal

Rule of Civil Procedure 23(b)(2). *See Laumann v. Nat'l Hockey League,* No. 12-cv-1817, 2015 WL 2330036, at *15-22 (S.D.N.Y. May 14, 2015) ("*Daubert* Order"); Class Cert. Order, 2015 WL 2330107, at *18.

### C. The Parties' Settlement Negotiations

In November 2014, while Plaintiffs' motion for class certification was pending, settlement negotiations began in earnest between Plaintiffs and the NHL. The parties negotiated the basic framework of a settlement over the next four months. The MVPD Defendants joined the negotiations in March 2015. After a month of negotiations, the parties remained far apart, leading them to enter mediation in late April and continuing into May with Stephen M. Orlofsky, former United States District Judge of the District of New Jersey. Judge Orlofsky conducted five separate full-day, in-person mediation sessions over several weeks, totaling more than 50 hours, and participated in countless less formal communications among the parties. On several occasions, settlement talks broke down before being revived by Judge Orlofsky.

Throughout, the parties negotiated at arm's length, represented by experienced and skilled counsel. Langer Dec. at ¶¶3-6. The Agreement is the product of a hard fought compromise.[4]

## III. KEY SETTLEMENT TERMS

### A. The Class

The Agreement combines the "Internet Class" and the "Television Class" certified in the Court's May 14, 2015 Order into a single definition:

---

[4] It was not until the parties had reached substantial agreement on the material terms of the relief to the Class that the mediation turned to the issue of attorneys' fees and costs to be paid to the Plaintiffs. *See* Langer Dec. at ¶7. The negotiation of attorneys' fees and costs therefore had no impact on the relief to be granted to the class.

> All individuals in the United States who purchased television service from the DirecTV and/or Comcast, which included Center Ice, and/o who purchased GCL from the NHL Defendants or their subsidiaries, at any time between March 12, 2008, and the date on which Plaintiffs file a motion for Preliminary Approval, as certified by the Court in its May 14, 2015 Order [Dkt. No. 346].

Agreement at ¶4.

### B.  Settlement Benefits

The Agreement significantly increases consumer choice. The NHL will offer single-team broadcast packages for all NHL teams over the Internet, in addition to the current league-wide GCL bundle, for a five-year period starting with the 2015-2016 season. Agreement at § B. The single-team offerings will be priced at least 20% below the league-wide bundle, which addresses one of the core effects of the restraints limiting consumer choice to either in-market television broadcasts or a single league-wide out-of-market package.[5] For the first time for any major league sport in the United States, fans can either purchase a season-long package of a single team or a season-long package of all out-of-market games.[6] The geographical limitations applicable to the league bundle will apply equally to the unbundled packages.

The Agreement provides for additional relief by reducing prices. The NHL will set early-bird, renewal and full-season prices for the 2015-2016 GCL season at a level discounted by at least 17.25% relative to the respective counterparts from the prior season. This discount, coupled with the 20% discount for the individual stream, will provide substantially less expensive options. A class member interested in a particular team will be able to pay just $105 for a full season (at

---

[5] The Agreement contains incentives for the NHL to lower prices even further. If after the first year the early bird price of GCL drops below $130.00 per year, the single-team package may be priced at 85% of that amount. Agreement at ¶43. Should that early bird pricing drop to less than $100 in future years, the single-team package pricing may be increased to 90% of that amount. *Id.*

[6] In addition, the NHL will make such single team packages available to DirecTV and Comcast, allowing them to offer television packages on this same basis. Agreement at ¶43.

the "early bird" price), where formerly the only choice was the $159 bundle. Both Comcast and DirecTV will provide all consumers who are currently their MVPD subscribers three free weeks of Center Ice for each of the next two seasons. This benefit will be conferred automatically, without any need to opt-in or volunteer. For full-season Center Ice subscribers, this benefit represents a 12.5% price reduction in their annual fee,[7] for each of the next two years.[8]

C. **Class Notice**

The parties have negotiated an effective notice plan. *See* Agreement, Ex. B.

With respect to Internet purchasers, the Agreement provides for the NHL to provide notice to the class and to pay for the administration of the settlement. In partnership with NeuLion, which administers the existing GCL package, the NHL will provide direct email notice of the settlement to all GCL subscribers at the email address associated with their GCL account. In addition, the NHL will publicize the new single-team packages, including prominently offering those packages as alternatives to the league-wide package at each website point of sale.

With respect to Center Ice purchasers, the MVPD Defendants will also assume the cost of notice to the class and administration of the settlement. Agreement at § H. Class members who purchased Center Ice from DirecTV will be provided with notice by either email (if the email address of the subscriber is available) or first-class mail. Class members who purchased Center Ice from Comcast during the 2014-2015 season and who currently subscribe to Comcast will be

---

[7] The Agreement provides that Comcast and DirecTV must charge no more than 12.5% less than 2014-15 prices for the remainder of the package in the 2015-2016 season.

