**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

THOMAS LAUMANN, et al., representing
themselves and all others similarly situated,

                Plaintiffs,

      v.

NATIONAL HOCKEY LEAGUE, et al.,

                Defendants.

12-cv-1817 (SAS)

ECF Case

 

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR
FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

# TABLE OF CONTENTS

I.    INTRODUCTION ......................................................................................... 1

II.   PROCEDURAL HISTORY ....................................................................... 3

    A.   Litigation to Date ................................................................................. 3

    B.   Settlement Negotiations ...................................................................... 5

III.  THE PROPOSED SETTLEMENT ........................................................... 6

    A.   The Class ............................................................................................. 6

    B.   Settlement Benefits ............................................................................. 6

    C.   Attorneys' Fees, Costs, and Service Payments ................................... 9

    D.   Release of Claims ............................................................................... 9

IV.   THE APPROVED NOTICE WAS ADEQUATE AND SATISFIED DUE PROCESS ........ 10

V.    THE SETTLEMENT MEETS THE STANDARDS FOR FINAL APPROVAL................. 11

    A.   The Settlement Process was Procedurally Fair .......................... 11

    B.   The Settlement Is Reasonable, Adequate and Substantively Fair.............. 12

        1.   The anticipated complexity, duration and expense of additional litigation .......... 13

        2.   The reaction of the settlement group .................................. 15

        3.   The stage of the proceeding and the amount of the discovery completed ........... 16

        4.   The risks of establishing liability ...................................... 16

        5.   The risks of establishing damages ..................................... 19

        6.   The risks of maintaining the class action through trial ....................... 19

        7.   The ability of the Defendants to withstand a greater judgment ............... 20

        8.   The range of reasonableness of the settlement amount in light of the best possible recovery and in light of all attendant risks of litigation ........... 20

VI.   CONCLUSION........................................................................................ 22

# TABLE OF AUTHORITIES

## Cases

*American Express Co. v. Italian Colors Restaurant,*
  133 S. Ct. 2304 (2013) ............................................................................................. 19

*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,*
  441 U.S. 1 (1979) ...................................................................................................... 14

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
  429 U.S. 477 (1977) .................................................................................................. 14

*City of Detroit v. Grinnell Corp.,*
  495 F.2d 448 (2d Cir. 1974) ....................................................................... 12, 17, 20, 21

*Concord Boat Corp. v. Brunswick Corp.,*
  207 F.3d 1039 (8th Cir. 2000) .................................................................................. 18

*Cronas v. Willis Grp. Holding, Ltd.,*
  No. 06 CIV.15295 (RMB), 2011 U.S. Dist. LEXIS 147171 (S.D.N.Y. Dec. 19, 2011) ......... 12

*Denney v. Jenkens & Gilchrist,*
  230 F.R.D. 317 (S.D.N.Y. 2005) ............................................................................... 11

*Ebbert v. Nassau County,*
  No. CV 05-5445 (AKT), 2011 U.S. Dist. LEXIS 150080 (E.D.N.Y. Dec. 22, 2011) ............. 11

*Foe v. Cuomo,*
  700 F. Supp. 107 (E.D.N.Y. 1988) ............................................................................ 10

*Gallagher v. T-Bone Rest. LLC,*
  2011 U.S. Dist. LEXIS 143773 (S.D.N.Y. Dec. 13, 2011) ........................................... 19

*In re American Bank Note,*
  127 F. Supp. 2d 418 (S.D.N.Y. 2001) ....................................................................... 15

*In re AremisSoft Corp. Sec. Litig.,*
  210 F.R.D. 109 (D.N.J. 2002) ................................................................................... 10

*In re Carbon Dioxide Industry Antitrust Litig.,*
  229 F.3d 1321 (11th Cir. 2000) ................................................................................ 19

*In re Citigroup Inc. Sec. Litig.,*
  No. 09 CIV 7359 SHS, 2014 WL 2112136 (S.D.N.Y. May 20, 2014) ........................... 21

*In re Corrugated Container Antitrust Litig.,*
  1983 WL 1872 (S.D. Tex. 1983) ............................................................................... 19

*In re Global Crossing Sec. & ERISA Litig.,*
  225 F.R.D. 436 (S.D.N.Y. 2004) ............................................................................... 12

*In re Linerboard Antitrust Litig.,*
  292 F. Supp. 2d 631 (E.D. Pa. 2003) ........................................................................ 17

*In re Marsh ERISA Litig.,*
  265 F.R.D. 128 (S.D.N.Y. 2010) ............................................................................... 10

*In Re Nissan Radiator/Transmission Cooler Litig.*,
   No. 10CV-7493 (VB), 2013 U.S. Dist. LEXIS 116720 (S.D.N.Y. May 30, 2013)................. 12

*In re PaineWebber Ltd. P'ships Litig.*,
   171 F.R.D. 104 (S.D.N.Y. 1997). ................................................................................. 20

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*,
   986 F. Supp. 2d 207 (E.D.N.Y. 2013) ........................................................................ 14

*In re Sumitomo Copper Securs. Litig.*,
   189 F.R.D. 274 (S.D.N.Y. 1999)................................................................................. 16

*In re Westcap Enters.*,
   230 F.3d 717 (5th Cir. 2000) ..................................................................................... 18

*Jermyn v. Best Buy Stores, L. P.*,
   2012 U.S. Dist. LEXIS 90289 (S.D.N.Y. June 27, 2012)............................................. 12

*Johnson v. Brennan*,
   2011 U.S. Dist. LEXIS 105775 (S.D.N.Y. Sept. 16, 2011)........................................... 13

*Kimble v. Marvel Entmt. LLC*,
   135 S. Ct. 2401 (2015) ............................................................................................. 19

*Lachance v. Harrington*,
   965 F. Supp. 630 (E.D. Pa. 1997) .............................................................................. 10

*Laumann v. Nat'l Hockey League*,
   907 F. Supp. 2d 465 (S.D.N.Y. 2012) ......................................................................... 4

*Laumann v. Nat'l Hockey League*,
   No. 12-cv-1817, 2013 WL 837640 (S.D.N.Y. Mar. 6, 2013)......................................... 4

