1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   THOMAS LAUMANN, et al.,

4                    Plaintiffs,

5            v.                          12 Civ. 1817 (SAS)

6   NATIONAL HOCKEY LEAGUE,
    et al.,
7                                        Fairness Hearing

                     Defendants.
8
    ------------------------------x
9
                                         New York, N.Y.
10                                       August 31, 2015
                                         2:30 p.m.
11
    Before:
12
                HON. SHIRA A. SCHEINDLIN
13
                                         District Judge
14

15

16          APPEARANCES

17

    LANGER GROGAN & DIVER P.C.
18       Attorneys for Plaintiffs
    BY:  HOWARD LANGER
19       EDWARD DIVER
         PETER LECKMAN
20

21  POMERANTZ LLP
         Attorneys for Plaintiffs
22  BY:  MARC GROSS
         ADAM KURTZ
23

24  COHEN MILSTEIN SELLERS & TOLL LLP
         Attorneys for Plaintiffs
25  BY:  JEFFREY DUBNER

                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

APPEARANCES


KLEIN KAVANAGH COSTELLO LLP
     Attorneys for Plaintiffs
BY:  KEVIN COSTELLO


DAVIS POLK & WARDWELL LLP
     Attorneys for Defendant Comcast
BY:  ANDREW DELANEY
     ARTHUR BURKE
     DAVID TOSCANO
     KATHERINE MARSHALL


ALSTON & BIRD LLP
     Attorneys for Defendant DIRECTV
BY:  ANDREW PARIS
     LOUIS KARASIK
     STEPHANIE JONES


SKADDEN ARPS SLATE MEAGHER & FLOM LLP
     Attorneys for Defendant National Hockey League
BY:  SHEPARD GOLDFEIN
     PAUL ECKLES


QUINN EMANUEL URQUHART & SULLIVAN LLP
     Attorneys for Defendant NY Rangers
BY:  DEBORAH BROWN

```
 1              (Case called)
 2              THE COURT:  Welcome to all of you, some of whom I
 3    recognize from the other case.  We are here to talk about the
 4    settlement that has been reached.  This is the fairness
 5    hearing.  One question I have, of course, is are there any
 6    objectors present who wish to be heard?  I have received
 7    written objections.  Are there any objectors present?  No.
 8    Counsel for any objectors?  No.
 9              I can say that I have received a number of objections,
10    a small number, and have reviewed them, so I'm aware of the
11    content of the objections received from those people, ten in
12    total, a very small number.
13              With that, I assume somebody wants to speak in support
14    of the settlement.  Mr. Langer, that's you?
15              MR. LANGER:  That's me, your Honor.
16              THE COURT:  All right.
17              MR. LANGER:  Good afternoon.  I take it you would like
18    me to run through all of the criteria, and so on, for the
19    record.
20              THE COURT:  Sure.
21              MR. LANGER:  Your Honor, I am here to speak in support
22    of the settlement of the National Hockey League and the other
23    defendants in the NHL case.  The settlement itself has certain
24    chief components, certainly the most important of which is the
25    unbundling provision, which provides that people will be able
```

1    to buy individual team streams in the coming season at a

2    significant, 20 percent, discount over the overall bundle that

3    they previously had to pay.

4         In addition the price next year for the Internet

5    product will be 17 percent lower for the bundle product.

6    Practically speaking, this means that somebody who I was paying

7    $159 last season for the bundle of all teams, who is interested

8    in a particular team, will pay approximately $105, $106.

9         The discounts that I just stated are basically

10   available to anybody, whether they are a customer of the cable

11   companies or they are a customer, former customer, of the NHL

12   or anybody else.  They are readily available on the Internet.

13   A person, through modern technology, can easily watch them on

14   television.  I view those pieces of the settlement as really

15   the core pieces of the settlement.

16        In addition to that, there is a portion of the settle-

17   ment with the MBPDs that provides that somebody who is just any

18   cable subscriber to them will get the first three weeks of next

19   season available on their television sets for free.  If they

20   ultimately do subscribe through that means, they will get a 12½

21   percent discount, representing those three weeks.  For me, the

22   core is really the NHL piece, the Internet piece that I

23   described.

24        Professor Ayres has submitted a declaration to your

25   Honor in which he basically evaluates what this means in terms

of real dollars.  He very conservatively used the number of

subscribers for last year in coming to his conclusions, even

though there is a much larger body of people in former years

and presumably, with lower prices, additional people in the

coming years.

He estimates that the settlement value is between

roughly 21 and $28 million, depending on how many people avail

themselves of the opportunity to purchase a single-team stream

as opposed to the bundle.  He uses the numbers between 30

percent and 50 percent because, as your Honor will recall, the

studies the defendants themselves did show that as many as 50

percent of the fans have a loyalty to a specific team.  He felt

that it is likely that they would buy a specific team, not

bundle, a specific team subscription considering the discount

involved.