[8] In addition to the benefit of having 30 more choices, each person who opts for a single-team package will save approximately $54 in the first year. If 30% of the subscribers select a single-team package in the first year, this benefit alone should generate roughly $10 million in savings. The discounts on the league-wide packages in the Agreement will generate approximately another $10 million in savings, holding pricing and subscriber numbers otherwise constant. And these figures do not account for the increase in subscriptions that are expected as a result of the increased choice and lower prices.

provided with notice via first-class mail. *Id.* The Agreement allows for postal notice to be inserted into the class member's monthly billing statement. *Id.*[9] Defendants will also provide publication notice of the settlement via various online media outlets through a targeted media campaign estimated to deliver 20,000,000 impressions over a 30-day period. *Id.*

### D. Attorneys' Fees, Costs, and Service Payments

The Agreement also provides for the payment of Attorneys' Fees and Costs, as well as Service Payments. The Agreement allows the Plaintiffs to seek Court approval for up to $6.5 million in attorneys' fees and costs. Agreement at § F. In addition, the Agreement provides that the Plaintiffs will seek Service Payments of $10,000 each for the named plaintiffs. The Defendants have agreed to pay each of these amounts, to the extent that they are awarded by the Court. These awards cannot in any way reduce the value conferred on the Class under the Settlement.[10]

### E. Release

The Agreement provides for a release of all claims for relief that have been or could have been asserted based on the facts alleged in the Complaint, including claims for damages. Agreement at §I. Specifically excluded from this release are any claims asserted in the *Garber v. Office of the Commissioner of Baseball* litigation. *Id.* Further, the Agreement provides for class members to release claims based upon the conduct adopted pursuant to this settlement, during the period between its implementation and the five-year sunset provision. *Id.* Class members who wish to pursue retrospective claims for damages are permitted to opt out of the settlement

---

[9] In each instance where the Agreement provides for notice by email, it also requires the Defendants to mail written notice to the last known postal address of Class members where the email is returned as undeliverable.

[10] Plaintiffs will move the Court for approval of these awards separately, well in advance of the proposed Final Approval Hearing in order to provide ample notice to the Class of the substance of these requests and the rationale underlying them in advance of the Fairness Hearing.

for that purpose. Given that this is a settlement of an injunctive class under Rule 23(b)(2), class members may not opt-out of the practice changes set forth in the settlement.

## IV. THE COURT SHOULD PRELIMINARILY APPROVE THE SETTLEMENT AGREEMENT

### A. Legal Standard

"Preliminary approval of a class action settlement proposal 'is at most a determination that there is what might be termed 'probable cause' to submit the [settlement] proposal to class members and hold a full-scale hearing as to its fairness.'" *Authors Guild v. Google, Inc*. No. 05 Civ. 8136, 2009 WL 4434586 at *1 (S.D.N.Y. Dec. 1, 2009) (quoting *In re Traffic Executive Assoc.,* 627 F.2d 631, 634 (2d Cir.1980)). Ultimately, the Court must decide whether the compromise is fair, reasonable and adequate. *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982), *cert. denied*, 464 U.S. 818 (1983). As a first step, preliminary approval is "appropriate where ... there are no grounds to doubt its fairness and no other obvious deficiencies (such as unduly preferential treatment of class representatives ... or excessive compensation for attorneys), and where the settlement appears to fall within the range of possible approval." *In re Herald, Primeo, and Thema Sec. Litig.*, No. 09 Civ. 289(RMB), 2011 WL 4351492 at *4 (S.D.N.Y. Sept. 15, 2011) (citing Manual for Complex Litig. § 30.41).

### B. The Compromise is Fair, Reasonable and Adequate

The Court may attach a strong, initial presumption of fairness where "the Settlement was reached by experienced counsel after extensive arm's length negotiations." *Van Oss v. New York*, No. 10-Civ-7525-SAS, 2012 WL 2550959 at *1 (S.D.N.Y. July 2, 2012). Where "the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the range of possible approval, preliminary approval is

granted." *In re Initial Public Offering Sec. Litig.*, 226 F.R.D. 186, 191 (S.D.N.Y. 2005) (citation omitted) ("*IPO*").

This settlement brings significant relief to Class members, substantially expanding the choices available to them and saving them tens of millions of dollars. To be sure, the settlement is a compromise – as all settlements are – and does not accomplish everything Plaintiffs set out to accomplish. But the benefits to be afforded class members are fair, reasonable and adequate and the Agreement easily exceeds the standard for preliminary approval.

1. *Non-Collusive Negotiations*

The Agreement is the "product of serious, informed, non-collusive negotiations." *IPO*, 226 F.R.D. at 191. As recounted at length above, this is mature litigation in which the Parties were fully apprised of the strengths and weaknesses of their respective claims and defenses at the time they decided to explore settlement. Discovery yielded a full evidentiary record on which the Court based its summary judgment and class certification rulings.

Moreover, the parties negotiated for months, including five full days of mediation with Judge Orlofsky. These negotiations were exhaustive, characterized by fierce advocacy on both sides, conducted at arm's length, in good faith, and wholly free from collusion. *See* Langer Dec. at ¶¶3-6. Experienced counsel struck the compromise embodied by the Agreement, and therefore it should be afforded a strong, initial presumption of fairness, warranting preliminary approval. *Van Oss v. New York*, 2012 WL 2550959 at *1.