*Laumann v. Nat'l Hockey League*,
   No. 12-cv-1817, 2015 WL 2330107 (S.D.N.Y. May 14, 2015)................................. 5, 21

*Laumann v. Nat'l Hockey League*,
   2015 WL 3542322 (May 29, 2015).............................................................................. 13

*Laumann v. National Hockey League*,
   56 F. Supp. 3d 280 (S.D.N.Y. 2014) .......................................................................... 18

*Law v. National Collegiate Athletic Ass'n*,
   134 F.3d 1010 (10th Cir.1998).................................................................................... 18

*Leegin Creative Leather Prods. v. PSKS, Inc.*,
   551 U.S. 877 (2007)................................................................................................... 18

*Maley v. Del Global Techs. Corp.*,
   186 F. Supp. 2d 358 (S.D.N.Y. 2002) ........................................................................ 15

*McReynolds v. Richards-Cantave*,
   588 F.3d 790 (2d Cir. 2009) ...................................................................................... 12

*New York v. Reebok Int'l, Ltd.*,
   903 F. Supp. 532 (S.D.N.Y. 1995) ............................................................................. 12

*New York v. Salton, Inc.*,
  265 F. Supp. 2d 310 (S.D.N.Y. 2003) ................................................... 11

*Park v. Thomson Corp.*,
  No. 05 Civ. 2931 (WHP), 2008 U.S. Dist. LEXIS 84551 (S.D.N.Y. Oct. 22, 2008)............... 13

*Robbins v. Koger Props.*,
  116 F.3d 1441 (11th Cir. 1997) ............................................................ 18

*Thompson v. Metro. Life Ins. Co.*,
  216 F.R.D. 55 (S.D.N.Y. 2003) ............................................................ 12

*United States v. Aluminum Co. of America*,
  91 F. Supp. 333 (S.D.N.Y. 1950) ......................................................... 14

*United States v. Aluminum Company of America*,
  148 F.2d 416 (2d Cir. 1945)................................................................ 14

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
  396 F.3d 96 (2d Cir. 2005) ............................................................ 11, 14

*Weinberger v. Kendrick*,
  698 F.2d 61 (2d Cir. 1982) ................................................................ 11

I.     **INTRODUCTION**

The proposed settlement resolves Plaintiffs' claims against all defendants in the *Laumann* matter. Under the settlement, the NHL has agreed to offer an unbundled Game Center Live Internet package ("GCL") for the next five years — allowing for the purchase of single-team packages for a price at least twenty percent below the price of the bundled package.[1] For the first time, a fan of a major-league sport in the United States will be able to choose between purchasing a league-wide bundle of out-of-market games and a lower-cost package of one individual team's games. And the case has had wider effect. Since the settlement, the National Basketball Association announced a similar, pro-consumer shift away from requiring fans of a particular team to purchase an expensive bundle of out-of-market broadcasts. Industry observers have attributed this change of policy to the success of this lawsuit. *See, e.g.*, Ira Boudway, "Basketball Unbundled: How Much Would You Pay to Watch One NBA Game?" *BloombergBusiness*, July 8, 2105, http://bloom.bg/1HbnQvP.

The settlement also lowers the prices of NHL programming. In the coming GCL season, the NHL will discount early-bird, renewal and full season prices by 17.25%. Taken together with the discounted single-team package, a fan of a particular team who paid as much as $169 last season for a full season package will be able to purchase a single team stream for approximately $105. In addition, Comcast and DirecTV will provide three weeks of free access to NHL Center Ice for all of their MVPD subscribers (regardless of whether they subscribed to the out-of-market package) for the next two seasons, thereby reducing that package price by 12.5%. As explained in the accompanying declaration of Professor Ian Ayres, in addition to the increased consumer

---

[1] The NHL will also offer the MVPD Defendants the ability to offer Center Ice television packages as single-team unbundled products.

choice, the settlement is worth between $20.9 and $28.7 million for class members, without including the value to hockey fans who are new consumers or former subscribers re-entering the lower-priced market. *See* Declaration of Professor Ian Ayres ("Ayres Dec."), ¶¶ 14-29.

On June 15, 2015, the Court preliminarily approved this Settlement Agreement ("Settlement") and approved a Notice Plan.  On August 5, 2015, the Defendants certified their compliance with the Notice Plan. *See* Dkt. Nos. 356 & 357. As explained in those certifications, direct notice was provided to all purchasers of GCL and to all current Comcast and DirecTV Center Ice purchasers. The NHL sent direct notice to over 400,000 email addresses. Declaration of Nili R. Doft Certifying Compliance with Settlement Notice Plan ("Doft Decl."), Dkt. 356, ¶ 3. DirecTV provided direct notice to all class members who purchased NHL Center Ice from DirecTV. Notice Plan, ¶¶ 3-4. Comcast sent direct notice via first-class mail to all class members who purchased NHL Center Ice from Comcast during the 2014-2015 season and who currently subscribe to Comcast. Declaration of Ronald A. Bertino Regarding Defendants' Provision of Notice ("Bertino Decl."), Dkt. 357, ¶ 3. In total, the Defendants sent approximately 718,000 direct notices to class members.

The direct notice was supplemented with a comprehensive online notice program. A press release was issued on July 6, 2015, that generated 189 news mentions and online articles. Bertino Decl., ¶ 4.[2]  Banner advertisements appeared on over 100 web properties, which were selected in order to reach the largest number of NHL enthusiasts. *Id*., ¶ 5. The banner advertisements

---

[2] *See, e.g.*, Jonathan Stempel, "NHL, broadcasters settle lawsuit over TV blackouts," <u>Reuters</u>, June 11, 2015; Jen Neale, "Proposed NHL antitrust lawsuit settlement brings price changes, single-team streaming options," *Yahoo! Sports*, June 14, 2105; Eriq Gardner, "NHL Agrees to Pricing Changes to Settle Antitrust Lawsuit Over TV Packages," *The Hollywood Reporter*, June 12, 2015; Mike Florio, "Settlement of NHL lawsuit could spark renewed attack on Sunday Ticket," *NBCSports*, June 12, 2105.

appeared over 43 million times. *Id.*, ¶ 6. The NHL also placed a top-of-page alert to appear across most pages of the NHL.com website. This alert will remain until August 21, 2015 (the deadline for class members to object to, or exclude themselves from, the settlement), but it has already been viewed by more than 3,850,000 unique visitors. Doft Decl., ¶ 8. The advertisements directed individuals to an official settlement website (www.nhlbroadcastingsettlement.com), which contained information about the settlement and case and explained how class members could object or exclude themselves from portions of the settlement. As of August 5, 2015, this website had been visited by over 111,600 unique visitors. Bertino Decl., ¶ 7.