He is also very conservative in his valuation because

he doesn't take into account any value for the three weeks, for

example, or any other attendant value.

The other key factors that are components of the

settlement are, of course, the attorney's fee and costs

provision, which I will speak to later as a separate part of

the argument, which defendants have agreed to pay up to

$6.5 million for.

The legal criteria in the circuit are really twofold.

First, there is the procedural criteria:  Was this an arm's

1     length settlement? was this the result of negotiation.  In this

2     case certainly that was the case.  I have been doing this a

3     long time.  This was one of the most difficult that I have ever

4     had.  I say that bearing in mind at least that modern

5     psychology says that the most recent experience is the one that

6     sits strongest.  But it went over a very long period of time.

7         I think your Honor should find some, whatever the

8     appropriate word is, comfort in the sense that we originally

9     were sent to Magistrate Judge Dolinger, and those efforts,

10    which were well over a year ago, completely failed.  There was

11    no follow-up at all.  The parties were at such distance from

12    each other.  The negotiation of the current settlement really

13    began just after Thanksgiving of last year, and it wasn't

14    consummated until June.  It was long haul.

15        It was overseen ultimately by a mediator, a former

16    federal judge, Judge Orlofsky.  I have to say, without his

17    efforts, I don't know that we ever would have gotten to where

18    we got to.  He helped a lot.  Unlike a lot of other cases,

19    where you have two parties, these were really not bilateral.

20    As I understand it, there were much different interests among

21    the defendants themselves that had to be dealt with.  I think

22    he probably was very helpful in that as well, though I was not

23    in the room for those sessions, obviously.

24        Because of that, as your Honor has found in the past,

25    and I'm quoting from your Honor's Van Oss opinion, a strong

1    presumption of fairness attaches because the settlement was

2    reached by experienced counsel after extensive arm's length

3    negotiation.

4              It is the procedural posture that creates the

5    presumption.  Of course, the presumption has to be confirmed by

6    the substantive criteria.  Those are the criteria that are set

7    forth in what is commonly known as the Grinnell test.

8              As this Court recognized in Van Oss, which itself was

9    an approval of a (b)(2) class, the criteria don't always fit

10   perfectly within the context that we are presenting today

11   because they were created in a (b)(3) context.  But we can run

12   through them, and I think all of them will support the

13   settlement before your Honor.

14             First, the complexity, duration, and expense of the

15   litigation.  I don't have to dwell on the complexity.  I think

16   your Honor knows as well as anybody how complex this case is.

17   You found in your order of May 29th that it was unusually

18   complex.

19             Duration.  We cite to your Honor some of the famous

20   cases out of this district, the antitrust cases, that went to

21   the Supreme Court.  We cite the BMI case and the Brunswick

22   case, both of which took ten years before they ultimately got

23   resolved.  Unfortunately, in both cases, even though the

24   plaintiffs had prevailed in different parts below, the Supreme

25   Court found against them at the ultimate stage.

1          We can give you more recent cases.  The Walmart case

2     in the Second Circuit took seven years.  And a recent case in

3     front of Judge Gleeson in Brooklyn, the Payment Card

4     Interchange Fee case, which he commented, when he approved the

5     settlement, had been pending for eight years.  My understanding

6     is they are still waiting for argument on the objections in the

7     Court of Appeals as I stand here today.

8          Duration is a particular factor in this case.  Unlike

9     a damage class action, where there is some hope, because of the

10    delay, of recouping for the class the injury that arises from

11    the violation that continues, there is no such possibility in a

12    (b)(2) circumstance.  They won't get injunctive relief until

13    they get injunctive relief.  And the delay in obtaining the

14    injunctive relief is a heavier factor in this context than it

15    would be I think in a typical damages action, in fact

16    substantially heavier.

17         THE COURT:  But you did make a decision to forgo the

18    damages claim.  In other words, you, too, could have cross-

19    appealed and asked the Court of Appeals to reverse this Court

20    and to allow a damages class.  But you made the considered

21    opinion, I think, to accept this Court's ruling and proceed

22    with the injunctive class only.

23         MR. LANGER:  That is correct.

24         THE COURT:  But you did start by bringing a damages

25    claim.

 1              MR. LANGER:  There is no question.  We certainly did

 2      in it a particular context.  I don't want to speak to the 23(f)

 3      aspect because it is pending and we have another case.