2. *No Preferential Treatment*

The Agreement does not improperly grant preferential treatment to class representatives or segments of the class. The settlement benefits are available uniformly across the class without preference or segregation for the class representatives or any other class member.

Among the various aspects of the Agreement's relief, only the service payments proposed for each of the named plaintiffs do not apply equally to all class members. Such payments are routinely awarded in class settlements in order to recognize the risk undertaken and effort expended by class representatives on behalf of the class. *See Velez v. Novartis Pharm. Corp.*, No. 04-Civ.-09194, 2010 WL 4877852 at *24 (S.D.N.Y. Nov. 30, 2010) ("Incentive awards have been awarded to individual class members in a variety of contexts, including employment discrimination suits, antitrust cases and consumer fraud suits.") As a whole, the uniform treatment of all class members under the Agreement warrants a presumption of fairness and preliminary approval.

Last, the Agreement's provision for attorneys' fees and costs suggests the absence of any preferential treatment. Class counsel will move the Court separately for approval of these fees and costs. The requested fees are proportional to Class counsel's collective loadstar and the fees and costs together conservatively represent 25 percent of the calculable value of the settlement. *See* Langer Dec. at ¶7.

      3.     *The Settlement is Within the Range of Possible Approval*

The core of the settlement is the unbundling of the full league-wide package. This directly addresses an injury "every class member has suffered" by being "deprived of an option—a la carte channels—that would have been available absent the territorial restraints." Class Cert. Order, 2015 WL 2330107, at *11. By providing an option to purchase an unbundled, single-team broadcast package, the Agreement directly addresses classwide injury that the Court identified and provides options that Plaintiffs allege were illegally withheld.[11]

---

[11] While Comcast and DirecTV have not guaranteed that they will provide that option themselves, every Class member – no matter which Defendant they purchased from – will be able to purchase a single-team package over the Internet from the NHL. This package can be

11

The Agreement also lowers prices. Comcast and DirecTV have agreed to provide Center Ice automatically at a reduced price to all of their subscribers and the NHL has agreed to cut the price for the upcoming GCL season by 17.25%. The settlement thus achieves substantial improvement in the core areas of injury discussed in the Court's class certification ruling, providing benefits that clear the bar of fair, reasonable and adequate. To be sure, the agreement does not represent everything sought by Plaintiffs—local games will continue to be available only through RSNs and not through any of the packages—but that is the nature of a compromise. The substantial benefits directly addressing many of the core harms Plaintiffs allege make the settlement more than adequate.

Further, the Agreement provides for an effective plan of notice that should be approved. When considering a class action settlement, "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal." *In re Bank of Am. Corp. Sec., Derivative, and Emp. Ret. Income Sec. Act (ERISA) Litig.*, 772 F.3d 125, 132 (2d Cir. 2014). "The yardstick against which we measure the sufficiency of notices in class action proceedings is one of reasonableness." *Id.*

The Agreement requires Defendants to provide notice of the settlement. Specifically, and as described above, NHL must provide direct email notice to GCL subscribers at the email address associated with their GCL account and give the new single-team packages reasonable publicity, including prominently offering those packages as alternatives to the league-wide package at each point of sale. The MVPD Defendants will send notice to their current Center Ice customers by either email if the email address of the subscriber is available, first class mail to the postal address associated with the subscriber's account for billing purposes, or via a targeted

---

watched on a TV through a wide variety of methods, including low-cost devices such as the Roku or AppleTV.

Internet campaign aimed at providing publication notice of the settlement via various online media outlets. *See* Agreement, Exhibit B (Plan of Notice).[12] The publication notice will include links and banner ads on sports-related and hockey-related websites, and is estimated to deliver 20,000,000 impressions over a 30-day period. *Id*.

Such notice will facilitate the Court's "responsibility to protect members of the class who have had no opportunity to protect themselves" by "fairly appris[ing] the ... members of the class of the terms of the proposed settlement." *Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exchange*, 660 F.2d 9, 20-21 (2d Cir. 1981) (internal citations and quotations omitted). The proposed notice explains the settlement benefits and includes an Appendix reciting the language of the release verbatim. As the Second Circuit has held, "due process requires [no] further explanation of the effects of the release provision in addition to the clear meaning of the words of the release." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005).

## V. CONCLUSION

For the reasons set forth above, the Plaintiffs' motion should be granted and the Court should set deadlines for notice, claims, exclusions, objections, and a date for fairness hearing under Rule 23 by entering the Proposed Order. Plaintiffs respectfully request that the Court promptly rule on this motion so that the settlement will have a chance of being finally approved before the 2015-2016 NHL season.

---

[12] DirecTV will notice all of its customers directly. Comcast will provide direct notice to current Center Ice subscribers, and will provide publication notice to reach former subscribers.

June 11, 2015                                                   Respectfully Submitted,

*Howard Langer*
Edward Diver
Howard Langer
Peter Leckman
LANGER, GROGAN & DIVER, P.e.
1717 Arch Street, Suite 4130
Philadelphia, PA 19103
Telephone: (215) 320-5660
Facsimile: (215) 320-5703

*Lead Class Counsel*