The response to this notice has been positive. Only 8 exclusion requests and 5 objections had been received by August 10.[3]

Because the Settlement is fair, adequate and reasonable, Plaintiffs now request, pursuant to Federal Rule of Civil Procedure 23, that the Court grant final approval of the Settlement and enter the Proposed Approval Order. The fairness hearing is set for August 31, 2015.

## II.   <u>PROCEDURAL HISTORY</u>

The Court is well versed in the factual background of this case and the Plaintiffs' claims. *See, e.g., Laumann v. Nat'l Hockey League*, 56 F. Supp. 3d 280 (S.D.N.Y. 2014). The following is a brief summary of the litigation and negotiations that resulted in the Settlement.

### A.   **Litigation to Date**

Plaintiffs filed their original complaint on March 12, 2012, after five months of investigation into the broadcasting practices of the National Hockey League and Major League Baseball. Declaration of Edward Diver ("Diver Decl."), ¶ 2. During these five months, counsel devoted substantial time to researching the myriad of issues involved in the cases. *Id.*, ¶ 3.

---

[3] The deadline for objections is August 21, 2015.

Defendants moved to dismiss on numerous grounds. The Court denied much of Defendants' motion on December 5, 2012, but limited the case, on grounds of standing, to plaintiffs who had purchased out-of-market bundles from one of the Defendants. *Laumann v. Nat'l Hockey League,* 907 F. Supp. 2d 465, 472-75 (S.D.N.Y. 2012).

Nearly eighteen months of discovery followed. Defendants produced over 4 million pages of documents and transactional databases with millions of records. Diver Decl., ¶¶ 17-18. Plaintiffs deposed numerous Defendants' executives, including the Commissioner of the NHL, Gary Bettman, and the Deputy Commissioner, William Daly. *Id.*, ¶ 19.

During this same time period, Defendants filed a number of motions intended to effectively terminate or further limit the litigation. *See, e.g.*, *Laumann v. Nat'l Hockey League,* No. 12-cv-1817, 2013 WL 837640 (S.D.N.Y. Mar. 6, 2013) (denying motion to stay litigation); Docket No. 167 (granting in part and denying in part motion to compel arbitration and stay certain claims).

Then, in April 2014, the Comcast, DirecTV, and NHL Defendants each moved separately for summary judgment. These motions presented multiple arguments, any one of which, Defendants argued, would have disposed of the Plaintiffs' claims. The Court denied all of Defendants' summary judgment motions in full. *Laumann*, 56 F. Supp. 3d 280.

The parties exchanged lengthy declarations from four expert economists, each of whom sat for full-day (or, in the case of Plaintiffs' expert Dr. Roger Noll, multi-day) depositions. Plaintiffs moved to certify a class and Defendants moved to exclude Dr. Noll's testimony. In March 2015, the Court held a three-day evidentiary hearing to consider Plaintiffs' motion for class certification and Defendants' *Daubert* challenge to Plaintiffs' expert's damages model. Docket Nos. 242, 269, 326. On May 14, 2015, the Court granted in part and denied in part each

side's motion. It excluded a portion of Dr. Noll's damages analysis, but admitted the remainder of his extensive testimony. *See Laumann v. Nat'l Hockey League,* No. 12-cv-1817, 2015 WL 2330036, at *15-22 (S.D.N.Y. May 14, 2015) ("*Daubert* Order"). Simultaneously, it denied certification of a class for damage claims under Rule 23(b)(3) but certified under Rule 23(b)(2) a class of purchasers of the out-of-market packages seeking injunctive relief. *See Laumann v. Nat'l Hockey League,* No. 12-cv-1817, 2015 WL 2330107, at *18 (S.D.N.Y. May 14, 2015) ("Class Cert. Order").

**B.**     **Settlement Negotiations**

The first settlement talks occurred during a mediation session before Magistrate Judge Dolinger in December 2013. They were unsuccessful.

The talks leading to the proposed settlement began a year later, in late November 2014, while Plaintiffs' motion for class certification was pending. Those bilateral negotiations were between Plaintiffs and the NHL. *See* Declaration of Howard Langer ("Langer Decl."), ¶ 3. In the ensuing four months Plaintiffs and the NHL negotiated a basic framework of a possible settlement. In March 2015, they invited the MVPD Defendants to join the negotiations. *Id*. By late April, the parties found themselves at loggerheads. They secured the services of Stephen M. Orlofsky, former United States District Judge of the District of New Jersey, to serve as a mediator. *Id*., ¶ 5. Through late April and May, Judge Orlofsky conducted negotiations both in person, in New York and Philadelphia, and by telephone. He conducted five full-day mediation sessions, and participated in countless telephone calls with counsel. *Id*., ¶¶ 5, 6.  On several occasions, settlement talks broke down entirely only to be revived as a result of Judge Orlofsky's efforts. *Id*., ¶ 7.

The negotiations were between experienced and skillful counsel negotiating at arm's length. *Id.*, ¶ 7. The Agreement that emerged represents a hard-fought compromise.[4]

## III.   THE PROPOSED SETTLEMENT

### A.   The Class

The Agreement combines the "Internet Class" and the "Television Class" certified in the Court's May 14, 2015 Order into a single definition:

> All individuals in the United States who purchased television service from the DirecTV and/or Comcast, which included Center Ice, and/or who purchased GCL from the NHL Defendants or their subsidiaries, at any time between March 12, 2008, and the date on which Plaintiffs file a motion for Preliminary Approval [June 11, 2015], as certified by the Court in its May 14, 2015 Order [Dkt. No. 346].