 4              THE COURT:  It does raise that issue.

 5              MR. LANGER:  Yes.  Certainly at the time we settled

 6      the case, and you can tell from the negotiation I described to

 7      you, it obviously was being negotiated a certain way and your

 8      Honor's ruling came down and it ultimately got resolved.  It

 9      was resolved in the context of where we were in the district

10      court.

11              THE COURT:  That was my point.  You made a strategic

12      or reasoned decision to forgo damages in favor of this

13      settlement.

14              MR. LANGER:  Correct.

15              THE COURT:  But it was brought as a damages class

16      action.

17              MR. LANGER:  Definitely.

18              THE COURT:  As I understand it, tell me if I'm wrong,

19      only 16 people have asked to have their dismissal without

20      prejudice, so theoretically they can proceed with the damages

21      actually, right?

22              MR. LANGER:  That's correct.

23              THE COURT:  Still only 16.  The deadline has come.

24              MR. LANGER:  Right.  We are going to get to that,

25      which is the next criterion, in a moment.

1          THE COURT:  I'm not talking about objections per se.

2     They excluded themselves from the dismissal with prejudice, and

3     they have the right to do that.

4          MR. LANGER:  Correct.  Complexity and duration and,

5     I'm going to get to it in a few minutes, increased risk.  That

6     is really the ultimate thing the courts look at, is risk.  I

7     will speak about that in a few minutes.

8          The reaction of the class to the settlement.  Notice

9     was sent to over 718,000 people.  In addition, there were ads

10    on the Internet.  As I understand it, there were 43 million

11    views of the ads.  That is, they were on Internet sites, and

12    they were seen 43 million times.  In addition, there was an

13    active involvement of class members.

14         THE COURT:  I don't know if the word "see" is correct.

15    They are displayed 43 million times.  I know myself there are

16    ads.  I don't look at them, but they are there.  That's OK.

17    They were displayed.  I accept that.

18         MR. LANGER:  There was an article last week in The

19    Times on ad blockers, of which I have availed myself.  There

20    certainly was extensive publicity both there and in the press

21    as well.

22         In addition, and this I consider much more important

23    than the others, frankly, is that 140,000 unique persons

24    actually went to the trouble of going to the website with the

25    complete notice.  We have all been through this a lot.  The

1    passivity of a consumer class isn't something from which

2    normally I would draw huge conclusions.  But the fact that

3    140,000 people actually took the trouble to go to the website,

4    which had extensive information on it, does show us that there

5    was a large body of people who might be members of the class

6    who looked at this more closely and determined not to opt out

7    or file objections.

8            That puts us in the position of you can satisfy some

9    of the people some of the time.  We have satisfied a lot of

10   people in this case.  I had a few phonecalls myself.  I won't

11   say I had a deluge of them, as I have had in certain other

12   cases in my career.  When I explained the settlement to people,

13   they were reasonably happy with what they heard.  None of the

14   people I actually spoke to ultimately objected, at least as far

15   as I can tell.

16           In addition, notice was sent to all of the state

17   attorneys general under CAFA.  Normally, again, they are not

18   apt to object.  But this particular case it was a high-

19   publicity case.  It's a case that has a rather strong public

20   interest in some states.  To date there is no objection.

21           There is an issue there that Mr. Goldfein has brought

22   to my attention today, which is that while they received the

23   notice of the settlement which told them that objections had to

24   be filed by a particular date, there has to be a 90-day period

25   between a CAFA notice and the actual approval, which will be

1   September, depending on how you count it, 15 or 16.

2           We think if there is a final approval, it should be

3   effective September 16th, though we would ask that it be

4   entered earlier because, frankly, the National Hockey League

5   wants to begin the process of publicizing and marketing the

6   product.

7           THE COURT:  Does your proposed order say effective?

8           MR. LANGER:  No.  We just learned this when we came in

9   today.

10          THE COURT:  OK.

11          MR. LANGER:  So I think the reaction of the class

12  really strongly supports the settlement in this case.

13          Stage of the proceedings, the third criterion.  We all

14  know this came after discovery closed, after a summary judgment

15  motion, which I'm sure persuaded your Honor that my colleagues

16  and myself were thoroughly familiar with the facts of this

17  litigation and in a position to evaluate the case prior to

18  settlement.

19          The risk of establishing liability.  Because of the

20  Garber case, I don't want to spend much time on that.  I will

21  say your Honor knows the number of issues that the defendants

22  have raised.  The defendants view any one of those issues, some

23  of which are procedural, some of which are substantive, as

24  dispositive.  Because I know your Honor is as familiar with

25  them as anybody, I don't want to run through them as the risks.