Agreement at ¶4.

### B.   Settlement Benefits

The Agreement significantly increases choice and reduces prices for the class of present and former subscribers of the out-of-market packages certified by the Court. In addition to the existing league bundle, the NHL will offer single-team broadcast packages for all thirty NHL teams over the Internet for a five-year period starting with the 2015-2016 season. Agreement at § B. The single-team offerings will be priced at least 20% below the league-wide bundle.[5] For the first time fans of a major league sport in the United States will be able to purchase either a

---

[4] It was not until the parties had reached substantial agreement on the material terms of the relief to the Class that the mediation turned to the issue of attorneys' fees and costs to be paid to the Plaintiffs. *See* Langer Dec. at ¶8. The negotiation of attorneys' fees and costs therefore had no impact on the relief to be granted to the class.

[5] The Agreement contains incentives for the NHL to lower prices even further. If after the first year the early bird price of GCL drops below $130.00 per year, the single-team package may be priced at 85% of that amount. Agreement at ¶43. Should that early bird pricing drop to less than $100 in future years, the single-team package pricing may be increased to 90% of that amount. *Id.*

season-long subscription of a single team or a season-long package of all out-of-market games. The NHL will also make the single-team subscriptions available to DirecTV and Comcast, allowing them to offer television packages on this same basis if they determine to do so. Agreement at ¶43. Even if the MVPDs fail to act on the NHL's offer, all class members will be able to avail themselves of the NHL's unbundled offering and watch them on television (as well as on computers, phones, tablets, and other devices) through such services as Roku, Apple TV, Chromecast, Amazon Fire TV, smart TVs, or the many other services that carry Game Center Live — or by simply connecting their computer to their TV. The settlement significantly increases consumer choice.

The Agreement also achieves a second goal of the litigation by reducing prices. The NHL will lower early-bird, renewal and full-season prices for the 2015-2016 GCL season by at least 17.25%. This discount, coupled with the 20% discount for the individual stream, will provide a class member interested in a particular team the option of paying just $105 for a full season (at the "early-bird" or renewal price) where formerly the only choice was the bundle priced at $159-$169. Both Comcast and DirecTV will provide all consumers who are currently their MVPD subscribers (regardless of whether they purchased the out-of-market package in the past) three free weeks of Center Ice for each of the next two seasons. This benefit will be conferred automatically, without any need to opt-in or volunteer. For persons who ultimately subscribe to Center Ice, this benefit represents a 12.5% price reduction in their annual fee, for each of the next two years.[6]

_____

[6] In addition to the discounts Comcast and DirecTV must offer, any Comcast or DirecTV subscriber can take advantage of the discounts NHL must offer by subscribing to a GCL single-team package instead of the Comcast or DirecTV bundle they previously purchased.

Professor Ayers explains in his Declaration that in addition to expanding consumer choice, the discounted prices mandated by the settlement taken in the aggregate are substantial. He estimates the value created for the class to be between $20.9 million (assuming 30% of current subscribers switch to the package) and $28.7 (assuming a 50% switch). Ayres Decl., ¶¶ 14-29. These assumptions are reasonable because, as Professor Ayres explains, the "NHL has estimated that 45 percent of GCL subscribers have one favorite team, and the NHL's economic expert testified that 'more than half of the subscribers have a strong team preference.'" *Id*., ¶ 16. Indeed, for the purposes of calculating the monetary value of the settlement, Professor Ayres states that his assumptions are conservative. *Id*., ¶ 17.  He explains: "For the purposes of valuing the settlement in monetary terms, what matters is the absolute number of consumers who purchase the single team package instead of the traditional package, not any given percentage of preexisting subscribers. My calculations of the value of the unbundled GCL package to the 30% to 50% share of *current* subscribers does not include the value to the additional consumers who would enter the market once an unbundled package becomes available." *Id*. [7]

In addition to increasing choices and lowering prices, the settlement has affected the conduct of other sports leagues, benefiting many members of the class as well as the broader public. Bloomberg recently reported that the NBA will be offering a package of games similar to what the NHL has agreed to here in large part because of this litigation. "The sole outside pressure pushing the NBA towards variable pricing comes from a different kind of court. Sports fans sued the National Hockey League and Major League Baseball in 2012 over regional

---

[7] Professor Ayres is also conservative in assuming for purposes of obtaining a minimum valuation that current Comcast and DirecTV subscribers who do not switch to the discounted individual streams remain Center Ice customers rather than switching to the less expensive GCL package.

blackout policies and out-out-market subscription packages, claiming that anti-competitive systems had been created by illegal cartels. … In May, a federal judge agreed to certify the hockey and baseball suits as class actions. By adding à la carte offerings, the NBA preempts a similar complaint." Ira Boudway, "Basketball Unbundled: How Much Would You Pay to Watch One NBA Game?," *BloombergBusiness*, July 8, 2105, http://bloom.bg/1HbnQvP.

        C.        **Attorneys' Fees, Costs, and Service Payments**

The agreement allows the Plaintiffs to seek Court approval for up to $6.5 million in attorneys' fees and costs, which they have done in a fee and expense petition submitted separately. The Agreement also permits each of the representative Plaintiffs to petition for service payments of $10,000. The Defendants have agreed to pay each of these amounts, to the extent that they are awarded by the Court. The awards cannot reduce the value conferred on the Class under the Settlement.

        D.        **Release of Claims**

The Agreement releases all claims for relief that have been or could have been asserted based on the facts alleged in the Complaint. Agreement at § I. Excluded from this release are any claims asserted in *Garber v. Office of the Commissioner of Baseball.* The Agreement also releases claims by class members based upon the conduct adopted pursuant to this settlement, but only during the period between its implementation and the five-year sunset provision. *Id.* Because the release extends to damage claims, class members who wished to pursue retrospective claims for damages were given the option of excluding themselves from the settlement for that purpose. Because this is a settlement of an injunctive class under Rule 23(b)(2), class members may not opt-out of the practice changes set forth in the settlement.