1    It is a complex litigation with significant attendant risk that

2    I think we all can agree upon.

3        Grinnell established this one statement which is

4    particularly appropriate in antitrust cases.  I have read many

5    of your Honor's opinions on the subjects of approvals prior to

6    today, the opinions.  I, frankly, do not see any in antitrust.

7    There may have been one, but I couldn't find it.

8        Grinnell dealt with the antitrust situation and it

9    dealt with it at a certain point in time.  It said that the

10    only true measure is whether a prior government case

11    established plaintiffs' prima facie case.  They do that because

12    the antitrust cases are so fraught with risk that the statute,

13    the Sherman Act, the Clayton Act actually, has a specific

14    provision that antedated offensive collateral estoppel that

15    allowed plaintiffs to use a prior government decree.

16        The court, ruling as it did I think in 1973, before

17    Parklane Hosiery, looked to that criteria because the statutory

18    scheme actually recognized the importance of a prior government

19    decree.  In this case, there no prior government decree, though

20    the actions of the defendants were open and notorious for an

21    extended period of time and the subject of a lot of public

22    debate.  The government did not act.  There was no prior action

23    that laid the groundwork for the case that we presented to your

24    Honor.  I think that is particularly strong criterion in

25    approving the settlement here.

1        The risk of establishing damages.  While your Honor

2   held in Van Oss that we were in a (b)(2) context, that really

3   wasn't a criterion that applied.  As your Honor pointed out, we

4   would have to prevail on appeal in order to get to first base.

5        The risk of maintaining class through trial.  There

6   are 23(f) appeals pending.  I think that suffices.  If you ask

7   me, I think we have a good chance of maintaining the class

8   through trial.  But the appeal is there.

9        The ability of the defendants to withstand a greater

10  judgment.  Your Honor held in Van Oss that that didn't really

11  apply in the (b)(2) context.  We possibly could have gotten

12  greater relief and I don't think all the defendants would have

13  gone into bankruptcy, but I'm not sure how one would argue that

14  here today.

15       The range of reasonableness in light of the best

16  possible recovery and in light of the attendant risks of

17  litigation.  Again, your Honor held in Van Oss that that didn't

18  really apply in the (b)(2) context.  I think it can be argued

19  that what we sought and what your Honor stressed in the class

20  decision was that the ultimate relief that would be obtained

21  would increase choice and decrease prices.  I think we

22  substantially increased choice.

23       It was the first time ever that any major sports

24  league in the United States agreed to disaggregate its games

25  and unbundle them in the fashion that it did.  It did so at a

1    significant discount.  On top of that, we got a broader

2    discount for everyone involved.  The goal was to in some way

3    mimic the kind of broader relief we would have gotten had we

4    gone all the way through to the end.  Instead of waiting those

5    years for that, we have gotten it today.

6         THE COURT:  I think you wrote that the NBA has now

7    followed suit voluntarily, something like that.

8         MR. LANGER:  The NBA actually just a few days after

9    the settlement was announced -- I'm sorry I can't claim that

10   the settlement did it.

11        THE COURT:  I'm sure it was my decision.

12        MR. LANGER:  -- the NBA announced that it was selling

13   individual streams, even individual games.  A sense of how the

14   world is changing in this area and why getting the settlement

15   now is significant is that, to be honest, following the class

16   hearing -- I didn't get the impression that your Honor reads

17   the sports pages regularly -- on Friday Steve Balmer, the

18   former CEO of Microsoft who bought the Clippers, threatened Fox

19   with the fact that he wasn't going to sign any contract with an

20   RSN for the Clippers because they weren't offering him enough

21   money, and he was going to stream and sell his games himself

22   for the Clippers.  He didn't say he was going to do it; he was

23   threatening to do it.  So the world is changing in this fashion

24   quickly.

25        THE COURT:  Which sport is that?

1          MR. LANGER:  Basketball, your Honor.

2          THE COURT:  Then today there was a lawsuit filed

3     against the NFL.

4          MR. LANGER:  Right.  That is something I was going to

5     stress in the argument.

6          THE COURT:  Is that you?

7          MR. LANGER:  No.  Not yet anyway.  It was in the fee

8     argument.  What I will point out to you is that it was -- let

9     me save it for the fee argument.

10          Those are the criteria under Grinnell.

11          Ten people filed objections, took the trouble to do

12     that.  I greatly respect that.  The objections took various

13     forms.  Mr. Beckham and a few other people objected that there

14     was no compensation for the past, which is understandable for a

15     layperson to present.  But, as your Honor knows, it was no

16     longer a part of the case as far as the class case at that

17     point in time unless we prevailed on appeal.

18          Other people -- Mr. Zubranes, Mr. Weitzberg -- wanted

19     better pricing concessions.  That is true in every case, one

20     could get better.  I think what we got was the best that we

21     could do under the circumstances.  They don't suggest how one

22     could come to this other, better pricing; they just suggest

23     that it would be better.