## IV.     THE APPROVED NOTICE WAS ADEQUATE AND SATISFIED DUE PROCESS

 "[N]otice to class members [of a settlement] must be reasonably calculated under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 119 (D.N.J. 2002) (quoting *Lachance v. Harrington*, 965 F. Supp. 630, 636 (E.D. Pa. 1997)). The notice should "fairly, accurately, and neutrally describe the claims and parties in the litigation as well as the terms of the proposed settlement and the identity of persons entitled to participate in it." *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 145 (S.D.N.Y. 2010) (quoting *Foe v. Cuomo*, 700 F. Supp. 107, 113 (E.D.N.Y. 1988), *aff'd*, 892 F.2d 196 (2d Cir. 1989)).

The plan of notice, approved by the Court before implementation, provided clear comprehensive information concerning the proposed Settlement, the consumer's options, and the procedures to follow. In granting preliminary approval of the Settlement, the Court found that the Notice Plan "satisfies the requirements of due process [and] the Federal Rules of Civil Procedure" and "constitutes the best notice that it practicable under the circumstances." *Laumann v. NHL*, 12-cv-1817 (S.D.N.Y. Jun. 15, 2015), Dkt. No. 353, at ¶ 8.

Most class members received direct notice of the settlement. The NHL sent notice by email to all class members that had purchased the Internet package, GameCenter Live, during the class period. The majority of class members who purchased television packages were DirecTV subscribers, and DirecTV provided them with direct notice either by email or first-class mail. Comcast sent notice to its current subscribers who purchased NHL Center Ice during the 2014-2015 by first-class mail. In all, notice was sent directly to over 715,000 class members.

In addition to the direct notice, Heffler Claims Group, an experienced class action administration firm, was retained to design and implement a supplemental online notice program. *See* Declaration of Ron Bertino (submitted as part of Defendants' certification of compliance

with the notice procedures), ¶¶ 4-5. The campaign included a press release that generated 189 news mentions and online articles. *Id.*, ¶ 4. Heffler placed web-based advertisements on over 100 websites specifically targeted to reach class members, and nearly doubled the number of targeted impressions called for under the Notice Plan. *Id.*, ¶ 6. The web-based ads were presented more than 43 million times. Together with the direct notice, this campaign ensured that nearly all class members received notice of the Settlement.

The wesbite established for the Settlement included all notices, the settlement agreement, key pleadings, and a means for class members to object and exclude themselves from the settlement. As of the end of July, more than 110,000 people had viewed this website. Bertino Decl., ¶ 7.

## V.     THE SETTLEMENT MEETS THE STANDARDS FOR FINAL APPROVAL

"There are weighty justifications, such as the reduction of litigation and related expenses, for the general policy favoring the settlement of litigation…." *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982). This is especially true for complex litigation. *See Denney v. Jenkens & Gilchrist*, 230 F.R.D. 317, 328 (S.D.N.Y. 2005), *aff'd in part, vacated in part on other grounds*, 443 F.3d 253 (2d Cir. 2006). The standard for court approval is whether the settlement is fair, adequate and reasonable and not a product of collusion. *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005); *New York v. Salton, Inc.*, 265 F. Supp. 2d 310, 313 (S.D.N.Y. 2003).

### A.     The Settlement Process was Procedurally Fair

The initial determination, often called "procedural fairness," focuses on the settlement process itself. *Ebbert v. Nassau County*, No. CV 05-5445 (AKT), 2011 U.S. Dist. LEXIS 150080, at *20 (E.D.N.Y. Dec. 22, 2011). "A presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between

experienced, capable counsel after meaningful discovery." *Cronas v. Willis Grp. Holding, Ltd.*, No. 06 CIV.15295 (RMB), 2011 U.S. Dist. LEXIS 147171, at *6-7 (S.D.N.Y. Dec. 19, 2011) (quoting *Wal-Mart Stores, Inc.*, 396 F.3d at 116). *See also New York v. Reebok Int'l, Ltd.*, 903 F. Supp. 532, 535 (S.D.N.Y. 1995), *aff'd,* 96 F.3d 44 (2d Cir. 1996); *McReynolds v. Richards-Cantave*, 588 F.3d 790, 803-04 (2d Cir. 2009) (citing *Wal-Mart Stores Inc.*, 396 F.3d at 116).

In granting preliminary approval of the Settlement, the Court found "that the Settlement is the product of arm's length negotiation by experienced counsel." *Laumann v. NHL*, 12-cv-1817 (S.D.N.Y. Jun. 15, 2015), Docket No. 353, at ¶ 3. The negotiation extended over many months. The considerable involvement of Judge Orlofsky, who conducted five separate full-day, mediation sessions totaling more than 50 hours, reinforces the conclusion that the Settlement Agreement is not the product of collusion and is procedurally fair.

## B.     The Settlement Is Reasonable, Adequate and Substantively Fair

The Second Circuit has set forth a series of considerations in determining whether a settlement is reasonable, adequate, and substantively fair. *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 462-63 (2d Cir. 1974); *In Re Nissan Radiator/Transmission Cooler Litig.*, No. 10CV-7493 (VB), 2013 U.S. Dist. LEXIS 116720, at *14-15 (S.D.N.Y. May 30, 2013). While these factors have been applied when considering approval of an injunctive class settlement under 23(b)(2), *see, e.g.*, *Jermyn v. Best Buy Stores, L. P.*, 2012 U.S. Dist. LEXIS 90289, *9 (S.D.N.Y. June 27, 2012), several are of limited application in the (b)(2) context. "In finding that a settlement is fair, not every factor must weigh in favor of settlement, 'rather the court should consider the totality of these factors in light of the particular circumstances.'" *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 456 (S.D.N.Y. 2004) (quoting *Thompson v. Metro. Life Ins.* Co., 216 F.R.D. 55, 61 (S.D.N.Y. 2003)).

There is a "strong judicial policy in favor of settlement" of class actions. *Johnson v. Brennan*, 2011 U.S. Dist. LEXIS 105775, at *21 (S.D.N.Y. Sept. 16, 2011) (internal citations omitted) (quoting *Wal-Mart Stores, Inc.*, 396 F.3d at 116 (internal quotation marks omitted)).

Here, the totality of these factors weighs in favor of approving this Settlement.