24          Mr. Guthrie wrote wanting to apply this to his

25     provider Verizon.  Of course, Mr. Guthrie could buy the

1    Internet product and watch it on his television.  Verizon was

2    not a defendant, so we obviously could not extend it that way.

3         Then a group of people -- Mr. Davis, Ms. Gaul, Mr.

4    Draper, several others -- raised the issue of the absence of

5    blackout relief.  Certainly it's a legitimate concern that they

6    presented.  It was an issue in the case from the start.  It was

7    not something we could obtain through settlement.  After all

8    those months, that is the one thing that I can say with

9    conviction I could perhaps get a year or two from now or three,

10   but I can't not get it through settlement.

11        What instead we got were, as I put it to you earlier,

12   surrogates:  Reduction in price and increase in --

13        THE COURT:  The bottom line is the in-market blackouts

14   remain?

15        MR. LANGER:  The in-market blackouts remain, correct.

16        What I would say about all of the objectors is that

17   none of them do what we have to do here, which is weigh the

18   benefits of the settlement against possible relief we would get

19   at the end and the risk attendant to getting that.  They are

20   just objections that we haven't gotten it.  There is no, shall

21   I say, concern for the remainder of the class, for the hundreds

22   of thousands of people who did not complain of the settlement

23   and who felt that this discount, at least to some degree, was a

24   valuable thing such that they are not motivated to --

25        THE COURT:  I don't know if the absence of a negative

1    is a positive.  But they certainly didn't complain.  Hundreds

2    of thousands of people did not complain.

3              MR. LANGER:  At least 140,000 people knew -- well,

4    took the trouble of trying to understand what they were

5    getting.

6              THE COURT:  Right.

7              MR. LANGER:  To sum up on the settlement, it is the

8    first occasion in which there has been unbundling.  The case

9    has influenced other sports leagues to undertake similar

10   things.  It has created lower prices, it has created greater

11   choice, and it is obtained now rather than years from now.

12             With regard to all of the criteria under Grinnell --

13   complexity, duration, cost, the stage at which it was

14   negotiated, risks that exist --

15             THE COURT:  All of that has to be weighed against the

16   two things you didn't get, which were damages and the

17   elimination of the in-market blackout.  I understand that is

18   the equation.

19             MR. LANGER:  That's the argument on the settlement.

20   Should I turn to the fee now?

21             THE COURT:  Sure.

22             MR. LANGER:  The fee in this case comes up in a

23   context that isn't really the subject of a lot of opinions.  It

24   is the subject of one opinion by your Honor, and I found one

25   opinion by Judge Lynch.  That is where there is an agreed-upon

1  fee where the court is being asked to approve it.  It falls

2  somewhere between the totally contingent situation and a pure

3  lodestar approach.

4          THE COURT:  Which was my case?

5          MR. LANGER:  Van Oss.

6          THE COURT:  Same one.  OK.

7          MR. LANGER:  Rule 23(h) provides for the circumstance.

8  It says specifically, in a certified class action, a court may

9  award reasonable attorney's fees and untaxable costs that are

10 authorized by law or by the parties' agreement.  Then it goes

11 on to present that.

12         In Van Oss your Honor put it that the task is to

13 determine the reasonableness of the agreed-upon date.  It is

14 discussed in greater detail in the MacBean case by Judge Lynch,

15 which we cite in our papers.  He talks about the fact that in

16 this context there is the one protection, which is that the

17 reduction in fee isn't going to create an increased amount for

18 the class itself.  He found that to align the interests

19 greater.