    1.  **The anticipated complexity, duration and expense of additional litigation.**

"[A]ntitrust cases, by their nature, are highly complex." *Park v. Thomson Corp.*, No. 05 Civ. 2931 (WHP), 2008 U.S. Dist. LEXIS 84551, at *7 (S.D.N.Y. Oct. 22, 2008) (quoting *Wal-Mart Stores, Inc.*, 396 F.3d at 122). The Court has recognized that this case is "unusually complex." *Laumann v. Nat'l Hockey League*, 2015 WL 3542322, *10 (May 29, 2015).

The three-day class certification hearing in March offered a glimpse of the complexities of this case. Well-respected experts gave differing opinions on the effects of the Defendants' territorial allocations. And that hearing did not address many of the issues that would be considered at trial. Defendants have given every indication of their intention to litigate the full gamut of defenses they raised in their summary judgment motion.[8]

As for the duration of the litigation, any relief through trial and certain appeal would not be obtained for many years. The settlement offers class members benefits now. This is a particular consideration and benefit in this injunctive case. Unlike a damage class action, in which damages from the violation may run until the time of trial and pre-judgment interest may compensate class members for delay, there is no possibility of that kind of compensation for delay in an injunctive action. The value of the increases in choice and savings coming

---

[8] As Plaintiffs argued in opposing Defendants' summary judgment motion, many of those defenses are not relevant or legally cognizable, and none are supported by the facts—but they expect Defendants to reargue them all the same, requiring Plaintiffs to rebut them both in this Court and on appeal.

immediately, rather than several years from now, is considerable. *See, e.g., In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503, 510 (E.D.N.Y. 2003) (approving settlement where action "would have taken many more years to finally resolve, taking into account the time necessary to exhaust all avenues of review").[9]

The value of this settlement in giving hockey fans choice and lower prices immediately is a particular benefit in the context of the rapidly evolving media markets. Sports broadcasting practices—like other forms of media—are evolving rapidly due to advances in technology and the growth of the Internet. Delay of several years could obviate certain forms of relief, or could allow Defendants to entrench their monopoly pricing through new means.[10] By agreeing to this settlement, NHL fans will immediately receive new ways to watch professional hockey and will receive price discounts of up to nearly 35 percent next season, and future changes will come from this baseline rather than the current, less competitive baseline.[11]

---

[9] One of the most famous antitrust cases of all, *United States v. Aluminum Company of America*, 148 F.2d 416 (2d Cir. 1945), in which the government succeeded in proving ALCOA's monopolization, resulted in something of a pyrrhic victory when after years of delay, on remand, the court found that the aluminum market had so changed that most of the divesture remedy sought by the government was unwarranted. *United States v. Aluminum Co. of America*, 91 F. Supp. 333 (S.D.N.Y. 1950).

[10] And long delay—in the absence of settlement—is likely no matter what efficiencies are employed by the district court. Two of the leading antitrust cases out of this district, *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977), and *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1 (1979), took ten years from filing to Supreme Court resolution. *Brunswick* involved two trials and *BMI* one. More recently, the Second Circuit's opinion in *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 102 (2d Cir. 2005), describes how that antitrust suit was filed in 1996 and only settled on the eve of trial in 2003. In approving a settlement in *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 986 F. Supp. 2d 207, 215 (E.D.N.Y. 2013), *appeal pending*, Judge Gleeson, noted: "This case has been extensively litigated for more than eight years."

[11] Currently, the GCL package costs $169 for a full year and $159 for "early bird" and renewal subscribers. The settlement requires that this price be discounted by 17.25% next season,

Without a settlement, class members would have no realistic prospect of receiving any relief for at least three years, and could be in limbo for five years or more. A trial in this case has yet to be scheduled, but is unlikely to occur before next summer. Even on an ambitious schedule, a ruling would not be expected before the last months of 2016. If Plaintiffs were victorious, the Court would likely conduct additional proceedings to determine the scope of injunctive relief, and Defendants would likely file various post-trial motions seeking to relitigate the verdict. An appeal to the Second Circuit would then likely eat up another year or more.[12]

While concerns of complexity and duration both strongly support approval of the settlement, they also affect other considerations discussed below. Complexity greatly increases risk because of the multiplicity of dispositive issues upon which the case can turn. Failure in this Court or on appeal on any dispositive issue could deny class members any relief at all. Moreover, duration creates risk of adverse precedent and changes in the law as well as changes in circumstances. These issues are discussed below.

### 2.     The reaction of the settlement class.

"It is well-settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy." *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 362 (S.D.N.Y. 2002) (citing *In re American Bank Note*, 127 F. Supp. 2d 418, 425 (S.D.N.Y. 2001)). To date, only eight people have asked to be excluded from the

---

meaning that "early bird" and renewal prices cannot be more than $132. The settlement requires the individual team packages to be priced no more than 80% of this $132. An individual team package thus cannot be priced more than $105 – a 34% discount from the current $159 package price.

[12] For comparison, the last antitrust bench trial in this district, *United States v. Apple Inc.*, No 12. Civ. 2862, was not affirmed until 23 months after Judge Cote issued her post-trial verdict and more than 2 years after the trial ended. A petition for certiorari could then take several months or more to be decided even if denied, and over a year if granted.

settlement and only five objections have been received. When the objection deadline passes on August 21, 2015, Plaintiffs will respond to any objections and discuss how this factor sheds light on the fairness of the settlement.

3.      **The stage of the proceeding and the amount of the discovery completed.**

This factor considers whether the litigation was developed sufficiently to provide counsel with an adequate appreciation of the merits of the case from which to fairly negotiate and settle the action. Plaintiffs reviewed millions of pages of documents, served and responded to lengthy interrogatories and requests for admission, and deposed each of the Defendants' key executives. The parties also enlisted well-respected experts to research and analyze the effects of the Defendants' restraints. The Court was able to observe much of this work distilled in plaintiffs' responses to Defendants' summary judgment motion and in the proceedings relating to class certification. Courts have found that, as is the case here, the substantial and thorough discovery conducted and the late stage of settlement "strongly favor" approval of a class action settlement. *In re Sumitomo Copper Securs. Litig.*, 189 F.R.D. 274, 281-82 (S.D.N.Y. 1999).