20         The fee petition comes to the Court in a way that

21 truly benefited --

22         THE COURT:  Of course, your role is much diminished if

23 it is not a (b)(3) class.  The notion of the court as fiduciary

24 for the class members disappears.  It is not coming out of

25 their pocket.  It can't.

```
 1              MR. LANGER:  Correct.  I think we have to still seek

 2    your Honor's approval.

 3              THE COURT:  For sure.  But I'm not protecting absent

 4    class members.

 5              MR. LANGER:  In that fashion, correct.  In fact, the

 6    class here benefited substantially, whoever it is.  Maybe we

 7    should say the defendants benefited substantially.  Remember,

 8    we had two cases.  Almost all of the work that was done was

 9    commonly done for both cases.  In presenting a petition to your

10    Honor, the time is basically split.

11              There are some places where lawyers kept certain tasks

12    separate, certain depositions we could itemize as separate.

13    But overall the vast amount of work that was done was common to

14    both cases, and only half of it is the subject of the petition

15    in front of your Honor.

16              THE COURT:  Was that true for the 1.32 million in

17    litigation expenses?

18              MR. LANGER:  Yes.  We were out of pocket a very, very

19    large sum.

20              THE COURT:  You are seeking 800,000, which isn't half

21    of 1.32.  I didn't know if you did the same reduction.

22              MR. LANGER:  We divided them both.

23              THE COURT:  Let me ask again.  Half of 1.32 is 650.

24              MR. LANGER:  It is not there.  The other half is in

25    the petition.
```

```
 1                THE COURT:  But it's not half.  You asked for 800,000.
 2                MR. LANGER:  I think there is a misunderstanding, your
 3       Honor.  I think we asked for 1.3.  Some of that is still being
 4       paid.
 5                THE COURT:  I'm mixed up.  I thought you advanced
 6       1.32 million litigation expenses but you were seeking $800,000
 7       in recovery.  No?
 8                MR. LANGER:  No.  I think we are seeking the full
 9       amount.  May I have a moment?
10                THE COURT:  Please.
11                MR. LANGER:  What Mr. Leckman asked me to clarify is
12       the 6.5 as a total is less than the fee and the total expenses
13       because it was negotiated at the time.  In other words, we put
14       the 6.5 together as a single bundle of the fees and costs.
15                THE COURT:  I see.
16                MR. LANGER:  But it is less than the fees taken as a
17       total at current rates and the total costs.  But the cost that
18       your Honor sees in the petition are one-half, roughly.  Certain
19       depositions, and so on, couldn't be allocated.  But they are
20       roughly one half of the costs we incurred.  Take the experts,
21       for example.
22                THE COURT:  What you are saying is what you incurred
23       was more like 2½ million?
24                MR. LANGER:  Correct, yes.  So there is that benefit.
25       Let me go through the criteria.  Let me step back a second.
```

1              Taken as a percentage of what we totally recovered,

2     the attorney's fees themselves come to roughly 20 percent of

3     the whole recovery, that is, the 20 million, the 28 million,

4     plus the attorney's fee and costs that are recovered, which is

5     the way in which that is generally computed.

6              Your Honor has awarded 30 percent of the fund in a

7     number of cases that I suggest presented considerably less risk

8     than this case, such as the Amaranth case, the Thaddeus

9     securities case, if I pronounced it correctly, the Lehman

10    Brothers case.  All of them are securities cases.

11             THE COURT:  There is such a thing as the lodestar

12    cross-check which may have worked out there.

13             MR. LANGER:  Correct.

14             THE COURT:  You say that you did that.

15             MR. LANGER:  Here the lodestar cross-check I think

16    actually favors us substantially, first because the lodestar is

17    so low.  It's half of what it would have been if we just had an

18    NHL case.

19             THE COURT:  Right.

20             MR. LANGER:  Second, when you compare the total hours,

21    you have Professor Saltzburg's declaration, where he talks

22    about the analysis the Court did in the Linerboard case where

23    he was involved.  He quotes Judge DuBois -- he was the expert

24    in that case as well -- and he showed the total hours in this

25    case are less than 10,000 hours.  In Judge DuBois' analysis, he

1    shows that in a significant number of antitrust cases that were

2    settled at a similarly late stage, the hours were like 50 to

3    80,000.

4              THE COURT:  Is that because it was allocated between

5    the two, so it was 10,000 here and 10,000 for the baseball?

6              MR. LANGER:  It would be a total of approximately 20

7    in this case.

8              THE COURT:  OK.

9              MR. LANGER:  We were very, very efficient in the way

10   this case was litigated.  Of course, part of it was the nature

11   of the case, I concede that.  But a great part of it is the way

12   in which it was run.  It was not a case where you had a huge

13   number of law firms, multidistrict litigation, a structure with

14   lots of attorneys running the case, and so on.  It was a small

15   group of lawyers working very, very cooperatively together on

16   the plaintiffs' side, which worked out in the end in terms of

17   the number of hours ultimately expended.

18             THE COURT:  You haven't given time sheets to the

19   Court, right?

20             MR. LANGER:  They are available.  The time was

21   reported regularly to an accounting firm.  Mr. White has his

22   declaration in there.  He has those documents.

23             THE COURT:  I'm just saying they weren't given to me.

24             MR. LANGER:  Correct.

25             THE COURT:  But they are available if I want it?

 1              MR. LANGER:  They are available if you want it.  I did

 2   a calculation on the lodestar side.  Having read some of your

 3   Honor's opinions, I realized that might be an issue of concern

 4   to you.  Compare this case with the Amaranth case that your

 5   Honor decided three years ago.  In the Amaranth case your Honor

 6   analyzed the lodestar.  I did the division.  If you divided the

 7   lodestar sum by the hours, it came to $570 an hour.  Our

 8   historic lodestar in this case is significantly lower than

 9   that.  It's $538 an hour.