4.      **The risks of establishing liability.**

On the basis of the discovery produced to date and the Court's opinions denying Defendants' motions for summary judgment and granting, in part, Plaintiffs' motion for class certification, Plaintiffs believe that they would be able to establish that Defendants violated Sections 1 and 2 of the Sherman Act. But regardless of how strong Plaintiffs believe their claims to be, there is always uncertainty when a defendant has demonstrated the willingness and ability to contest matters fully, including through appeal, as Defendants have here, especially in a rule-of-reason antitrust case.

The Second Circuit has identified a basic factor that is used to assess risk in antitrust class action cases: "[T]he only truly objective measurement of the strength of plaintiffs' case is found by asking: 'Was defendants' liability *prima facie* established by the government's successful action?'" *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 641 (E.D. Pa. 2003) (quoting *Grinnell Corp.*, 495 F.2d at 455). As *Grinnell* explained, because antitrust actions are so risky and complex, the statutory scheme makes special provision for civil plaintiffs to avail themselves of judgments obtained in government actions. Here, where there was no government investigation or any other action that established liability, this objective measure suggests that the risk was considerable.

Risk is also created by the strength of the adversary. Defendants are represented by experienced counsel from several of the leading law firms in the country who have shown no reluctance to raise every possible issue in defense. Among other issues, Defendants have argued (1) that the Plaintiffs do not have standing under *Illinois Brick*; (2) that Plaintiffs' class claims are barred by arbitration clauses; (3) that the Television Defendants are merely following the dictates of the NHL and therefore did not participate in any concerted action; (4) that Defendants' conduct is legitimate joint-venture activity; (5) that Plaintiffs have not properly defined a relevant market; (6) that their conduct is pro-competitive because some games might not be broadcast otherwise; (7) that Plaintiffs cannot prove that the restraints negatively impact competition; and (8) that the restraints are pro-competitive because they maintain an ideal balance between local and national interests. Defendants have argued that any one of these defenses is dispositive of the case.

Although Plaintiffs are confident in their theories of liability, and the facts have borne those theories out, there is no question of risk not only in this Court, but on appeal. Nor is this

17

action a standard price-fixing matter with a clear model for litigation or a *per se* case of liability. While the conduct, allocation of markets, is undisputed and would present *per se* liability in other contexts, the present case involves application of a more complex rule-of-reason analysis, albeit possibly a truncated quick look. *Laumann v. National Hockey League*, 56 F. Supp. 3d 280, 297 (S.D.N.Y. 2014) ("The facts of this case could conceivably be amenable to a 'quick look' in favor of the plaintiffs."); *see also Law v. National Collegiate Athletic Ass'n,* 134 F.3d 1010, 1020 (10th Cir.1998) ("We find it appropriate to adopt such a quick look rule of reason in this case."). The absence of *per se* liability significantly increases risk.

Here, too, prior antitrust cases underscore the risk. Successful judgments may be reversed on appeal—often many years after the initial judgment. As mentioned above, *Brunswick,* 429 U.S. 477, took ten years from filing, including two trials, before the Supreme Court reversed the Second Circuit, which had remanded for a third trial. The Supreme Court found the plaintiff lacked a cause of action and created a new element to a claim known as "antitrust injury." *BMI* also took ten years, a trial which the plaintiff lost but successfully appealed to the Second Circuit, only to have it reversed when the Supreme Court again created a new concept under the antitrust laws.

These are not isolated instances of seemingly successful antitrust cases being lost on appeal.[13] Even a verdict that is manifestly correct under existing law is not guaranteed success on

---

[13] More recently in *Leegin Creative Leather Prods. v. PSKS, Inc*., 551 U.S. 877 (2007), the plaintiff won a $3.9 million jury verdict finding a *per se* vertical price fixing conspiracy, only to have the Supreme Court reverse a hundred-year-old precedent and subject vertical price fixing to rule of reason analysis. *See also Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039 (8th Cir. 2000) (reversing $44 million jury verdict in an antitrust case); *In re Westcap Enters.*, 230 F.3d 717 (5th Cir. 2000) (reversing $51 million judgment); *Robbins v. Koger Props.*, 116 F.3d 1441 (11th Cir. 1997) (reversing $81.3 million jury verdict for plaintiff after seven years of litigation). There are even instances in antitrust class actions which the class settled and opt-outs then went

appeal; the Supreme Court recently observed that it "has viewed *stare decisis* as having less-than-usual force in cases involving the Sherman Act." *Kimble v. Marvel Entmt. LLC*, 135 S. Ct. 2401, 2412 (2015).[14]

Pursuing this matter through trial presented a risk to both sides, justifying their mutual efforts to reach this settlement. For these reasons, and recognizing that "the primary purpose of settlement is to avoid the uncertainty of a trial on the merits," *Gallagher v. T-Bone Rest. LLC*, 2011 U.S. Dist. LEXIS 143773, at *14 (S.D.N.Y. Dec. 13, 2011), this factor also weighs in favor of approval.

### 5.      The risks of establishing damages.

The Court denied Plaintiffs' motion to certify a damages class under Federal Rule of Civil Procedure 23(b)(3). In light of this ruling, Plaintiffs would be unable to obtain damages on behalf of the class absent a change in circumstances, either through reconsideration, a motion under Rule 23(c)(1)(C), or upon successful Rule 23(f) appeal.

### 6.      The risks of maintaining the class action through trial.

A risk of establishing and maintaining class certification through trial and appeal exists for any settlement, and Defendants here have petitioned the Second Circuit to review the Court's

---

to trial and lost. *See, e.g.*, *In re Carbon Dioxide Industry Antitrust Litig.*, 229 F.3d 1321 (11th Cir. 2000); *In re Corrugated Container Antitrust Litig.*, 1983 WL 1872, at *4 (S.D. Tex. 1983) (class settled for over $360 million, but with regard to opt-out case that proceeded to trial, "the jury found that there was a conspiracy to fix, stabilize or maintain prices, but that the conspiracy did not have an impact upon these opt-out plaintiffs.").