10              THE COURT:  That is the historical one or the actual,

11   current?

12              MR. LANGER:  That is the current.

13              THE COURT:  Current hourly?

14              MR. LANGER:  No.  Current is 607.  Historic is 538.

15   Remember, that was three years ago.  Also, I will tell you that

16   part of the reason that the hours are as low as they are -- it

17   is kind of hard sometimes.  Different courts apply different

18   criteria at different points in time.  My firm has five

19   lawyers.  Most of us are partners.

20              Most of the work that your Honor saw was by senior

21   lawyers.  That's why there weren't so many hours put in,

22   because there is not this pyramid of time that you get where

23   you have more lawyers.  If the hourly rate is a little bit

24   high, which I don't think it is actually in this case, it is

25   where it is because of the way it was structured.

F8vslaub

```
 1           When you look at the associates, associates at least
 2    then, who worked on the case, these were not typical people.
 3    You have people like Mr. Dubner, who was Judge Calabresi's
 4    clerk and Judge Goettel's clerk.  You have Mr. Leckman, who was
 5    Judge Wood of the Seventh Circuit's clerk.  These are people
 6    who brought a very, very high degree of talent and
 7    sophistication.  It kept the number of lawyers involved
 8    limited, the number of hours accrued dramatically less than in
 9    other cases.
10           Since the hourly rate falls within a rate that your
11    Honor had no problem with years ago, I think it avoids the
12    necessity of your Honor having to go ask what those specific
13    time records were.  I think it is clear, it is just clear.
14           Going through what is called the Goldberger factors, I
15    discussed the time and labor already.  The risk.  The risk
16    here, of course, is a different risk than that which I spoke of
17    earlier.  It is the risk that was assumed at the time the case
18    was filed.  I think there is one way, from a question your
19    Honor asked me earlier, to see how risky this case is.
20           When the issue of auctions was a hot issue, there was
21    a big question:  What if law firm A develops a case but all
22    these other people file cases afterwards and they file a lower
23    proposal, what do we do then?  That was a big issue.  It is an
24    issue that Professor Saltzburg deals with actually in the Third
25    Circuit task force report.
```

 1            What would happen is people would file cases.  I don't
 2      have to tell you the kind of piling on that sometimes occurred.
 3      You had in the IPO case.  When I read that opinion, and I
 4      thought our courtroom was full, I thought you would need a
 5      gymnasium to deal with it.
 6            In this case, after our case was filed, nobody -- one
 7      person filed; that case was ultimately dismissed on the
 8      arbitration issue -- there was no one who followed on, because
 9      the risk was so great.  That is why other people did not follow
10      on.  Our complaint was clear.  It laid things out.  Nobody
11      wanted to be involved.  We even had trouble getting other firms
12      to cooperate and join us before we filed the case.
13            Then, after the settlement was announced, within a
14      week the NFL case was filed.  Do you know what?  The NFL case
15      copied verbatim huge sections of our complaint, the first of
16      the NFL cases, even though the NFL is a wholly different
17      structure.  So it's not like people weren't watching.  It is
18      only when the risk was ameliorated by the fact that a
19      settlement occurred that other firms began to get involved.
20            You have a very, very good barometer there, a good of
21      measure of the degree of risk we assumed at the beginning by
22      the fact that nobody joined along the way, nobody filed.  It
23      remained the same group of lawyers that you saw throughout.
24      But once it was perceived that risk was ameliorated because we
25      achieved the settlement, people did in fact act.  I think that

1     is the strongest indication of risk that I could show you.

2           Of course, the Grinnell language that I discussed

3     earlier all arose exactly in the context of the risk of

4     attorney's fees.

5           The quality of representation.  Your Honor has

6     commented in the past on the quality of the presentations that

7     we have given, so I don't think I have to spend much time

8     there.  The one time I ever got into that, I began by saying to

9     Judge Brody in Philadelphia, your Honor, it's always difficult

10    for me, and she said, oh, but you'll manage.  I think now I

11    have learned not to even try, because I think you have observed

12    it.

13          The requested fee in relation to the settlement, as I

14    said earlier, is between 20 and 25 percent of the overall value

15    of the settlement.  It is actually less if you take the high

16    end of 28 million.  It's a little more if you take the low end.

17          Public policy in the case.  Your Honor stressed in

18    your class action opinion at some length the importance of

19    class actions to the antitrust laws.  I really can't speak

20    better than your Honor did of the importance of class actions

21    to the antitrust laws.  It has been basically my career.  I

22    think this case was a very important case.