[14] For example, when this case was filed, the law of the Second Circuit allowed Plaintiffs to challenge class-action waivers attendant to arbitration clauses in antitrust cases where individual actions would be prohibitively expensive—a rule that would have defeated Defendants' arbitration arguments at the outset. But the Supreme Court reversed the Second Circuit's position in *American Express Co. v. Italian Colors Restaurant*, 133 S. Ct. 2304 (2013), requiring more detailed scrutiny of the clauses and allowing Defendant to force some plaintiffs to divide their claims between this Court and arbitration.

class certification decision pursuant to Federal Rule of Civil Procedure 23(f). While Plaintiffs are confident that the Court was correct in finding that a class action is the correct and proper vehicle through which to litigate their claims, a risk always exists that an appellate court might disagree.

### 7.    The ability of the Defendants to withstand a greater judgment.

This factor is not an issue given the Court's ruling that the Plaintiffs could only represent a class action seeking injunctive relief. In any event, "[while] evidence that the defendant will not be able to pay a larger award at trial tends to weigh in favor of approval of a settlement, ... the converse is not necessarily true; *i.e.*, the fact that a defendant is able to pay more than it offers in settlement does not, standing alone, indicate that the settlement is unreasonable or inadequate." *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 129 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997). This factor weighs neither in favor of nor against the Settlement. Were the Court to consider it a factor, it is likely the case that the Defendants could withstand a judgment providing greater relief than that obtained in the settlement.

### 8.    The range of reasonableness of the settlement amount in light of the best possible recovery and in light of all attendant risks of litigation.

The last two *Grinnell* factors are often considered together:

> Fundamental to analyzing a settlement's fairness is 'the need to compare the terms of the compromise with the likely rewards of litigation.' This determination 'is not susceptible of a mathematical equation yielding a particularized sum,' but turns on whether the settlement falls within 'a range of reasonableness.' The adequacy of the amount offered in settlement must be judged 'not in comparison with the best possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of the plaintiffs' case.'

*In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. at 129-30 (internal citations omitted).

A settlement that falls within the range of reasonableness, taking into account the strengths and weaknesses of the case, should be approved. *Aeropostale*, 2014 WL 1883494, at

*9; *In re Citigroup Inc. Sec. Litig.*, No. 09 CIV. 7359 SHS, 2014 WL 2112136, at *5 (S.D.N.Y. May 20, 2014). Here, recovery is well within the reasonable range of possible outcomes.

In its recent order, the Court determined that the Plaintiffs had not shown that they could pursue damages on a classwide basis, but had demonstrated that a class action seeking injunctive relief was appropriate. The question at this point is thus whether the injunctive relief provided for in the settlement is within a range of reasonable injunctive relief. It is.

Two basic goals of the antitrust laws are increased consumer choice and lower prices. *Class Cert. Order*, 2015 WL 2330107, at *8 ("Antitrust injuries come in two basic forms. *First,* anticompetitive conduct is injurious if it results in higher prices. *Second,* anticompetitive conduct is injurious if it limits consumer options.") (footnote omitted). The settlement achieves both of these goals. It lowers the price consumers will pay for out-of-market telecasts significantly and expands the options available to consumers. The settlement also pushes the sports broadcasting industry in a pro-consumer direction, encouraging not just the NHL, but other leagues, to increase the flexibility of their broadcast packages.

Although the NHL retains centralized control over out-of-market pricing, and the blackouts of in-market teams will remain, the discounts required for the single-team packages simulate the deflationary effect of inter-team competition. Plaintiffs and Class Counsel also believe the settlement will help pave the way for eventual blackout relief because the success of out-of-market single-team offerings will pressure in-market teams to make their own broadcasts available.

In light of all possible litigation risks and possible outcomes, application of the *Grinnell* factors supports the conclusion that each of the alternative settlement amounts is reasonable and appropriate, and that the Settlement is fair, reasonable and adequate.

## VI.   __CONCLUSION__

For the foregoing reasons, Plaintiffs respectfully request the Court:

1.      Find that Plaintiff's notice of the Settlement was fair, adequate, and reasonable

and in compliance with due process, Rule 23 and the Court's prior orders;

2.      Grant final approval of the Settlement Agreement;

3.      Reserve jurisdiction over the settlement to ensure compliance with its terms.

A Proposed Final Judgment for the Court's consideration is attached hereto.


                                         Respectfully Submitted,

August 10, 2015                          /s/ *Howard Langer*
                                         Edward Diver
                                         Howard Langer
                                         Peter Leckman
                                         LANGER, GROGAN & DIVER, P.C.
                                         1717 Arch Street, Suite 4130
                                         Philadelphia, PA 19103
                                         Telephone: (215) 320-5660
                                         Facsimile: (215) 320-5703

                                         Michael J. Boni
                                         Joshua D. Snyder
                                         BONI & ZACK LLC
                                         15 St. Asaphs Road
                                         Bala Cynwyd, PA 19004
                                         Telephone: (610) 822-0200
                                         Facsimile: (610) 822-0206

                                         J. Douglas Richards
                                         COHEN MILSTEIN SELLERS &
                                         TOLL, PLLC
                                         88 Pine Street, 14th Floor
                                         New York, NY 10005
                                         Telephone: (212) 838-7797
                                         Facsimile: (212) 838-7745

Jeffrey B. Dubner
COHEN MILSTEIN SELLERS &
TOLL, PLLC
1100 New York Ave. NW, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

Kevin Costello
Gary Klein
KLEIN KAVANAGH
COSTELLO, LLP
85 Merrimac Street, 4th Floor
Boston, MA 02114
Telephone: (617) 357-5500
Facsimile: (617) 357-5030

Robert J. LaRocca
Craig W. Hillwig
KOHN, SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107

Michael M. Buchman
John A. Ioannou
MOTLEY RICE, LLC
600 Third Avenue, Suite 2101
New York, NY 10016
Telephone: (212) 577-0040

Marc I. Gross
Adam G. Kurtz
POMERANTZ, LLP
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212)-661-1100
Facsimile: (212) 661-8665

*Attorneys for Plaintiffs and Class*