23          The fact that we are here today, that one league has

24    unbundled and another league has followed, and the pundits, so

25    to speak, attribute it to the presence of this case is

1    something that we feel good about.  I think it requires that we

2    at least get back our lodestar, which is really what we are

3    asking for, without an enhancement.

4         As to the lodestar itself, the cross-check, I

5    described it to your Honor already.  We are really not seeking

6    an enhancement.  Using the current hours, once you add in the

7    costs, it really doesn't even come to the current rate that we

8    are asking.  It's maybe a slight bump at most over the historic

9    rate.

10        I think Professor Saltzburg put it best, but he didn't

11   put it quite perfectly as to the context of this case.  He

12   said, look, the defendants know better than anybody else what

13   the value of the plaintiffs' work was.

14        In this case you have two defendants who are still

15   defendants in a big case with these very same lawyers.  If you

16   think it was easy to negotiate a fee as a part of things in

17   that context, it certainly was not.  It was a very difficult

18   thing because we remain adversaries in a second, very similar

19   case.  So, the fact that they were willing to pay that amount

20   should give the Court comfort as to it being a reasonable

21   amount.

22        Which brings me to the incentive awards for the

23   plaintiffs.  When we were at that point in our negotiation, I

24   said to myself, what is an appropriate incentive award?  I put

25   in "Southern District incentive awards."  Then I narrowed the

 1   search to "Judge Scheindlin."  I saw that your Honor had given

 2   a range of awards in different cases.

 3        In the Denny v. Jenkins & Gilchrist case, your Honor

 4   had given  $10,000 to each of the plaintiffs.  In the AFTRA v.

 5   JPMorgan case, you had given $50,000 to each of the plaintiffs.

 6   And in the Fogarazzo case, you had given 32,000 in a case to be

 7   divided among three plaintiffs.  So I chose 10,000.  I did that

 8   because the plaintiffs here all were deposed.  They all

 9   traveled to their depositions.  They were not deposed in their

10   home places.

11        THE COURT:  Whose pocket does that come from?

12        MR. LANGER:  Defendants', entirely from the

13   defendants'.  Some of the plaintiffs are very sophisticated

14   people.  Mr. Silver has actually tried cases with me in this

15   courthouse.  He is a distinguished IP lawyer.  Aside from

16   sitting for depositions before the case was filed, they

17   reviewed the complaints in great detail.  During the period of

18   settlement negotiations, they of course were consulted because

19   they had to approve of them before we could come before your

20   Honor.

21        I don't say that it is a staggering thing in the case

22   of individuals, because, as your Honor found in finding the

23   public purpose in these cases, you have to aggregate the

24   claims.  But they are also giving up their individual claims,

25   which they would have retained had we continued to go forward

 1   in order to get the suit resolved.

 2          I think that I picked the number basically based on

 3   what I saw the Court had done in the past as a reasonable

 4   number in this context, especially since it doesn't come from

 5   anybody else other than defendants.

 6          Unless your Honor has any questions.

 7          THE COURT:  I think you have covered everything that

 8   you could possibly cover and have done a fine job in explaining

 9   why I should sign off on your settlement and fees.

10          MR. LANGER:  I appreciate that, your Honor.

11          THE COURT:  Does anybody else wish to be heard with

12   respect to any of this?  No.  All right.

13          I will very likely issue an order in the next day or

14   two.  I just want to go over the proposed order.  Do you want

15   to resubmit to add an effective date?  Or I can just handwrite

16   something like that in.

17          MR. GOLDFEIN:  Your Honor, it is fine if you handwrite

18   in effective of a September 16th.

19          THE COURT:  September 16th?

20          MR. GOLDFEIN:  Yes.  That would be fine.  We would

21   like to start marketing.  If we have that order, I think that

22   will comply with CAFA.

23          THE COURT:  OK.

24          MR. LANGER:  I would like to hand up to your Honor a

25   list of the opt-outs.

1          THE COURT:  We looked for that.  The 16 names, the

2     Exhibit A16 names?

3          MR. LANGER:  Yes.  I have that.

4          THE COURT:  We were looking around for Exhibit A.  So

5     it is the order again.

6          MR. LANGER:  With the Exhibit A.

7          THE COURT:  With the exhibit.  This certainly is not

8     one of your four named people, right?

9          MR. LANGER:  No, none of the four named people.

10         THE COURT:  I just want to be sure, since they want

11    their incentive award.

12         Again, if there is nothing further, I expect to issue

13    an order very shortly.  We will do it not right now.  Hopefully

14    within a day or two.  Thank you, everyone.

15         (Adjourned)

16

17

18

19

20

21

22

23

24

25